UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 25-1922

KALSHIEX LLC,
*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY AND MATTHEW J. PLATKIN
*Defendant-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:25-CV-02152

**BRIEF OF APPELLANTS
MARY JO FLAHERTY AND MATTHEW J. PLATKIN**

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

STEPHEN EHRLICH
*Deputy Solicitor General*

EMILY M. BISNAUTH
LIZA B. FLEMING
PATRICK JHOO
VIVEK N. MEHTA
*Deputy Attorneys General*

R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Attorneys for Appellants

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ............................................ 2

STATEMENT OF ISSUES ON APPEAL ................................... 2

STATEMENT OF RELATED CASES ....................................... 2

STATEMENT OF THE CASE ................................................... 2

    A.    New Jersey's Historic Regulation Of Gambling. ................. 2

    B.    The Commodity Exchange Act. ............................................ 6

    C.    Kalshi And This Case. ........................................................ 10

SUMMARY OF ARGUMENT ................................................. 12

STANDARD OF REVIEW ...................................................... 15

ARGUMENT ........................................................................... 16

I.    Kalshi's event contracts do not fall within the Act. ............. 16

II.    The Act does not preempt New Jersey's gambling laws. ............. 26

    A.    Kalshi's preemption theories are all foreclosed by the text and structure of federal law. .............................................. 28

    B.    New Jersey's Sports Wagering Act is not express preempted, field preempted, or conflict preempted. ............ 38

        1.    Everyone agrees there is no express preemption. ........ 38

        2.    There is no comprehensive federal scheme to imply field preemption. ............................................... 40

        3.    Kalshi's conflict preemption theory fails because New Jersey law does not impede effectuation of the Act. ...................................................................... 47

CONCLUSION ....................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdullah v. Am. Airlines, Inc.*,
  181 F.3d 363 (3d Cir. 1999) ................................................................. 42

*Ah Sin v. Wittman*,
  198 U.S. 500 (1905).............................................................................. 27

*Ala. Ass'n of Realtors v. DHHS*,
  594 U.S. 758 (2021)......................................................................... 21, 22

*Am. Agric. Movement, Inc. v. Bd. of Trade*,
  977 F.2d 1147 (7th Cir. 1992)......................................................... 33, 52

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
  107 F.4th 934 (9th Cir. 2024) .............................................................. 32

*Artichoke Joe's Cal. Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003)................................................................ 27

*Baltimore & Ohio R. Co. v. Oberly*,
  837 F.2d 108 (3d Cir. 1988) ................................................................ 32

*Beecham v. United States*,
  511 U.S. 368 (1994) ............................................................................ 24

*Bonito Boats v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989).............................................................................. 31

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*,
  468 U.S. 491 (1984).............................................................................. 52

*California v. Zook*,
  336 U.S. 725 (1949.............................................................................. 35

*Cantor v. Detroit Edison Co.*,
  428 U.S. 579 (1976).............................................................................. 52

*CFTC v. Yukom Commc'ns Ltd.*,
  2021 WL 4477874 (N.D. Ill. Sept. 30, 2021) ........................................ 17

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming
  Control Bd.*,
  767 F. Supp. 3d 556 (W.D. Mich. 2025) ................................................ 30

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) ............................................................................... 32

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) ................................................................................. 51

*Davidson v. Sprout Foods, Inc.*,
  106 F.4th 842, 852 (9th Cir. 2024) ....................................................... 52

*Dayton Power & Light Co. v. FERC*,
  126 F.4th 1107 (6th Cir. 2025) ....................................................... 41, 45

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ........................................................................ 41, 47

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of
  Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) ................................................................ 15

*Effex Capital, LLC v. Nat'l Futures Ass'n*,
  933 F.3d 882 (7th Cir. 2019) ................................................................ 33

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ........................................................................ 20, 21

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ........................................................ 33, 42, 43

*Fellner v. Tri-Union Seafoods, L.L.C.*,
  539 F.3d 237 (3d Cir. 2008) ................................................................. 50

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995) ............................................................................... 32

*French v. Pan Am Exp., Inc.*,
   869 F.2d 1 (1st Cir. 1989) ..................................................... 42

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) .............................................. 44

*Greater New Orleans Broad. Ass'n v. United States*,
   527 U.S. 173 (1999) ............................................................ 27

*Green v. Fund Asset Mgmt., L.P.*,
   245 F.3d 214, (3d Cir. 2001) .......................................... 52, 53

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
   486 F.3d 430 (8th Cir. 2007) ............................................... 27

*Hillsborough County v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985) ............................................................ 42

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ............................................................ 33

*Inv. Co. Inst. v. CFTC*,
   891 F. Supp. 2d 162 (D.D.C. 2012) ................................ 19, 22

*Johnson v. Collins Entm't Co.*,
   199 F.3d 710 (4th Cir. 1999) ............................................... 27

*Jones v. B.C. Christopher & Co.*,
   466 F. Supp. 213 (D. Kan. 1979) ........................................ 44

*Just Puppies, Inc. v. Brown*,
   123 F.4th 652 (4th Cir. 2024) ............................................. 35

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ..................................................... passim

*Kerr v. First Commodity Corp.*,
   735 F.2d 281 (8th Cir. 1984) ............................................... 33

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
   991 F.3d 458 (3d Cir. 2021) ................................................ 26

*Knepper v. Rite Aid Corp.*,
   675 F.3d 249 (3d Cir. 2012) ................................................................ 33

*Knox v. Brnovich*,
   907 F.3d 1167 (9th Cir. 2018) .......................................................... 41

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012) .......................................................................... 43

*Lupian v. Joseph Cory Holdings*,
   905 F.3d 127 (3d Cir. 2018) .............................................................. 27

*MD Mall Assocs. v. CSX Transp.*,
   715 F.3d 479 (3d Cir. 2013) ........................................................ 47, 48

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ..................................................................... 26, 27

*Murphy v. NCAA*,
   584 U.S. 453 (2018) .................................................................. passim

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) .......................................................................... 36

*Patry v. Rosenthal & Co.*,
   534 F. Supp. 545 (D. Kan. 1982) ...................................................... 34

*Pennsylvania v. Navient Corp.*,
   967 F.3d 273 (3d Cir. 2020) ...................................................... passim

*Pic-A-State PA, Inc. v. Com. of Pa.*,
   42 F.3d 175 (3d Cir. 1994) ................................................................ 50

*Pinho v. Gonzales*,
   432 F.3d 193 (3d Cir. 2005) .............................................................. 37

*Power v. Arlington Hosp. Ass'n*,
   42 F.3d 851 (4th Cir. 1994) .............................................................. 35

*Pueblo of Pojoaque v. New Mexico*,
   863 F.3d 1226 (10th Cir. 2017) ......................................................... 35

*Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC,*
  38 F.4th 331, 335 (3d Cir. 2022) .......................................................... 16

*Riccio v. Sentry Credit, Inc.,*
  954 F.3d 582 (3d Cir. 2020) ................................................................. 18

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ............................................................................. 43

*Sikkelee v. Precision Airmotive Corp.,*
  822 F.3d 680 (3d Cir. 2016) ............................................. 27, 36, 39, 46

*Spectrum Ne., LLC v. Frey,*
  22 F.4th 287 (1st Cir. 2022) ................................................................ 53

*Speiser v. Randall,*
  357 U.S. 513 (1958) ............................................................................. 37

*Strax v. Commodity Exch., Inc.,*
  524 F. Supp. 936, (S.D.N.Y. 1981) ...................................................... 52

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't*
  *Hearing Bd.,*
  108 F.4th 144 (3d Cir. 2024) .............................................. 15, 39, 40, 41

*United States v. Fontaine,*
  697 F.3d 221 (3d Cir. 2012) ................................................................. 18

*United States v. King,*
  834 F.2d 109  (6th Cir. 1987) ................................................................ 2

*United States v. Lopez,*
  514 U.S. 549 (1995) ............................................................................. 25

*United States v. Texas,*
  97 F.4th 268 (5th Cir. 2024) ................................................................ 41

*United States v. Washington,*
  879 F.2d 1400 (6th Cir. 1989) ............................................................. 27

*Virginia Uranium v. Warren,*
  587 U.S. 761 (2019) ............................................................................. 41

*Whitman v. Am. Trucking Ass'ns., Inc.*,
531 U.S. 457 (2001 ................................................................ 21

*WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*,
553 F.3d 292 (4th Cir. 2009) ................................................. 27

*Wyeth v. Levine*,
555 U.S. 555 (2009) ................................................. 27, 31, 52

*Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*,
134 F.4th 326 (5th Cir. 2025) ................................. 35, 49, 50

## **Statutes**

5 U.S.C. § 8902 ........................................................................ 39

7 U.S.C. § 1a ................................................................... passim

7 U.S.C. § 2 ..................................................................... passim

7 U.S.C. § 5 ...................................................................... 6, 7, 51

7 U.S.C. § 6d ........................................................................... 44

7 U.S.C. § 7a-2 ............................................................... passim

7 U.S.C. § 13 ............................................................................ 17

7 U.S.C. § 16 ..................................................................... 31, 40

15 U.S.C. § 1172 ................................................................ 19, 29

15 U.S.C. § 3001 .................................................................... 28

15 U.S.C. § 3003 .............................................................. 20, 30

15 U.S.C. § 3004 .............................................................. 20, 30

18 U.S.C. § 1082 .................................................................... 29

18 U.S.C. § 1084 ........................................................................... 19, 20, 29

18 U.S.C. § 1955 ................................................................................... 30

18 U.S.C. § 1961 ................................................................................... 36

18 U.S.C. § 1962 ................................................................................... 36

25 U.S.C. § 2701 ................................................................................... 20

25 U.S.C. § 2703 ................................................................................... 29

25 U.S.C. § 2710 ................................................................................... 29

28 U.S.C. § 1291 ..................................................................................... 2

28 U.S.C. § 1331 ..................................................................................... 2

28 U.S.C. § 1343 ..................................................................................... 2

28 U.S.C. § 3702 ................................................................................... 20

28 U.S.C. § 3704 ................................................................................... 30

29 U.S.C. § 1144 ................................................................................... 39

31 U.S.C. § 5362 ................................................................................... 29

31 U.S.C. § 5363 ............................................................................. 19, 29

31 U.S.C.§ 5361 .................................................................................... 29

49 U.S.C. § 14501 ................................................................................. 39

N.J. Stat. Ann. § 5:12-1 ........................................................................ 4

N.J. Stat. Ann. § 5:12-1 to -233 ............................................................ 3

N.J. Stat. Ann. § 5:12A-10 ....................................................... 4, 5

N.J. Stat. Ann. § 5:12A-11 ............................................... passim

N.J. Stat. Ann. § 5:12A-13 .......................................... 5, 13, 51

N.J. Stat. Ann. § 5:12-55 .................................................... 4

N.J. Stat. Ann. § 5:12-76 .................................................... 4

N.J. Stat. Ann. § 5:12-77 .................................................. 34

N.J. Stat. Ann. § 5:12-92 .................................................... 5

N.J. Stat. Ann. § 5:12-104 .................................................. 5

N.J. Stat. Ann. § 5:12-112 ................................................ 34

N.J. Stat. Ann. § 5:12-127 ................................................ 34

Pub. L. No. 74-675, 49 Stat. 1491 (1936) ................................ 6

Pub. L. 93-463, 88 Stat. 1389 (1974) ..................................... 7

Pub. L. 106-554, 114 Stat. 2763 (2000) .................................. 7

Pub. L. 111-203, 124 Stat. 1376 (2010) ............................. 7, 8, 9

## **Regulations**

17 C.F.R. § 40.11 .................................................. 10, 34, 42, 46

N.J. Admin. Code § 13:69N-1.2 ..................................... 6, 13, 51

N.J. Admin. Code § 13:69O-1.2 ..................................... passim

## Other Authorities

Appellee Brief, *KalshiEX LLC v. CFTC*,
No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).............24, 49

120 Cong. Rec. 30, 464 (Sept. 9, 1974),
https://tinyurl.com/5n7nds2n. ............................................................45

156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010),
https://tinyurl.com/57c352v4 ...........................................................9, 48

*Commercial Gaming Revenue Tracker*, Am. Gaming Ass'n (May 16,
2025), https://tinyurl.com/3x7av3kx....................................................22

*Commodity Futures Trading Commission Act: Hearings
Before the Senate Committee on Agriculture & Forestry*,
93d Cong., 2d Sess. 685 (1974) ............................................................46

*KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the
Initial Listing of the "Will <team> win <title>?" Contract* (Jan. 22,
2025), https://tinyurl.com/2bs44zfz.....................................................25

Letter from Rep. Dina Titus to the Secretary of the Commission,
CFTC, at 2 (Apr. 1, 2025), https://tinyurl.com/y42b5jrf ......................11

*State of the States 2025*, Am. Gaming Ass'n (May 13, 2025),
https://tinyurl.com/5xey2yzy ...............................................................21

## **INTRODUCTION**

Like many other States, New Jersey has regulated gambling for over 125 years. For more than half that time, the federal government has done so too. But despite enacting landmark gambling legislation in nearly every decade since the 1940s, Congress has always accepted and even incorporated state gambling laws. In Congress's view, "the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests," but the "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a). That is also the Supreme Court's view: absent congressional action "regulat[ing] sports gambling directly," the "legalization of sports gambling requires an important policy choice" to be made by the States. *Murphy v. NCAA*, 584 U.S. 453, 486 (2018).

But that is apparently not the view of Appellee KalshiEX LLC. For the better part of a century, the Commodity Exchange Act has allowed the Commodity Futures Trading Commission (CFTC) to regulate commodities trading. That trading has always occurred separate and apart from the state-by-state multi-billion-dollar gaming industry. In Kalshi's telling, however, Congress silently undid decades of federal gambling policy and superseded all state gambling laws by adding the word "swaps" to the CFTC's "exclusive jurisdiction" as part of the 2010 Dodd-Frank reforms. The upshot is that Kalshi thinks it is exempt from state gambling

laws simply because it offers sports wagers in a new format (called event contracts) on a CFTC-designated market. Kalshi is wrong. The CFTC's jurisdiction does not include wagers based on the outcome of athletic events and, even if it did, that would not preempt state gambling laws under any theory of express or implied preemption. This Court should reverse the preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. §§ 1331, 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES ON APPEAL

Whether the district court erred in finding that New Jersey's Sports Wagering Act, N.J. Stat. Ann. §§ 5:12A-10 to -19, and the New Jersey Constitution, Article IV, § 7, ¶2(D) are likely preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1–27f.

## STATEMENT OF RELATED CASES

Appellants are not aware of any related pending cases.

## STATEMENT OF THE CASE

### A.    New Jersey's Historic Regulation Of Gambling.

Throughout our Nation's history, "regulation of gambling has been largely left to the state legislatures." *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987). As the Supreme Court explained, federal laws concerning gambling "implement a coherent federal policy: They respect the

policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. In Congress's own words, "the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests," but the "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a).

For well more than a century, New Jersey has regulated gambling within its borders. *See Murphy*, 584 U.S. at 458 (noting that in 1897, New Jersey banned all gambling by constitutional amendment). Gambling in New Jersey "is governed directly by the Constitution itself" as state law has long maintained that "[g]ambling is an activity rife with evil" and "mischief" affecting "the public welfare and morality." *Knight v. City of Margate*, 431 A.2d 833, 842 (N.J. 1981); *see* N.J. Const. art. IV, § 7, ¶2 (gambling may only be legalized through ballot measure).

Many forms of gambling remained illegal in New Jersey until 1976, when residents voted to amend the New Jersey Constitution and allow gambling within Atlantic City. *Murphy*, 584 U.S. at 459; N.J. Const. art. IV, § 7, ¶2(D). The following year, the New Jersey Legislature implemented that constitutional amendment by enacting the Casino Control Act, N.J. Stat. Ann. §§ 5:12-1 to -233, which regulates casinos within Atlantic City. In doing so, the Legislature found that "the public confidence and trust in the credibility and integrity of the regulatory process and of

casino operations" was "[a]n integral and essential element of the regulation and control of such casino facilities by the State." *Id.* § 5:12-1(b)(6). That statute also created the New Jersey Division of Gaming Enforcement, *id.* § 5:12-55, and charged it with enforcing the Casino Control Act and its implementing regulations, *id.* § 5:12-76(a).

New Jersey also allows for sports wagering. In 2011, New Jerseyans voted to amend their Constitution to permit sports wagering, with one caveat intended to protect student athletes from the potentially harmful effects of sports betting—that "wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. IV, § 7, ¶2(D). Although that constitutional amendment was enjoined by the district court and this Court, the Supreme Court in held in 2018 that a federal law prohibiting the state authorization of sports wagering violated the U.S. Constitution. *Murphy*, 584 U.S. at 486. The Court also observed that Congress had not elected to directly regulate sports wagering. *Id.*

After that case, the New Jersey Legislature swiftly enacted the Sports Wagering Act, N.J. Stat. Ann. §§ 5:12A-10 to -19. Under that law, casinos and racetracks may obtain sports wagering licenses to "operate a sports pool" in accordance with state law and regulations. *Id.* § 5:12A-11(a). A "sports pool" is defined as "the business of accepting wagers on any sports event by any system or method of wagering." *Id.* § 5:12A-10.

To be considered a "sports pool," a business need not accept bets against the "house"—rather, the definition includes any form of wagering, including "exchange wagering." *Id.* The holder of a sports wagering license "may authorize an internet sports pool operator" to "operate an online sports pool on its behalf provided the terms of the agreement are approved by the [D]ivision [of Gaming Enforcement]." *Id.* § 5:12A-11(a); *see id.* § 5:12-104(a)(12), (13). Conversely, "[n]o sports pool or online sports pool shall be offered or made available for wagering to the public by any entity other than a sports wagering licensee" or "an Internet sports pool operator, on behalf of a sports wagering licensee." *Id.* § 5:12A-11(c).

Sports wagering licensees and operators must comply with New Jersey's statutory and constitutional requirements. *See, e.g.*, *id.* §§ 5:12A-10 to -11, -13(a) (listing requirements that operators must abide by to receive or maintain a license); N.J. Admin. Code § 13:69O-1.2 (providing general requirements for internet and mobile gaming). An operator must provide documentation reflecting its "resources, including cash reserves, that are sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool or online sports pool." N.J. Stat. Ann. § 5:12A-13(a); *see id.* § 5:12-92(a)–(b). A sports-pool operator must also abide by state regulations, including "maintain[ing] a cash reserve of an amount necessary to ensure the ability to cover both the outstanding unpaid winning sport pool wagers and the outstanding sport pool wagers where the outcome has not been determined." N.J. Admin.

Code § 13:69N-1.2(d). And an online sports-pool operator must "only accept wagers from patrons that have been affirmatively located as being physically present in the State of New Jersey at the time of their wager." *Id.* § 13:69N-1.2(g). Internet or mobile gaming systems are likewise required to employ certain security measures like a geolocation system, age restrictions, and others. *See id.* § 13:69O-1.2.

Operators also must comply with the constitutional mandate prohibiting sports wagers on college sports events taking place in New Jersey or in which a New Jersey college team participates. N.J. Stat. Ann. § 5:12A-10. The Division conducts investigations, audits, and enforcement actions to protect the public by ensuring that operators follow the law. *See id.* § 5:12-76.

## B.    The Commodity Exchange Act.

Separately, Congress has long regulated commodity futures. This started with the Commodity Exchange Act in 1936, which delegated certain regulatory responsibilities for commodities trading to the Attorney General and the Secretaries of Agriculture and Commerce. *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936) (codified at 7 U.S.C. §§ 1–27f). In so doing, Congress established a regulatory framework for commodities contracts to "manag[e] and assum[e] price risk," 7 U.S.C. § 5(a), to "deter and prevent price manipulation," "ensure the financial integrity of all transactions," and protect "all market participants from fraudulent or other abusive sales practices" through "a system of effective self-regulation,"

6

*id.* § 5(b). In 1974, the Commodity Exchange Act was amended to create the CFTC and grant it exclusive jurisdiction over transactions regulated by the Act. *See* CFTC Act of 1974, Pub. L. 93-463, § 201, 88 Stat. 1389, 1395 (1974).

The Act's jurisdiction over "swap" transactions has changed over time. Under the Commodity Futures Modernization Act of 2000, both the CFTC and the Securities and Exchange Commission were barred from regulating most swaps. Pub. L. 106-554, 114 Stat. 2763 (2000). But in response to the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which gave the SEC regulatory authority over security-based swaps and gave the CFTC regulatory authority over all other swaps. *See* Pub. L. 111-203, § 722, 124 Stat. 1376, 1672 (2010). The Commodity Exchange Act defines "swaps" to include "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

As a result, the Act now provides that the CFTC "shall have exclusive jurisdiction" with respect to "accounts, agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant

to section 7b-3 of this title or any other board of trade, exchange, or market." *Id.* § 2(a)(1)(A). That exclusive-jurisdiction provision includes two savings clauses. The first provides: "Except as [provided in the exclusive-jurisdiction provision], nothing contained in this section" shall "(I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State," or "(II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.* The other provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

Through Dodd-Frank, Congress also amended the Act to add a self-certification requirement for designated contract markets to offer new publicly traded derivative contracts. Pub. L. 111-203, § 745, 124 Stat. 1376, 1735–36 (codified at 7 U.S.C. § 7a-2(c)). To do so, an entity that is designated as a contract market may list new contracts on its exchanges without agency pre-approval by providing the CFTC "a written certification that the new contract" complies with the Act. 7 U.S.C. § 7a-2(c)(1). The contract then becomes "effective," and the entity may list the contract for trading unless the CFTC notifies the contract market within ten business days that it is staying the certification in order to review the submission. *Id.* § 7a-2(c)(2). If the CFTC decides at any time to review

the contract, it must take final action on that review within 90 days. *Id.* § 7a-2(c)(5)(C)(iv).

Dodd-Frank also amended the Act to provide a "[s]pecial rule for review and approval of event contracts." Pub. L. 111-203, § 745, 124 Stat. 1376, 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)). Under the statute's special rule, the CFTC "may determine" that "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency"[1] by "a designated contract market" are "contrary to the public interest" and therefore prohibited if "the agreements, contracts, or transactions involve," "terrorism," "assassination," "war," "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). If the CFTC determines that a contract is "contrary to the public interest," it is prohibited from being listed for trading. *Id.* § 7a-2(c)(5)(C)(ii).

The legislative history makes clear that, through the special rule, Congress intended to prevent "gambling through supposed 'event contracts,'" including "gaming contract[s]," which are "used predominantly by speculators or participants not having a commercial or hedging interest." *See* 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010), https://tinyurl.com/57c352v4 (statements of Sen. Blanche Lincoln and Sen. Dianne Feinstein). To that end, the CFTC promulgated a regulation,

---

[1] The definition of an "excluded commodity" mirrors the definition of a "swap." *See* 7 U.S.C. § 1a(19)(iv).

which provides that "[a] registered entity shall not list for trading" a "swap based upon an excluded commodity" that "involves, relates to, or references," among other things, "gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1).

### C. Kalshi And This Case.

Kalshi is a CFTC-designated contract market where users can buy and sell derivatives contracts known as "event contracts." JA22 ¶12, JA28 ¶37. The event contracts identify a future event and propose a binary yes/no question about whether that event will occur. JA23 ¶20. Event contracts are traded on an exchange, and traders exchange positions with other traders in the marketplace. JA24 ¶21. A trader may purchase the "yes" or "no" position of the event occurring. JA23 ¶20. If the purchaser chooses the "yes" position, and the event occurs, the purchaser is paid out. JA23. The payout depends on market perceptions about the likelihood of the event's occurrence and accordingly fluctuates between the time of its creation and expiration date. JA24 ¶22. The ultimate value of the outcome is determined at the contract's expiration date. *Id.*

In January 2025, Kalshi self-certified and began offering event contracts related to the outcome of sports events on its exchange. JA29 ¶41. These sports-related event contracts allow users to place positions on the outcome of sports events, like which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S.

Open Golf Championship. *Id*. Although the CFTC may review and prohibit event contracts involving "gaming" or "activity that is unlawful under any Federal or State law," 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V), the CFTC has not yet taken action to review or prohibit Kalshi's sports-related event contracts, JA29 ¶41. Nonetheless, Representative Dina Titus, co-chair of the Congressional Gaming Caucus, has called on the CFTC to determine "if Kalshi filed a false certification" regarding its sports-related event contracts. Letter from Rep. Dina Titus to the Secretary of the Commission, CFTC, at 2 (Apr. 1, 2025), https://tinyurl.com/y42b5jrf.

After Kalshi began offering sports-related event contracts, the New Jersey Division of Gaming Enforcement issued a cease-and-desist letter to Kalshi in March 2025. JA37–38. The Division notified Kalshi that its sports wagers offered to individuals located within New Jersey violated the Sports Wagering Act, N.J. Stat. 5:12A-11, "which only permits licensed entities to offer sports wagering to patrons located in New Jersey," JA37. The Division also informed Kalshi that it was offering unauthorized sports wagering to residents on collegiate sporting events occurring in New Jersey in violation of the New Jersey Constitution's prohibition on such wagers. *Id*. (citing N.J. Const. art. IV, § 7, ¶2(D)). Because Kalshi's acceptance of unauthorized sports wagers violated state law, the Division demanded Kalshi cease and desist from doing so. JA38.

Kalshi then filed a complaint and a preliminary-injunction motion against Appellants Mary Jo Flaherty, Interim Director of the Division of

Gaming Enforcement, and Matthew J. Platkin, Attorney General of New Jersey. JA22–23 ¶¶13–19. Kalshi alleged that the Commodity Exchange Act preempts New Jersey's Sports Wagering Act and N.J. Const. art. IV, § 7, ¶2(D), because it occupies the entire field of trading on CFTC-regulated markets and because state law would frustrate the CFTC's exclusive authority to regulate designated exchanges. JA32–33 ¶¶59–60.

The district court granted Kalshi's preliminary-injunction motion in April 2025. JA2. The court held Kalshi was likely to succeed in arguing that the Act preempts New Jersey's sports-wagering laws because the Act's exclusive-jurisdiction provision "reflects an intent to occupy the field." JA12–13. The court also found that Kalshi's sports-wagering event contracts fall within the Act's exclusive-jurisdiction provision and disagreed that "sporting events are without potential financial, economic, or commercial consequence."[2] JA14. Because it held that Kalshi had demonstrated a sufficient chance of prevailing on its field-preemption claim, the court did not consider conflict preemption. *Id.* The State timely appealed.

## SUMMARY OF ARGUMENT

New Jersey has a comprehensive licensing and regulatory regime that protects minors from gambling, N.J. Admin. Code § 13:69O-1.2; ensures that sports-wagering operators are financially stable enough to

---

[2] The court also held that Kalshi was likely to suffer irreparable harm to its reputation and that the remaining equitable factors weighed in favor of an injunction. JA15–17.

cover outstanding sports wagers, N.J. Stat. Ann. § 5:12A-13(a); N.J. Admin. Code § 13:69N-1.2(d); facilitates detection of suspicious or illegal betting activity, N.J. Stat. Ann. § 5:12A-11(i); and employs security measures relating to anti-money laundering, cyber security, and identity authentication, N.J. Admin. Code § 13:69O-1.2. The district court's order erroneously prevents New Jersey from enforcing those critical sports-wagering laws. This Court should correct that error.

**I.** Kalshi's claim that federal law preempts New Jersey's sports-wagering laws fails for a threshold reason: its conduct lies outside federal law. Kalshi's case hinges on the idea that event contracts based on the outcome of sporting events are "swaps" within the CFTC's exclusive jurisdiction. But its theory has no limits: if a swap includes any transaction tied to an event with some sort of financial or economic impact—like the outcome of an athletic contest—it is difficult to imagine anything that would *not* be a swap under the Commodity Exchange Act. That interpretation would also impliedly repeal a raft of federal gambling laws and upend a multi-billion-dollar industry by requiring every sports-wagering business to register with the CFTC and to offer wagers exclusively on a CFTC-regulated exchange. Congress did not intend to effect such a massive sea change in gambling regulation by inserting "swap" into the Commodity Exchange Act. Because Kalshi's event contracts do not fall within the Act, this case can end there.

**II.** Even if Kalshi's conduct comes within the ambit of federal law, however, its contention that the Commodity Exchange Act preempts New Jersey sports-wagering laws would fail.

**A.** Initially, Kalshi's preemption theory is inconsistent with the text and structure of federal law itself. All three categories of preemption—express, field, and conflict—turn on Congress's choice to displace state law. So preemption is untenable where Congress expressly allows for the relevant state laws. That perfectly describes this case: Congress has time and again affirmed the States' regulation of gambling within their borders. And the Commodity Exchange Act both expressly *preserved* state laws and *incorporated* state laws into a special rule that determines allowable event contracts. Congress's decisions are fatal to Kalshi's claim.

**B.** Regardless, Kalshi cannot find support from any of the three traditional preemption categories. While the district court's analysis focused on field preemption, it based its analysis on the Act's bare statement that the CFTC has "exclusive jurisdiction" over the swaps (and other contracts) on CFTC-regulated exchanges. But whether a two-word statement of "exclusive jurisdiction" preempts state law is the province of *express* preemption, which looks to the text of a single statutory provision. It is not a basis for *field* preemption, a category of implied preemption that requires a particularly comprehensive statutory scheme. And not even Kalshi argues that the plain text of the Commodity Exchange Act expressly preempts state gambling laws.

Stuffed into the box of field preemption, the Act's assignment of "exclusive jurisdiction" to the CFTC cannot meet that high bar. Field preemption only "occurs when federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy*, 584 U.S. at 479. But no comprehensive federal scheme exists to field preempt even complementary state regulation of sports wagers just because they occur on CFTC-regulated exchanges.

The case for conflict preemption is weaker still. Event contracts involving "gaming" or "an activity that is unlawful under any State or Federal law" (like Kalshi's) are prohibited by the Act's special rule and its implementing regulation. So Kalshi is offering event contracts in contravention of federal law—a federal law that specifically embraces state statutes—yet balking at New Jersey's attempt to prohibit the same conduct. There is no conflict in those circumstances.

## STANDARD OF REVIEW

For a preliminary injunction, a movant must make "a clear showing" that they are likely to succeed on the merits. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024). A movant's failure to make this "threshold showing[] is fatal." *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 150 (3d Cir. 2024). This Court reviews a district court's findings of fact for clear error, legal conclusions de novo, and the decision to grant a

15

preliminary injunction for abuse of discretion. *Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022).

## ARGUMENT

The district court improperly halted New Jersey's enforcement of its sports-wagering laws. It held that Kalshi's event contracts—which are based on the outcome of sporting events—are "swaps" within the CFTC's "exclusive jurisdiction," and that the Commodity Exchange Act preempts state law. JA14. The court was wrong at both steps.

## I.    Kalshi's Event Contracts Do Not Fall Within The Act.

Kalshi's case hinges on the idea that event contracts based on the outcome of sporting events are "swaps" within the "exclusive jurisdiction" of the CFTC. JA26 ¶30, JA28 ¶35; D.N.J. Dkt. 2 (PI Br.) 5–6. But against the historical backdrop of federal gambling laws, the Act's text and structure show that Congress did not intend to effect a massive sea change in gambling regulation by inserting the word "swap" to cover wagers on the outcome of sporting events. Because Kalshi's conduct does not even fall within the Act, preemption necessarily cannot apply.

Congress added the term "swap" to the Commodity Exchange Act through the 2010 Dodd-Frank amendments. The Act now gives the CFTC "exclusive jurisdiction" over "accounts, agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed" on a designated contract market or "any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). The Act

then funnels swaps to CFTC-regulated markets by making it generally unlawful "to enter into a swap unless the swap is entered into on, or subject to the rules of," a designated contract market. *Id.* § 2(e). The statute also "prohibits anyone from soliciting or accepting orders for swaps" if "they are not registered with the CFTC as a futures commission merchant." *CFTC v. Yukom Commc'ns Ltd.*, 2021 WL 4477874, at *1 (N.D. Ill. Sept. 30, 2021); *see* 7 U.S.C. § 6d(a)(1). And any knowing or willful violation of these provisions is a felony, with fines up to $1 million and imprisonment up to ten years. *See* 7 U.S.C. § 13(a)(2), (5).

To fall within those provisions at all, sports-related event contracts must be "swaps." The Act defines "swap" as "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The district court adopted Kalshi's limitless definition of a swap, holding that sports-related event contracts fall within the Act because sporting events have a "potential financial, economic, or commercial consequence" in the sense that there is an "economic impact" in "television, advertising, and local communities." JA14.

That capacious view violates multiple hornbook interpretive rules. To start, courts are "obligated to construe statutes sensibly and avoid

constructions which yield absurd or unjust results." *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012). But if the district court is correct that a swap includes any transaction tied to an event with some sort of financial or economic impact, then it is difficult to imagine anything that would *not* be a swap within the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Any person betting their friend $100 that he will miss his Amtrak train is apparently now subject to CFTC oversight. Such a bet is an "agreement" that provides for the "payment" of $100 "dependent on the occurrence" of the friend missing his Amtrak train that has a "potential financial" impact on Amtrak. *Id.* § 1a(47)(A)(ii). So too for the local raffle to benefit a charitable cause; it is now a CFTC-regulated "transaction" that provides for the "payment" of money "dependent on the occurrence" of a random draw that has a "financial" impact on the charity. *Id.* More to the point, Kalshi and the court's "swap" interpretation covers classic casino games and sports bets, which all involve wagers placed on the outcome of some event with a financial impact for the casino and/or sportsbook. And because the Act bans all swaps outside CFTC-regulated exchanges, these charitable raffles, casinos, and sportsbooks are all violating federal law. *Id.* §§ 2(e), 6d(a)(1). Simply put, Kalshi's unbounded "swap" interpretation "defies rationality." *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020).

That extreme interpretation—in which the bingo game at a senior-citizen home now falls within the CFTC's domain—is also contrary to the

structure and history of Dodd-Frank. Congress added the term "swap" to the Act to "charg[e] the CFTC with the task of illuminating previously dark markets in the complex derivative instruments at the heart of the [2008 financial] crisis." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). But gambling does not involve "complex derivative instruments at the heart of the [2008 financial] crisis." *Id.* And nothing about state-regulated gambling—let alone sports gambling—occurs in "previously dark markets." *Id.*

To the contrary, by the time Congress added "swaps" to the Act in 2010, States had been regulating gambling for well over a century and the federal government had been consistently regulating gambling for at least half that time. *See supra* at 2–4. Just four years earlier, Congress passed the Unlawful Internet Gaming Enforcement Act of 2006 to prohibit acceptance of certain payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5363. And almost 60 years before that, federal law prohibited the operation of gambling on American vessels. 18 U.S.C. § 1082(a). Between those laws, Congress enacted the Wire Act of 1961 to largely criminalize the interstate transmission of bets or wagers on sporting events, 18 U.S.C. § 1084(a); the Johnson Act of 1962 to generally prohibit the interstate transportation of "any gambling device," 15 U.S.C. § 1172(a); the Illegal Gambling Business Act of 1970 to transform certain state gambling violations into federal crimes, 18 U.S.C. § 1955; the Interstate Horseracing

Act of 1978 to govern interstate horseracing wagers, 15 U.S.C. §§ 3003–04; the Indian Gaming Regulatory Act of 1988 to give Native American tribes "the exclusive right to regulate gaming activity on Indian lands," 25 U.S.C. § 2701(5); and the Professional and Amateur Sports Protection Act of 1992 to bar government entities from allowing gambling on competitive sporting events, 28 U.S.C. § 3702.

Under Kalshi's theory (adopted by the district court), the singular addition of the word "swap" would effect a massive transformation in federal gambling law. To name just a few examples, it would give the CFTC exclusive authority to regulate interstate sports wagering that the Wire Act prohibits. *See* 18 U.S.C. § 1084(a)–(b). It would reassign to the CFTC the tribes' authority to regulate wagering on tribal lands. *See* 25 U.S.C. § 2701(5). And it would allow persons to operate a wagering scheme under the Act at a time when it was prohibited by federal law. *See* 28 U.S.C. § 3702.

In other words, the logic of the district court's holding is that Congress impliedly repealed a myriad of other federal laws simply by inserting "swaps" into the Act. But such implied repeals are strongly disfavored. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). And Congress's addition of the word "swap" does not come close to showing a "clear and manifest" intent by Congress to "displace" preexisting federal laws. *Id.* The definition of "swap" does not mention sports wagering at all. *See* 7 U.S.C. § 1a(47)(A)(ii). Nor does it "even hint at a wish to displace" other

20

federal gambling laws, "let alone accomplish that much clearly and manifestly, as our precedents demand." *Epic Sys.*, 584 U.S. at 511.

The district court's sweeping construction also contravenes the fundamental interpretive rule that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001). Under that interpretation, Congress's 2010 "swap" amendment granted the CFTC broad authority over sports wagering nationwide. But "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (per curiam).

Given the broad array of federal gambling laws, Congress clearly thought gambling (including sports gambling) was a matter "of vast economic and political significance" that required landmark legislation in nearly every decade since the 1940s. *Id.* Indeed, as the Supreme Court observed, sports gambling is both a "controversial issue" and "immensely popular" form of entertainment that has long been regulated by the States. *Murphy*, 584 U.S. at 460, 484. And it involves enormous sums of money. In 2024, commercial gaming collectively brought in $72.04 billion, and generated $15.91 billion in gaming tax revenue for state and local governments. *See State of the States 2025*, Am. Gaming Ass'n (May 13, 2025), https://tinyurl.com/5xey2yzy. Of that, sports wagering brought in $13.78 billion nationwide. *Id.* In the first quarter of 2025 alone, sports

wagering grew by 13.6%, generating $3.87 billion. *See Commercial Gaming Revenue Tracker*, Am. Gaming Ass'n (May 16, 2025), https://tinyurl.com/3x7av3kx.

The single addition of "swap" is a "wafer-thin reed on which to rest such sweeping power" to control gambling (including sports wagering) throughout the country. *Ala. Ass'n*, 594 U.S. at 765. And although settled precedent "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power," *Sackett v. EPA*, 598 U.S. 651, 679 (2023), Congress's addition of "swap" to the Act does not remotely meet that standard.

A better interpretive path is available. Swaps, as properly understood, were indeed traded on "dark," unregulated markets before the 2010 Dodd-Frank amendments. *Inv. Co. Inst.*, 891 F. Supp. 2d at 174. And swaps were generally considered to be "financial contracts in which two counterparties agree to exchange or 'swap' payments with each other as a result of such things as changes in a stock price, interest rate or commodity price." *Id.* at 171. This is borne out in the Act's text, which again defines a swap as "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Critical to that definition is the phrase "associated with." In 2010 as now,

"associated" commonly meant "join[ed] or connect[ed] together." Associated, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). Just as in the phrase "lung cancer is associated with smoking," an "event or contingency" must be "join[ed] or connect[ed]" with "a potential financial, economic, or commercial consequence" such that they rise and fall together. Put differently, the best interpretation is that something is a "swap" when the referenced "event or contingency" is inherently "financial, economic, or commercial" in nature.

This makes sense with the surrounding subclauses of the same definition. Subclauses (i) and (iii) define a "swap" as an "option" or an "exchange" of "payments" that is "based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii). The Act even lists examples, including an "interest rate swap," a "cross-currency rate swap," "an equity index swap," and a "credit default swap." *Id.* § 1a(47)(A)(iii). Those examples are all tied to the idea that the parties to the transaction transfer "the financial risk associated with a future change" in some quantitative measure "without also conveying a current or future direct or indirect ownership interest in an asset." *Id.* And when "several items in a list share an attribute," that "counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S.

368, 371 (1994). So a "swap" (as relevant here) is likewise limited to a payment that depends on the "occurrence" of an "event" that is "joined or connected" with a financial, economic, or commercial instrument or measure. *See* 7 U.S.C. § 1a(47)(A)(ii).

Here, Kalshi's event contracts are not swaps because the *outcome* of a sports game is not "joined or connected" with a financial, economic, or commercial instrument or measure. For instance, the Phillies beating the Blue Jays is not at all financial in nature. Kalshi itself acknowledged as much in other litigation, arguing that "at least in general, contracts relating to *games*—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024). Below, however, Kalshi argued that when Rory McIlroy won the Masters "in a sudden-death playoff, television viewership rose by 33% over 2024, with enormous financial consequences for CBS and advertisers." D.N.J. Dkt.17 at 8–9. And the district court bought that analogy.[3] JA14. But, as explained above, this stretches the Act past its breaking point. Such an interpretation "lacks any real limits because,

---

[3] The court also relied on a law review article to find that "sports bets may meet the requirement of a potential financial, commercial, or economic consequence." JA14 (citing Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 79–80 (2021)). But the article merely opines that, in the case of sports betting generally, the "potential financial, commercial, or economic consequence" requirement "may or may not also be met." Aron & Jones, *supra*, at 80.

depending on the level of generality, any activity can be looked upon as commercial." *United States v. Lopez*, 514 U.S. 549, 565 (1995).

It also misapprehends the event contracts at issue here. The relevant "event" is the *outcome* of the game—*i.e.*, whether Rory McIlroy or Justin Rose wins the Masters—and not the game itself. Kalshi's own self-certification proves this point: the company self-certified to offer "Will <team> win <title>? contract[s]." *See KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?" Contract* (Jan. 22, 2025), https://tinyurl.com/2bs44zfz. Setting aside whether television viewership is itself financial in nature, Kalshi's example straightforwardly fails because the rise in television viewership is unconnected to the relevant "event" (McIlroy's win).

To be sure, some transactions involving "gaming" may meet the definition of "swap," triggering the Act's own special rule for event contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i). For example, someone could place a $100 wager on the Eagles collecting over $650 million in revenue this year. That is a "transaction" that provides for a "payment" to the winner that is "dependent on the occurrence" of a specific revenue amount, which is "joined or connected" with a financial measure. *See id.* § 1a(47)(A)(ii). That transaction also arguably involves "gaming"—the game of football—and therefore falls under the special rule. *Id.* § 7a-2(c)(5)(C)(i). But those are not the kinds of sports-wagering contracts Kalshi offers. Rather, Kalshi offers "sports-outcome contracts": wagers on which team or person will win

a particular athletic contest. JA29 ¶¶40–41. Because that is not a category of events joined with "a potential financial, commercial, or economic consequence," they are not "swaps."

The district court failed to consider any of this in adopting Kalshi's overbroad interpretation of "swap." This Court should reject its limitless interpretation, along with the absurd result that the Act silently nullifies numerous federal laws and makes the CFTC responsible for regulating all walks of life. The Court can reverse on this basis alone.

## II.   The Act Does Not Preempt New Jersey's Gambling Laws.

Even assuming Kalshi is offering "swaps" covered by the Act, its preemption theories fail. The Supremacy Clause "specifies that federal law is supreme in case of a conflict with state law." *Murphy*, 584 U.S. at 477; U.S. Const. art. VI, cl. 2. Such federal preemption can arise in three ways: (1) express preemption; (2) field preemption; or (3) conflict preemption. *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021). "In every preemption case, our inquiry is guided by two principles." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020). First, "the intent of Congress is the ultimate touchstone of preemption analysis." *Id.*; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, (1996). Second, "all preemption cases 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Sikkelee v.*

*Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see Lupian v. Joseph Cory Holdings*, 905 F.3d 127, 131 & n.5 (3d Cir. 2018) (presumption applies even to express preemption). That presumption is at its strongest when Congress has legislated "in a field which the States have traditionally occupied." *Medtronic*, 518 U.S. at 485; *see Navient*, 967 F.3d at 288 (same).

Gambling is exactly such a field. States have long regulated gambling, which lies at the core of their traditional police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) (same); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (same); *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999) (same); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) (similar). The reason is obvious: gambling is a potentially harmful "vice activity." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185 (1999). And States may act in that area to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's*, 353 F.3d at 737.

Particularly given that presumption, Kalshi cannot meet its heavy burden to establish that New Jersey law is preempted. Because federal

gambling law generally, and the Commodity Exchange Act specifically, acknowledge the applicability of state laws, there can be no preemption under any possible theory. But even examined individually, none of the three preemption categories—express, field, or conflict—indicate that the Commodity Exchange Act supersedes the Sports Wagering Act.

### A.  Kalshi's Preemption Theories Are All Foreclosed By The Text And Structure Of Federal Law.

As an initial matter, Kalshi's preemption theories necessarily fail because Congress has repeatedly confirmed that the States retain their traditional role in regulating gambling and has acknowledged the applicability of state law in the Act itself. Because Congress decides when preemption is appropriate, there can be no preemption where Congress has expressly allowed for the relevant state laws.

Federal law has long recognized the States' principal role in regulating gambling. Just four years after creating the CFTC, Congress made abundantly clear that while "the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests," States "have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a).

And Congress has repeatedly enshrined this principle across numerous federal gambling laws by incorporating state laws. For example, the Wire Act criminalizes interstate transmission of bets or wagers on

sporting events, 18 U.S.C. § 1084(a), but exempts "bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal, *id.* § 1084(b). Likewise, the Unlawful Internet Gaming Enforcement Act prohibits acceptance of certain payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5363. But the definition of "unlawful Internet gambling" hinges on state law, *id.* § 5362(10)(A), excludes intrastate transactions where gambling is legal under state law, *id.* § 5362(10)(B), and does nothing to alter state regulation of gambling, *id.* § 5361(b). The Indian Gaming Regulatory Act similarly accommodates state law: it allows Class III gaming activities (including sports gambling) on tribal land only if it occurs in a State that permits such gaming and there is a tribal-state compact covering issues like revenue sharing. 25 U.S.C. § 2703(8); *id.* § 2710(d).

Federal gambling laws' endorsement of historic state authority does not stop there. The Johnson Act prohibits the interstate transportation of "any gambling device," except when doing so is "lawful" under state law. 15 U.S.C. § 1172(a). The aptly named Gambling Ships Act also prevents the operation of gambling on American vessels, but only insofar as it is "*not* within the jurisdiction of any State." 18 U.S.C. § 1082(a) (emphasis added). Similarly, the Interstate Horseracing Act "outlines the exclusive procedures by which a 'person' can accept interstate off-track

wagers, striking a delicate balance between state authority over intra-state activity and Congress's powers over interstate commerce." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 767 F. Supp. 3d 556, 566 (W.D. Mich. 2025) (citing 15 U.S.C. §§ 3003–04). And the Illegal Gambling Business Act actually transforms state gambling violations into federal crimes when five or more people manage a gambling business that is illegal under state law and runs continuously for more than thirty days or makes more than $2,000 in any single day. 18 U.S.C. § 1955.

Even when Congress sought to ban sports betting through the Professional and Amateur Sports Protection Act, it grandfathered in States where such betting was legally operating under state law. *See Murphy*, 584 U.S. at 462; 28 U.S.C. § 3704(a). And in eventually holding that law unconstitutional, the Supreme Court was clear that the "legalization of sports gambling requires an important policy choice" to be made by the States. *Murphy*, 584 U.S. at 486. Congress may preempt state law by "regulat[ing] sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* Time and again, the same rule applied: the States retain authority to regulate gambling.

Against this decades-long backdrop, it makes little sense to interpret the Commodity Exchange Act—a statute concerned with the trading of commodity futures—as silently stripping the States' ability to regulate

gambling within their borders. As the Supreme Court has repeatedly explained, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." *Wyeth v. Levine*, 555 U.S. 555, 575 (2009) (quoting *Bonito Boats v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–67 (1989)). That is exactly what happened here: Congress accepted the application of state gambling laws for decades and said nothing in the Act to supersede that well-established authority just because wagers are offered on a market that also happens to be regulated by the CFTC. Congress's "silence on the issue, coupled with its certain awareness of the prevalence of" state gambling laws, "is powerful evidence that Congress did not intend" CFTC "oversight to be the exclusive means of" preventing unlawful gambling. *Id.*

"If Congress thought" state gambling laws hampered the CFTC's ability to oversee its regulated markets, "it surely would have enacted an express pre-emption provision at some point." *Id.* at 574. In fact, Congress *did* include two express-preemption provisions in the Act—but not for the event contracts Kalshi offers. One provision "supersede[s] and preempt[s] the application of any" state law "that prohibits or regulates gaming or the operation of bucket shops" in certain narrow situations inapplicable here. 7 U.S.C. § 16(e)(2). Another provision expressly

preempts state insurance laws as applied to swaps. *Id.* § 16(h). Yet nowhere does the Act expressly preempt state gambling laws—which Congress specifically addressed in the former express-preemption provision—as applied to all event contracts on CFTC-regulated markets. That omission does not "entirely foreclose[] any possibility of implied preemption." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). But it is strong evidence that Congress did not intend to wholesale override state gambling laws; "a statutory provision explaining when and how state regulation is to be preempted would hardly be necessary in a statute manifesting Congress's intent to occupy a particular regulatory field." *Baltimore & Ohio R.R. Co. v. Oberly*, 837 F.2d 108, 113 (3d Cir. 1988). Put simply, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not preempted." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992); *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024) (same).

Congress actually went out of its way to *preserve* state law. Where a transaction—like Kalshi's sports-related event contracts—does not fall within the CFTC's "exclusive jurisdiction," the Act makes clear that "nothing contained in this section" shall "(I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State," or "(II) restrict the Securities and Exchange Commission

and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). Still more, Congress specified that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

These savings clauses are "fundamentally incompatible" with preemption, especially field preemption, because "if Congress intended to preempt the entire field there would be nothing to 'save,' and the provision would be mere surplusage." *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010); *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 262 (3d Cir. 2012) (same); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (agreeing a savings clause "negates the inference that Congress left no room for state causes of action"). Courts interpreting these clauses agree: Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." *See, e.g.*, *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (holding this "savings clause" is "designed to preserve in the futures trading context at least some state law causes of actions"); *accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984). In fact, the latter savings clause was added precisely to allay fears that the Act "might oust the courts' jurisdiction over typical state law claims." *Patry v. Rosenthal & Co.*, 534 F. Supp. 545, 548–49 (D. Kan. 1982).

Those typical state-law claims include state enforcement actions in state court against violators of state law—exactly how New Jersey would enforce its gambling laws against Kalshi. *See* N.J. Stat. Ann. § 5:12A-11; *id.* § 5:12-77; *id.* § 5:12-112; *id.* § 5:12-127. For its part, the district court properly recognized that "[o]f course state courts retain jurisdiction over claims such as private fraud actions." JA13. But the court never explained why private individuals are free to pursue their state-law claims in state court while the State itself is preempted from doing the same. That nonexplanation is understandable: if the Act prevented States from bringing state-court actions they could otherwise bring, then it "supersede[ed] or limit[ed] the jurisdiction" of state courts, in direct contravention of the savings clause. 7 U.S.C. § 2(a)(1)(A).

Beyond repeatedly accommodating state law and including savings clauses to protect state law, Congress even explicitly *incorporated* state law into the special rule that governs the event contracts at issue here. *See id.* § 7a-2(c)(5)(C)(i). The special rule provides that "swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" are "contrary to the public interest" and therefore prohibited if they involve "gaming" or an "activity that is unlawful under any Federal or State law." *Id.*; *see also* 17 C.F.R. § 40.11(a)(1). As explained above, Congress well knew that States historically regulated "gaming" and it repeatedly accepted those state regulations. More to the point, however, Congress overtly incorporated "activity that is unlawful under

34

any Federal or State law" into the Act's prohibited categories. 7 U.S.C. § 7a-2(c)(5)(C)(i).

And where "a federal statute expressly incorporates state law," it makes sense that a "preemption analysis is inappropriate." *Cf. Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). Just as there is no preemption if state law incorporates federal law, there is no preemption when federal law incorporates state law either. *Compare California v. Zook*, 336 U.S. 725, 735 (1949) (state law incorporates federal law), *and Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 332 (5th Cir. 2025) (same), *with Just Puppies, Inc. v. Brown*, 123 F.4th 652, 662 (4th Cir. 2024) (a federal law's "acknowledgement of concurrent state and local" regulation "demonstrates that Congress did not intend for the [federal law] to occupy the field . . . to the exclusion of state law"), *and Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1236 (10th Cir. 2017) ("Because [the Indian Gaming Regulatory Act] expressly contemplates parallel state laws, there is no manifestation of congressional intent to preempt the field"). After all, "States may have a legitimate interest in punishing or providing redress for wrongs even if federal law already does so," and vice versa. *Zyla*, 134 F.4th at 333. States are hardly preempted, for example, from enforcing their own laws against murder, kidnapping, and gambling simply because federal RICO law uses those state laws as the basis for a federal prohibition. 18 U.S.C. §§ 1961–62.

So too here. Congress's incorporation of "activity that is unlawful under any Federal or State law" proves it had no intention of preempting state law. 7 U.S.C. § 7a-2(c)(5)(C)(i). The district court dismissed this logic out of hand, explaining that "'unlawful under any Federal or State law' refers to the underlying event rather than the act of staking money on that event." JA13. But true or not, that is beside the point. The inquiry here is whether it was the "clear and manifest purpose of Congress" to preempt generally applicable state laws just because they touch a market that might also be regulated by the CFTC. *Sikkelee*, 822 F.3d at 687; *see Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasizing "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted"). And the special rule's reference to "gaming"—an area long regulated by the States and accepted by Congress—as well as to "activity that is unlawful under" any state law, plainly indicates that the answer is no.

Of course, the CFTC may examine whether an activity is "gaming" or is "unlawful" under state law in determining whether to allow event contracts on designated contract markets. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). But, contrary to the district court's conclusion, that does not mean the CFTC is the *only* one responsible for doing so. *See* JA12–14. State regulatory authorities simultaneously apply their own laws. To hold otherwise would make the CFTC—a federal agency responsible for regulating U.S. derivatives markets—the final arbiter of state laws ranging from

criminal law to election law to sports wagering in more than 50 jurisdictions covering 340 million people. Put differently, in Kalshi's world, the CFTC's construction of an ambiguous state gaming statute would become authoritative because the CFTC alone would have the power to enforce it. That result would be bizarre; even federal *courts* do not authoritatively interpret state law. *See Pinho v. Gonzales*, 432 F.3d 193, 212 (3d Cir. 2005); *Speiser v. Randall*, 357 U.S. 513, 522 n.7 (1958) (noting it is a "basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts"). And "the respect that federal courts owe the States" is "owed no less by federal agencies than by federal courts." *Pinho*, 432 F.3d at 212. So Congress's incorporation of state law into the special rule was plainly meant to parallel, not usurp, the States' enforcement of their own laws.

Given that "the intent of Congress is the ultimate touchstone of preemption analysis," *Navient*, 967 F.3d at 288, preemption is untenable here. Congress has accepted state gambling laws for decades. And in the Commodity Exchange Act, it preempted some state gambling laws without preempting those at issue, it explicitly preserved state laws and state-court jurisdiction, and it incorporated state law into the special rule that determines allowable event contracts. Combined, the text and structure of federal law indicate Congress's plain intent to account for—not to foreclose—state legislation.

**B.    New Jersey's Sports Wagering Act Is Not Express Preempted, Field Preempted, or Conflict Preempted.**

Even examined individually, none of the three preemption categories—express, field, or conflict—indicate that the Act supersedes New Jersey's Sports Wagering Act.

**1.    Everyone Agrees There is No Express Preemption.**

The district court misunderstood the governing preemption framework. The decision below rests on just two words in the Act: "exclusive jurisdiction." JA12–14. The CFTC's "exclusive jurisdiction" over "swaps" on certain exchanges, the district court held, "reflects an intent to occupy the field." JA12–14. But even assuming that Kalshi's event contracts are "swaps" at all, that analysis misunderstands preemption.

At bottom, whether a single, explicit statutory provision preempts state law is not the province of *field* preemption but *express* preemption. Field preemption is necessarily a form of implied preemption; it "focuses on when Congress does *not* expressly preempt state law but where federal law leaves no room for state regulation." *Navient*, 967 F.3d at 287 (emphasis added); *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (explaining that field preemption is a form of "preempt[ion] by implication"). In contrast, express preemption is meant to analyze situations where Congress "exert[ed] its supremacy by expressly preempting state law" via an explicit textual provision. *Sikkelee*, 822 F.3d at 687. And that is exactly how the district court should have analyzed the Act's exclusive-jurisdiction

provision: it should have asked whether the Act's use of the term "exclusive jurisdiction" expressly preempts state law. *Cf. Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151–52 (3d Cir. 2024) (explaining that the "explicit statutory conferral of exclusive jurisdiction to a federal court over a particular subject matter is a form of express preemption"). But there is a reason Kalshi has never argued for express preemption: the text does not support it.

"Express preemption requires an explicit statement of federal law that announces and defines the scope of displaced state regulation." *Id.* The U.S. Code is littered with such statutory provisions superseding and preempting state law in so many words. *See, e.g.*, 5 U.S.C. § 8902(m)(1) ("The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits . . . shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans."); 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title"); 49 U.S.C. § 14501(c)(1) ("Except as provided in paragraphs (2) and (3), a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."). The

Act itself contains express preemption clauses too. *See* 7 U.S.C. § 16; *see supra* 31–32.

Put simply, Congress knows how to expressly preempt state law when it wants to. And it did not do so here. Far from "an explicit statement of federal law that announces and defines the scope of displaced state regulation," *Transcon. Gas*, 108 F.4th at 151–52, the Act's exclusive-jurisdiction provision uses just those two words—"exclusive jurisdiction"—and then expressly *preserves* state law and state-court jurisdiction, 7 U.S.C. § 2(a)(1)(A); *see supra* 32–34. It is therefore no surprise that Kalshi has never argued for express preemption. But that is the proper framework for interpreting the Act's exclusive-jurisdiction provision, and it should be fatal to Kalshi's case.

### 2.    There Is No Comprehensive Federal Scheme To Imply Field Preemption.

Without any express preemption, the district court was left to use the Act's exclusive-jurisdiction provision to support its holding of field preemption. JA12 (citing 7 U.S.C. § 2(a)(1)(A)). But field preemption only "occurs when federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy*, 584 U.S. at 479; *Transcon. Gas*, 108 F.4th at 156. And the Act does not so comprehensively displace state sports-wagering laws.

Other field-preemption cases demonstrate the high bar that applies. Field preemption is only justified upon "a demonstration that complete ouster of state power"—including "state power to promulgate laws not in conflict with federal laws"—"was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). So the "essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018). That high standard is met only in "rare cases." *Garcia*, 589 U.S. at 208. For example, there is a "comprehensive, complex, and national" scheme governing how noncitizens may enter or be removed from the country. *United States v. Texas*, 97 F.4th 268, 285 (5th Cir. 2024). A similarly comprehensive statutory framework governs nuclear safety, like whether someone can "build and run a nuclear power plant." *Virginia Uranium v. Warren*, 587 U.S. 761, 768 (2019) (lead op.); *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025) (same). So too for in-air flight operations, which are covered by an "intricate web of statutory provisions." *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 370 (3d Cir. 1999) (quoting *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 4 (1st Cir. 1989)).

Nothing remotely approaching a comprehensive federal scheme exists to field preempt even complementary state regulation of sports wagers if they happen to occur on CFTC-regulated exchanges. The most

41

Kalshi identified below are federal regulations that lay out the procedures for an entity to become an CFTC-regulated exchange and, after it does, certain recordkeeping requirements, reporting obligations, and liquidity standards. PI Br. 16–17. But that runs into two problems. For one, field preemption cannot be inferred from regulations alone. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717 (1985); *Farina*, 625 F.3d at 121. For another, this case has nothing to do with the mechanics of how an entity becomes a CFTC-regulated exchange or what it must do procedurally to maintain that status.

This case is about what event contracts a CFTC-regulated exchange can offer, and, specifically, whether it can offer sports wagers in violation of state law. The only provisions speaking to that question are the special rule and its implementing regulation. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). And those two (largely identical) provisions each have fewer than 400 words, a far cry from the reams of the U.S. Code devoted to noncitizen removal, nuclear safety, or in-air flight operations. *See supra* 41. Plus the special rule and its implementing regulation outright prohibit event contracts involving "gaming"—long regulated by the States and accepted by Congress—and "activity that is unlawful under" any state law. *See supra* 34–37. Given Congress's "hesitation to override all state law" in this area and its "recognition of a role for state regulation within the field," the Act does not "so thoroughly occup[y] a legislative

field" that "Congress left no room for the States to supplement it." *Farina*, 625 F.3d at 121–22.

The district court did not perform that type of preemption analysis. It instead hinged its entire holding on a statutory provision noting the CFTC's "exclusive jurisdiction" over certain financial transactions. JA12–14. But two words is hardly a "comprehensive" framework. Since at least the 1940s, the Supreme Court has held that Congress "must do much more to oust all of state law from a field" than simply "granting regulatory authority over [some] subject matter to a federal agency." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring); *id.* at 640–41 (Sotomayor, J., concurring in part) (same); *see Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). This Court has rejected similar arguments before. *See Farina*, 625 F.3d at 121 (no field preemption despite "Congress's delegation of 'exclusive authority'" over radio-frequency-emission regulation). And it should do so again here.

In fact, using the CFTC's "exclusive jurisdiction" as the basis for field preemption does not even make sense on its own terms. As noted above, the CFTC's "exclusive jurisdiction" covers not just "swaps" on regulated exchanges but also "swaps" on "any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A); *see supra* 16–17. And the Act outlaws "swaps" outside CFTC-regulated exchanges. 7 U.S.C. § 2(e); *id.* § 6d(a)(1); *see supra* 17–18. So under Kalshi's theory, any wager placed on the outcome of any event—including raffles or classic casino games—would also

be a swap subject to the CFTC's "exclusive jurisdiction." *See supra* 18. And if "exclusive jurisdiction" truly equates to field preemption, then the Act occupies the field of not only "futures trading on CFTC-regulated exchanges" as Kalshi would have it (PI Br. 13), but of all gaming regulation in the country. That is untenable. Congress did not field preempt every state gambling law in America (or impliedly repeal every federal gambling law) by adding "swaps" to the "exclusive jurisdiction" of a federal agency responsible for regulating U.S. derivatives markets.

Instead, "exclusive jurisdiction" has a different function entirely: it gives the CFTC sole regulatory authority over certain transactions as distinct from other federal agencies. "The aim of this provision, according to one of its chief sponsors, was to 'avoid unnecessary, overlapping and duplicative regulation,' especially as between the Securities and Exchange Commission and the new CFTC." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citing 120 Cong. Rec. H34,736 (Oct. 9, 1974) (remarks of House Agriculture Committee Chairman)); *see Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979) (describing "spat between the CFTC and SEC concerning the frontiers of their respective jurisdictions" as basis for CFTC exclusive jurisdiction)).

The Act's text bears this out. The first savings clause in the exclusive-jurisdiction provision explicitly draws the distinction between CFTC and SEC authority: outside of the CFTC's "exclusive jurisdiction," "nothing contained in this section shall (I) supersede or limit the jurisdiction

at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State," or "(II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). This is reinforced by other provisions of the Act. *See, e.g.*, *id.* § 2(a)(1)(D)(i) ("Notwithstanding any other provision of this chapter, the Securities and Exchange Commission shall have jurisdiction and authority over security futures as defined in section 3(a)(55) of the Securities Exchange Act of 1934."). Put simply, the exclusive-jurisdiction provision merely reflects Congress's concern about keeping federal agencies in their respective lanes.

To the extent legislators were concerned about state law at all, their focus was on state laws that affirmatively *conflict* with the Act, not generally applicable state laws that in any way touch CFTC-regulated markets. *See Dayton Power*, 126 F.4th at 1130 ("[S]tate actions indirectly affecting a federally regulated field are not necessarily preempted."). For example, Senator Curtis noted that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law." *See* 120 Cong. Rec. 30, 464 (Sept. 9, 1974), https://tinyurl.com/5n7nds2n. Senator Clark likewise railed against incompatible state laws, like a hypothetical Nebraska law prohibiting futures trading in direct conflict with federal law. *See Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685

45

(1974). But there is no indication that Congress had the "clear and manifest" intent to field preempt *all* state laws—much less state gambling laws it has long accepted—just because they touch a market that also happens to be regulated by the CFTC. *See Sikkelee*, 822 F.3d at 687.

"From a practical standpoint, if [this Court] were to hold that the" Commodity Exchange Act field preempts all state laws that in any way touch a CFTC-regulated market, "consumers would be left with no protection against unfair or deceptive acts or practices." *Navient*, 967 F.3d at 294. That is partially because States' general laws designed to protect their residents—like deceptive-trade-practice, consumer-protection, and sports-wagering laws—would all be preempted. But it is also because of the Act's self-certification system: the Act allows Kalshi to self-certify and offer event contracts unless the CFTC steps in. 7 U.S.C. § 7a-2(c). And because the CFTC has not stepped in—due to an immense workload, understaffing, or any other reason—Kalshi continues to offer sports wagers on its platform in clear violation of both state and federal law. *See* 17 C.F.R. § 40.11(a)(1) ("A registered entity shall not list for trading" a "swap" that "involves, relates to, or references," "gaming, or an activity that is unlawful under any State or Federal law."); N.J. Stat. Ann. §§ 5:12A-10, -11, -13(a). Yet Congress never thought it was exposing Americans to the dangers of unregulated gambling (among many other harms) by allowing companies like Kalshi to immunize themselves from all state laws through the self-certification process.

"Taken to its logical conclusion, [Kalshi's] proposed outcome here would mean that" CFTC-regulated entities "would in theory be free to" swindle customers, offer sports bets to minors, exploit compulsive gamblers, and facilitate other irresponsible gaming practices as long as they self-certify first. *Navient*, 967 F.3d at 294. "That outcome is untenable." *Id.* There is no comprehensive federal scheme demonstrating a "complete ouster of state power" such that usurping even complementary state laws "was the clear and manifest purpose of Congress." *DeCanas*, 424 U.S. at 357.

### 3. Kalshi's Conflict Preemption Theory Fails Because New Jersey Law Does Not Impede Effectuation Of The Act.

With no express preemption and no comprehensive scheme demonstrating field preemption, Kalshi's final refuge is conflict preemption. Although the district court did not reach Kalshi's arguments on this front, they fail too. Conflict preemption arises only "where it is impossible for a private party to comply with both state and federal law," *MD Mall Assocs. v. CSX Transp.*, 715 F.3d 479, 495 (3d Cir. 2013), or where the state law poses an obstacle to the full effectuation of a federal statute's "text and structure," *Garcia*, 589 U.S. at 208. Here, everyone agrees it is not "impossible" for Kalshi "to comply with both state and federal law." *MD Mall Assocs.*, 715 F.3d at 495; *see* PI Br. 18–21. So the issue is simply whether New Jersey's Sports Wagering Act poses an obstacle to the effectuation of the Commodity Exchange Act. It does not.

In the very 2010 Dodd-Frank amendments on which Kalshi relies, Congress specifically sought to *prohibit* the exact type of sports-wagering event contracts Kalshi offers here. Under the special rule, Congress authorized the CFTC to ban "transactions" or "swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" that involve, among other things, "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). This was intended to "prevent gambling through futures markets" and "protect the public interest from gaming contracts." *See* 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010), https://tinyurl.com/57c352v4 (statements of Sen. Blanche Lincoln). As the author of the special rule explained, it "would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." *Id.*

Unsurprisingly, then, the CFTC expressly prohibited these event contracts by regulation: "A registered entity shall not list for trading" a "swap" that "involves, relates to, or references," among others, "gaming, or an activity that is unlawful under any State or Federal law."[4] 17 C.F.R.

---

[4] To ensure that such event contracts are not improperly listed through the self-certification process, the CFTC may engage in a 90-day "review of the terms or conditions of" such self-certification to "determine" whether an event contract has been listed in violation of § 40.11(a) and therefore should be removed. 17 C.F.R. § 40.11(c).

§ 40.11(a)(1). And Kalshi knows this rule. As the company admitted in other litigation, an event contract "involves 'gaming' if it is contingent on a game or a game-related event." Appellee's Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024). "The classic example," Kalshi admitted, "is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." *Id.*

Yet here we are. Kalshi is offering "gaming" event contracts on its platform in direct contravention of federal law and nonetheless balking at New Jersey's attempt to prohibit the same conduct.[5] In any event, there cannot be conflict preemption when federal and state law prohibit the same conduct and the federal law specifically endorses the other. *See Zyla*, 134 F.4th at 336 ("States may generally regulate the same conduct the Federal Government does" and "especially so when state standards mimic federal ones."); *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1234 (10th Cir. 2020) (no preemption where "the federal regulatory standard is precisely the same as the state law standards sought to be imposed"); *Pic-A-State PA, Inc. v. Com. of Pa.*, 42 F.3d 175, 178 (3d Cir. 1994) (similar). Because

---

[5] To be clear, Kalshi can offer most of its sports-related event contracts simply by obtaining a New Jersey license. *See supra* 4–5. The only slice of sports wagers categorically prohibited in the State are college sporting events involving New Jersey colleges or taking place in New Jersey. *See supra* 4.

the Commodity Exchange Act (and implementing regulation) prohibit sports-related event contracts, New Jersey's Sports Wagering Act does not stand as an obstacle to the congressional scheme by prohibiting the same thing.

This leaves Kalshi with the untenable argument that New Jersey's sports-wagering laws are conflict preempted merely because the CFTC has not yet attempted to enforce the Act against Kalshi's sports-wagering event contracts. *See* PI Br. 18–21. But "mere deliberate agency inaction" will "not alone preempt state law." *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 247 (3d Cir. 2008). "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia,* 589 U.S. at 212. So the "mere fact that state laws" overlap with federal provisions (and have corresponding federal enforcement discretion) "does not even begin to make a case for conflict preemption." *Id.* at 211. "[M]any federal statutes grant the Executive Branch extensive enforcement discretion," but "those statutes do not preclude parallel or non-parallel state regulation of the same conduct." *Zyla*, 134 F.4th at 338. In "the vast majority of cases where federal and state laws overlap, allowing the States to" enforce their laws "is entirely consistent with federal interests." *Garcia,* 589 U.S. at 212.

So it is here. The Commodity Exchange Act was intended to, among other things, "deter and prevent price manipulation or any other disrup-

tions to market integrity"; "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets"; and "promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b). New Jersey law *furthers* this scheme. The State has a comprehensive licensing and regulatory regime that protects minors from gambling, N.J. Admin. Code § 13:69O-1.2; ensures that sports-wagering operators are financially stable enough to cover outstanding sports wagers, N.J. Stat. Ann. § 5:12A-13(a); N.J. Admin. Code § 13:69N-1.2(d); facilitates detection and reporting of suspicious or illegal betting activity, N.J. Stat. Ann. § 5:12A-11(i); and employs security measures relating to anti-money laundering, cyber security, and identity authentication, N.J. Admin. Code § 13:69O-1.2. Just as for the Commodity Exchange Act, those requirements work to "ensure the financial integrity of all transactions" and "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b).

So conflict preemption is especially inapposite here. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 82 (1987) (holding state law not preempted because it "furthers a basic purpose" of the federal statute); *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 226–28 (3d Cir. 2001) (finding state law did not stand as an obstacle to federal securities law where state law furthered the purpose and objectives of Congress). New Jersey's Sports Wagering Act has little to do with regulation of futures

markets. *Cf. Am. Agric. Movement, Inc.*, 977 F.2d at 1157 ("Laws of general application … are preempted only when plaintiffs attempt to use them in a manner that would, in effect, regulate the futures markets."). And nothing about the State's licensure and regulatory requirements for offering sports wagers in New Jersey, even when styled as event contracts, impede the CFTC's ability to regulate those event contracts. An entity like Kalshi can obtain a license from New Jersey to offer sports wagers and remain under CFTC oversight as a designated contract market. *See Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 509 (1984); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 942 (S.D.N.Y. 1981).

Despite Kalshi's complaints, companies are subject to simultaneous state and federal regulation all the time. Corporations across the country routinely must comply with, for example, state and federal antitrust laws, securities laws, drug-labeling laws, consumer-protection laws, and many others. *See, e.g.*, *Wyeth*, 555 U.S. at 581 (drug labeling); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 579 (1976) (antitrust); *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (food labeling); *Green*, 245 F.3d at 227 (securities); *Spectrum Ne., LLC v. Frey*, 22 F.4th 287, 301 (1st Cir. 2022) (consumer protection). The entire point of the presumption against preemption is that *States* are the primary regulators of health and safety. *See supra* 26–28. So the constitutional default

is that companies like Kalshi will *necessarily* have to navigate interlocking state and federal laws. Nothing in the Commodity Exchange Act or New Jersey's Sports Wagering Act compels a different result.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  */s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 250-8412

Dated: June 10, 2025

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am a member in good standing of the bar of the U.S. Court of Appeals for the Third Circuit.

<div align="right">

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

</div>

Dated: June 10, 2025

## <u>CERTIFICATION OF COMPLIANCE</u>

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,814 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the Microsoft Word processing system.

3.     The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.     This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with the following anti-virus software: Windows Defender and Crowdstrike Windows Sensor, version 7.2219409.0.

<div align="right">

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

</div>

Dated: June 10, 2025

**CERTIFICATION OF SERVICE**

I hereby certify that on June 10, 2025, I caused the Brief for Appellants to be filed with the Clerk of the U.S. Court of Appeals for the Third Circuit via electronic filing. Counsel of record will receive service via the Court's electronic filing system.

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

Dated: June 10, 2025