**Case No. 25-1922**

---

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**KALSHIEX LLC,**

*Plaintiff-Appellee*

**v.**

**MARY JO FLAHERTY, *et al.*,**

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of New Jersey
(1:25-cv-02152-ESK-MJS)

---

**AMICUS BRIEF BY STOP PREDATORY GAMBLING, TEXANS
AGAINST GAMBLING, AND THE ASSOCIATION OF AMERICAN
PHYSICIANS AND SURGEONS IN SUPPORT OF DEFENDANTS-
APPELLANTS AND IN SUPPORT OF REVERSAL**

---

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, NJ 07931
908-719-8608
908-934-9207 (fax)

*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* Stop Predatory Gambling and the Association of American Physicians and Surgeons are non-profit corporations that have no parent corporations, and no publicly held corporation owns 10% or more of any of their stock.

*Amicus Curiae* Texans Against Gambling is a d/b/a/ of Texans Who Care, a non-profit corporation that has no parent corporations, and no publicly held corporation owns 10% or more of any of its stock.

/s/ Andrew L. Schlafly

Dated:  June 16, 2025                    *Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ............................................................. ii

Table of Contents .................................................................................. iii

Table of Authorities ..............................................................................iv

Identity, Interest and Authority to File ................................................... 1

Summary of Argument ............................................................................4

Argument ...............................................................................................8

    I. *Murphy v. NCAA* Confirmed State Authority Over Gambling, Which
    the Decision Below Erroneously Overlooked ......................................8

    II. Kalshi's Argument Amounts to an Assertion of an "Extravagant"
    Override of Statute Regulation of Gambling, Without the Required
    Clear Authority from Congress .........................................................14

    III. Amid a Pandemic of Commercialized Gambling and Immense Harm
    Caused by It, the District Court Erred in Ignoring this Strong Public Interest
    Against the Preliminary Injunction ...................................................18

Conclusion ...........................................................................................29

Certificate of Compliance ......................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                          Page(s)

*Allen v. Hearn*, 99 Eng. Rep. 969, 1 T.R. 56, 59-60 (1785)....................................27

*Atlantic City Racing Ass'n v. Att'y Gen.*, 98 N.J. 535,
    489 A.2d 165 (N.J. 1985) ................................................................28

*Ball v. Gilbert*, 53 Mass. 397 (1847) ..............................................28

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)...............................13

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)......................18

*Feitler v. Fed. Trade Com.*, 201 F.2d 790 (9th Cir. 1953) ....................................24

*Globe Cardboard Nevelty Co. v. Fed. Trade Com.*,
    192 F.2d 444 (3d Cir. 1951) ...........................................................24

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)....................................................9

*Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289,
    749 S.E.2d 429 (2012)...........................................................16, 17

*Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039 (9th Cir. 2015) ..............................16

*KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS,
    2025 U.S. Dist. LEXIS 79893 (D.N.J. Apr. 28, 2025)......................13, 18, 19

*Knight v. City of Margate*, 431 A.2d 833 (N.J. 1981) .............................................16

*MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.,*
    512 U.S. 218 (1994)................................................................17

*Murphy v. NCAA*, 584 U.S. 453 (2018)................................. iii, 1, 5, 8, 9, 10, 13, 24

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*,
    669 F.3d 374 (3d Cir. 2012) .........................................................19

*New York v. United States*, 505 U.S. 144, 181-82 (1992) .........................................9

*Ocean Cty. Bd. of Comm'rs v. AG of N.J.*, 8 F.4th 176 (3d Cir. 2021)....................9

*Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) ..................................................26

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .........................................14

*Springer v. Henry*, 435 F.3d 268 (3d Cir. 2006)....................................................3

*Sun Life Assurance Co. v. Wells Fargo Bank NA*, Nos. 16-4337, 16-4387,
    2018 U.S. App. LEXIS 7870 (3d Cir. Jan. 30, 2018)....................................28

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014)..........................................15

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................15

**Constitutions, Statutes and Rule**

18 U.S.C. § 1084 ...........................................................................................................8

18 U.S.C. § 1952 ...........................................................................................................8

18 U.S.C. § 1953 ...........................................................................................................8

18 U.S.C. § 1955 ...........................................................................................................8

18 Pa. Cons. Stat. Ann. § 5514(3) ............................................................................26

Idaho Const. art. III, § 20............................................................................................16

N.J. Const. of 1947, art. IV, § 7, ¶ 2 ...................................................................16, 28

N.J.S.A. § 5:12-119.....................................................................................................23

N.J.S.A. § 2A:40-1.......................................................................................................28

N.J.S.A. § 2A:40-3.......................................................................................................28

Utah Code Ann. § 76-10-1102(1) ................................................................................9

FED. R. APP. P. 29(A)(4)(E) ........................................................................................ 1

**Other Authorities**

American Gaming Association, "National Economic Impact of the U.S.
    Gaming Industry 2023" (Oct. 9, 2023)
    https://www.americangaming.org/resources/national-economic-impact-
    of-the-u-s-gaming-industry/...........................................................................16

American Gaming Association, "New Updates to AGA Responsible
    Marketing Code for Sports Wagering Prohibit "Risk Free," Enhance
    College-Aged Protections" (Mar. 28, 2023)
    https://www.americangaming.org/new-updates-to-aga-responsible-
    marketing-code-for-sports-wagering-prohibit-risk-free-enhance-
    college-aged-protections/................................................................................23

M. Arain, et al., "Maturation of the adolescent brain,"
    9 *Neuropsychiatr Dis Treat*., 449 (Apr. 3, 2013)
    https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/ ..................................29

Dan Bernstein, "Chalky March Madness Slams Sportsbooks but Spares
Kalshi," *Sportico* (April 8, 2025) ("*Sportico*")
https://www.sportico.com/business/sports-betting/2025/march-madness-
sports-betting-results-1234846724/ ...............................................................4

Pippa Boering, et al. "A scoping review of routinely collected linked data in
research on gambling harm," 8 *Digital Medicine* No. 1 (June 2025) ....19, 20

D. Boland, "Sports betting demographics in the U.S.," *Birches Health*
(Feb. 28, 2024)
https://bircheshealth.com/resources/sports-betting-demographics-
in-the-u-s. ...................................................................................................21

Cleveland Clinic, "How Super Bowl stress can affect your heart,"
*Newsroom* (Feb. 5, 2025)
https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-
stress-can-affect-your-heart ......................................................................25

Charles T. Clotfelter & Philip J. Cook, *Selling Hope*
(Nat'l Bur. Econ. Research, Harvard Univ. Press 1989)..............................21

D. Cohen, "Americans to Wager Estimated $1.39 Billion on Super Bowl LIX,"
American Gaming Association (Feb. 4, 2025)
https://www.americangaming.org/americans-to-wager-estimated-1-39-
billion-on-super-bowl-lix/ ........................................................................25

Jonathan D. Cohen, "Where are all the anti-gambling Christians?"
ARC Religion, Politics, Etc. (May 15, 2025)
https://arcmag.org/where-are-all-the-anti-gambling-christians/ ..................21

Roger Ebert, "More than a game" (Oct. 8, 2004)
https://www.rogerebert.com/reviews/friday-night-lights-2004 ...................12

Jose Enrico, "Online Gambling Boom Over? Major States Hit Pause Amid
Job Loss Fears, Addiction Warnings," *Tech Times* (Oct 16 2024).
https://www.techtimes.com/articles/307890/20241016/online-
gambling-boom-over-major-states-hit-pause-amid-job-loss-fears-
addiction-warnings.htm ..............................................................................7

*The Federalist No. 51* (J. Madison)
https://avalon.law.yale.edu/18th_century/fed51.asp ......................................9

T.W. Fong, "The biopsychosocial consequences of pathological gambling,"
2 *Psychiatry* (Edgmont) 22-30 (2005)..........................................................22

"Gambling policy ballot measures"
https://ballotpedia.org/Gambling_policy_ballot_measures..........................14

Jeffrey Steven Gordon, "Silence for Sale," 71 Ala. L. Rev. 1109 (2020)...............27

David Huber, "Kalshi Review – How does it work and is it any good?" *Props*
    https://props.com/sportsbook/kalshi/review/.................................................23

ICD10Data.com. "Gambling and betting." ICD10Data.com
    https://www.icd10data.com/ICD10CM/Codes/Z00-Z99/Z69-Z76/Z72-
    /Z72.6#:~:text=Code%20POA%20Exempt-
    ,Z72.,a%20diagnosis%20for%20reimbursement%20purposes ...................23

Philip F. Johnson, *The Commodity Futures Trading Commission Act:
    Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976)
    https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/................................14

Kalshi, "New Jersey Governorship Winner?"
    https://kalshi.com/markets/govpartynj/new-jersey-governor-race..................5

Kalshi, "Will Trump publicly criticize Amy Coney Barrett before July?"
    https://kalshi.com/markets/kxdjtattackacb/djt-attack-acb .............................5

John W. Kindt, "Legalized Gambling Activities as Subsidized by Taxpayers,"
    48 Ark. L. Rev. 889 (1995) ..........................................................................20

John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively:
    Incentives for Perpetual Non-Compliance," 27 S. Ill. U. L. J. 219 (2003)...21

John W. Kindt, "U.S. National Security and the Strategic Economic Base:
    The Business/Economic Impacts of the Legalization of Gambling
    Activities," 39 St. Louis L.J. 567 (1995).......................................................21

Paula Lavigne, "Youth coaches face gambling charges," ESPN (Oct 29, 2012)
    https://www.espn.com/espn/otl/story/_/id/8568724/nine-south-florida-
    youth-football-coaches-face-gambling-charges ....................................12, 13

C. Morris. "Super Bowl Monday will soar 40% over last year as more people
    than ever call out of work to recover," *Fortune* (Feb 10, 2025)
    https://fortune.com/2025/02/10/office-absences-super-bowl-monday/ ........26

Tom Nightingale, "CFTC Chair nominee Quintenz intends to resign from
    Kalshi board," *SBC Americas* (May 28, 2025)
    https://sbcamericas.com/2025/05/28/quintenz-kalshi-recusal-plans/..............6

E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral
    sclerosis presenting with pathological gambling,"
    9 *J Clin Neurol* 133-137 (2013)
    https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ ..................................22

"Public Question 1, Sports Betting on State College Athletics Amendment
(2021)" https://ballotpedia.org/New_Jersey_Public_Question_1,_Sports_
Betting_on_State_College_Athletics_Amendment_(2021) .........................10

Jasper Sherer, "Casino and sports betting companies press for a win in Texas
despite Senate opposition," *Texas Tribune* (Feb. 11, 2025)
https://www.texastribune.org/2025/02/11/texas-legislature-gambling-
casinos-sports-betting/ .................................................................................2

E. Sohn, "How gambling affects the brain and who is most vulnerable to
addiction," American Psychological Association (July 1, 2023)
https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain ......22

"Sports gambling scandal timeline: from Jontay Porter to Terry Rozier," ESPN
(Jan 31, 2025)
https://www.espn.com/espn/betting/story/_/id/39908218/a-line-sports-
gambling-scandals-2018 ..............................................................................26

Ryan Young, "Multiple college basketball programs linked to federal
investigation amid NBA gambling ring probe,"
*Yahoo Sports* (Feb 3, 2025)
https://sports.yahoo.com/multiple-college-basketball-programs-linked-
to-federal-investigation-amid-nba-gambling-ring-probe-204332209.html...11

World Health Organization, "Gambling" (Dec. 2, 2024).
https://www.who.int/news-room/fact-sheets/detail/gambling .....................19

WorldAtlas, "Countries That Gamble The Most" (2023)
https://www.worldatlas.com/society/countries-that-gamble-the-
most.html ....................................................................................................7

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Stop Predatory Gambling is a nonprofit national organization

that for decades has advocated for improving the lives of the American people by

exposing the harms from state-sanctioned gambling. In 2008 it held a much-

acclaimed conference at the National Harbor in Maryland which featured anti-

gambling speakers including Taylor Branch, a Pulitzer Prize-winning biographer

of the Rev. Martin Luther King Jr. and historian of the civil rights movement, and

Bishop John R. Schol, who at the time was the head of the Baltimore/Washington

United Methodist Conference. Stop Predatory Gambling led a remarkably diverse

coalition, which included the Center for Popular Democracy, the Islamic Society of

North America, Public Good Law Center, Public Health Advocacy Institute,

United for a Fair Economy, Louisiana Baptist Convention, and the Lutheran

Church – Missouri Synod, in an amicus brief filed in the landmark case of *Murphy

v. NCAA*, which was cited favorably by the majority opinion. 584 U.S. 453, 460

n.16 (2018).

---

[1] All parties have either consented or stated that they do not oppose the filing of
this amicus brief. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel
certifies that: counsel for the *Amici* authored this brief in whole; no counsel for a
party authored this brief in any respect; and no person or entity – other than *Amici*,
their members, and their counsel – contributed monetarily to this brief's
preparation or submission.

*Amicus curiae* Texans Against Gambling is a group of volunteers devoted to preventing the expansion of gambling. Founded in 1988 as Texans Who Care, Texans Against Gambling operates as a d/b/a of this nonprofit Texas corporation.

Texans Against Gambling strives to improve lives by freeing Texans and others from the lower standard of living, exploitation, and fraud that commercialized gambling spreads. In part due to the efforts of volunteers associated with this group and many other groups, the State of Texas continues to prohibit sports gambling as ten other states do, despite immense political pressure to allow it. Earlier this year Texans Against Gambling was quoted as saying that:

> Sports gambling and casinos are economically regressive, scholarly studies show, because they produce nothing of external value. They do not spur longterm economic growth. Instead they hinder it. Keep Texas, Texas.

Jasper Sherer, "Casino and sports betting companies press for a win in Texas despite Senate opposition," *Texas Tribune* (Feb. 11, 2025).[2] This leading political news source in Austin reported that "supporters and opponents of gambling legalization have settled into a state of trench warfare in the House" in Texas, as gambling interests seek to lift or loosen restrictions that have been in place in Texas for 169 years. Texans Against Gambling stands for the legal principle that gambling issues should be resolved politically at the state level. *Id.*

---

[2] https://www.texastribune.org/2025/02/11/texas-legislature-gambling-casinos-sports-betting/ (viewed June 3, 2025).

2

This appellate case will set the nationwide precedent as to whether state laws and regulations may be circumvented under the auspices of event contracts regulated (or, in practice, not regulated) by the Commodity Futures Trading Commission. This possibility of entirely bypassing state laws and regulations of Texas by offering the equivalent of wagers on sporting events and even elections is of dire concern to all those associated with Texans Against Gambling.

The Association of American Physicians and Surgeons (AAPS) is a national nonprofit membership organization founded in 1943, and its motto is "all for the patient." In 2006, this Court cited an amicus brief filed by AAPS in support of a prevailing physician. *See Springer v. Henry*, 435 F.3d 268, 271 (3d Cir. 2006). Members of AAPS have testified at many state legislative committee hearings on health and medical issues concerning the American public. AAPS members see first-hand the harm being caused by the growing pandemic of commercialized gambling.

*Amici* have a direct interest in opposing the override of many state constitutions, laws and regulations that prohibit or limit commercialized gambling, which are being challenged in this lawsuit.

## SUMMARY OF ARGUMENT

The decision below is unprecedented and unjustified in overturning more than a century of state regulation of gambling. States properly prohibit wagering on elections and all gambling by those under 21 years old, and have long regulated other aspects of this addictive activity. No one doubts that profits could be made by KalshiEX LLC ("Kalshi") offering the equivalent of commercialized gambling prohibited by states, but Congress has not usurped the essential role of states, as part of their police power, to prohibit harmful commercialized gambling activities within their jurisdictions.

There is a strong public interest in limiting commercialized gambling, such as not allowing it by those under age 21 just as alcohol and cigarette sales to that age group are also prohibited. Gambling is not a commodity like corn or wheat which is the historical basis of regulation by the Commodity Futures Trading Commission (CFTC), as authorized by the Commodities Exchange Act (CEA). Plaintiff Kalshi makes an imaginative but strained argument to transfer exclusive jurisdiction to the CFTC over Kalshi's gambling products, to the exclusion of state regulation, so that Kalshi can then offer underage gambling,[3] wagers on

---

[3] "Kalshi's age restriction is 18 rather than 21." Dan Bernstein, "Chalky March Madness Slams Sportsbooks but Spares Kalshi," *Sportico* (April 8, 2025) (hereinafter, "*Sportico*"). *See also infra* n.26.

elections,[4] bets on whether President Trump will "publicly criticize Amy Coney Barrett before July,"[5] sports bets without the limitations set by New Jersey, and nearly any bet on any other future event. Kalshi's legal theory flies in the face of the public interest, which the district court failed to adequately consider, and is contrary to applicable Supreme Court precedent.

Specifically, the decision below runs afoul of the holding by the U.S. Supreme Court in favor of state authority over gambling in *Murphy v NCAA*, a case brought by New Jersey then-Governor Chris Christie. There the Supreme Court emphasized that the regulation of gambling is an issue for the states, and returned to the states the full authority to decide whether they want to allow sports gambling. More than a half-decade later, the two most populous states (California and Texas) continue to prohibit sports gambling, while nine additional states also ban it. Two states on opposite sides of the political spectrum have long banned all gambling within their borders: Hawaii and Utah. Virtually every state has always prohibited wagering on elections, reflecting the judicial disapproval of enforcing

---

https://www.sportico.com/business/sports-betting/2025/march-madness-sports-betting-results-1234846724/ (viewed June 13, 2025).

[4] Kalshi is currently offering events contract on many elections, including "New Jersey Governorship Winner?" https://kalshi.com/markets/govpartynj/new-jersey-governor-race (viewed June 13, 2025).

[5] Kalshi is currently offering an event contract on "Will Trump publicly criticize [U.S. Supreme Court Justice] Amy Coney Barrett before July?" https://kalshi.com/markets/kxdjtattackacb/djt-attack-acb (viewed June 13, 2025).

contracts about election outcomes since at least the 1700s in courts of England. Yet Kalshi seeks to circumvent all of these sensible restrictions under the guise of offering a gambling product under the auspices of the CFTC, whose incoming Chairman is a board member of Kalshi itself. *See* Tom Nightingale, "CFTC Chair nominee Quintenz intends to resign from Kalshi board," *SBC Americas* (May 28, 2025).[6]

Multiple additional legal doctrines stand against Kalshi's attempt to transfer vast regulatory authority from states to the ill-equipped CFTC, while it looks the other way in allowing Kalshi to sell whatever gambling products it likes. Implicit abrogation of state authority over an entire field of law is not inferred without an express command by Congress in a federal statute, which is lacking here. There were never any legislative hearings on CFTC's oversight of gambling, and Congress never intended or enacted a 50-state transfer of authority to this small federal agency having no experience in regulating this vast field. This enormous transfer sought by Kalshi would have the effect of stripping away from all the state gambling commissions and boards, along with their corresponding state agencies, much of their regulatory power.

---

[6] https://sbcamericas.com/2025/05/28/quintenz-kalshi-recusal-plans/ (viewed June 3, 2025).

The public interest is strongly against the preliminary injunction issued below. The district court devoted merely one cursory sentence to this factor, without considering the immense public harm to be inflicted by unregulated commercialized gambling. The rate of suicide by gamblers is 15 times the overall population. Online casino gambling is "as deadly as heroin and cocaine are," testified *Amicus* Stop Predatory Gambling national director Les Bernal last year in successfully halting its expansion in New York.[7] Physical harm caused by gambling includes cardiovascular disease, hypertension, peptic ulcer disease, and loss of sleep. Research further suggests a link between gambling and dementia, and also Parkinson's disease. Psychiatric harm induced by gambling includes severe depression, anxiety and substance use disorders, and intense feelings of shame. Financial losses inflicted by gambling exceed $115 billion annually in the United States today,[8] harming demographics that can least afford it and regressively transferring wealth from the poor to the rich.

---

[7] Jose Enrico, "Online Gambling Boom Over? Major States Hit Pause Amid Job Loss Fears, Addiction Warnings," *Tech Times* (Oct. 16, 2024). https://www.techtimes.com/articles/307890/20241016/online-gambling-boom-over-major-states-hit-pause-amid-job-loss-fears-addiction-warnings.htm (viewed June 7, 2025).

[8] WorldAtlas, "Countries That Gamble The Most" (2023) https://www.worldatlas.com/society/countries-that-gamble-the-most.html (viewed June 11, 2025).

## ARGUMENT

### I. *Murphy v. NCAA* Confirmed State Authority Over Gambling, Which the Decision Below Erroneously Overlooked.

The U.S. Supreme Court confirmed in *Murphy v. NCAA* the state authority to regulate gambling. Without distinguishing this controlling precedent, Kalshi seeks to circumvent state authority over gambling in New Jersey and nationwide. Appellant Flaherty argued below against Kalshi by citing the *Murphy* decision, and yet the district court was entirely silent about it. (NJ Br. in Dist. Ct. 13, citing *Murphy* and many additional authorities for state authority over regulating gambling). Kalshi's attempt to do an end run around more than a century of federalism and the landmark precedent of *Murphy v. NCAA* should be halted here, by reversing the preliminary injunction in favor of Kalshi granted below.

The Supreme Court grounded its *Murphy v. NCAA* decision in favor of state authority over gambling in multiple federal statutes:

> [Multiple federal] provisions implement a coherent federal policy: ***They respect the policy choices of the people of each State on the controversial issue of gambling***. By contrast, if § 3702(2) is severed from § 3702(1), it implements a perverse policy that ***undermines whatever policy is favored by the people of a Stat***e.

*Murphy v. NCAA*, 584 U.S. at 484 (citing 18 U.S.C. §§ 1084, 1952, 1953, and 1955, emphasis added).

The Supreme Court further explained that its ruling in favor of state authority was based on a long line of precedents preserving "a healthy balance of

power between the States and the Federal Government [to reduce] the risk of

tyranny and abuse from either front.'" *Murphy v. NCAA*, 584 U.S. at 473 (cleaned

up, quoting *New York v. United States*, 505 U.S. 144, 181-82 (1992), which quoted

*Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)). This can be traced back to

*Federalist No. 51*, which is often quoted for its colorful insight that "[i]f men were

angels, no government would be necessary" and which further expounded on state

power as a necessary check against federal overreach:

> In the compound republic of America, the power surrendered by the people
> is first divided between two distinct governments, and then the portion
> allotted to each subdivided among distinct and separate departments. Hence
> a double security arises to the rights of the people.

*The Federalist No. 51* (J. Madison).[9] This Court has since applied the *Murphy v.*

*NCAA* precedent to reject a claim of federal preemption. *See Ocean Cty. Bd. of*

*Comm'rs v. AG of N.J.*, 8 F.4th 176, 181 (3d Cir. 2021) (quoting *Murphy v.*

*NCAA*).

　　With very different traditions, two states – Hawaii and Utah – completely

prohibit virtually all forms of gambling, and yet Kalshi's approach would bypass

entirely those bans such that the customs and cultures in those states would be

severely undermined by Kalshi. *See, e.g.*, Utah Code Ann. § 76-10-1102(1) ("A

person is guilty of gambling if the person: (a) participates in gambling or fringe

_____

[9] https://avalon.law.yale.edu/18th_century/fed51.asp (viewed May 29, 2025).

gambling, including any Internet or online gambling; (b) knowingly permits gambling or fringe gambling to be played, conducted, or dealt upon or in any real or personal property owned, rented, or under the control of the actor ….") The gambling bans in these states are rooted in diverse cultures of the sort that federalism protects, by allowing states to enact their own laws that comport with their own local concerns. Throughout American history the settled understanding is that states can regulate gambling, as they have.

Yet in its motion for the preliminary injunction below, Kalshi did not refer to the *Murphy* precedent anywhere. In its reply brief, Kalshi merely quoted *Murphy* for its statement that "'New Jersey wants to legalize sports gambling .…'" (Kalshi Reply Br. in Dist. Ct., D.E. 17, at 15) But that is incomplete, as New Jersey wanted only limited sports gambling, while banning wagering on many types of sporting events (including all high school sports) and under no circumstances allowing any betting by 18-, 19-, and 20-year-olds. In 2021 the People of New Jersey voted 57-43% ***against*** the legislature-referred ballot question of New Jersey Public Question 1, Sports Betting on State College Athletics Amendment (2021).[10] By this landslide, New Jersey voters continued its ban on betting on college

---

[10] https://ballotpedia.org/New_Jersey_Public_Question_1,_Sports_Betting_on_State_College_Athletics_Amendment_(2021) (viewed June 14, 2025).

sporting events held in New Jersey, or held elsewhere but involving a New Jersey college team.

The potential for corruption of college sports by commercialized gambling is significant, as New Jersey voters recognized in prohibiting wagering on in-state games or teams, which Kalshi's approach would allow. Kalshi placed an enormous $500 million in sports event contracts on the March Madness men's and women's college basketball tournaments, quickly attaining 16% of the expected total amount of bookings by the traditional sports gambling companies on those tournaments. *See Sportico*, *supra* n.3.

Many college athletes need cash and could obtain it easily by participating in gambling on their contests. An NBA player has already pled guilty to his participating in a gambling ring, and "[t]he federal investigation into [this] gambling ring … has been linked to unusual betting activity with at least three men's college basketball programs." Ryan Young, "Multiple college basketball programs linked to federal investigation amid NBA gambling ring probe," *Yahoo Sports* (Feb 3, 2025).[11]

Kalshi's arguments create a slippery slope for even worse consequences. Under the injunction issued below, Kalshi could offer bets by New Jersey residents

---

[11] https://sports.yahoo.com/multiple-college-basketball-programs-linked-to-federal-investigation-amid-nba-gambling-ring-probe-204332209.html (viewed May 28, 2025).

on high school games, setting the stage for tragedies of high school players being bribed and suicides resulting. In Texas, where sports gambling continues to be prohibited, high school football games are as big in many communities as professional sports, as featured in the acclaimed movie "Friday Night Lights" (2004). The movie depicts the obsession of residents of Odessa, Texas, with their high school football team as it strove to win the state championship. Renowned film critic Roger Ebert wrote that this "movie demonstrates the power of sports to involve us; we don't live in Odessa and are watching a game played 16 years ago, and we get all wound up." Roger Ebert, "More than a game" (Oct. 8, 2004).[12]

Youth sports is vulnerable to exploitation by commercialized gambling. "Nine youth football coaches or associates in South Florida are facing felony charges in connection with a system of rampant, elaborate and high-dollar gambling on *little league football*." Paula Lavigne, "Youth coaches face gambling charges," ESPN (Oct. 29, 2012) (emphasis added).[13] A state investigation found that:

> Though the games featured little boys, the gamblers made big bets, said Det. Solomon Barnes, whose confidential informant, along with undercover deputies, placed bets on youth football during the police investigation. Barnes said $20,000 was bet in a rivalry game between the Northwest

---

[12] https://www.rogerebert.com/reviews/friday-night-lights-2004 (viewed June 7, 2025).

[13] https://www.espn.com/espn/otl/story/_/id/8568724/nine-south-florida-youth-football-coaches-face-gambling-charges (viewed May 29, 2025).

> Broward Raiders and the Fort Lauderdale Hurricanes a few weeks ago. And up to $100,000 would be bet on the youth leagues' championship games of the season, he said. … Sheriff Al Lamberti said deputies discovered a floor safe in the barbershop [used for placing these bets] that had $37,000 in cash in it.

*Id.* Kalshi or another national provider of event contracts cannot screen for this harmful conduct at a local level. As lawful activity under the reasoning below, Kalshi could offer event contracts on little league football. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893, at *16 (D.N.J. Apr. 28, 2025) (interpretating a CFTC regulation as allowing Kalshi to offer contracts on any future event that is itself lawful, as youth football of course is, even if the wagering on that event is unlawful under state law).

Kalshi is only partly correct in arguing below that a "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (quoted by Kalshi Mot. 12) That statement is true only within the confines of federalism, which recognizes state autonomy over the police power, marriage, alcohol, and similar issues including gambling. Moreover, after *Murphy* Congress has not sought to preempt state limitations on gambling, and did not hold legislative hearings concerning gambling when it enacted or amended the CEA. Gambling has also long been the subject of more than a hundred ballot initiatives dating back to 1889 in dozens of

states, including New Jersey,[14] yet Kalshi seeks to bypass all that. Kalshi ignores

this tradition, which limits the CEA and its implementing regulations to merely

preempting regulation of the sort of contracts governed by the CFTC, not "all other

would-be regulators at every level of government" concerning gambling. Philip F.

Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public

Policy*, 29 Vand. L. Rev. 1, 2 (1976) (quoted by Kalshi Mot. 12). Kalshi's own

cited article about the CFTC illustrates this point: it never mentions gambling once,

because Congress never intended for the CFTC to acquire jurisdiction over

gambling. *Id.*[15]

## II.    Kalshi's Argument Amounts to an Assertion of an "Extravagant" Override of Statute Regulation of Gambling, Without the Required Clear Authority from Congress.

"States have traditionally occupied" the field of gambling regulation, and

thus courts should "start with the assumption that the historic police powers of the

States were not to be superseded by the Federal Act unless that was the clear and

manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218,

230 (1947). There is no "clear and manifest purpose of Congress" to give Kalshi

*carte blanche* to sell the equivalent of gambling products without complying with

---

[14] "Gambling policy ballot measures" https://ballotpedia.org/Gambling_policy_ballot_measures (viewed June 14, 2025).
[15] https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/ (viewed June 7, 2025).

regulations in New Jersey, including its ban on gambling on high school sports and taking bets by those under 21 years old.

Kalshi's unprecedented legal argument should be rejected under the "ordinary method" of "normal statutory interpretation": "the Court simply insist[s] that the text of a broad delegation, like any other statute, should be read in context, and *with a modicum of common sense*." *West Virginia v. EPA*, 597 U.S. 697, 764-65 (2022) (Kagan, J., dissenting, emphasis added); *see also id.* at 724 (while quoting Justice Kagan, the majority opinion emphasized that "we 'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism'") (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Gambling is indeed a significant part of the national economy as regulated by states, and Kalshi's assertion of a never-before discovered, implicit "extravagant statutory power" over gambling by Congress warrants substantial "skepticism" indeed. According to research conducted by the gaming industry itself, gambling supports a total economic impact including "$329 billion of output (business sales)" and "$53 billion of federal, state and local taxes, including $13.5 billion of gaming taxes." American Gaming Association, "National Economic Impact of the U.S. Gaming Industry 2023" (Oct. 9, 2023) (describing its research as "the first comprehensive report on the gaming industry's national economic

impact since 2018").[16] Gambling thereby occupies a significant portion of the American economy, such that transferring regulatory authority over it from the states and territories to the CFTC, soon to be chaired by a Board member of Kalshi itself, *see supra* n.3, is something that only Congress could do explicitly after holding extensive public hearings and while comporting with fundamental principles of federalism.

Gambling in New Jersey "is governed directly by the Constitution itself" as this state has long maintained that "[g]ambling is an activity rife with evil" and "mischief" affecting "the public welfare and morality." *Knight v. City of Margate*, 431 A.2d 833, 842 (N.J. 1981); *see* N.J. Const. art. IV, § 7, ¶ 2 (providing that gambling of any kind may be legalized only through a legislature-initiated ballot measures). Many other state constitutions likewise sharply limit gambling within their jurisdictions, including New York, Georgia, Alabama, Texas, Ohio, Idaho, and Florida. *See, e.g.*, *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1043 (9th Cir. 2015) (The Idaho Constitution provides that '[g]ambling is contrary to public policy and is strictly prohibited. …'") (quoting Idaho Const. art. III, § 20); *Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 290, 749 S.E.2d 429, 431 (2012) ("State legislatures have weighed the social costs of gambling against

---

[16] https://www.americangaming.org/resources/national-economic-impact-of-the-u-s-gaming-industry/ (viewed June 16, 2025).

the economic benefits and chosen different paths according to each legislature's conclusions."). Typically a statewide vote of the people is required before changing state constitutions. No plausible reading of any Act of Congress, including the CEA, overrides this self-governance by the People of New Jersey and other states as to commercialized gambling within their state.

The U.S. Supreme Court has repeatedly rejected attempts to transfer or delegate vast powers to a federal agency based on the sort of imaginative new interpretations of a federal statute that Kalshi attempts here. In *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.,* the argument was that the FCC had authority to make voluntary a rate-filing requirement of long distance carriers, because the Communications Act of 1934 allowed the FCC to "modify any requirement." 512 U.S. 218 (1994). The Supreme Court held that "it is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion – and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." *Id.* at 231. Likewise, Kalshi unreasonably argues here that subtle language in the CEA confers exclusive authority over the CFTC to displace longstanding gambling regulations the states. *See Hest Techs.*, 366 N.C. at 290, 749 S.E.2d at 431 ("Since the founding of this nation, states have exercised the police power to regulate gambling.").

In rejecting an argument that the FDA had plenary authority over cigarettes, the Supreme Court explained further:

> As in *MCI*, we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160-61 (2000) (O'Connor, J., writing for the majority).

The Supreme Court's holding against the assertion that Congress delegated so much authority "in so cryptic a fashion" resonates in this case: Congress did not transfer immense authority over gambling products from states to the CFTC as Kalshi argues.

### III.    Amid a Pandemic of Commercialized Gambling and Immense Harm Caused by It, the District Court Erred in Ignoring this Strong Public Interest Against the Preliminary Injunction.

The public interest is an essential factor to consider before granting a preliminary injunction, as the district court acknowledged: "whether granting the requested relief will result in an even greater harm to the nonmovant or other interested party and whether the public interest favors relief." *KalshiEX LLC v. Flaherty*, 2025 U.S. Dist. LEXIS 79893, at *8. The worsening public health crisis caused by commercialized gambling should have been part of this analysis below, weighing heavily against the injunction granted below.

The lower court dismissed this public interest concern with its solitary statement that "[t]he public interest is not served by the enforcement of an unconstitutional law." *Id.* at *21 (quoting *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012), cleaned up). Nothing is unconstitutional about New Jersey's regulation of gambling, and the harm to the public resulting from commercialized gambling is enormous.

The rate of suicide among gamblers is estimated to be 15 times the rate in the general population.[17] Relatively few — typically less than 10% — of addicted gamblers ever seek help to overcome their habit.

A massive recent study of routinely collected data (RCD) published by researchers in the United Kingdom confirms that "[g]ambling harm is a global public health challenge." Pippa Boering, et al. "A scoping review of routinely collected linked data in research on gambling harm," 8 *Digital Medicine* No. 1 (June 2025) (available on LexisNexis). Among its many findings are that "the greatest risk profiles are evident among those engaged in online gambling, and problematic patterns of gambling are associated with comorbidities, such as anxiety and depression, and increased risk of suicide." *Id.* (footnotes omitted). "Suicide was the leading cause of death for people diagnosed with" gambling

---

[17] World Health Organization, "Gambling" (Dec. 2, 2024). https://www.who.int/news-room/fact-sheets/detail/gambling (viewed May 22, 2025).

disorder, and in general "[s]econd-generation individuals from minority ethnic groups, including Asian, African, and North American countries of birth, were at an increased risk of [gambling disorder] compared to the rest of the population of Norway." *Id.* Extreme addiction to gambling afflicts about 5% of the population, and the vulnerability is higher for young adults as discussed below.

The leading American expert on gambling, Professor (now-emeritus) John W. Kindt, explains how regressive gambling is in the harm it causes:

> Gambling also has a tendency to attract those who can least afford it; it is well-established that legalized gambling activities act as a type of regressive tax on the poor and on minority groups. People living at the poverty level, often lacking an education which would enable them to understand the odds against winning, gamble with the hope of changing their lives. The statistics of lost paychecks, financial ruin, crime, incarceration, spousal abuse, child abuse and neglect, suicide, and other problems which have been documented by social-welfare agencies and charities should quickly dispel the notion that legalized gambling constitutes a painless tax. The reality is that legalized gambling fuels enormous social problems ….

John W. Kindt, "Legalized Gambling Activities as Subsidized by Taxpayers," 48 Ark. L. Rev. 889, 896-97 (1995) (footnotes omitted).

"Studies show that a state's legalization of online sports betting is associated with increased bankruptcies and reduced savings, especially for low-income households. Emerging evidence points to rising rates of problem gambling,

particularly among young men." Jonathan D. Cohen, "Where are all the anti-gambling Christians?" ARC Religion, Politics, Etc. (May 15, 2025).[18]

*See also* John W. Kindt, "U.S. National Security and the Strategic Economic Base: The Business/Economic Impacts of the Legalization of Gambling Activities," 39 St. Louis L.J. 567, 579 (1995) ("In the social-welfare context, legalized gambling is widely-accepted as constituting a regressive tax on the poor.") (citing Charles T. Clotfelter & Philip J. Cook, *Selling Hope* (Nat'l Bur. Econ. Research, Harvard Univ. Press 1989)).

In 2023, $49 billion (not merely million) was spent on table games and slot machines.[19] An estimated 26% of Americans gamble at a bricks-and-mortar casino, while 20% gamble on sporting events. "The United States has periodically experimented with legalized gambling activities. In each historical 'wave,' the social costs related to gambling became both apparent and overwhelming, consistently leading to the criminalization of all gambling activities." John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively: Incentives for Perpetual Non-Compliance," 27 S. Ill. U. L. J. 219, 221 (2003).

---

[18] https://arcmag.org/where-are-all-the-anti-gambling-christians/ (viewed May 30, 2025).

[19] D. Boland, "Sports betting demographics in the U.S.," *Birches Health* (Feb. 28, 2024)   https://bircheshealth.com/resources/sports-betting-demographics-in-the-u-s. (viewed May 22, 2025).

Physical health problems result from gambling, including "hypertension, sleep deprivation, cardiovascular disease, and peptic ulcer disease."[20] Psychiatric harm includes exacerbation and initiation of major depressive episodes, anxiety disorders, or substance use disorders, and intense shame, deceptive conduct, and rash decision-making.[21] Pathological gambling has also been linked to Parkinson's disease, frontotemporal dementia, and amyotrophic lateral sclerosis.[22]

The *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* ("DSM-5"), the standard used by U.S. mental health professionals, began classifying gambling addiction as an addictive disorder in 2013. Gambling addiction is the first and only behavioral addiction defined in the clinical section of *DSM-5*.[23] Like most other addictions, gambling requires increased participation over time to attain the same level of satisfaction, and withdrawal discomfort typically arises in those who attempt to overcome this addiction.[24] The ICD-10-CM, which is the International Classification of Diseases, Tenth Revision, Clinical

---

[20] T.W. Fong, "The biopsychosocial consequences of pathological gambling," 2 *Psychiatry* (Edgmont) 22-30 (2005).

[21] *Id.*

[22] E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral sclerosis presenting with pathological gambling," 9 *J Clin Neurol* 133-137 (2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ (viewed June 14, 2025).

[23] *See* E. Sohn, "How gambling affects the brain and who is most vulnerable to addiction," American Psychological Association (July 1, 2023). https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain (viewed May 22, 2025).

[24] *See id.*

Modification, is used for medical diagnoses and includes a code Z72.6 for

"gambling and betting" disorders.[25]

In contrast with the decisions on other topics cited by the district court

below, the commercialized gambling at issue in this case adversely affects families

and athletes in New Jersey. Kalshi accepts trades, which are the equivalent of

wagers, by gamblers aged 18 to 21,[26] while the American Gaming Association (of

which the major U.S. sports gambling companies are members) limits gambling to

those over 21 years old.[27] New Jersey punishes gambling under the age of 21 (also

the minimum age for alcohol and cigarette purchases) as a disorderly persons

criminal offense. N.J.S.A. 5:12-119 (punishable by a fine of not less than $500 and

not more than $1,000). There is a strong public interest against Kalshi's

inducement of teenagers to gamble, as recognized by both the national gaming

---

[25] ICD10Data.com. "Gambling and betting." ICD10Data.com https://www.icd10data.com/ICD10CM/Codes/Z00-Z99/Z69-Z76/Z72-/Z72.6#:~:text=Code%20POA%20Exempt-,Z72.,a%20diagnosis%20for%20reimbursement%20purposes (viewed May 22, 2025).

[26] "Kalshi has become a revamped platform in 2025 that allows individuals aged 18 and above to place real-money predictions on just about any category that piques the public's interest within the United States." David Huber, "Kalshi Review – How does it work and is it any good?" *Props* https://props.com/sportsbook/kalshi/review/ (viewed June 13, 2025).

[27] American Gaming Association, "New Updates to AGA Responsible Marketing Code for Sports Wagering Prohibit "Risk Free," Enhance College-Aged Protections" (Mar. 28, 2023) https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/ (viewed May 30, 2025).

association and New Jersey law. The U.S. Supreme Court expressly recognized in *Murphy v. NCAA* that gambling opponents argue that "[s]ports gambling … is particularly addictive and especially attractive to young people with a strong interest in sports." 584 U.S. at 460. The district court never addressed this important public interest while issuing its preliminary injunction that allows these underage sales.

This Circuit has previously indicated that "the sale of goods by lottery" is contrary to the public interest. *Globe Cardboard Nevelty Co. v. Fed. Trade Com.*, 192 F.2d 444, 447 (3d Cir. 1951). While that precedent concerned the combination of gambling with the sale of goods, and was rendered at a time when gambling was illegal in New Jersey, it remains good law suggestive that unregulated gambling is contrary to the public interest. Indeed, a long line of precedents concerning actions taken by the Federal Trade Commission (FTC) are based on the recognition that inducing the public to gamble in order to buy certain goods is contrary to the public interest. *See Feitler v. Fed. Trade Com.*, 201 F.2d 790, 793 (9th Cir. 1953) ("It is the fact that the interstate shipment of these devices facilitates a kind of merchandising which induces and encourages the public to gamble which makes such shipment an 'unfair trade practice.'") While in these FTC cases there was a combining of gambling with merchandise sales that was particularly objectionable

– and the basis for FTC jurisdiction to enjoin it – the implicit holding of these decisions is that an inducement to gamble is contrary to the public interest.

The linkage of commercialized gambling to sports, as Kalshi offers as event contracts, is particularly harmful. Nicholas Ruthmann, M.D., a cardiologist for the Cleveland Clinic, explained that during the annual Super Bowl "the emotional stress of watching the game can trigger surges of adrenaline. In turn, this can elevate blood pressure, increase your heart rate and even provoke dangerous heart rhythms—particularly in those with an underlying cardiovascular disease."[28] He added that there is extensive documentation that major sporting events can increase the risk of heart attacks.[29] The added stress of gambling on the outcome surely worsens these harms to public health, and the high emotional attachment by fans of professional sports makes sports gambling a toxic combination.

Legal betting on the Super Bowl increased to a record $1.39 billion last February,[30] and absenteeism the day after this game increased by 40% to an

---

[28] Cleveland Clinic, "How Super Bowl stress can affect your heart," *Newsroom* (Feb. 5, 2025). https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-stress-can-affect-your-heart (viewed May 22, 2025).

[29] *Id.*

[30] D. Cohen, "Americans to Wager Estimated $1.39 Billion on Super Bowl LIX," American Gaming Association (Feb. 4, 2025). https://www.americangaming.org/americans-to-wager-estimated-1-39-billion-on-super-bowl-lix/ (viewed May 22, 2025).

estimated record 22.6 million employed Americans who failed to show up for work the day after the Super Bowl.[31]

Meanwhile, hundreds of suspicious sports performances annually are correlated with unusual betting activity. "In the past two years, dozens of professional and collegiate athletes and coaches have been suspended or fired for gambling violations, and at least one bettor has pleaded guilty to obstruction charges related to a college baseball betting scandal."[32]

As to Kalshi's planned offering of the equivalent of wagers on elections, the strong public interest against this is well-established and yet was not addressed by the lower court while issuing its preliminary injunction to allow this. Within the Third Circuit, Pennsylvania law expressly prohibits placing "any bet or wager upon the result of any political nomination, appointment or election, or upon any contest of any nature." 18 Pa. Cons. Stat. Ann. § 5514(3). This Court quoted that approvingly recently while rejecting an argument by a violator of it to own a firearm. *Pitsilides v. Barr*, 128 F.4th 203, 208 (3d Cir. 2025).

_____

[31] C. Morris. "Super Bowl Monday will soar 40% over last year as more people than ever call out of work to recover," *Fortune* (Feb 10, 2025) https://fortune.com/2025/02/10/office-absences-super-bowl-monday/ (viewed May 22, 2025).

[32] "Sports gambling scandal timeline: from Jontay Porter to Terry Rozier," ESPN (Jan 31, 2025) https://www.espn.com/espn/betting/story/_/id/39908218/a-line-sports-gambling-scandals-2018 (viewed May 22, 2025).

For centuries agreement has been virtually unanimous that wagers on

elections violate public policy, extending back to English common law decisions:

> Although common law judges differed on whether wagering contracts
> contravened public policy, all agreed that *election* wagers violated
> democratic norms. In 1785, the full King's Bench held that a wager between
> two voters over the election of a member of Parliament was void. Whether
> the winner of the bet is entitled to recover, said Lord Mansfield,
>> turns on the species and nature of the contract; and if that be in the eye
>> of the law corrupt, and against the fundamental principles of the
>> constitution, it cannot be supported by any Court of Justice. One of
>> the principal foundations of this constitution depends on the proper
>> exercise of this franchise, that the election of members of Parliament
>> should be free, and particularly that every voter should be free from
>> pecuniary influence in giving his vote.
> The wager was therefore void because it placed the two voters under a
> pecuniary influence.

Jeffrey Steven Gordon, "Silence for Sale," 71 Ala. L. Rev. 1109, 1160-61 (2020)

(footnotes omitted) (quoting *Allen v. Hearn*, 99 Eng. Rep. 969, 971, 1 T.R. 56, 59-

60 (1785)).

American courts have uniformly reached the same conclusion against

gambling on elections. The seminal decision on this was by the Massachusetts

Supreme Judicial Court, a decision that has been followed ever since, explaining

that allowing wagering on elections would have the detrimental effect that:

> all idea of social duty and personal responsibility [would be] overwhelmed
> in mere blind partisan feeling and desire of triumph, which lose sight of the
> object for which the right of suffrage is conferred. An election so influenced
> could not be regarded as the expressed will of an intelligent constituency; ***it
> would violate the whole theory, on which the right of suffrage is founded***,
> and destroy the confidence of all judicious persons in that particular power
> of the people, which has been regarded as the principal security for

permanent, regulated, constitutional liberty. If it be true that wagers on elections would have any tendency to create such a pecuniary interest in their result, as we have no doubt they have, we can have no hesitation in saying, that ***all such wagers are illegal and utterly void***.

*Ball v. Gilbert*, 53 Mass. 397, 401-02 (1847) (emphasis added).

Accordingly, New Jersey bans betting on elections as virtually all states do, as part of New Jersey's general prohibition of gambling except as specifically allowed. *See, e.g.*, N.J. Const. of 1947, art. IV, § VII, ¶ 2; N.J. Stat. Ann. §§ 2A:40-1, 2A:40-3; *Atlantic City Racing Ass'n v. Att'y Gen.*, 98 N.J. 535, 489 A.2d 165, 171 (N.J. 1985) ("New Jersey's comprehensive policy against all forms of gambling (except where specifically authorized by the people) has been clear and long-standing.") (quoted approvingly by this Court in *Sun Life Assurance Co. v. Wells Fargo Bank NA*, Nos. 16-4337, 16-4387, 2018 U.S. App. LEXIS 7870, at *8 (3d Cir. Jan. 30, 2018)). New Jersey properly prohibits commercialized gambling on its upcoming gubernatorial election this fall, while Kalshi is already taking wagers on this. *See supra* n.4.

Allowing Kalshi to circumvent New Jersey public policy against underage gambling and betting on elections, high school sports, and all sporting events located in New Jersey or when a New Jersey team is playing is harmful to the public. Kalshi's promotion of gambling to those below age 21 exploits the particular vulnerability of an undeveloped mind: The prefrontal cortex is responsible for decision-making, planning, problem-solving, and controlling

impulses and is not fully developed until age 25. "The adolescent brain is structurally and functionally vulnerable to environmental stress, risky behavior …." M. Arain, et al., "Maturation of the adolescent brain," 9 *Neuropsychiatr Dis Treat*., 449, 458-49 (Apr. 3, 2013).[33]

At a minimum, the district court should squarely address the harm to the public before rendering a preliminary injunction that allows Kalshi to offer the equivalent of these wagers in New Jersey contrary to New Jersey law.

### CONCLUSION

The preliminary injunction issued below should be fully reversed.

Dated:    June 16, 2025

Respectfully Submitted,

<u>/s/ Andrew L. Schlafly</u>

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
aschlafly@aol.com
Voice: 908-719-8608
Fax:    908-934-9207

Attorney for *Amici Curiae* Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons

---

[33] https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/ (viewed June 14, 2025).

# COMBINED CERTIFICATIONS

Andrew L. Schlafly, attorney for *Amici Curiae* Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons, hereby certifies as follows:

1. I was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit on March 12, 2003, and am presently a member in good standing at the Bar of said Court.

2. This *Amicus* brief complies with the type/volume limitation contained in Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure. The brief contains 6,435 words, excluding the items identified in Rule 32(f).

3. The printed copies of this *Amicus* brief being filed with the Court are identical to the text in the electronic versions being filed with the Court.

4. The electronic version of this *Amicus* brief was virus checked on the date of filing and found to have no viruses.

5. This *Amicus* brief was served and filed with the Court via the Court's ECF system. In accordance with L.A.R. 113.2(c), counsel for all the parties are filing users and have therefore consented to electronic service of all documents.

Dated: June 16, 2025

/s/ Andrew L. Schlafly
Attorney for *Amici Curiae*
Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons