No. 25-1922

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellee*,

v.

MARY JO FLAHERTY et al.,
*Defendants-Appellants*.

Appeal from the United States District Court
for the District of New Jersey
No. 1:25-cv-2152-ESK-MJS

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, NATIVE AMERICAN FINANCE OFFICERS ASSOCIATION, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, TRIBAL ALLIANCE OF SOVEREIGN INDIAN NATIONS, AND 60 FEDERALLY RECOGNIZED TRIBES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

Scott Crowell
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
scottcrowell@clotag.net

Joseph H. Webster
Elizabeth A. Bower
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com

*Attorney for Amici Tribes,*
*Indian Gaming Association,*

*Attorneys for Amici Tribes,*
*Indian Gaming Association,*

*National Congress of American
Indians, California Nations Indian
Gaming Association, Arizona Indian
Gaming Association, Washington
Indian Gaming Association,
Oklahoma Indian Gaming
Association, Native American
Finance Officers Association,
United South and Eastern Tribes
Sovereignty Protection Fund, and
Tribal Alliance of Sovereign
Indian Nations*

*National Congress of American
Indians, California Nations Indian
Gaming Association, Arizona Indian
Gaming Association, Washington
Indian Gaming Association,
Oklahoma Indian Gaming
Association, Native American
Finance Officers Association,
United South and Eastern Tribes
Sovereignty Protection Fund, and
Tribal Alliance of Sovereign
Indian Nations*

Michael Hoenig
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of
San Manuel Nation*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, *Amici Curiae*

disclose that they have no parent corporations and that no publicly held

corporations hold 10% or more of stock in any of the *Amici Curiae*.

DATE: June 17, 2025

 /s/ Scott Crowell                             /s/ Joseph H. Webster
Scott Crowell                             Joseph H. Webster

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................................. iii

STATEMENT OF AMICI'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ........................................................................................1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS .........6

ARGUMENT ...........................................................................................................8

   I.   IGRA Governs Kalshi's Sports Betting Conduct on Indian Lands...............10

     A.   Kalshi's sports event contracts constitute "Class III Gaming" under IGRA ........................................................................................................10

     B.   The CEA does not preempt IGRA ..........................................................13

        1.   Kalshi's sports event contracts are expressly prohibited and therefore beyond the scope of the CEA .............................................16

        2.   Kalshi's sports event contracts do not qualify as "swaps" or swaps based on "excluded commodities," and are therefore not subject to the CFTC's exclusive jurisdiction ............................................................20

        3.   The self-certification provisions of the CEA and the CFTC's implementing regulations are invalid, and therefore Kalshi's sports event contracts offered pursuant thereto are invalid.............................23

     C.   The CEA does not impliedly repeal IGRA .............................................26

   II.   Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates the Federal Indian Policy ........................................................................30

CONCLUSION .....................................................................................................34

COMBINED CERTIFICATE OF COMPLIANCE ...............................................36

CERTIFICATE OF SERVICE ..............................................................................37

# TABLE OF AUTHORITIES

## Cases

*Amador County v. Salazar,*
　640 F3d 373 (D.C. Cir. 2011)...............................................................8

*Artichoke Joe's v. Norton,*
　353 F.3d 712 (9th Cir. 2003) ...............................................................9

*Bryan v. Itasca County,*
　426 U.S. 373 (1976).............................................................................27

*California v. Cabazon Band of Mission Indians,*
　480 U.S. 202 (1987)............................................................ 8, 10, 30, 32

*Carter v. Carter Coal Co.,*
　298 U.S. 238 (1936).............................................................................24

*Chicken Ranch Rancheria of Me-Wuk Indians v. California,*
　42 F.4th 1024 (9th Cir. 2022) ...........................................................8, 33

*Consumers' Rsch. v. Fed. Commc'ns Comm'n,*
　109 F.4th 743 (5th Cir. 2024) ............................................................24

*Epic Sys. Corp. v. Lewis,*
　584 U.S. 497 (2018)....................................................................... 26, 29

*Gaming Corp. of Am. v. Dorsey & Whitney,*
　88 F.3d 536 (8th Cir. 1996) ...............................................................11

*Georgia v. Pa. R.R. Co.,*
　324 U.S. 439 (1945).............................................................................26

*Gundy v. United States,*
　588 U.S. 128 (2019).............................................................................24

*Hagen v. Utah,*
　510 U.S. 399 (1994).............................................................................27

*KalshiEX LLC v. CFTC,*
　No. 1:23-cv-03257-JMC (D.D.C. May 30, 2024) ....................... 19, 22

*KalshiEX LLC v. CFTC*,
  No. 24-5205 (D.C. Cir. Nov. 15, 2024) ............................................................19

*KalshiEX LLC v. Martin*,
  No. 1:25-cv-01283-ABA (D. Md. May 19, 2025) ................................ 13, 17, 26

*Merrill Lynch v. Curran*,
  456 U.S. 353 (1982) ..........................................................................................13

*Michigan v. Bay Mills Indian Community*,
  572 U.S. 782 (2014) ........................................................................ 30, 31, 33, 34

*Mistretta v. United States*,
  488 U.S. 361 (1989) ..........................................................................................24

*Morton v. Mancari*,
  417 U.S. 535 (1974) ..........................................................................................26

*Pauma Band of Luiseño Mission Indians v. California*,
  813 F.3d 1155 (9th Cir. 2015) ..........................................................................33

*Posadas v. Nat'l City Bank of New York*,
  296 U.S. 497 (1936) ..........................................................................................26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ..........................................................................................27

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) ............................................................................................30

*Schs., Health & Librs. Broadband Coal. v. Consumers' Rsch.*,
  145 S. Ct. 587 (2024) ........................................................................................25

*Sierra Club v. Lynn*,
  502 F.2d 43 (5th Cir. 1974) ..............................................................................24

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ..........................................................................................24

*Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*,
  63 F.3d 1030, 1033 (11th Cir. 1995) ................................................................11

iv

*United States v. Fausto*,
484 U.S. 439 (1988).................................................................26

*United States v. Lara*,
541 U.S. 193 (2004).................................................................30

*United States v. Mazurie*,
419 U.S. 544 (1975).................................................................30

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).................................................................15

**Statutes**

18 U.S.C. § 1084 ............................................................... 15, 20

18 U.S.C. § 1166 ............................................................... 27, 28

25 U.S.C. § 2701 ............................................................... 10, 32

25 U.S.C. § 2702 ....................................................................8

25 U.S.C. § 2704 ...................................................................11

25 U.S.C. § 2710(b)(2)(B) ........................................................33

25 U.S.C. § 2710(d) ......................................... 8, 10, 20, 27, 32

25 U.S.C. § 5302(b) .................................................................31

31 U.S.C. § 5361 ............................................................... 15, 20

31 U.S.C. § 5362(1)(A).............................................................12

7 U.S.C. § 16(e) .....................................................................29

7 U.S.C. § 1a(19) ............................................................... 21, 22

7 U.S.C. § 1a(47)(A)(ii) ....................................................... 21, 22

7 U.S.C. § 2(a)(1)(A) ......................................................... 16, 28

7 U.S.C. § 5(a)–(b)..................................................................16

7 U.S.C. § 7a-2(c)(2).................................................................23

7 U.S.C. § 7a-2(c)(5)(C) ........................................................ 13, 14, 16, 18

**Regulations**

17 C.F.R. § 40.11(a)(1) ................................................. 14, 16, 17, 18, 19

17 C.F.R. § 40.11(c)...............................................................................17

17 C.F.R. § 40.2(a)......................................................................... 23, 25

25 C.F.R. § 502.4(c)....................................................................... 11, 32

**Other Authorities**

156 Cong. Rec. S5906–7 (2010)....................................................... 18, 29

Adopting Release, 76 Fed. Reg. 44,786 (July 27, 2011) ............................14

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event
 Horizon (Apr. 3, 2025) .....................................................................12

Exec. Order No. 13175, Consultation and Coordination with Indian Tribal
 Governments, 65 Fed. Reg. 67249, § 2(c) (Nov. 6, 2000) ..................31

Exec. Order No. 13647, Establishing the White House Council on Native
 American Affairs, 78 Fed. Reg. 39539, § 1(a) (June 26, 2013) ........31

F. Cohen, Handbook of Federal Indian Law 221 (1982 ed.)...................27

FY 2023 Gross Gaming Revenue Report, Nat'l Indian Gaming Comm'n 4–5 (July
 2024) ............................................................................................10

Letter from Kevin K. Washburn, General Counsel for NIGC, to Joseph M. Speck,
 Nic-A-Bob Productions, re: WIN Sports Betting Game (Mar. 13, 2001)..........11

Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a
 Substitute for Reservation Tax Revenue*, 80 N. D. L. Rev. 759, 771, 774 (2004)
 ....................................................................................................34

S. Rep. No. 100-446, at 6 (Aug. 3, 1988) ...............................................11

Statement of Commissioner Brian Quintenz (Mar. 25, 2021)...................14

Statement of Commissioner Caroline D. Pham (Aug. 26, 2022) ............14

## STATEMENT OF AMICI'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), California Nations Indian Gaming Association ("CNIGA"), Arizona Indian Gaming Association ("AIGA"), Washington Indian Gaming Association ("WIGA"), Oklahoma Indian Gaming Association ("OIGA"), the Native American Finance Officers Association ("NAFOA"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Tribal Alliance of Sovereign Indian Nations ("TASIN"), and 60 federally recognized Indian Tribes ("Amici Tribes") (collectively, "Tribal Amici"), submit this brief as *amici curiae* pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure.[1]  While the Tribal Amici concur with and support the arguments submitted by the Defendants-Appellants in their principal brief, the Tribal Amici believe that the additional arguments included in this brief are relevant and will be helpful to the Court's deliberation of this case.

IGA is an inter-tribal non-profit organization comprised of 124 federally recognized Indian tribes that operate gaming enterprises throughout Indian Country.  IGA also has non-voting members, which represent organizations, tribes,

---

[1] Counsel for both Appellants and Appellee have consented to the filing of this brief.

1

and businesses engaged in tribal gaming enterprises around the country.  IGA's mission is to advance tribal economic, social, and political interests, and to preserve and promote tribal sovereignty, self-sufficiency, and economic development by advocating for tribally owned governmental gaming enterprises. To pursue this mission, IGA operates as an educational and public-policy resource for tribes, policy makers, and members of the public concerning Indian gaming issues and tribal community development.

NCAI is the oldest and largest national organization comprised of American Indian and Alaska Native tribal governments and their citizens.  Since 1944, NCAI has advised and educated the public, Tribal Nations, state governments, and the federal government on a broad range of issues involving tribal sovereignty, self-government, treaty rights, and policies affecting Tribal Nations, including jurisdiction, taxation, and gaming issues.  NCAI currently represents more than 275 Tribal Nations.  NCAI works daily to strengthen the ability of Tribal Nations to ensure the health and welfare of their communities.

CNIGA is a non-profit organization that represents 54 federally recognized tribal governments located within the State of California.  CNIGA acts as a planning and coordinating agency for legislative, policy, legal and communications efforts on behalf of its members, especially with respect to gaming-related matters.

2

AIGA is a non-profit association comprised of eight federally recognized Tribes. AIGA is committed to protecting and promoting the welfare of Tribes striving for self-reliance by supporting tribal gaming enterprises on Arizona Indian lands. AIGA provides educational, legislative, and public policy resources for Tribes, policymakers, and the public on Indian gaming issues and tribal community development. AIGA is deeply committed to maintaining and protecting Tribal sovereignty and self-governance.

WIGA is a non-profit organization of tribal government leaders representing 23 federally recognized Indian Tribes in the State of Washington. WIGA's purpose is to educate and disseminate information to the Indian gaming community, federal and state governments, and the general public concerning issues related to gaming in Indian Country. WIGA advocates on behalf of Washington's Indian gaming community to promote government relations and effective communication between tribes and the State. WIGA aims to promote, protect, and preserve the general welfare of Indian tribes through the development of sound policies and practices with respect to the conduct of gaming activities in Indian Country.

OIGA is a non-profit organization of Indian Nations and other non-voting members representing organizations, tribes, and businesses engaged in tribal gaming enterprises in Oklahoma. OIGA's mission is to promote the general

welfare of the Oklahoma Indian Tribes through the development of sound policies and practices with respect to the conduct of gaming enterprises in Indian Country. OIGA's purpose is to educate and disseminate information to tribal, federal, and state governments and the general public on issues relating to tribal gaming.

NAFOA is a national not-for-profit organization of tribal officers, controllers, treasurers, accountants, auditors, and financial advisors. It has served as a resource for tribal leaders and finance professionals for over 30 years. NAFOA's mission is to foster development of financial and business expertise among tribal governments and their businesses by providing educational forums and resources, and by instilling finance and accounting best practices. NAFOA focuses its efforts on building economic capacity, developing effective tribal economic policy, and forging relationships with the investment banking community in an effort to promote tribal economic growth.

USET SPF is a non-profit, inter-Tribal organization advocating on behalf of 33 federally recognized Tribal Nations from the Northeastern Woodlands to the Everglades and across the Gulf of Mexico. USET SPF is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of Tribal Nations and in assisting its membership in dealing effectively with public policy issues. USET SPF works at the regional and national level to educate federal,

state, and local governments about the unique historic and political status of its member Tribal Nations.

TASIN is an intergovernmental association of federally recognized tribal governments throughout Southern California. TASIN's mission is to protect and promote the tribal sovereign government rights, the cultural identity and interests of federally recognized tribes located within the Federal Central Judicial District within the State of California.

The Amici Tribes are 60 federally recognized Tribes[2] within the meaning of the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. § 2703(5). Each of the

---

[2] The Amici Tribes include: Bay Mills Indian Community; Big Sandy Rancheria of Western Mono Indians of California; Buena Vista Rancheria of Me-Wuk Indians of California; Cher-Ae Heights Indian Community of the Trinidad Rancheria; Chicken Ranch Rancheria of Me-Wuk Indians of California; Confederated Tribes of the Chehalis Reservation; Confederated Tribes of the Colville Reservation; Confederated Tribes of Siletz Indians of Oregon; Coquille Indian Tribe; Dry Creek Rancheria Band of Pomo Indians; Elk Valley Rancheria; Enterprise Rancheria of Maidu Indians of California; Guidiville Rancheria of California; Ho-Chunk Nation of Wisconsin; Jamestown S'Kallam Tribe; Jamul Indian Village of California; Kalispel Indian Community of the Kalispel Reservation; Karuk Tribe; Klamath Tribes; Leech Lake Band of Ojibwe; Lower Brule Sioux Tribe of the Lower Brule Reservation; Lummi Tribe of the Lummi Reservation; Lytton Rancheria of California; Mashantucket Pequot Indian Tribe; Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan; Metlakatla Indian Community; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Muscogee (Creek) Nation; Northern Arapaho Tribe of the Wind River Reservation; Pechanga Band of Indians; Penobscot Nation; Picayune Rancheria of Chukchansi Indians; Pinoleville Pomo Nation; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Quapaw Nation; Quinault Indian Nation; Redding Rancheria; Rincon Band of Luiseño Indians; Robinson Rancheria; Saint Regis Mohawk Tribe; San Pasqual Band of Diegueno Mission Indians of California; Santa Ynez Band of Chumash Mission

Amici Tribes is a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian lands.  The Amici Tribes all have a direct and immediate interest in maintaining their sovereign rights regarding gaming, including sports betting, on their Indian lands.

Together, the Tribal Amici all have a shared, strong interest in this case because of its potential to have a significant impact on their or their member tribes' rights regarding gaming on Indian lands, as well as Indian gaming and tribal governmental revenue as a whole.  Such revenue is vital and provides funding for essential government services, tribal programs, and economic development needed to reach the goals of self-governance and self-sufficiency.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

The undersigned counsel, who do not represent any party to this appeal, authored this brief.  The Tribal Amici paid the entire cost of this amicus brief. None of the Tribal Amici are party to this appeal or the underlying suit.

---

Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Shoalwater Bay Indian Tribe; Snoqualmie Indian Tribe; Soboba Tribe of Luiseño Indians; Spokane Tribe of the Spokane Reservation; Stillaguamish Tribe of Indians of Washington; Suquamish Indian Tribe of the Port Madison Reservation; Susanville Indian Rancheria; Sycuan Band of the Kumeyaay Nation; Table Mountain Rancheria; Tejon Indian Tribe; Tulalip Tribes of Washington; Twenty-Nine Palms Band of Mission Indians; Wampanoag Tribe of Gay Head (Aquinnah); and Yuhaaviatam of San Manuel Nation.

Accordingly, no party to this appeal or the underlying suit contributed money for the preparation of this amicus brief.

# ARGUMENT

Indian tribes are sovereign nations with primary jurisdiction over their lands and the activities occurring on their lands.  In accordance with this principle, both the United States Supreme Court and Congress have recognized tribes' inherent and exclusive sovereign right to conduct and regulate gaming on their Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987); 25 U.S.C. § 2702.  The Indian Gaming Regulatory Act ("IGRA") was enacted to provide a comprehensive federal regulatory framework for tribal government gaming, including providing a mechanism for tribes and states to negotiate compacts governing the operation of Class III games, such as sports betting, subject to federal approval.

IGRA created a comprehensive regulatory framework for tribal government gaming intended to balance state, federal, and tribal interests.  *Amador County v. Salazar*, 640 F3d 373, 376 (D.C. Cir. 2011); *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022).  Congress recognized that each state's public policy for gaming law itself was the product of each state's own deliberations, such that tribes are only entitled to compacts allowing, and states are only required to include in compacts, those Class III gaming activities permitted by the state.  25 U.S.C. § 2710(d).  Some states have negotiated compacts to allow for tribes to be the exclusive operators of certain types of

8

gaming. *Artichoke Joe's v. Norton*, 353 F.3d 712, 718 (9th Cir. 2003)   This delicate balance of federal, tribal, and state interests has allowed tribes to generate substantial gaming revenue, which goes directly to fund important tribal government services that benefit tribal citizens.

KalshiEX LLC's ("Kalshi") unlawful and unfair entrance into the gaming market has adversely impacted tribal gaming revenue and the benefit of tribes' bargained-for compacts.  Additionally, by offering its so-called sports event contracts under the guise of commodity trading pursuant to the Commodity Exchange Act ("CEA"), Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on Indian lands.  Contrary to Kalshi's arguments:  (1) the CEA does not govern its gaming-related sports event contracts; (2) such contracts are expressly prohibited by the CEA and Commodity Futures Trading Commission's ("CFTC") own regulations; and (3) federal, state, and tribal gaming laws therefore apply to the contracts (including IGRA).

Because the lower court wrongly determined that Kalshi established a likelihood of success on the merits of its claims that its sports event contracts are exclusively governed by the CEA, this Court should reverse the decision granting Kalshi's motion for preliminary injunction.

## I. IGRA Governs Kalshi's Sports Betting Conduct on Indian Lands

### A. Kalshi's sports event contracts constitute "Class III Gaming" under IGRA

Congress enacted IGRA in 1988 in the wake of *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), to protect the sovereign authority of tribes to regulate gaming activity on their own lands, and to provide states the ability to coordinate with tribes in the regulation of that gaming. IGRA advances the longstanding national policy of promoting and sustaining tribal self-sufficiency. *See* 25 U.S.C. § 2701(4).

In this regard, IGRA has been an incredible success.[3] The revenue generated by tribal gaming supports thousands of jobs in hundreds of rural communities and provides critical funding to state and local governments through revenue-sharing agreements, tax revenue generation, and economic stimulus.

IGRA establishes a three-tier regulatory structure for Class III gaming on Indian lands, providing that such gaming is only lawful if it is: (1) authorized by tribal ordinance or resolution; (2) located in a state that permits such gaming; and (3) conducted in accordance with a tribal-state gaming compact. 25 U.S.C. § 2710(d)(1). IGRA also established the National Indian Gaming Commission

---

[3] *See* FY 2023 Gross Gaming Revenue Report, Nat'l Indian Gaming Comm'n 4–5 (July 2024), available at https://www.nigc.gov/images/uploads/GGR23_Final.pdf.

("NIGC") to oversee much of this regulatory regime.  25 U.S.C. § 2704.  The
NIGC has promulgated a wide range of implementing regulations.

This regulatory regime is comprehensive, and occupies the entire field of
gaming on Indian lands.  *See Tamiami Partners, Ltd. v. Miccosukee Tribe of
Indians*, 63 F.3d 1030, 1033 (11th Cir. 1995) (IGRA was "intended to expressly
preempt the field in the governance of gaming activities on Indian lands" (quoting
S. Rep. No. 100-446, at 6 (Aug. 3, 1988))); *Gaming Corp. of Am. v. Dorsey &
Whitney*, 88 F.3d 536, 547 (8th Cir. 1996).

IGRA's implementing regulations define "Class III Gaming" to include
"[a]ny sports betting . . . ."[4]  25 C.F.R. § 502.4(c).  While the term "sports betting"
is not defined within IGRA or its implementing regulations, it is generally
understood to mean:

> [T]he staking or risking by any person of something of value upon the
> *outcome* of . . . a    sporting    event . . . upon    an    agreement    or
> understanding that the person or another person will receive something
> of value in the event of a certain outcome.

---

[4] *See* Letter from Kevin K. Washburn, General Counsel for NIGC, to Joseph M.
Speck, Nic-A-Bob Productions, re: WIN Sports Betting Game (Mar. 13, 2001),
available at https://www.nigc.gov/images/uploads/game-
opinions/WIN%20Sports%20Betting%20Game-Class%20III.pdf ("Because sports
betting does not fit into any of the specifically defined categories of Class II
gaming set forth above, it is a Class III form of gaming.").

31 U.S.C. § 5362(1)(A) (defining "bet or wager" under the Unlawful Internet Gambling Enforcement Act ("UIGEA")) (emphasis added).  This is precisely what Kalshi is offering: contracts that stake or risk something of value upon the outcome of a sporting event based on the understanding that the person will receive something of value based on that outcome.  In fact, Kalshi has repeatedly referred to its own sports event contracts as "bets" or "sports betting."[5]  Kalshi's sports event contracts therefore clearly constitute sports betting and are thus Class III gaming.

Users as young as 18 years-old can bet on sports through Kalshi's platform on the lands of hundreds of tribes across the United States.  Kalshi has not obtained a license to offer these bets pursuant to any tribal ordinance or resolution; nor has Kalshi been authorized to conduct its sports betting pursuant to any tribal-state compact.  Across the board, Kalshi does not restrict its sports event contracts and therefore offers such on Indian lands without complying with IGRA.  Thus, each bet Kalshi offers and facilitates on Indian lands is a violation of IGRA.  These violations are highly impactful—they undermine tribal sovereignty and encroach on tribal gaming revenue and critical government funding.

---

[5] *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), available at https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could.

## B. The CEA does not preempt IGRA

If taken as true, Kalshi's argument below—that the CEA governs and the CTFC has exclusive jurisdiction over Kalshi's sports event contracts—presumes that the CEA preempts IGRA in its entirety.   In fact, Kalshi has made such an argument before the U.S. District Court for the District of Maryland, stating: "IGRA's definition of 'gaming' does not refer to sports event contracts, and even if it did, the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts."  Pl.'s Reply in Support of Prelim. Inj., *KalshiEX LLC v. Martin*, No. 1:25-cv-01283-ABA, ECF No. 29 at 7 (D. Md. May 19, 2025) (citations omitted).  While the issue is more accurately one concerning a conflict of law, the CEA neither preempts nor conflicts with IGRA, and IGRA therefore governs Kalshi's sports event contracts on Indian lands.

Congress has been regulating commodity futures for more than a century, originally to support and protect markets for agricultural commodities.  *See Merrill Lynch v. Curran*, 456 U.S. 353, 357–63 (1982).  Following the 2008 financial crisis, Congress amended the CEA, in part, to include the "Special Rule" concerning event contracts.  7 U.S.C. § 7a-2(c)(5)(C).  The Special Rule authorizes the CFTC to prohibit event contracts that are contrary to the public interest, including certain enumerated categories that Congress considered may be contrary

13

to the public interest.  These enumerated categories expressly include gaming or

activity that is unlawful under federal or state law.  *Id.*

Shortly afterwards, the CFTC adopted regulations to implement the CEA's

Special Rule.  Those regulations explicitly prohibit the listing and trading of any

event contract that "involves, relates to, or references . . . gaming, or an activity

that is unlawful under any State or Federal law."  17 C.F.R. § 40.11(a)(1).  In

promulgating § 40.11(a)(1), the CFTC therefore made the categorical

determination that event contracts involving these specific activities are contrary to

the public interest.[6]  Indeed, when announcing its rule, the CFTC clarified:

> [I]ts prohibition of . . . "gaming" contracts is consistent with
> Congress's intent [for the CEA's Special Rule] to "prevent gambling
> through the futures markets" and to "protect the public interest from
> gaming and other events contracts."

Adopting Release, 76 Fed. Reg. 44,786 (July 27, 2011) (citations omitted).

---

[6] This is reinforced by positions taken by both current and former CFTC
Commissioners.  *See* Statement of Commissioner Caroline D. Pham (Aug. 26,
2022), available at
https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement082622 ("In
promulgating [§] 40.11(a)(1) pursuant to Section [7a-2](c)(5)(C), the [CFTC]
determined that an event contract that 'involves, relates to, or references' . . .
gaming, or illegal activity is prohibited because it is contrary to the public
interest."); Statement of Commissioner Brian Quintenz (Mar. 25, 2021), available
at https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521
("In 2012, the [CFTC] promulgated Regulation 40.11 implementing this section of
the statute.  This regulation states that, "pursuant to" [7 U.S.C. § 7a-2](c)(5)(C),
the [CFTC] is prohibiting all event contracts that involve the enumerated activities
above.").

Nothing in any of this language preempts, amends, diminishes, or even conflicts with IGRA. If anything, the statutory and regulatory language above reinforces the longstanding view that IGRA's comprehensive structure dominates the regulation of gaming on Indian lands.

Kalshi's sports betting operation rests entirely on its assertion that it alone has the preemptive authority to self-certify that its gaming activities are not actually gaming in violation of the CEA, CFTC regulations, IGRA, or other federal statutes governing gaming such as the UIGEA and the Wire Act.[7]

It is inconceivable that Congress would have granted the authority to offer and accept sports betting throughout the United States—including on Indian lands—without explicitly stating as much, especially in the face of comprehensive statutes and regulations governing gaming on Indian lands. It is axiomatic that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Ignoring this history and the longstanding principles of federal statutory interpretation, Kalshi now presents an alternate reality—one in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination

---

[7] *See* 31 U.S.C. § 5361 *et seq.*; 18 U.S.C. § 1084.

of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), exclusively governs

nationwide sports betting, including sports betting that occurs on Indian lands,

thereby preempting the comprehensive regulatory scheme set forth in IGRA.

Clearly, this cannot be the case.  The CEA is only preemptive with respect to

**lawful** transactions that fall under the CFTC's exclusive jurisdiction.  *See* 7 U.S.C.

§ 2(a)(1)(A).  Kalshi's sports event contracts, and other similar sports event

contracts, are neither lawful transactions nor transactions that fall under the

CFTC's exclusive jurisdiction.

> 1.    *Kalshi's sports event contracts are expressly prohibited and therefore beyond the scope of the CEA*

Kalshi's sports event contracts fall within the class of contracts the CFTC

categorically prohibited as contrary to the public interest.  17 C.F.R. § 40.11(a)(1).

Thus, Kalshi is not authorized to offer such contracts under the CEA, and such

contracts fall beyond the scope of the CFTC's jurisdiction.

The CEA's Special Rule authorizes the CFTC to determine that event

contracts are "contrary to the public interest" if such event contracts involve

"activity that is unlawful under any Federal or State law" and "gaming."  7 U.S.C.

§ 7a-2(c)(5)(C)(i).  Where the CFTC makes such a determination, the CEA

prohibits those contracts.  *Id.* § 7a-2(c)(5)(C)(ii) ("No agreement, contract, or

transaction determined by the [CFTC] to be contrary to the public interest . . . may

be listed or made available for clearing or trading on or through a [DCM].").  Here,

16

the CFTC made such a determination when it promulgated 17 C.F.R. § 40.11(a)(1), wherein it categorically prohibited event contracts that "involve[], relate[] to, or reference[] . . . gaming, or an activity that is unlawful under any State or Federal law."

Kalshi contends that bans of event contracts under the Special Rule entail a two-step process, whereby: (1) the event contract must involve one of the enumerated, prohibited activities under § 40.11(a)(1); and (2) the CFTC must conduct a separate 90-day public interest review under § 40.11(c) and conclude such an event contract is contrary to the public interest. *See* ECF No. 2, at 7; Pl.'s Reply in Support of Prelim. Inj., *KalshiEX LLC v. Martin*, No. 1:25-cv-01283-ABA, ECF No. 29 at 11–12 (D. Md. May 19, 2025). Not so.

Contrary to what Kalshi suggests, § 40.11(a)(1) is a categorical prohibition on event contracts that involve gaming or activity that is unlawful under federal or state law; there is no two-step process because the CFTC has already determined that such event contracts are contrary to the public interest. Additionally, this determination negates the need for a 90-day review of such event contracts. Rather, § 40.11(c) is meant to allow the CFTC discretion to review event contracts that "*may* involve" one of the prohibited categories under § 40.11(a)(1). It in no way requires a 90-day review for event contracts that *do* involve such prohibited categories, like Kalshi's sports event contracts. The same is true of the Special

17

Rule, which merely requires the CFTC to make a public interest determination "no later than 90 days" from when it commences a review—something the CFTC did long-ago when promulgating its categorical determination in § 40.11(a)(1). *See* 7 U.S.C. §§ 7a-2(c)(5)(C)(i)–(ii), (iv).

The CFTC acted consistently with Congress's intent that the Special Rule prevent the usage of event contracts "to enable gambling"—particularly including sports betting. In fact, in a colloquy between Senator Lincoln—one of the principal architects of the Special Rule—and Senator Feinstein, Senator Lincoln explained:

> [It] is our intent . . . [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

156 Cong. Rec. S5906–7 (2010).

Because Kalshi's sports event contracts involve both gaming and activity that is unlawful under state and federal law, they expressly violate 17 C.F.R. § 40.11(a)(1) and therefore fall outside the scope of the CFTC's exclusive jurisdiction.

As explained above, Kalshi's sports event contracts constitute sports betting. As such, they necessarily involve gaming in violation of § 40.11(a)(1). In fact,

Kalshi's own position before the D.C. Circuit confirms the categorical

determination the CFTC made under § 40.11(a)(1) regarding "gaming" extends to

Kalshi's sports event contracts:

> An event contract . . . involves "gaming" if it is contingent on a game
> or a game-related event—like the Kentucky Derby, *Super Bowl, or*
> *Masters golf tournament*, all of which were mentioned in the
> provision's only legislative history.

Br. of Appellee, *KalshiEX LLC v. CFTC*, No. 24-5205, Doc. No. 2085055 at 31

(D.C. Cir. Nov. 15, 2024) (emphasis added).  Although it did not directly rule on

the legality of sports event contracts, the U.S. District Court for the District of

Columbia effectively adopted Kalshi's definition of "gaming" under the CEA.  *See*

*KalshiEX LLC v. CFTC*, No. 1:23-cv-03257 (JMC), 2024 WL 4164694, *12

(D.D.C. Sept. 12, 2024).  Kalshi's sports event contracts, thus, involve "gaming."

Additionally, because Kalshi's sports events contracts constitute gaming,

they also violate various federal and state laws.  Kalshi allows participants to

purchase its sports event contracts throughout the United States including on

Indian lands; this amounts to a speculative sports wager, which is gaming activity.

Kalshi's sports event contracts do not meet any of the requirements for gaming on

Indian lands described above.  *See* 25 U.S.C. § 2710(d)(1).  Kalshi's sports event contracts therefore involve activity that is unlawful under federal law—IGRA.[8]

For these reasons, Kalshi's sports event contracts are not lawful transactions under the exclusive jurisdiction of the CFTC.  Therefore, the CEA does not preempt or otherwise conflict with IGRA, and IGRA governs Kalshi's sports event contracts.

> 2.  *Kalshi's sports event contracts do not qualify as "swaps" or swaps based on "excluded commodities," and are therefore not subject to the CFTC's exclusive jurisdiction*

Second, Kalshi's sports event contracts do not qualify as "swaps" or swaps based on "excluded commodities," and therefore are not under the CFTC's exclusive jurisdiction.  Kalshi presumes to offer its sports event contracts as "swaps" that are based on "excluded commodities."  Under the CEA, a "swap" is defined as:

> [A]ny agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

---

[8] In addition to IGRA, Kalshi's sports event contracts also violate other federal laws including the Wire Act, 18 U.S.C. § 1084, and UIGEA, 31 U.S.C. § 5361 *et seq.*, as well as state gaming laws.

7 U.S.C. § 1a(47)(A)(ii).  Similarly, an "excluded commodity" means, among

other things, "an occurrence, extent of an occurrence, or contingency . . . that is—

(I) beyond the control of the parties to the relevant contract, agreement, or

transaction; and (II) associated with a financial, commercial, or economic

consequence."  *Id.* § 1a(19)(iv).

Kalshi's sports event contracts do not meet these definitions as they are not

dependent on the *occurrence* or *nonoccurrence* of a sports event—i.e., whether the

sports event occurs[9]—but rather on the *outcome* of the sports event—i.e., which

team wins.[10]  Because Kalshi's sports event contracts are outcome-focused, they

are quite simply speculative sports bets.  And although the parties to such contracts

presumably have no direct control over whether that team wins or loses, the

contracts also fail the second requirement, as any "financial, commercial, or

economic consequence" that may potentially be associated with Kalshi's sports

---

[9] An example of what could arguably be a valid "sports event contract" would be:
If bad weather is threatening to cause the cancellation of a football game in
Buffalo, the owner of Highmark Stadium could purchase an event contract that the
Buffalo Bills will not play their Sunday game.  This would allow the stadium
owner to hedge against the loss of revenue in the event the football game does not
occur.  This type of contract is not dependent on the *outcome* of the Buffalo Bills'
game, but rather on the *occurrence* or *nonoccurrence* of the game.

[10] Ostensibly, Kalshi presumes that the act of a particular team winning a sports
game is the "event" underlying its sports event contracts—not so.  The "events" at
the heart of *valid* sports event contracts are the sports games themselves.

event contracts are related to the *outcome* of the games, not the *occurrence* or *nonoccurrence* of the games.  In Kalshi's own words, the games upon which its sports event contracts are based have "no inherent economic significance" or "any real economic value."  *See* Transcript of Motion Hearing at 15, *KalshiEX LLC v. CFTC*, No. 1:23-cv-03257-JMC (D.D.C. May 30, 2024).  Kalshi's sports event contracts are not hedging opportunities for interested parties to supplement the risk of a cancelled sporting event; instead, they are speculative wagers on the outcome of that sporting event. They are therefore not dependent upon, or otherwise related to, any potential "financial, commercial, or economic consequence."

Furthermore, the other provisions within the definitions of "swap" and "excluded commodity" provide further insight into Congress's intention when adding the terms to the CEA.  *See* 7 U.S.C. §§ 1a(19)(i)–(iii), (47)(A)(i), (iii)–(vi). Specifically, under the canon of *noscitur a sociis*, the potential "financial, economic, or commercial consequence[s]" required to meet the definition of "swap" or "excluded commodity" must be related to rates, currencies, commodities, securities, instruments of indebtedness, indices, and other such quantitative measures.  *Id.*  The outcome of a sporting event is not so limited.

>   3.   *The self-certification provisions of the CEA and the CFTC's*
>        *implementing regulations are invalid, and therefore Kalshi's*
>        *sports event contracts offered pursuant thereto are invalid*

The structure of the CEA's provisions allowing for contract self-certification is invalid, rendering both its implementing regulations allowing for self-certification—and, importantly here, the contracts issued pursuant to those regulations—invalid. The statutory and regulatory framework governing the listing of new event contracts delegates to private entities a sweeping authority to implement binding regulatory decisions without meaningful federal oversight. This violates the nondelegation doctrine, which guards precisely the type of unchecked, privately exercised regulatory power that Kalshi is claiming to transform the highly regulated sports betting market.

The CEA establishes a self-certification mechanism that permits registered entities to introduce new financial instruments, including event contracts, without prior regulatory approval. The self-certification regulatory structure favors self-certification—self-certified contracts may become active with only one business day notice. *See* 17 C.F.R. § 40.2(a)(2). The CFTC may stay such self-certifications only upon finding "novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter." 7 U.S.C. § 7a-2(c)(2). This scheme permits private entities, such as Kalshi, to exercise extraordinary sovereign

regulatory authority—approving, implementing, and launching financial

instruments with nationwide economic impact—without any meaningful federal

oversight.

Under well-settled law, Congress may not delegate its legislative powers

absent an "intelligible principle" to guide the exercise of discretion. *Gundy v.*

*United States*, 588 U.S. 128, 129 (2019). No intelligible principle exists where

"'Congress ha[s] failed to articulate *any* policy or standard' to confine discretion."

*Id*. (quoting *Mistretta v. United States*, 488 U.S. 361, 373, n.3 (1989)) (emphasis

added). While the Supreme Court routinely upholds congressional delegations of

power to agencies to execute the law, it pays particular attention to delegations to

private entities. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). The

Fifth Circuit has developed a three-part test, based on Supreme Court precedent,

for determining the constitutionality of private delegations:

> Private delegations are . . . constitutional only on three conditions.
> First, government officials must have final decision-making authority.
> Second, agencies must *actually exercise* their authority rather than
> "reflexively rubber stamp [work product] prepared by others." And
> third, the private actors must always remain subject to the "pervasive
> surveillance and authority" of some person or entity lawfully vested
> with government power.

*Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 109 F.4th 743, 769–70 (5th Cir.

2024) (quoting *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974); *Sunshine*

*Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)) (emphasis and

alterations in original), cert. granted, *Schs., Health & Librs. Broadband Coal. v. Consumers' Rsch.*, 145 S. Ct. 587 (2024).

Here, the self-certification provisions empower private entities (like Kalshi) to define, structure, and launch contracts, which affects the national economy and infringes upon tribal sovereignty.  Moreover, the provisions provide no mechanism for advance public comment, no requirement of CFTC findings or review, no mandatory agency oversight, and no standards by which the CFTC may implement its discretion whether to stay a self-certification.  These provisions therefore violate the three-part test noted above because: (1) the CFTC abdicates its final decision-making authority given self-certified contracts may be listed for trading with virtually no review period under 17 C.F.R. § 40.2(a); (2) the CFTC has continuously chosen not to scrutinize the legality of  Kalshi's unlawful sports event contracts; and (3) Kalshi and other private entities are not subject to any meaningful government supervision where their contracts have been allowed due to inaction by the CFTC.

Therefore, because the self-certification provisions improperly delegate Kalshi the authority to perform a core governmental function without any clear guiding principles, standards, or limitations, Kalshi's sports event contracts listed pursuant to these provisions are invalid.

## C. The CEA does not impliedly repeal IGRA

In arguing that the CFTC has exclusive jurisdiction over sports betting conducted on Indian lands, Kalshi asserts, in effect, that the CEA impliedly repealed IGRA.[11]  But Congress did not express the requisite intent for implied repeal.

The U.S. Supreme Court applies "the strong presumption that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a latter statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *United States v. Fausto*, 484 U.S. 439, 452 (1988)).  Congress's intent to repeal must be "clear and manifest." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936). "[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  "[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* at 550 (citing *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 456–57 (1945)).  Further, "the specific governs the general," particularly where "a general

---

[11] Again, Kalshi made such an argument in the U.S. District Court for the District of Maryland.  *See* Pl.'s Reply in Support of Prelim. Inj., *KalshiEX LLC v. Martin*, No. 1:25-cv-01283-ABA, ECF No. 29 at 7 (D. Md. May 19, 2025).

permission or prohibition is contradicted by a specific prohibition or permission."

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Finally, the Indian Canons of Construction[12] require courts to resolve statutory

ambiguities in favor of tribes. *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976).

If the Court accepts Kalshi's position that its sports event contracts—which

constitute sports betting and therefore Class III gaming under IGRA—are "swaps"

subject to the CFTC's exclusive jurisdiction, then the Court must also accept the

underlying assumption that Congress intended to upend the entire federal

framework for tribal government gaming and repeal many key provisions of

IGRA. *See* 25 U.S.C. § 2710(d)(1).

Additionally, IGRA's criminal provisions provide:

> The United States shall have exclusive jurisdiction over criminal
> prosecutions of violations of State gambling laws that are made
> applicable under [18 U.S.C. § 1166] to Indian country, unless an Indian
> tribe pursuant to a Tribal-State compact . . . has consented to the
> transfer to the State of criminal jurisdiction with respect to gambling on
> the lands of the Indian tribe.

---

[12] As the Justice Blackmun has explained:

> Because Congress' authority to legislate unilaterally on behalf of the
> Indians derives from the presumption that Congress will act with
> benevolence, courts "have developed canons of construction that
> treaties and other federal action should when possible be read as
> protecting Indian rights and in a manner favorable to Indians."

*Hagen v. Utah*, 510 U.S. 399, 423 n.1 (1994) (Blackmun, J., dissenting) (quoting
F. Cohen, Handbook of Federal Indian Law 221 (1982 ed.)).

18 U.S.C. § 1166(d). If "swap" is read to include Kalshi's sports event contracts, thereby subjecting them to exclusive CFTC jurisdiction, the DOJ's jurisdiction over such criminal prosecutions will also have been impliedly repealed.

However, Congress did not express its "clear and manifest" intent to repeal these key provisions of IGRA. At most, the definition of "swaps" is ambiguous as to whether it includes sports event contracts, which are virtually identical to speculative sports wagers, i.e., sports betting. Ambiguity is not "clear and manifest" intent and an ambiguous statutory provision cannot overcome the strong presumption against repeals by implication. Ambiguity also implicates the Indian canon of statutory construction that would require the ambiguous definition of "swaps" to be interpreted in favor of tribes to maintain IGRA and all its provisions.[13]

As further evidence that Congress did not signal its clear and manifest intent to repeal IGRA, the legislative history of the CEA amendments reveals Congress's concern about event contracts facilitating gambling, and in particular sports betting. Indeed, as mentioned in the above-discussed colloquy between Senators Lincoln and Feinstein, the amendment's principal drafter explained Congress

---

[13] To the extent that IGRA grants the NIGC regulatory authority over gaming on Indian lands, Congress likewise did not express its "clear and manifest" intent to repeal that authority. In fact, Congress expressly reserved it. *See* 7 U.S.C. § 2(a)(1)(A).

intended the Special Rule to prevent derivatives contracts from being used to facilitate gambling.  156 Cong. Rec. S5906–7 (2010).  Rather than demonstrate intent to repeal federal gaming laws, this legislative history shows the exact opposite: Congress designed the Special Rule to prevent sports betting through supposed event contracts.

As to IGRA's criminal provisions, Congress likewise did not express a clear and manifest intent to repeal DOJ's authority.  In fact, Congress expressly disclaimed such a repeal in the text of the CEA.  7 U.S.C. § 16(e) ("Nothing in this chapter shall supersede or preempt . . . criminal prosecution under any Federal criminal statute.").  It is impossible for the CFTC to exercise exclusive jurisdiction over sports event contracts while the DOJ exercises its exclusive jurisdiction over criminal prosecutions of violations of state gambling laws made applicable by IGRA to Indian Country.

The party arguing that two statues are irreconcilable bears the "heavy burden" of proving congressional intent to repeal.  *See Epic Sys. Corp.*, 584 U.S. at 510.  Kalshi cannot meet that heavy burden because there is a reasonable way to interpret the CEA that would give full effect to both statutes—sports event contracts are not "swaps" subject to the CFTC's exclusive jurisdiction.  Further, given the CFTC's categorical prohibition on event contracts involving "gaming" and illicit activity, Kalshi is not authorized to offer such contracts under the CEA.

29

Because these statutes are capable of coexistence, the court must read both in a way that gives effect to both.

Finally, IGRA provides very specific permissions and prohibitions related to sports betting on Indian lands. Therefore, Supreme Court precedent dictates that IGRA's specific prohibitions and permissions must govern general prohibitions or permissions, such as Kalshi's interpretation of the catch-all definition of "swap."

## II. Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates the Federal Indian Policy

Kalshi's sports betting violates well-established federal Indian policy supporting tribal sovereignty and self-determination. The U.S. Supreme Court has "consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Cabazon*, 480 U.S. at 207 (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). Additionally, "[t]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that are 'plenary and exclusive,'" *see United States v. Lara*, 541 U.S. 193, 200 (2004), "[a]nd yet they remain 'separate sovereigns pre-existing the Constitution[,]'" *see Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). A "key goal of the Federal Government is to render Tribes more self-sufficient, and better

positioned to fund their own sovereign functions, rather than relying on federal funding." *Id.* at 810 (Sotomayor, J., concurring).

Congress has declared its "commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy . . . [and] to supporting and assisting Indian Tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. § 5302(b). The Executive Branch has consistently affirmed this policy. *See e.g.*, Exec. Order No. 13175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67249, § 2(c) (Nov. 6, 2000); Exec. Order No. 13647, Establishing the White House Council on Native American Affairs, 78 Fed. Reg. 39539, § 1(a) (June 26, 2013).

In *Cabazon*, the Court recognized that "federal interests in Indian self-government, including the goal of encouraging tribal self-sufficiency and economic development, are important, and federal agencies, acting under federal laws, have sought to implement them by promoting and overseeing tribal bingo and gambling enterprises," and the Indian casinos provided "the sole source of

31

revenues for the operation of the tribal governments and are the major sources of employment for tribal members." 480 U.S. at 203.

Moreover, Congress declared in IGRA that, "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government," and "Indian tribes have the *exclusive right* to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  25 U.S.C. §§ 2701(4), (5) (emphasis added).

Kalshi tramples upon established federal Indian policy by usurping the rights of tribes to regulate gaming on Indian land and by siphoning revenue from tribal governments.  The IGRA mandates that tribes have the *exclusive right* to regulate gaming on Indian lands, and sports betting is lawful *only if* conducted in conformance with a tribal-state compact.  25 U.S.C. §§ 2701(5), 2710(d)(1)(C); 25 C.F.R. § 502.4(c).  Kalshi violates this exclusive right.  Kalshi's intrusion is particularly dangerous because it does not comply with any gaming regulations that protect consumers, ensure fairness, or mitigate negative gaming impacts.  In fact, Kalshi's "self-certified" sports betting products are wholly unregulated by any gaming authority.

As noted above, Kalshi not only violates IGRA, but strikes at the heart of tribal sovereignty by offering what is effectively unregulated nationwide online sports betting. Kalshi usurps the rights of tribes to regulate gaming within their borders and undermines the sovereign right of tribes to negotiate Class III gaming compacts with states. IGRA "strike[s] a delicate balance between the sovereignty of states and federally recognized Native American tribes." *Chicken Ranch*, 42 F.4th at 1031 (quoting *Pauma Band of Luiseño Mission Indians of the Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015)). Kalshi's sports betting on Indian land therefore diminishes tribal bargaining power in compact negotiations and diminishes the value of the tribes' bargained-for benefits by violating the tribes' exclusive compact rights.

Finally, Kalshi is siphoning revenue from tribal governments in defiance of federal Indian policy. IGRA requires all revenues from tribal gaming be used for governmental or charitable purposes. 25 U.S.C. § 2710(b)(2)(B). As Justice Sotomayor explained in *Bay Mills*: "[T]ribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions." 572 U.S. at 812–13 (Sotomayor, J., concurring). Tribes rely on gaming revenue because destructive former federal policies "left a devastating legacy" on tribes that are "largely unable to obtain substantial revenue by taxing members . . . [because] there is very little income,

property, or sales [that tribal governments] could tax." *Id.* (quoting Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N. D. L. Rev. 759, 771, 774 (2004)).  If Kalshi continues to offer illegal nationwide online sports betting, the impact on tribal governments will be devastating.

For all these reasons, Kalshi's sports event contracts violate well-established federal Indian policy that supports tribal sovereignty and self-sufficiency through Indian gaming.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court reverse the District Court's decision granting Kalshi's motion for preliminary injunction.

DATED:  June 17, 2025

Respectfully submitted,

  /s/ Scott Crowell
Scott Crowell (WSBA 18868)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
scottcrowell@clotag.net

  /s/ Joseph H. Webster
Joseph H. Webster (DCB 448458)
Elizabeth A. Bower (DCB 90031924)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com

*Attorney for Amici Tribes,*
*Indian Gaming Association,*
*National Congress of American*
*Indians, California Nations Indian*

*Attorneys for Amici Tribes,*
*Indian Gaming Association,*
*National Congress of American*
*Indians, California Nations Indian*

*Gaming Association, Arizona Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, Native American Finance Officers Association, United South and Eastern Tribes Sovereignty Protection Fund, and Tribal Alliance of Sovereign Indian Nations*

*Gaming Association, Arizona Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, Native American Finance Officers Association, United South and Eastern Tribes Sovereignty Protection Fund, and Tribal Alliance of Sovereign Indian Nations*

 /s/ Michael Hoenig
Michael Hoenig (DCB 497369)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of San Manuel Nation*

## COMBINED CERTIFICATE OF COMPLIANCE

In accordance with the applicable Federal Rules of Appellate Procedure and Local Rules for the Third Circuit, I certify as follows:

1. All of the above-signed attorneys are members in good standing of the Bar of this Court.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7) because this brief contains 6462 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 29.1(b). In making this certification, I have relied upon the word count function of the word-processing system used to prepare this brief.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

4. The text of the electronic brief filed is identical to the text in the paper copies filed.

5. The electronic file containing the brief was scanned for viruses using Microsoft Defender Antivirus Signature Version: 1.431.70.0 and no viruses were detected.

DATED: June 17, 2025

 /s/ Joseph H. Webster
Joseph H. Webster

36

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participates.

DATED:  June 17, 2025

  /s/ Joseph H. Webster
Joseph H. Webster