No. 25-1922

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY, ET AL.,
*Defendants-Appellants.*

On Appeal from the Judgment of the United States
District Court for the District of New Jersey
(Dist. Ct. No. 24-cv-4037)

BRIEF OF *AMICI CURIAE* OF NEVADA, OHIO, 32 OTHER STATES,
DISTRICT OF COLUMBIA, AND NORTHERN MARIANA ISLANDS
SUPPORTING APPELLANTS

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae*
  *State of Nevada*

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................ii

INTRODUCTION AND STATEMENT OF *AMICI* INTEREST ..............1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT .........................................................................................5

    I.    When Congress preempts the States from exercising their traditional authority, it does so clearly, not obscurely. ..............6

    II.   The States have traditionally regulated gambling. ....................8

    III.  Kalshi's contrary position would leave sports betting largely unregulated and endanger the States' citizens.........................14

        A.    Recognizing an events-contract loophole to state gaming laws would have far-reaching consequences. ........................16

        B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations..................................22

CONCLUSION ....................................................................................25

ADDITIONAL COUNSEL ...................................................................27

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF ..............30

CERTIFICATE OF VIRUS SCAN .......................................................31

CERTIFICATE OF COUNSEL............................................................32

CERTIFICATE OF SERVICE...............................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ah Sin v. Wittman,*
    198 U.S. 500 (1905)...................................................... 4, 9, 13

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)........................................................ 25

*Bond v. United States,*
    572 U.S. 844 (2014)................................................. *passim*

*Booth v. Illinois,*
    184 U.S. 425 (1902)........................................................ 13

*CSX Transp. v. Easterwood,*
    507 U.S. 658 (1993)....................................................... 4, 8

*EEOC v. Arabian Am. Oil Co.,*
    499 U.S. 244 (1991)......................................................... 5

*Fin. Oversight & Mgmt. Bd. v. Centro de Periodismo Investigativo, Inc.,*
    598 U.S. 339 (2023)......................................................... 7

*Helton v. Hunt,*
    330 F.3d 242 (4th Cir. 2003).............................................. 9

*Kansas v. Garcia,*
    589 U.S. 191 (2020)......................................................... 5

*Mills-Jennings of Ohio, Inc. v. Department of Liquor Control,*
    70 Ohio St. 2d 95 (1982) ............................................. 10, 11

*Murphy v. NCAA,*
    584 U.S. 453 (2018)................................................. 1, 10, 12

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*
    595 U.S. 109 (2022)......................................................... 6

*Rousso v. State*,
    170 Wn. 2d 70 (2010) ............................................................... 9

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .................................................................. 7

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................. 4, 6

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. X ....................................................................... 7

U.S. Const. art. VI, cl. 2 ................................................................. 5

Ohio Const. art. XV, §6 ................................................................. 12

17 C.F.R. §38.100–.1200 ............................................................... 22

17 C.F.R. §38.700 ......................................................................... 22

17 C.F.R. §38.750 ......................................................................... 22

17 C.F.R. §38.850 ......................................................................... 22

17 C.F.R. §38.1150 ....................................................................... 22

7 U.S.C. §2 ................................................................................ 2, 3

7 U.S.C. §7 .............................................................................. 2, 24

Nev. Gaming Comm'n Reg. 22.010 ............................................... 19

Nev. Gaming Comm'n Reg. 22.080 ............................................... 19

Nev. Gaming Comm'n Reg. 22.1205 ............................................. 20

Nev. Gaming Comm'n Reg. 22.121 ............................................... 20

Nev. Gaming Comm'n Reg. 5.170 ................................................. 19

Nev. Gaming Comm'n Regs. 22.060-.063 ...................................... 19

Nev. Rev. Stat. ch. 462 ................................................................. 13

Nev. Rev. Stat. ch. 463 ................................................................. 13

Nev. Rev. Stat. ch. 463B ............................................................... 13

Nev. Rev. Stat. ch. 465 ................................................................. 13

Nev. Rev. Stat. §129.010 .............................................................. 21

Nev. Rev. Stat. §463.0129 ............................................................ 19

Nev. Rev. Stat. §463.170 ................................................. 19, 23, 24

Nev. Rev. Stat. §463.220 .............................................................. 24

Nev. Rev. Stat. §463.318 .............................................................. 24

Nev. Rev. Stat. §463.350 .............................................................. 21

Nev. Rev. Stat. §§463.362–.3668 ................................................ 19

Nev. Rev. Stat. §463.530 .............................................................. 19

Nev. Rev. Stat. §463.5735 ............................................................ 19

Nev. Rev. Stat. §§465.092–.094 ................................................... 19

Ohio Rev. Code §3109.01 ............................................................ 21

Ohio Rev. Code §§3769.01–.28 ................................................... 13

Ohio Rev. Code §§3772.01-.99 .................................................... 13

Ohio Rev. Code §§3775.01-.99 .................................................... 13

Ohio Rev. Code §3775.02 ............................................................ 20

Ohio Rev. Code §3775.03 ............................................................ 20

Ohio Rev. Code §3775.09 ............................................................ 20

Ohio Rev. Code §3775.13 ............................................................ 21

Ohio Rev. Code §3775.99 ............................................................ 21

## Other Authorities

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024) ................................................................... 17

Dusting Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon ........................................................ 1, 15, 16

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) ................................................................... 17

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947) ................................................. 6

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch & Rev. J. 65 (1996) .......................... 9, 10

*History of Gaming in Nevada*, Nevada Resort Association ............. 10, 11

Jennifer Carleton et al., Nevada *in* The Gambling Law Review (Carl Rohsler ed. 2016) .......................................................... 12

Kalshi Member Agreement (Dec. 13, 2024) ........................................... 21

Kalshi Website, Help Center: Trading; Fees ......................................... 15

Kalshi Website, Sports: Baseball ........................................................... 14

Kalshi Website, Sports: Football ............................................................ 14

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) ................................... 18, 20

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) ................................... 17

Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) .................................................. 18

Matt Stone, *Risk of Gambling Addiction Up 30%* (Feb. 16, 2025) ........................................................................ 17

Nat'l Gambling Impact Study Comm'n, Final Report (1999) ..... 13, 17, 18

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission .......................................................... 18

Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024) .................................................. 12, 17

Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, University of Nevada: The Center for Gaming Research (2011) ............................. 11

## INTRODUCTION AND STATEMENT OF *AMICI* INTEREST

"Americans have never been of one mind about gambling." *Murphy v. NCAA*, 584 U.S. 453, 458 (2018).  But this country's system of government is well equipped for such disagreement.  Under our federalist approach, States act as laboratories of democracy for solving complex problems and serving the needs of a diverse citizenry.  As a result, the States have long experimented with different approaches to gambling, as their citizens' "attitudes have swung back and forth" on the topic.  *Id.*

Stripping away the semantics, this case most directly concerns gambling on sports.  In 2018, the Supreme Court held that Congress could not bar the States from authorizing sports betting.  *Id.* at 458, 480.  Most States have since legalized the practice.  In these States—and even in other States that have not legalized sports betting, like California and Texas—companies such as Kalshi now offer online sports betting through events contracts on the futures marketplace.  Kalshi itself has called what it does "sports betting."  Dusting Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon, https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could (last accessed June 16, 2025); *see below* 16 (advertisement).  Even so, Kalshi makes a

bold legal claim: it says that the States have no power to regulate its conduct, regardless of whether these so-called events contracts qualify as sports betting under state law. According to Kalshi, Congress—through obscure language within a special rule in the Commodity Exchange Act— subtly preempted the States from exercising authority over sports betting when that betting is offered through a so-called events contract.

If that sounds farfetched, that is because it is. When Congress removes the States' historic police powers, it does not whisper in the dark of night. Rather, courts expect Congress to speak clear as day when it intends a dramatic shift in our country's traditional balance of power. *See Bond v. United States*, 572 U.S. 844, 857–59 (2014). This federalism canon proves quite significant here. Nothing in the Commodity Exchange Act's language clearly signals that Congress was trying to strip the States of their traditional power to regulate sports gambling. Indeed, several parts of the statutory scheme overtly recognize the continued application of state law. *See, e.g.*, 7 U.S.C. §§2(a)(1)(A), 7a-2(c)(5)(C)(i)(I). It follows that the Commodity Exchange Act does not accomplish the broad preemptive coup that Kalshi envisions.

2

For these and other reasons, the *amici* States are interested in this case.  Accepting Kalshi's position would wrongly upset our country's traditional division of power.  Beyond that, eliminating the States' ability to regulate online sports betting would pose very serious risks to the States' citizens.  Online sports betting, while convenient and entertaining for many, comes with life-altering consequences for some.  Thus, depriving the States of the power to regulate naturally increases the dangers to a vulnerable population of citizens.  Because no federal law requires that potentially devastating result, the *amici* States urge reversal.

## SUMMARY OF ARGUMENT

The *amici* States agree with New Jersey that the Commodity Exchange Act does not preempt States from regulating sports betting via events contracts.  The preemption analysis in this case implicates several underlying issues—including whether sports-events contracts even qualify as "swaps" under federal law.  *See* 7 U.S.C. §2(a)(1)(A).  The *amici* States leave those finer details to the parties.  The *amici* States also assume that absent preemption Kalshi's events contracts would otherwise qualify as regulated (or illegal) sports betting under many if not most States' laws.  With those assumptions in place, this brief focuses on how

this country's federalist structure should inform the Court's preemption analysis here.

**I.** When lawmakers intend major changes to the existing state of the law, they do not obscure that intent. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That holds true when Congress intends to make major changes to this nation's traditional division of power. Courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond*, 572 U.S. at 857–59. It follows that, absent clear language from Congress, courts should hesitate to read federal law as preempting an area of traditional state power. *See CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993).

**II.** That principle matters a great deal to the preemption analysis in this case. As the Supreme Court has long recognized, the regulation of gambling forms a part of the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Thus, for centuries, the States have been regulating gambling, including sports betting. This Court should not upset that traditional balance absent a clear directive from Congress. And—as the New Jersey defendants explain in this case—the Commodity Exchange Act offers no such clear directive.

4

**III.** The negative ramifications of Kalshi's aggressive position are just another sign that the company is wrong. Millions of Americans struggle with gambling problems. Those struggles have only increased as modern technology has made gambling more convenient. Against those realities, state-gambling regulations play an important role in protecting vulnerable individuals across this country. And federal regulations, geared toward the futures marketplace, provide cold comfort in the absence of state protections.

## ARGUMENT

Under the Supremacy Clause, federal law constitutes "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. It follows that, when Congress acts within the boundaries of its enumerated powers, it may choose to preempt state law through federal statutes. Such preemption can take different forms: federal statutes sometimes preempt state law expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But no matter the form, preemption turns on the text of federal law. *Id.* at 202. And to give statutory text a "fair reading," courts must remain aware that "'Congress legislates against the backdrop'" of certain presumptions. *Bond*, 572 U.S. at 857 (quoting *EEOC v. Arabian*

5

*Am. Oil Co.*, 499 U.S. 244, 248 (1991)); *see* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

Keeping that last notion in mind, this brief unfolds in three parts. *First*, the *amici* States stress a backdrop canon—arising from this country's federalist structure—that should inform the Court's analysis. *Second*, the *amici* States explain why that canon applies with full force to the States' regulation of gambling. *Third*, and finally, the *amici* States highlight the considerable downsides of removing the States' ability to regulate online sports betting.

## I.    When Congress preempts the States from exercising their traditional authority, it does so clearly, not obscurely.

Congress, as the saying goes, does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468.  Thus, when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.*  Textual arguments that suggest otherwise "ultimately founder." *See id.*

This no-elephants-in-mouseholes principle has several context-specific applications.  For example, the "major questions doctrine" teaches that if Congress "wishes to assign to an executive agency decisions of vast economic and political significance," it must "speak clearly." *Nat'l Fed'n of*

*Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (quotation omitted). Likewise, to abrogate a government body's sovereign immunity, "Congress must use unmistakable language." *Fin. Oversight & Mgmt. Bd. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts stick with the default assumption that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857; *see also West Virginia v. EPA*, 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (discussing these and other "clear-statement rules" that "help courts act as faithful agents of the Constitution" (quotation omitted)).

The federalism canon offers another example of this principle at work. This canon stems from "basic principles of federalism embodied in the Constitution." *Bond*, 572 U.S. at 859. As every schoolchild learns, the Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Id.* at 854; *see* U.S. Const. amend. X. That setup leaves the States with considerable police powers that they exercise for the public good. *Bond*, 572 U.S. at 854. Congress, for its part, legislates against this default ordering of sovereign authority. *Id.* at 857–58. Against that "backdrop," any statute that displaces or

limits a significant amount of state power constitutes a major change. *See id.* (quotation omitted). And one expects Congress to speak clearly when effecting a major change to the existing order. Adding all this up, the following rule emerges: absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted).

This federalism canon applies with particular force to preemption. Preemption, by its nature, triggers the "sensitive relation between federal and state" authority. *Id.* (quotation omitted). Courts thus need "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted). And courts should be especially "reluctant to find" preemption when "interpreting a federal statute pertaining to a subject traditionally governed by state law." *Easterwood*, 507 U.S. at 664.

## II.    The States have traditionally regulated gambling.

The question remains whether the regulation of sports gambling triggers the federalism canon. It certainly does. As mentioned already, the States' reserved powers include police powers, which refer to the States'

"broad authority to enact legislation for the public good." *Bond*, 572 U.S. at 854. Given the dangers of gambling (more on that to come, *below* 16–18), the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin*, 198 U.S. at 505–06; *see also Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) ("[B]ecause the regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens the regulation of gambling lies at the heart of the state's police power." (quotation omitted)); *Rousso v. State*, 170 Wn. 2d 70, 82 (2010) (noting various "societal ills" associated with gambling, including "gambling addiction" and "underage gambling"). Unsurprisingly, therefore, the States have a lengthy history of gambling regulation.

Gambling has a long track record in this country, and its regulation dates back to well before the founding. On their way to the Americas, sailors on Columbus's ships played games of chance to help pass the time. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch & Rev. J. 65, 66 (1996). But, at least as early as the seventeenth century, settling communities began to outlaw such behavior. In 1633, for instance, the Puritans of Massachusetts enacted idleness laws that barred people from possessing cards, dice, or other gambling

devices. *Id.* About fifty years later, the Quakers of Pennsylvania enacted a similar prohibition. *Id.* During the next century, colonies like New Hampshire and New Jersey took comparable steps. *Id.* Authorities in the Northwest Territories did, too. *Mills-Jennings of Ohio, Inc. v. Department of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982).

After the founding, opposition to gambling continued to build. For example, shortly after Ohio entered the Union, its General Assembly made various forms of gambling illegal. *Id.* And the Ohio Constitution of 1851 expressly added prohibitions on lotteries. *Id.* Even in Nevada, perhaps the most gambling-friendly State in the Union, games of chance were prohibited by the territorial and early State legislatures of the 1860s. *See History of Gaming in Nevada*, Nevada Resort Association, https://perma.cc/9VX4-F8NG (last accessed June 16, 2025). Eventually, by the late 1800s, "gambling was largely banned throughout the country." *Murphy*, 584 U.S. at 458; *but see* Fenich, *A Chronology of (Legal) Gaming in the U.S.*, at 67–69 (listing some early examples of gambling).

The pendulum began to swing back in the twentieth century, with many States loosening gambling prohibitions to raise state revenue or fund non-profits. *Murphy*, 584 U.S. at 458–59. Return to Nevada. It was

an early adopter of legalized gambling, first decriminalizing certain forms of gambling in 1869. *History of Gaming in Nevada*, Nevada Resort Association. After a brief ban on gambling during the Progressive Movement, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, University of Nevada: The Center for Gaming Research, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11 (last accessed June 16, 2025). A decade later, the Nevada Legislature shifted licensing authority from local to state government through passage of the Gaming Control Act of 1949. *See* Faiss, *Nevada Gaming Statutes: The Evolution and History*, at 3. The State's current regulatory structure, which involves the Nevada Gaming Control Board and Nevada Gaming Commission, evolved from there. *Id.* at 4–6.

Although Nevada was on the forefront, other States' views have also softened on gambling over time. For example, in the 1970s, Ohio legalized bingo for charitable purposes and state-conducted lotteries. *Mills-Jennings of Ohio*, 70 Ohio St. 2d at 101. And, about fifteen years ago, a

slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C).

Recently, the country's attention has turned to sports gambling. *Murphy*, 548 U.S. at 460–61. Nevada set the pace in this area, too: the Silver State has permitted sports betting since the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., Nevada *in* The Gambling Law Review 147 (Carl Rohsler ed. 2016), https://perma.cc/3BSY-UYMZ. By the 1990s, a few other States had also legalized certain forms of sports betting. *Murphy*, 548 U.S. at 462.

To prevent sports gambling's continued growth, Congress enacted the Professional and Amateur Sports Protection Act, which purported to bar the States from authorizing sports betting. *Id.* at 461. A few years ago, however, the Supreme Court held in *Murphy* that Congress could not lawfully impose such a barrier on state lawmakers. *Id.* at 458, 480. That clarification has led most States to embrace sports betting. At present, nearly forty States have legalized at least some forms of sports betting. Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024), https://perma.cc/XL7W-QS2L.

Importantly, the increased legalization of gambling across the States does not mean that such gambling is unregulated. Quite the opposite. The States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of a corresponding regulatory regime and structure." Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (1999). For example, Ohio has comprehensive statutory schemes regulating the forms of gambling it authorizes. *See, e.g.*, Ohio Rev. Code §§3769.01–.28 (horse racing), 3772.01–.99 (casino gaming), 3775.01–.99 (sports gaming). As does Nevada. *See, e.g.*, Nev. Rev. Stat. chs. 462 (lotteries and games), 463 (licensing and control of gaming), 463B (supervision of certain gaming establishments), 464 (pari-mutuel wagering), 465 (crimes and liabilities concerning gaming), 466 (horse racing).

The takeaway from this history is simple. Gambling undeniably qualifies as an area of "traditional state responsibility." *See Bond*, 572 U.S. at 858; *see also Booth v. Illinois*, 184 U.S. 425, 429–32 (1902). Thus, under the federalism canon, this Court should not interfere with the State's police power over gambling absent "'clear, unmistakable'" legislation from Congress. *See Ah Sin*, 198 U.S. at 505–06 (quoting *Booth*, 184 U.S.

at 429). And, as the New Jersey defendants aptly explain, the language within the Commodity Exchange Act does not clearly signal Congress's intent to override the States' traditional authority over sports betting.

## III. Kalshi's contrary position would leave sports betting largely unregulated and endanger the States' citizens.

Kalshi takes a much different view of the world. Initially, it claims that its events contracts do not count as sports gambling. As a legal matter, that depends on definitions within state law. But, as a real-world matter, the activity Kalshi facilitates is obviously sports betting.

To confirm as much, one must only peruse Kalshi's website. The website has an entire category dedicated to "sports" where—through a few easy clicks—people can bet on things like the Steelers winning more than eight games this season or the Ravens winning the Super Bowl. *See* Kalshi Website, Sports: Football, https://perma.cc/M9ZA-V7DP (last accessed June 9, 2025). Baseball fans can similarly play the odds on whether the Phillies or the Mets will win the National League East. *See* Kalshi Website, Sports: Baseball, https://perma.cc/GP7X-ZLEW (last accessed June 9, 2025).

Kalshi's counter position strains credulity. The company has argued to States that its events contracts are not sports gambling because it is

not acting as the "House," like a traditional sportsbook operator does. Since Kalshi merely operates the "exchange" on which "contracts" are entered between two willing participants on either side of an uncertain outcome, the argument goes, Kalshi falls outside state gaming law in the first instance. This amounts to a distinction without a difference. Kalshi's position is indistinguishable from that of a Las Vegas poker room that simply operates as the venue in which willing participants play a card game. Like the poker room operator that takes a "rake" from each hand of poker played in its poker room, Kalshi takes a transaction fee from each contract entered on its exchange. *See* Kalshi Website, Help Center: Trading; Fees, https://perma.cc/49FW-FM8K (last accessed June 10, 2025).

Perhaps most importantly, from the consumer's perspective, it is immaterial whether Kalshi is acting as the "House" that sets the line and takes a vig, or as an exchange, which facilitates the contract and takes a transaction fee. Kalshi has even told the public that they can "bet" using its platform. Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon. Take the following advertisement from last year's March Madness tournament:



*Id.* Thus, Kalshi's own words betray its this-is-not-gambling position.

Regardless, Kalshi's broader argument is that, because of federal preemption, it does not matter if it facilitates sports gambling within the meaning of state laws. Said another way, Kalshi claims that by structuring sports betting as events contracts, it effectively makes state-law requirements disappear. And Kalshi relatedly argues that federal regulation—administered through the Commodity Futures Trading Commission—is both comprehensive and sufficient to protect consumers. Kalshi's views, in addition to being legally wrong, come with considerable societal consequences.

## A.    Recognizing an events-contract loophole to state gaming laws would have far-reaching consequences.

**1.** While gambling is entertaining for many, it is dangerous for some. Millions of Americans across the country qualify as problematic or

pathological gamblers. Nat'l Gambling Impact Study Comm'n, *Final Report*, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), https://perma.cc/BQY6-YBC3. Research, moreover, has linked gambling to many other problems—substance abuse and psychological distress, to name a few. *See* Richardson, *Online gambling has fueled an industry boom*, NBC News. Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), https://perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), https://perma.cc/E4ZU-U3MN. And still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), https://perma.cc/76KG-5ZGS (noting that one in five problematic gamblers contemplates suicide due to hopelessness).

With the growing ease of gambling, these problems are on the rise. *See id.* For example, a 2022 survey performed by the Ohio Casino Control

Commission signaled that the prevalence of at risk/problem gamblers in the Buckeye State had nearly doubled in five years. *See Ohio Gambling Survey 2022*, Ohio Casino Control Commission, https://perma.cc/4GG3-SGQE (slide five of PowerPoint). As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023. Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that one in every five people surveyed between the ages of 18 and 24 was at a high risk of a gambling problem. *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), https://perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

**2.** State regulations offer a powerful tool for combatting these dangers. Think, for example, of Nevada's regulatory scheme. Given the importance of gambling to Nevada's overall economy, the State strictly

regulates all gambling activities to ensure the public's continued "confidence and trust."  Nev. Rev. Stat. §463.0129(1) (outlining Nevada's public policy on gambling).  A central part of Nevada's mission is ensuring that gaming proprietors are "controlled and assisted" so as to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State."  *Id.*

Consistent with that goal, Nevada's regulatory scheme offers gamblers in the State many levels of protection.  As a general matter, Nevada employs a rigorous licensing process that ensures any gambling entity undergoes an in-depth investigation before receiving a license.  *See* Nev. Rev. Stat. §§463.170, 463.530, 463.5735; *see also below* 23–24.

Nevada's regulatory scheme also offers a variety of more specific protections.  For instance, Nevada requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers.  Nev. Gaming Comm'n Reg. 5.170.  Nevada law also includes various safeguards to protect against improper betting practices, including improper wagers on sports.  *See, e.g.*, Nev. Rev. Stat. §§465.092–.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060–.063, 22.080(1); *cf. also* Nev. Rev. Stat. §§463.362–.3668 (detailing Nevada's dispute resolution

process). Of particular note here, Nevada prohibits sports wagers by game officials, owners, coaches, players, or other team staff. *See* Nev. Gaming Comm'n Reg. 22.1205; *cf. also* Mogg, *Gambling addiction hotlines say volume is up*, NBC News (reporting that gamblers recently threatened the coach of the Cleveland Cavaliers). Further, Nevada requires that those facilitating sports betting report suspicious activity. Nev. Gaming Comm'n Reg. 22.121.

Under Kalshi's reading of the law, these types of state-law safeguards fall away so long as companies package sports betting as events contracts. That, in turn, creates a sizeable hole in the States' ability to protect their citizens from predatory practices or other problematic behavior.

For additional support, consider Ohio's recently adopted approach to sports gambling. Similar to Nevada, Ohio prohibits companies from offering sports betting without a license. Ohio Rev. Code §3775.03(A). That requires a company to establish that it can responsibly facilitate such gambling. *See* Ohio Rev. Code §3775.09(A)–(B). Along related lines, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list. *See* Ohio Rev. Code §3775.02(B)(11). To enforce that list, sports

gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1). But, adopting Kalshi's view, the company has no such state-law obligation.

Another problem also warrants mention. If left unregulated, Kalshi's business model would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement (Dec. 13, 2024), https://perma.cc/7G3F-W7B5. In many—if not most—States, the age of majority is eighteen years old. *See, e.g.*, Nev. Rev. Stat. §129.010; Ohio Rev. Code §3109.01. But many States have decided to specifically limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, Nev. Rev. Stat. §463.350; Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As discussed above, those who begin gambling at a younger age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

**B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.**

Contrary to Kalshi's suggestions, federal regulation of the futures marketplace is not a cure-all when it comes to nationwide sports betting. More precisely, Kalshi seeks to alleviate any concern about the far-reaching consequences of its position by pointing to the Commodity Exchange Act's "detailed requirements for exchanges to maintain good standing as designated contract markets." ECF No. 2, at 5. These requirements, termed the "Core Principles," are twenty-three points, codified in the Code of Federal Regulations, by which designated contract markets, such as Kalshi, must abide. *See* 17 C.F.R. §38.100–.1200. These Core Principles govern topics from diversity of directors on the board of trade, 17 C.F.R. §38.1150, to dispute resolution, 17 C.F.R. §38.750, to conflicts of interest, 17 C.F.R. §38.850, to disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these Core Principles are naturally designed for participants in the financial markets. They do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling. *See above* 18–21. What is more, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with other approaches.

Giving the States flexibility to create their own regulatory schemes that are responsive to localized concerns is a core feature of federalism.

To better illustrate these points, return one last time to Nevada. The State, after all, has nearly one hundred years' experience in regulating legalized gambling and responding to challenges unique to both the gambling industry and local Nevadan concern.

With Nevada's considerable experience in mind, consider a key gap that would be left by a federal-only regime. Nevada has developed robust procedures for determining the suitability of any person involved in the gaming industry in Nevada. This suitability determination is a front-loaded process in which the person seeking a gaming approval bears the burden of showing the person is qualified to hold a license. Nev. Rev. Stat. §463.170(1). This burden entails satisfying the Nevada Gaming Commission that the person is a "person of good character, honesty and integrity"; that the person's "prior activities, criminal record . . ., reputation, habits and associations do not pose a threat to the public interest of [Nevada] or to the effective regulation and control of gaming"; and that the person is "[i]n all other respects qualified to be licensed or found suitable consistently with the declared policy of [Nevada]." Nev. Rev. Stat.

§463.170(2). This burden extends to the person showing "adequate business probity, competence and experience, in gaming" and that the financing for the operation is both adequate and from a suitable source. Nev. Rev. Stat. §463.170(3).

Further, the Nevada Gaming Commission "has full and absolute power and authority to deny any application for any cause it deems reasonable." Nev. Rev. Stat. §463.220(7). The decision of the Nevada Gaming Commission concerning a person's suitability is final; a person may not seek judicial review. Nev. Rev. Stat. §463.318(2).

For its part, the Commodity Exchange Act has no corollary to the Nevada suitability procedures. Worse still, designated contract markets may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the Commodity Futures Trading Commission that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). The result of such loose processes will be to have individuals who would be unable to clear state-law hurdles running de facto sports books throughout the country, immune from the States' regulation. And this is but one example where federal regulations for the futures marketplace fall short of safeguarding important public policy

considerations of the States and protecting consumers in the milieu of gambling.

*

All told, Kalshi's desire to be free from state regulation should give the Court considerable pause. As alluded to above, one of the benefits of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted). The problems associated with modern-day online sports betting fit that description, no matter how proprietors label such betting. And the States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry.

## CONCLUSION

The Court should reverse.

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae*
 *State of Nevada*

DAVE YOST
Ohio Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
 *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae*
 *State of Ohio*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawaii Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

AUSTIN KNUDSEN
Montana Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

EDWARD E. MANIBUSAN
Northern Mariana Islands
Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 4,770 words. *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF

I hereby certify that the electronic version of this brief is identical to the text version in the paper copies that are being dispatched by over-night delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

 */s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

# CERTIFICATE OF VIRUS SCAN

I hereby certify that this document was scanned using CrowdStrike Falcon Sensor, version 7.24.19607, and Microsoft Defender 365 and no viruses were detected.

*/s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

31

## CERTIFICATE OF COUNSEL

I hereby certify that I am a member of the bar of this Court.

_/s/  T. Elliot Gaiser_
T. ELLIOT GAISER
Ohio Solicitor General

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, the foregoing was filed electron-ically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General