No. 25-1922

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY AND MATTHEW J. PLATKIN;

*Defendants-Appellants.*

*On Appeal From The United States District Court*
*For The District of New Jersey*
*Hon. Edward S. Kiel*
*Case No. 1:25-cv-2152*

## BRIEF OF THE CASINO ASSOCIATION OF NEW JERSEY, INC. AS AMICUS CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL

Owen B. Smitherman
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
300 W. 6th Street Suite 2010
Austin, TX 78701
(737) 667-6100
owensmitherman@quinnemanuel.com

Derek L. Shaffer
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

Alex H. Loomis
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

*Counsel for Amicus Curiae The Casino Association Of New Jersey, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Casino Association of New Jersey, Inc. states that it has no parent corporation or publicly held corporation that owns 10% or more of its stock.

Dated: June 17, 2025                    Respectfully submitted,

<u>*/s/ Derek L. Shaffer*</u>

Derek L. Shaffer
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for Amicus Curiae The Casino Association of New Jersey, Inc.*

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICUS CURIAE ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 2

ARGUMENT ...................................................................................... 8

I.  KALSHI'S PREEMPTION ARGUMENT WOULD FEDERALIZE
    THE ENTIRE SPORTS BETTING INDUSTRY ............................................ 8

II. KALSHI'S PREEMPTION ARGUMENT WOULD UNDERMINE
    PUBLIC POLICY ........................................................................... 13

    A.  Kalshi's Sports Contracts Are Just Traditional Sports Betting,
        Not "Swaps" Or "Event Contracts" ............................................. 13

    B.  New Jersey's Sports Betting Regulations That Kalshi Seeks To
        Preempt Serve Important Purposes .............................................. 26

    C.  The CFTC Does Not And Cannot Act As A National Gaming
        Commission ......................................................................... 30

CONCLUSION .................................................................................. 34

COMBINED CERTIFICATE OF COMPLIANCE ............................................ 36

CERTIFICATE OF SERVICE ................................................................. 37

# TABLE OF AUTHORITIES

**Page**

### Cases

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015).................................................................3

*Campione v. Adamar of New Jersey, Inc.,*
714 A.2d 299 (N.J. 1998) ...........................................................1

*CFTC v. Yukom Commc'ns Ltd.,*
No. 19-cv-5416, 2021 WL 4477874 (N.D. Ill. Sept. 30, 2021) .........................9

*Fellner v. Tri-Union Seafoods, LLC,*
539 F.3d 237 (3d Cir. 2008) .......................................................34

*Gonzales v. Raich,*
545 U.S. 1 (2005)................................................................12

*KalshiEX LLC v. CFTC,*
119 F.4th 58 (D.C. Cir. 2024).......................................................9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982)...............................................................15

*Murphy v. NCAA,*
584 U.S. 453 (2018)......................................................2, 12, 13

*West Virginia v. EPA,*
597 U.S. 697 (2022)...............................................................34

### Statutes

7 U.S.C. § 2(a)(1)(A) .............................................................9, 12

7 U.S.C. § 2(e) ...................................................................4, 9

7 U.S.C. § 6(a)(1) ................................................................9, 12

7 U.S.C. § 6d(a)(1).................................................................9

7 U.S.C. § 7.......................................................................9

7 U.S.C. § 7a-2(c) ..................................................................3

7 U.S.C. § 13(a) .....................................................................9

18 U.S.C. § 1084 ...................................................................28

28 U.S.C. § 3701 .....................................................................2

28 U.S.C. § 3704 .....................................................................2

N.J. Stat. § 5:12-1(b)(3) ..........................................................1

N.J. Stat. § 5:12A-10 .........................................................3, 19

N.J. Stat. § 5:12A-11(a) ........................................................28

N.J. Stat. § 5:12A-11(c) ........................................................27

N.J. Stat. § 5:12A-11(f)(1) ....................................................27

N.J. Stat. § 5:12A-11(i) .........................................................27

N.J. Stat. § 5:12A-11(*l*) ........................................................27

N.J. Stat. § 5:12A-13(a)(11) ..................................................27

N.J. Stat. § 5:12A-16 ............................................................27

N.J. Stat. § 5:12A-19 .......................................................3, 27

## Rules and Regulations

Fed. R. App. P. 29(a)(2) ..........................................................2

Fed. R. App. P. 29(a)(4)(E) ......................................................2

N.J. Admin. Code § 13:69N-1.12 ..........................................27

## Other Authorities

@Kalshi, X (Feb. 18, 2021, 3:58 PM ET),
    https://perma.cc/85Y7-HMXW ........................................18

@Kalshi, X (Apr. 14, 2025, 11:15 AM ET),
    https://perma.cc/LM49-VEYD .....................................18, 24

@mansourtarek_, X (Nov. 16, 2021, 10:41 AM ET),
    https://perma.cc/626H-3PFM ..................................................................10

Associated Press, *California overwhelmingly votes no on sports
    betting*, ESPN (Nov. 9, 2022),
    https://tinyurl.com/3mj44ebd; ..........................................................30

Barry Ritholtz, *Transcript: Luana Lopes Lara*, The Big Picture (Apr.
    17, 2022, 12:00 PM),
    https://tinyurl.com/mt7cmtm6 ...........................................................14

Brady Dale, *Donald Trump Jr. joins Kalshi as an adviser,* Axios (Jan.
    13, 2025),
    https://tinyurl.com/bdew5udy;............................................................11

Brian Sausa, *Texas Sports Betting 2025 — Latest Texas Legal News*,
    Legal Sports Report (updated June 13, 2025),
    https://tinyurl.com/fddfh4dn..............................................................30

Carousel posted by Front Office Sports (@frontofficesports) and
    Kalshi (@kalshi_official), Instagram (June 12, 2025),
    https://tinyurl.com/2ma6ye7k ........................................................6, 26

*CFTC Designates KalshiEX LLC as a Contract Market*, CFTC (Nov.
    4, 2020), https://perma.cc/Q6D7-4EKN ...............................................3

CoinDesk, *LIVE: Brian Quintenz CFTC Nomination Hearing*, at
    1:14:05-53, YouTube (June 10, 2025),
    https://tinyurl.com/448dfdn4n .......................................5, 11, 25, 32

*Commodity Futures Trading Commission*, EEOC,
    https://perma.cc/PY94-B9EV ...........................................................32

*Contracts & Products*, CFTC,
    https://perma.cc/8QH2-3Z4J .............................................................14

*Contract Approval Filing Fees*, CFTC,
    https://tinyurl.com/jc8sujsa (last visited June 4, 2025) .....................29

Dan Bernstein, *CFTC Cancels Sports Futures Meeting With
    Gambling Groups*, Sportico (Apr. 24, 2025),
    https://tinyurl.com/4evhk977..............................................................32

Daniel O'Boyle, *Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows*, InGame (May 21, 2025), https://tinyurl.com/j2cbrkxf ................................................................. 18

Daniel O'Boyle, *Kalshi's Fee Revenue Was $15M Over Last 90 Days, Dwarfed By Top Sportsbooks*, InGame (May 28, 2025), https://tinyurl.com/bde8e3ju ................................................................. 18

Daniel Wallach, *Kalshi's Nevada Court Win May Be Short-Lived Due To Federal Wire Act Ban On Sports Betting*, Forbes (Apr. 15, 2025), https://perma.cc/W2J7-4JVF ................................................................. 23

DraftKings Sportsbook, https://sportsbook.draftkings.com/ ................................................................. 20

Dustin Gouker, *Five Interesting Things Kalshi CEO Tarek Mansour Said At Solana Accelerate*, Event Horizon (May 29, 2025), https://tinyurl.com/42h78scnd ................................................................. 29

Dustin Gouker, *Kalshi Volume Report: Tennis Betting Is Biggest Market Last Week*, Event Horizon (June 10, 2025), https://tinyurl.com/yeyuesmy ................................................................. 19

Dustin Gouker, *More Than 80% Of Kalshi Trading Volume Was On Sports Last Week*, Event Horizon (May 27, 2025), https://tinyurl.com/2295ww5e; ................................................................. 19

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/5a6x8kan ................................................................. 23

*Featured Markets*, IBKRForecastTrader, https://perma.cc/W2VL-NEUY ................................................................. 16

*Gambling & Young Adults*, Responsible Gambling https://tinyurl.com/djs8hfj (last visited June 4, 2025) ................................................................. 28

Help Center, *Signing Up as an Individual*, Kalshi, https://perma.cc/85WE-3K4A ................................................................. 28

Jill R. Dorson, *Indian Country Says CFTC Won't Take Any Action On Prediction Markets*, In Game (May 30, 2025),
https://perma.cc/KA4D-KTU5 ........................................................... 33

Justina Lee, *Two MIT Math Nerds Crack Open Legalized Gambling on Wall Street*, Bloomberg (May 30, 2025),
https://tinyurl.com/5czrczd6 ............................................................... 19

Kalshi,
https://kalshi.com/ ............................................................................... 17

Kalshi (@kalshi_official), *You can now legally put money on Basketball in all 50 States with Kalshi. Sign up now* 🏀, Instagram (June 11, 2025),
https://tinyurl.com/fdf4nds ............................................................. 6, 24

Kathryn Rand & Steven Light, *ICGR White Paper Series on the Regulation of Tribal Sports Wagering*, Int'l Center for Gaming Regulation (Sep. 2022),
https://tinyurl.com/53d7t7ub............................................................... 30

*Letter from American Gaming Association to CFTC, Re: Prediction Markets Roundtable* (Feb. 20, 2025),
https://tinyurl.com/3f5ndzu6............................................................... 31

*Letter from KalshiEX LLC to CFTC* (Jan. 22, 2025),
https://perma.cc/KM36-2VKD ............................................................. 3

*Letter from NBA to CFTC, Re: Prediction Markets Roundtable*, (May 1, 2025),
https://tinyurl.com/3f5ndzu6............................................................... 31

*Letter from Sporttrade to CFTC* (Apr. 25, 2025),
https://tinyurl.com/d83jfdna .............................................................. 26

Mari Novik, Marianna Gusti & Philip Stafford, *Prediction market with Trump ties threatens US sports bet sector*, Financial Times (May 29, 2025),
https://tinyurl.com/3w4bhhwu............................................................ 11, 18

Nathan Bomey, *Sports Event Contracts Are Not Gambling, Kalshi CEO Says*, Axios (Apr. 17, 2025), https://tinyurl.com/2pv455fx .................................................................14

*Securities and Exchange Commission*, EEOC, https://perma.cc/8PTU-R6EU .................................................................32

*Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts*, CFTC (Mar. 25, 2021), https://tinyurl.com/y3jzms7s.................................................5, 10, 11

*Swaps Report Data Dictionary*, CFTC, https://perma.cc/V7AW-B4SL .................................................................15

Tax Foundation, *Bets on Legal Sports Markets Pay Off Big for States, Sportsbooks, and Consumers* (Dec. 2024), https://tinyurl.com/y4zs554f.................................................................28

*Who Will Die in the White Lotus Season 3 Finale?*, Kalshi, https://perma.cc/S6VP-T5H6.................................................................17

*Will the Futures Market Go Up or Down? Choose a Side with Event Contracts*, CME Group, https://tinyurl.com/ytmuypsd.................................................................15

## INTERESTS OF AMICUS CURIAE

The Casino Association of New Jersey ("CANJ") is a trade organization that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders, and the public.  Its overarching mission is advocating for the ongoing revitalization of Atlantic City into a world-class destination resort and "Playground of the World," N.J. Stat. § 5:12-1(b)(3), which in turn drives economic growth, job creation, tax revenue, and overall prosperity in Atlantic City and beyond. In prior cases that impacted its members' interests, the CANJ has submitted amicus briefs.  *See, e.g.*, Brief of Proposed Amicus Curiae CANJ, *Antar v. BetMGM, LLC*, No. 24-1364 (3d Cir. Aug. 1, 2024), ECF No. 37; *Campione v. Adamar of New Jersey, Inc.*, 714 A.2d 299, 300 (N.J. 1998).

In the district court, the CANJ moved, over Plaintiff-Appellee KalshiEx LLC's ("Kalshi") objection, for leave to file an amicus brief.  JA59 (ECF No. 18). The district court granted the CANJ's motion eight days after it granted Kalshi's motion for a preliminary injunction.  JA59-60 (ECF Nos. 22 & 23).

The CANJ offers a unique and on-point perspective as to the parties' submissions.  In court, Kalshi calls itself a derivatives exchange and purports to offer businesses hedging opportunities, like other Commodity Futures Trading Commission ("CFTC")-regulated exchanges.  That account does not withstand

scrutiny. In actuality, Kalshi is a competitor to casinos like the CANJ's members, not the Chicago Mercantile Exchange, Chicago Board of Trade, or New York Mercantile Exchange. As a trade organization whose members work in the gaming space every day, the CANJ has deep expertise in the legal issues here, and it wishes to provide its distinct insight into the larger public interests that are served by New Jersey's continuing exercise of its established rights to regulate sports betting.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Until just a few years ago, sports betting was illegal in all but four States. *See Murphy v. NCAA*, 584 U.S. 453, 461-62 (2018). In 1992, Congress enacted the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. §§ 3701-04, which required the other 46 States to maintain their bans on sports betting. *See Murphy*, 584 U.S. at 467-68. In May 2018, however, the Supreme Court struck down PASPA. In so doing, the Court did not *Lochner*-ize sports betting. Rather, it simply returned this "controversial issue" back to the People. *Id.* at 484. "[E]ach State," the Court explained, was now "free to act on its own." *Id.* at 486.

Dozens of States, including New Jersey, took up the Court's invitation and enacted comprehensive statutory schemes for sports betting that protected children

---

[1]  No party's counsel authored this brief either in whole or in part, and no party or party's counsel, or person or entity other than amicus, its counsel, and its members contributed money intended to fund preparing or submitting this brief. Counsel for both parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2), (a)(4)(E).

and problem gamblers, preserved the integrity of sports leagues, and established Pigouvian taxes on bets to fund schools, roads, and other public goods. *See, e.g.*, Sports Wagering Act, N.J. Stat. §§ 5:12A-10 to -19. Companies around the country, including the CANJ's members, work assiduously to comply with these laws.

"What chumps!" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting). In April 2025, Kalshi convinced the U.S. District Court for the District of New Jersey (Kiel, J.) that, in fact, federal law makes sports betting legal nationwide and subject exclusively to the CFTC's jurisdiction. All a sports betting company had to do is follow three easy-peasy steps. First, register with the CFTC as a designated contract market.[2] Second, notify the CFTC that you intend to allow sports betting on your website.[3] Third, wait ten business days. *See* 7 U.S.C. § 7a-2(c)(1)-(2). If the CFTC does not intervene, presto!, the company has free license to offer sports betting nationwide, flout state laws that ban it, and ignore state regulations and taxes that restrict it.

Kalshi's win below rests on a house of cards, and the district court's endorsement of Kalshi's thesis is misconceived in multiple respects. The court accepted Kalshi's implausible theory that the 2010 Dodd-Frank Amendments to the

---

[2]  *See CFTC Designates KalshiEX LLC as a Contract Market*, CFTC (Nov. 4, 2020), https://perma.cc/Q6D7-4EKN.

[3]  *See Letter from KalshiEX LLC to CFTC* (Jan. 22, 2025), https://perma.cc/KM36-2VKD.

Commodity Exchange Act ("CEA"), just by adding one magic word ("swaps"), turned the CFTC into a national gaming commission with exclusive jurisdiction over sports bets. So concluding requires disregarding the defining thrust of Dodd-Frank, which was to empower the CFTC to regulate financial institutions' risky swaps that led to the 2008 financial crisis; making the CFTC a national gaming commission would only distract from its essential mission. Moreover, accepting Kalshi's theory requires assigning error to all nine Justices and every litigant (including the United States) in *Murphy*, who must (according to Kalshi) have deeply misunderstood the national gaming regime.

This Court should reverse, for the reasons stated in New Jersey's Brief, and for two more reasons outlined herein.

First, Kalshi's ask is far more extreme than it acknowledges. Kalshi portrays sports betting companies as having the choice between opting into federal regulation by registering as a CFTC-designated contract market or opting out of CFTC regulations and complying with the regulations of all 50 States. Yet that is a false choice. As the district court correctly noted, it is generally "unlawful for any person ... , to enter into a swap if it is not entered on, or subject to the rules of, a board of trade designated as a contract market." JA5 (citing 7 U.S.C. § 2(e)). As Kalshi board member and former CFTC Commissioner, Brian Quintenz, said in 2021, "all

contracts on future events are commodity futures contracts, which means *all future event contracts need to be traded on a regulated and registered futures exchange.*"[4]

If Kalshi wins this appeal, it is positioned to leverage its considerable influence to sic the federal government on casinos that comply with state law. This is no idle speculation: Mr. Quintenz—again, a Kalshi board member—has been nominated as CFTC Chair, and during his nomination hearing, he reaffirmed that trading event contracts (including sports event contracts) is illegal outside a CFTC-designated contract market.[5] Kalshi's suit is thus not just an effort to circumvent New Jersey law. It is a stalking horse for Kalshi to displace state regulators while crushing competitors.

Second, adopting Kalshi's legal arguments would severely undermine important public policies served by state gaming regulations.

The district court implicitly assumed that Kalshi is an ordinary CFTC-regulated designated contract market, offering trades that professional investors could find on the Chicago Mercantile Exchange ("CME"). But Kalshi is, in its

---

[4]    *Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts*, CFTC (Mar. 25, 2021), https://tinyurl.com/y3jzms7s (emphasis added).

[5]    CoinDesk, *LIVE: Brian Quintenz CFTC Nomination Hearing*, at 1:14:05-53, YouTube (June 10, 2025), https://tinyurl.com/448dfdn4n (Sen. Booker, asking, after reading Mr. Quintenz's prior dissent, "Do you still agree with that statement today?" Mr. Quintenz: "Uh, I do.").

words, a consumer-facing sports "betting"[6] company that, also in its words, aired an "UNHINGED AI NBA FINALS AD" featuring a beer-chugging extraterrestrial to entice more customers.[7]



(The video is available at https://tinyurl.com/46azpmmx.)  Kalshi is an online casino with a guerrilla marketing strategy, not the next CME competitor.

---

[6]  _Kalshi (@kalshi_official), *You can now legally put money on Basketball in all 50 States with Kalshi. Sign up now* 🏀, Instagram (June 11, 2025), https://tinyurl.com/fdf4nds.

[7]  Carousel posted by Front Office Sports (@frontofficesports) and Kalshi (@kalshi_official), Instagram (June 12, 2025), https://tinyurl.com/2ma6ye7k.

The injunction below would allow new market entrants to circumvent New Jersey's established legal framework for regulating sports betting. It would also disadvantage and imperil the entire existing industry that has organized itself to comply with that legal framework. At-risk groups like minors and problem gamblers would become casualties of this regulatory revolution. And if the district court's decision below were adopted by every circuit, sports betting would effectively become legalized nationwide by judicial fiat. This would override the will of the People in States as different as California and Texas, both of which have chosen to ban sports betting, and undermine the sovereignty of Indian Tribes that rely on gaming revenues.

Finally, Kalshi convinced the district court that compliance with New Jersey law would interfere with the CFTC's regulation of Kalshi. Not so. The CFTC is not a gaming commission, and it does not have the expertise, experience, or legal authority to replace the New Jersey Casino Control Commission or New Jersey Division of Gaming Enforcement. Kalshi has sued because it well grasps that "CFTC regulation" in this context amounts to *no* regulation—a regulatory vacuum. Kalshi is not trying to swap state gambling regulations for federal gambling regulations, which are nonexistent. Rather, it is here bidding to offer sports betting without answering to *any* meaningful constraints.

This Court should reverse.

**ARGUMENT**

I.    **KALSHI'S PREEMPTION ARGUMENT WOULD FEDERALIZE THE ENTIRE SPORTS BETTING INDUSTRY**

The district court's ruling below derived from its view that Section 2(a)(1)(A) of the CEA preempts, either expressly or via field preemption, state regulation of all "swaps," and that Kalshi's "sports event contracts" are a type of "swap."  JA11-14. New Jersey has shown why those arguments are wrong.  But it bears emphasizing that these arguments would have extreme, unintended consequences that the district court did not grapple with because Kalshi pretended they did not exist.

It is not the case, as Kalshi argued below, that its preemption argument "does not call into question [New Jersey's] regulation of casinos or other gambling establishments, none of which are CFTC-designated exchanges and are fundamentally different businesses than those exchanges."  Dist. Ct. ECF No. 2 at 13.  Whereas Kalshi suggested that traditional purveyors have a choice between (1) offering commodity futures contracts and swaps through registrations under the CFTC's purview and (2) subjecting themselves to state jurisdiction, that choice is illusory.  Once the transactions at issue fall within the CFTC's purview, state regulations would no longer have any place, nor would compliance with them afford comfort.

The CEA effectively prohibits "transactions involving swaps or contracts of sale of a commodity for future delivery" unless the trades take place on CFTC-

regulated exchanges.  *See* 7 U.S.C. § 2(a)(1)(A).  It is generally unlawful to "enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under [7 U.S.C. § 7]," *id.* § 2(e), and 7 U.S.C. § 6d(a)(1) "prohibits anyone from soliciting or accepting orders for swaps or options contracts if they are not registered with the CFTC as a futures commission merchant."  *CFTC v. Yukom Commc'ns Ltd.*, No. 19-cv-5416, 2021 WL 4477874, at *1 (N.D. Ill. Sept. 30, 2021).  7 U.S.C. § 6(a)(1) in turn makes it unlawful to facilitate "a contract for the purchase or sale of a commodity for future delivery" unless the relevant transaction is "conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity."  Knowing or willful violation of these provisions is a felony, carrying a fine up to $1 million and imprisonment of up to ten years.  *Id.* § 13(a)(2), (a)(5).  So, under the CEA, "only federally regulated exchanges, known as 'Designated Contract Markets' … can offer event contracts."  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 61 (D.C. Cir. 2024) (citation omitted).

Affirmance would therefore entail astonishing implications.  If, as the district court ruled, Kalshi's "sports event contracts" truly are "swaps" subject to the CFTC's "exclusive jurisdiction," then it would be illegal for *anyone* to offer "sports event contracts"—that is, sports bets, *see infra*, Part II.A—*outside* of a CFTC-

designated exchange.  In other words, law-abiding casinos and their customers would be branded felons and state gaming regulators branded usurpers.

Notably, the district court acknowledged this implication of its ruling only in passing—yet seemed untroubled.  *See* JA5 (observing it is generally "unlawful ... to enter into a swap if it is not entered on, or subject to the rules of, a board of trade designated as a contract market").  The same acknowledgement appears in the law review article that the court cited as its sole authority for ruling that "sports bets" are "swaps" subject to CEA preemption.  JA14; *see* Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 56 (2021) (arguing "that state laws that permit sports gambling ... in the form of a swap conflict with CEA § 2(e) and thus may be preempted by it").

Kalshi's leadership likewise grasps the larger implications of its argument.  In 2021, former CFTC Commissioner Brian Quintenz joined Kalshi's board.[8]  Just months earlier, Mr. Quintenz dissented when the CFTC moved to block a company from listing a type of sports event contract, insisting in his dissent that "football game[s]" are "commodities" subject to the CFTC's jurisdiction.[9]  His argument paralleled the argument Kalshi made below and that the district court adopted.  The

---

[8]    @mansourtarek_, X (Nov. 16, 2021, 10:41 AM ET), https://perma.cc/626H-3PFM.

[9]    *Statement of Commissioner Brian D. Quintenz*, *supra* note 4.

CFTC has exclusive jurisdiction over any event that is "associated with a financial, commercial, or economic consequence," and "practically any event has at least a minimal financial, commercial, or economic consequence."[10] "Got that? All events are commodities, which means all contracts on future events are commodity futures contracts, which means all future event contracts need to be traded on a regulated and registered futures exchange."[11]

In the event of affirmance, Kalshi will be primed to leverage its formidable political influence[12] to go after its competitors. Mr. Quintenz, who is still an active Kalshi board member, has been nominated to be CFTC Chair. During his nomination hearing before the Senate Committee on Agriculture, Nutrition, and Forestry, Mr. Quintenz confirmed he still subscribed to this view.[13]

---

[10]   *Id.*

[11]   *Id.*

[12]   *See* Brady Dale, *Donald Trump Jr. joins Kalshi as an adviser*, Axios (Jan. 13, 2025), https://tinyurl.com/bdew5udy; Mari Novik, Marianna Gusti & Philip Stafford, *Prediction market with Trump ties threatens US sports bet sector*, Financial Times (May 29, 2025), https://tinyurl.com/3w4bhhwu ("Kalshi has ties to the current administration," and its CEO "has posted pictures of himself with members of the Trump family on more than one occasion.").

[13]   CoinDesk, *supra* note 5, at 1:14:07-53.

In an effort to make this answer more palatable, Mr. Quintenz invented an illusory yet unsupported limitation on his prior statement. He stated that Kalshi's interpretation of the CEA does not bar sports wagering that is not conducted "across state lines." *Id.* at 1:14:54-15:24. There are two problems with this position.

*First*, the supposed distinction is alien to the statute. The relevant portions of the CEA do not tie the CFTC's jurisdiction or the criminal prohibition on

These implications of the district court's interpretation of the CEA would have shocked the *Murphy* Court.  Again, *Murphy* enforces federalism principles.  Specifically, the Court struck down PASPA as violating the "anticommandeering doctrine," which is "the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  584 U.S. at 470.  This doctrine "serves as 'one of the Constitution's structural protections of liberty.'"  *Id.* at 473 (citation omitted).  It also "promotes political accountability" by ensuring that "[v]oters who like or dislike the effects of [a] regulation know who to credit or blame."  *Id.*  With PASPA struck down, no federal law governed gambling directly.  Instead, Congress had enacted a series of laws that "implement a coherent federal policy:  They respect the

---

unregulated trading to acts that cross state lines.  *See* 7 U.S.C. §§ 2(a)(1)(A), 6(a)(1).  Nor does the Constitution impose such limitations.  Eight Justices in *Murphy* took the view that "Congress can regulate sports gambling directly" if it chooses.  584 U.S. at 486; *see id.* at 496 (Ginsburg, J., dissenting) ("Congress permissibly exercised its authority to regulate commerce by instructing States and private parties to refrain from operating sports-gambling schemes."); *cf. Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (reaffirming "Congress' power to regulate purely local activities").  Only one Justice expressed any "doubt" on this issue.  *Murphy*, 584 U.S. at 487 (Thomas, J., concurring).

*Second*, even if the CEA were limited in this way, it would still carry outsized implications.  It would mean that a person who travels or otherwise books a bet remotely between States where betting is legal commits a federal crime.  That breaks from federal criminal legislation addressing gambling, under which it is *not* illegal to travel or transfer information in interstate commerce to facilitate bets in States where gambling is legal.  *See* N.J. Br. 28-30.

policy choices of the people of each State on the controversial issue of gambling." *Id.* at 484; *see* N.J. Br. 19-20, 28-30 (federal statutes incorporate, rather than displace, state gambling restrictions). *Murphy* would, the Court emphasized, leave "each State … free to act on its own" on sports betting regulation. 584 U.S. at 486.

The Court wrote those words seven years ago. Yet it took the district court here just thirty days from the Complaint's filing to issue an injunction that is at odds with *Murphy*, federalizes regulation of the sports betting industry, and threatens to preempt all state sports betting laws. The ruling below presents far greater risk to liberty and political accountability than PASPA ever did. Reversal is not only warranted but imperative.

## II.    KALSHI'S PREEMPTION ARGUMENT WOULD UNDERMINE PUBLIC POLICY

### A.    Kalshi's Sports Contracts Are Just Traditional Sports Betting, Not "Swaps" Or "Event Contracts"

It is apparent how the district court, operating on an expedited schedule and without a hearing, may have been led astray. Kalshi took undue liberties (to say the least) in how it characterized itself and its so-called "sports event contracts."

Kalshi portrayed itself as a "financial services company" that "operates a derivatives exchange and prediction market" where investors trade "[e]vent contracts." JA22, 24 (¶¶12, 24). It likewise emphasized the importance of event contracts to financial markets, both as a hedging tool and a source of information to

the public.   JA24-25 (¶¶23-24, 26).   And it has insisted that its "sports event contracts" differ from traditional sports betting.  Kalshi's CEO has said, for example, that he does not "know what" Kalshi's offering of sports event contracts "has to do with gambling."[14]  Kalshi claims, instead, that it offers "[everyday] hedging … like retail, and Americans every day can hedge things like inflation, like rates, risks that we see and read about like in the news or on TV every day."[15]

That is all spin.  Event contracts traded on CFTC-regulated exchanges are, to be sure, important financial instruments.  But Kalshi's "sports event contracts"—and, indeed, most of its betting contracts—are nothing like traditional event contracts.  They are sports bets, nothing more.

The classic event contract "is a derivative contract whose payoff is based on a specified event, occurrence, or value such as the value of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane."[16]  CFTC-regulated "swaps"—which, Kalshi claims, its "sports event contracts" qualify as—likewise almost exclusively pay out based on events tied to assets, like interest rates, credit instruments, foreign exchanges, equities, and

---

[14]   Nathan Bomey, *Sports Event Contracts Are Not Gambling, Kalshi CEO Says*, Axios (Apr. 17, 2025), https://tinyurl.com/2pv455fx.

[15]   Barry Ritholtz, *Transcript: Luana Lopes Lara*, The Big Picture (Apr. 17, 2022, 12:00 PM), https://tinyurl.com/mt7cmtm6 (podcast interview with Kalshi co-founder).

[16]   *Contracts & Products*, CFTC, https://perma.cc/8QH2-3Z4J.

physical commodities.[17]  These types of contracts, of course, relate to events that are closely tied to, and thus can be used to hedge against, economic, corporate, and (in the case of weather) agricultural outcomes.[18]  Event contracts thus serve the same hedging function that futures contracts do.  "A farmer who takes a 'short' position in the futures market is protected against a price decline," while "a processor who takes a 'long' position is protected against a price increase."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982).  The same holds true for traders who buy and sell contracts that pay out if the "E-mini S&P 500 Daily close[s] above 5970.00 today" (a contract taken from the CME website, *see infra*).

A professional or retail investor looking to trade event contracts on a CFTC-regulated exchange is likely to trade contracts along the following lines.[19]

---

[17]    *See Swaps Report Data Dictionary*, CFTC, https://perma.cc/V7AW-B4SL (explaining the types of swaps, by category, listed in the CFTC's Weekly Swaps Report).

[18]    The CEA was originally enacted to regulate agricultural commodity futures.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-66 (1982).

[19]    *Will the Futures Market Go Up or Down? Choose a Side with Event Contracts*, CME Group, https://tinyurl.com/ytmuypsd (screenshot taken on June 13, 2025, 3:45 PM ET).



Other options on a CME-linked broker site include "Global Carbon Dioxide Emissions," "Monthly Average Global Temperature," likely "US Corporate Tax" rate in the new tax bill, and "US Initial Jobless Claims."[20]



---

[20]  *Featured Markets*, IBKRForecastTrader, https://perma.cc/W2VL-NEUY.

Someone logging on to Kalshi.com will find a very different set of bets. To be sure, Kalshi lists some traditional event contracts tied to economic measures, weather, and politics. But the leading "contracts" have nothing to do with hedging strategies. They pay out based on sports outcomes and cultural trivia. The Friday before this brief was filed, for example, the leading bet was who would win the "US Open Golf Championship," followed by who would win Game 4 of the NBA Finals. Other leading bets are political yet trivial (like "Will Trump publicly criticize Amy Coney Barrett before July?"), or just plain frivolous ("'Elio' Rotten Tomatoes score?" or, a few months ago, "Who will die in the White Lotus season 3 finale?").[21]



---

[21]    Kalshi, https://kalshi.com/ (screenshot taken 4:15 PM); *Who Will Die in the White Lotus Season 3 Finale?*, Kalshi, https://perma.cc/S6VP-T5H6.

To state the obvious, these "event contracts" are far afield from retail hedging services. Betting on who will win the U.S. Open is entertainment. It does not help a consumer hedge against rising grocery costs or a small business hedge against tariff policy. *Cf.* N.J. Br. 24-25. Kalshi itself once differentiated its event contracts from sports betting for this reason. Four years ago, it Tweeted "Risk hedging is a very important part of the value prop of event contracts and differentiates them from gambling instruments. We do not do sports."[22]

Now things have changed. Today, Kalshi's daily sports betting fees generate exponentially more revenue than total fees charged for all non-sports prediction sectors *combined*.[23] Kalshi, in fact, receives a greater portion of its revenue from sports betting than the leading sports betting platforms, DraftKings and FanDuel.[24] Kalshi's trades on the March Madness college basketball tournament generated $500 million in market volume alone.[25] In April, Kalshi processed $86 million in bets on the Masters Tournament.[26] In early June, bets on the French Open accounted for

---

[22] @Kalshi, X (Feb. 18, 2021, 3:58 PM ET), https://perma.cc/85Y7-HMXW.

[23] Daniel O'Boyle, *Kalshi's Fee Revenue Was $15M Over Last 90 Days, Dwarfed By Top Sportsbooks*, InGame (May 28, 2025), https://tinyurl.com/bde8e3ju.

[24] Daniel O'Boyle, *Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows*, InGame (May 21, 2025), https://tinyurl.com/j2cbrkxf.

[25] Novik et al., *supra* note 12.

[26] @Kalshi, X (Apr. 14, 2025, 11:15 AM ET), https://perma.cc/LM49-VEYD.

more than 30% of all Kalshi trades.[27]  Sports betting more broadly has consistently made up about 80% of all bets on Kalshi's website, sometimes ranging as high as 90%.[28]

Kalshi's explanation for why these "sports event contracts" are not real sports betting rests on a hollow technicality:  Its traders "do not bet against the house, but rather enter into contracts with other traders on an exchange."  JA46 (¶27).  But that does not make a dime's worth of difference to a betting customer.  For all practical purposes, Kalshi's sports event contracts are sports betting by another name.  Offering the opportunity to spend $50 on the bet that the Oklahoma City Thunder will win the NBA Championship, with the possibility of a $100 payout, is no different than taking a bet of $50 with +100 or 1:1 odds.  Relabeling sports bets as "sports event contracts" is just a marketing maneuver, and not one that makes any substantive difference legally or economically.  *See, e.g.*, N.J. Stat. § 5:12A-10 (defining "sports pool" to include "exchange wagering").  It is like a company

---

[27]  Dustin Gouker, *Kalshi Volume Report: Tennis Betting Is Biggest Market Last Week*, Event Horizon (June 10, 2025), https://tinyurl.com/yeyuesmy.

[28]  *See id.*; Dustin Gouker, *More Than 80% Of Kalshi Trading Volume Was On Sports Last Week*, Event Horizon (May 27, 2025), https://tinyurl.com/2295ww5e; Justina Lee, *Two MIT Math Nerds Crack Open Legalized Gambling on Wall Street*, Bloomberg (May 30, 2025), https://tinyurl.com/5czrczd6.

opening an unauthorized casino just by calling its craps games "Dice Contracts" or its Blackjack tables "Card Contracts."

Consider a consumer who visits Kalshi.com and is dissatisfied with the odds it lists for the U.S. Open and the NBA Finals. She starts to shop for other options. The CME website and other CFTC-regulated exchanges do not list golf and basketball contracts. The only companies that do are DraftKings and other sports betting companies not registered with the CFTC.[29]

---

[29] DraftKings Sportsbook, https://sportsbook.draftkings.com/ (screenshots taken at 10:00 PM ET on June 12 and 13, 2025).





Kalshi, in short, offers the same "contracts" that sports betting companies do and operates in the market no differently from a sports betting company.

Kalshi knows that it is offering regular sports betting.  Kalshi markets its sports event contracts to gamblers—not to commodity traders or sports books looking to hedge house bets.  Indeed, Kalshi has repeatedly advertised itself on social media as "sports betting."  Sample tags include: "The First Nationwide Legal Sports Betting Platform"; "Betting on Kalshi, the first app for legal sports betting in all 50

states"; and "Sports Betting Legal in all 50 States on Kalshi."[30]  See, for example,

Kalshi's social media posts from earlier this year.[31]



[30]    Daniel Wallach, *Kalshi's Nevada Court Win May Be Short-Lived Due To Federal Wire Act Ban On Sports Betting*, Forbes (Apr. 15, 2025), https://perma.cc/W2J7-4JVF.

[31]    *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/5a6x8kan.



And just six days ago, Kalshi posted an Instagram video bragging that, with its win below, it had "made betting on sports accessible in all 50 States."[32]

Kalshi's X account also periodically posts screenshots of its live markets to encourage gambling. These screenshots directly resemble odds markets, and nothing more.[33]

---

[32]     Kalshi (@kalshi_official), *supra* note 6.

[33]     *E.g.*, @Kalshi, X (Apr. 14, 2025, 11:15 AM ET), https://perma.cc/LM49-VEYD.



In short, Kalshi cannot credibly claim so-called "sports event contracts" are anything other than sports betting. Outside of court, it has already said the silent part aloud. These contracts do not, as Mr. Quintenz claimed, offer "people the opportunity for risk management, price discovery, and price dissemination."[34] They are, just like all sports bets, mere entertainment targeted towards consumers. Kalshi is seeking to replace traditional sports betting by targeting traditional gaming organizations' customers. And it is trying to get a leg up on competitors by being

---

[34] CoinDesk, *supra* note 5, at 1:05:08-12.

more entertaining—using memes and AI-generated advertisements featuring people riding alligators and extraterrestrials chugging beer[35]—while capitalizing on court-awarded injunctions.

Kalshi should of course be free to compete on the open market, like others do. But it should be forced to play by the same rules as everyone else[36] and denied the anomalous injunction it obtained below.

### B. New Jersey's Sports Betting Regulations That Kalshi Seeks To Preempt Serve Important Purposes

Kalshi has treated with disdain the various state regulations that the CANJ's members follow and Kalshi flees. But those regulations are grounded in vital considerations of public policy, by which States seek to promote the welfare of their residents, safeguard sporting and gaming integrity, deter unlawful conduct, and fund government services. *See* N.J. Br. 3-6, 51. Kalshi's position impedes the capacity of States to accomplish these essential goals.

To illustrate the full impact of Kalshi's arguments, consider two hypothetical betters, John and Jane, who want to bet on NFL over / under win totals for the

---

[35] Carousel, *supra* note 7.

[36] For example, another sports betting exchange, Sporttrade, complies with New Jersey gaming regulations while offering the same products. *See Letter from Sporttrade to CFTC* (Apr. 25, 2025), https://tinyurl.com/d83jfdna.

upcoming 2025 season.  John places a wager with a traditional sportsbook regulated by New Jersey state gaming authorities.  Jane buys a sports event contract on Kalshi.

John's experience with the traditional sportsbook aligned with standard practice across the country.  John was first drawn to this particular sportsbook by one of its online advertisements, which contained a disclaimer about resources for problem gamblers.  *See* N.J. Stat. § 5:12A-13(a)(11).  When he went to place his bet, the sportsbook made sure that John was 21 years or older, *see id.* § 5:12A-11(e), and checked his name against a long list of athletes, coaches, referees, game managers, and persons with ownership interests in sports teams or organizations, who are prohibited from placing sports bets, *see id.* § 5:12A-11(f)(1).  The sportsbook also confirmed that John was located either in the same State, or at least, in a State that has legalized sports betting, *see id.* §§ 5:12A-11(*l*), 5:12A-19, and was not engaged in abnormal activity that would raise concerns about integrity of sports games, money laundering, or use of false identification, *see id.* § 5:12A-11(i); N.J. Admin. Code § 13:69N-1.12.

At the end of the year, the sportsbook tallied up all of the sports bets that it had received from customers like John and paid proportionate taxes plus other fees to the relevant State.  *See* N.J. Stat. § 5:12A-16 (14.25% tax on online sports wagering, 9.75% tax on brick and mortar sports wagering).  All told, that State received millions of dollars in taxes and fees.  *See* Tax Foundation, *Bets on Legal*

*Sports Markets Pay Off Big for States, Sportsbooks, and Consumers* 13 (Dec. 2024), https://tinyurl.com/y4zs554f (over $125 million in tax collections from sports wagering by New Jersey in 2024). The State used a portion of those funds to combat compulsive or problem gamblers, *see* N.J. Stat. § 5:12A-11(a), and the remainder went to important public services.

Jane's experience with Kalshi differed vastly. Jane was drawn to Kalshi by one of their advertisements, which, although similar to those of a traditional sportsbook, *see supra* pp.22-24, was not required to contain a disclaimer about resources for problem gamblers. When Jane went to buy a "sports event contract," Kalshi cared only that she was 18 years or older.[37] Studies show that 18 to 20-year-olds are "significantly more likely to have chased their losses and bet more than they could afford."[38] Nor did Kalshi care whether Jane lived in a State where sports gambling was illegal. *But see* 18 U.S.C. § 1084 (making it a crime to offer a sports gambling business unless sports betting is legal in the State where it takes place). And even though Kalshi now encourages individuals to bet their *retirement savings*

---

[37] Help Center, *Signing Up as an Individual*, Kalshi, https://perma.cc/85WE-3K4A.

[38] *Gambling & Young Adults*, Responsible Gambling https://tinyurl.com/djs8hfj (last visited June 4, 2025).

on its "sports event contracts"[39]—creating an extraordinary incentive to do what it takes to win—Kalshi did not check to see if Jane is an athlete, coach, referee, or manager (or an agent for the same) who might be able to influence the outcome of her bets.

At the end of the year, Kalshi did not pay a portion of its sports gambling revenues to any State or the federal government. Instead, it paid a small, upfront amount for the CFTC to approve each of its sports event contracts.[40]

*    *    *

The difference between these two scenarios is stark and manifests in several ways. Even if Jane is an 18-year-old college freshman on the Rutgers basketball team, Kalshi would let her bet on her own games, notwithstanding the threat to competitive integrity and concern about youth betting. Or Jane could be a problem gambler in need of crucial government resources, yet Kalshi would never inform her about those resources or fund them through taxes.

These examples and many more evidence the threat that Kalshi's current position poses to the dozens of States and Tribes that regulate sports betting in

---

[39] *See* Dustin Gouker, *Five Interesting Things Kalshi CEO Tarek Mansour Said At Solana Accelerate*, Event Horizon (May 29, 2025), https://tinyurl.com/42h78scnd.

[40] *See Contract Approval Filing Fees*, CFTC, https://tinyurl.com/jc8sujsa (last visited June 4, 2025) ($6,000 for each futures contract, with $600 for each successive contract in the same submission).

furtherance of critical public policies—not to mention the many States that have chosen to ban it outright.[41]  They also show the threat that Kalshi's suit poses to casinos—like the CANJ's members—that do play by the rules and will now be put at a competitive disadvantage because they remain committed to complying with state law.

### C.    The CFTC Does Not And Cannot Act As A National Gaming Commission

Nor should this Court assume that, upon affirmance, the CFTC will suddenly step in and fill the gap with gaming regulations that replicate or improve upon New Jersey's.  Even setting aside the revenue losses that States will suffer if Kalshi wins, the CFTC does not have regulations that protect against problem gambling or sports players throwing matches.  Nor does the CFTC have any experience handling the day-to-day problems confronted by state gaming commissions.

Consider the special challenges that must be confronted in just protecting sports integrity.  Commodity traders might at times trade on inside information, but unlike professional athletes, they cannot *influence* the outcomes they trade by, for

---

[41]    *See, e.g.*, Brian Sausa, *Texas Sports Betting 2025 — Latest Texas Legal News*,  Legal Sports Report (updated June 13, 2025), https://tinyurl.com/fddfh4dn; Associated Press, *California overwhelmingly votes no on sports betting*, ESPN (Nov. 9, 2022), https://tinyurl.com/3mj44ebd; Kathryn Rand & Steven Light, *ICGR White Paper Series on the Regulation of Tribal Sports Wagering*, Int'l Center for Gaming Regulation at 6-7 (Sep. 2022), https://tinyurl.com/53d7t7ub (noting that Tribes in several States have compacts allowing them to offer gaming services).

example, throwing games. For that reason, the NBA, despite its support for sports betting in general, has expressed significant concern about the rise in sports event contracts on Kalshi, given the CFTC's "lack of oversight and regulation tailored to the specific circumstances of sports wagering."[42] The CFTC does not mandate that "either exchanges or brokers report potentially suspicious trades or trading patterns to an affected league or cooperate with any league-run investigations into such suspicious activity," nor does it "require ongoing information sharing between exchanges and affected leagues."[43] Absent such controls, leagues have little ability to catch sports insiders who are placing improper bets.

Likewise, commodity futures markets have historically had fewer connections with organized crime than sports betting. As a result, the CFTC has not developed the same types of "Know Your Customer (KYC) and anti-money laundering (AML) protocols, ... and integrity monitoring" that many States mandate.[44]

Although Kalshi has made much of the fact that the CFTC imposes many regulations on its designated contract markets, the key point is that the CFTC does

---

[42]   *Letter from NBA to CFTC, Re: Prediction Markets Roundtable*, at 2 (May 1, 2025), https://tinyurl.com/3f5ndzu6.

[43]   *Id.*

[44]   *See Letter from American Gaming Association to CFTC, Re: Prediction Markets Roundtable*, at 2 (Feb. 20, 2025), https://tinyurl.com/3f5ndzu6.

*not* impose *gaming* regulations on them.  Affirmance would accordingly create a regulatory vacuum for sports betting on CFTC-designated markets.

That will not change any time soon.  The CFTC has fewer than 700 employees.[45]  For comparison, the SEC has nearly 4,000.[46]  The CFTC does not have the manpower to fulfill its primary responsibility (regulating derivatives markets) while also transforming itself into a national gaming commission.  And it has no intention of taking on this role.  Mr. Quintenz stated during his nomination hearing that he had no "plans to issue any guidance" on sports event contracts "in the near term."[47]  His disavowal comes on the heels of the CFTC abruptly and inexplicably canceling a "roundtable" it had planned to host this Spring on sports prediction markets after stakeholders far and wide expressed serious concern about Kalshi's operations.[48]

Even if a future CFTC wanted to try, it would be ill-equipped to replace state gaming commissioners.  The CFTC, according to Kalshi and the district court, does not punish exchanges that list improper contracts.  Instead, according to them, it

---

[45]    *Commodity Futures Trading Commission (CFTC)*, EEOC, https://perma.cc/PY94-B9EV.

[46]    *Securities and Exchange Commission (SEC)*, EEOC, https://perma.cc/8PTU-R6EU.

[47]    CoinDesk, *supra* note 5, at 1:08:18-21.

[48]    Dan Bernstein, *CFTC Cancels Sports Futures Meeting With Gambling Groups*, Sportico (Apr. 24, 2025), https://tinyurl.com/4evhk977.

wields its regulatory power through the so-called "Special Rule," 7 U.S.C. § 7a–2(c)(5)(C)(ii), a part of Dodd-Frank that allows the CFTC to issue regulations barring certain contracts and to suspend contracts that violate those regulations. JA14. Such a feeble cudgel cannot meaningfully check the vastness of the sports betting industry operating nationwide. Indeed, the present CFTC acting Chair told Tribes that complained about Kalshi that the CFTC has *never*, in fifty years, sought to punish an exchange that listed contracts banned by CFTC regulations.[49]

This regulatory scheme also would leave the CFTC free to pick industry winners and losers, based on the prevailing political winds. The Special Rule allows the CFTC, after all, to suspend contracts it considers wrongful, but the contracts can be listed absent affirmative action. So if the CFTC were to, say, ban sports event contracts listed by one company, while doing nothing when a politically-connected company lists the same contracts, its inaction would be unreviewable. *See* N.J. Br. 50. That of course, is what happened here: The CFTC blocked Crypto.com from listing sports event contracts just days before Kalshi listed its own version of the same contracts, yet the CFTC took no action against Kalshi. JA29 (¶42).

---

[49] Jill R. Dorson, *Indian Country Says CFTC Won't Take Any Action On Prediction Markets*, In Game (May 30, 2025), https://perma.cc/KA4D-KTU5 ("Both sources said that Pham told participants that in its 50 years of existence, the CFTC has never denied or taken action against a contract.").

It is not plausible that Congress wrote Dodd-Frank to give the CFTC unchecked authority to confer national gambling licenses by default. Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). And "mere deliberate agency inaction—an agency decision *not* to regulate an issue—will not alone preempt state law." *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 247 (3d Cir. 2008) (emphasis in original). The statutory scheme that Kalshi envisions is a recipe for regulatory dereliction, corruption, gaming scandals, and ultimately distrust in the CFTC and the markets it regulates. That is not remotely what Congress wanted, intended, or prescribed when it discretely checked the risky swaps that had precipitated the 2008 financial crisis.

## CONCLUSION

This Court should reverse.

Dated: June 17, 2025

Respectfully submitted,

*/s/ Derek L. Shaffer*

Owen B. Smitherman
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
300 W. 6th Street Suite 2010
Austin, TX 78701
(737) 667-6100
owensmitherman@quinnemanuel.com

Derek L. Shaffer
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

Alex H. Loomis
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

## COMBINED CERTIFICATE OF COMPLIANCE

1.      Pursuant to this Court's Local Appellate Rules ("LAR") 28.3(d) and 46.1(e), as the signatory on the foregoing document, I am admitted and a member in good standing at the Bar of this Court.

2.      This brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure ("FRAP") because this brief contains 6,132 words, excluding the parts of the brief exempt by FRAP 32(f) and LAR 29.1(b).

3.      This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

4.      The text of the electronic brief is identical to the text in any paper copies.

5.      A virus detection program has been run on the file, and no virus was detected. The virus detection program used is Microsoft Defender.

Dated: June 17, 2025                                    Respectfully submitted,

                                                        */s/ Derek L. Shaffer*
                                                        Derek L. Shaffer

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief for Amicus Curiae with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 17, 2025                                  Respectfully submitted,

                                                      */s/ Derek L. Shaffer*
                                                      Derek L. Shaffer