No. 25-1922

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

KALSHIEX LLC,
*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY, ET AL.,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of New Jersey
No. 1:25-cv-02152
The Honorable Edward S. Kiel

---

BRIEF OF AMERICAN GAMING ASSOCIATION
AS AMICUS CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL

---

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

Kevin King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Eli Nachmany
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST OF AMICUS CURIAE .......................... 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT .................................................................................... 4

I.    Kalshi's approach undermines the States' strong interest in enforcing sports-wagering regulations. ................................................. 4

    A.    New Jersey's legal gambling regime is specifically designed to protect residents and provide important public benefits. ..................... 5

        1.    New Jersey has adopted a comprehensive sports betting regulatory scheme. ...................................................... 6

        2.    This regulatory scheme provides significant benefits to New Jersey and its residents. ..................................... 10

    B.    Kalshi's sports wagers undermine the protections and benefits offered by New Jersey's regulatory framework. ............................... 12

    C.    The CFTC is ill-equipped to regulate the sports-betting market. ...... 15

II.    Congress speaks clearly when it displaces state gaming law, and the CEA has no clear statement to this effect. .................................... 19

    A.    Sports betting has long been regulated by the States, and Kalshi's attempted workaround contravenes this carefully crafted system. ...................................................................... 20

    B.    When Congress has enacted gaming laws, it has spoken clearly and specifically delineated between federal and state regulation. ..... 21

    C.    Familiar canons of construction establish that the CEA does not preempt state sports betting laws. ..................................... 24

    D.    The CFTC's regulations foreclose Kalshi's preemption argument. .......................................................................... 27

CONCLUSION ................................................................................ 29

CERTIFICATE OF COMPLIANCE ................................................... 30

CERTIFICATE OF BAR MEMBERSHIP ........................................... 31

CERTIFICATE OF SERVICE ........................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

*Flynt v. Bonta*,
131 F.4th 918 (9th Cir. 2025) ...............................................................5

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999).................................................................5, 10

*Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*,
90 F.4th 919 (7th Cir. 2024) ...............................................................25

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)...............................................................24

*Michigan v. Bay Mills Indian Community*,
572 U.S. 782 (2014)...............................................................23

*Murphy v. NCAA*,
584 U.S. 453 (2018).......................................... 5, 18, 19, 21, 22, 23, 24

*Reuters, Ltd. v. FCC*,
781 F.2d 946 (D.C. Cir. 1986)...............................................................28

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996)...............................................................23

*United States v. Lopez*,
514 U.S. 549 (1995)...............................................................20

*West Virginia v. EPA*,
597 U.S. 697 (2022)...............................................................27

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001)...............................................................3

**Statutes and Regulations**

7 U.S.C. § 7a-2 ...............................................................27, 28

7 U.S.C. § 9 ...............................................................28

7 U.S.C. § 13a-1 ................................................................28

15 U.S.C. § 8302 ..............................................................27

18 U.S.C. § 1084 ..............................................................22

25 U.S.C § 2701 ...............................................................23

28 U.S.C. § 3704 ..............................................................22

31 U.S.C. § 5362 ..............................................................22

31 U.S.C. § 5363 ..............................................................22

N.J. Stat. Ann. § 5:12-11 ...................................................10

N.J. Stat. Ann. § 5:12-80 .....................................................7

N.J. Stat. Ann. § 5:12-84 ..................................................7, 9

N.J. Stat. Ann. § 5:12-91 .....................................................7

N.J. Stat. Ann. § 5:12-92 .....................................................7

N.J. Stat. Ann. § 5:12-96 ..................................................7, 8

N.J. Stat. Ann. § 5:12-112 ...................................................7

N.J. Stat. Ann. § 5:12A-13 ..................................................9

17 C.F.R. § 40.11 ..............................................................28

N.J. Admin. Code § 13:69A–9.4 ...........................................9

N.J. Admin. Code § 13:69C-14.2 ........................................14

N.J. Admin. Code § 13:69G-2.3 ..........................................13

N.J. Admin. Code § 13:69G-2.4 ..........................................14

N.J. Admin. Code § 13:69N-1.2 ............................................9

N.J. Admin. Code § 13:690-1.4 ..........................................14

**Other Authorities**

AGA, *Responsibility* (accessed June 16, 2025) .........................................8

AGA, *Responsible Gaming Regulations and Statutes Guide* (Sept. 1, 2022) ...............................................................................................8

AGA, Responsible Play (accessed June 17, 2025) .................................14

AGA, *State Advocacy & Regulatory Engagement* (accessed June 17, 2025) ..............................................................................................21

AGA, *State of the States: The AGA Survey of the Commercial Casino Industry* (2025).............................................................8, 10, 11, 13, 21

AGA, *Wisconsin Fact Sheet* (2025).........................................................23

Appellee's Br., *KalshiEx LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ............................................................................................27

Becky Harris, *Regulated Sports Betting: A Nevada Perspective*, 10 UNLV Gaming L.J. 75 (2020).........................................................20

CFTC, *U.S. Equal Employment Opportunity Commission* (archived June 17, 2025)....................................................................................15

Defs.' Opp. to Prelim. Inj. Mot., *KalshiEX LLC v. Flaherty*, No. 1:25-cv-2152, ECF No. 15 (D.N.J. Apr. 18, 2025).........................................9

Dustin Racioppi, *New Jersey Sports Betting Now Legal as Gov. Phil Murphy Signs Bill into Law* (June 11, 2018) .........................................7

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2024) ..........................16

H.R. Rep. No. 109-412 (2006).................................................................22

KalshiEX LLC, *Responsible Risk Management* (May 2025)..................13

KalshiEX LLC, *Voluntary Opt-Out* (May 2025)....................................13

Kendall Howell, *You Can Bet on It: The Legal Evolution of Sports Betting*, 11 Harv. J. Sports & Ent. L. 73 (2020) .................................11

*Legality Map: The State of Betting in the U.S.*, USA Today: Sports
Data (accessed June 17, 2025)................................................................20

Letter from Alexandra Roth, General Counsel, NBA, to Commodity
Futures Trading Comm'n (May 1, 2025) ...........................................18

Mem. Supp. Pl.'s Mot. Summ. J., *KalshiEx LLC v. CFTC*, No. 23-
03257, ECF No. 17-1 (D.D.C. Jan. 25, 2024) ...................................26

N.J. Att'y Gen., *Creating a Legal Framework for Sports Wagering*
(archived June 12, 2025).......................................................................12

New Jersey Office of the Attorney General, *DGE Announces
December 2024 Gaming Revenue Results* (Jan. 16, 2025)................11

OpenGovPay, *New Jersey Division of Gaming Enforcement Salaries*
(archived June 17, 2025).......................................................................15

Pat Forde*, Inside the Alabama Baseball Gambling Scandal*, Sports
Illustrated (July 10, 2023)....................................................................17

Tex. Att'y Gen. Op. KP-0057 (2016) ......................................................20

Wayne Parry, *Gov. Murphy Places First Wager as New Jersey Begins
Taking Legal Sports Bets*, WHYY (June 14, 2018) ..........................11

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The American Gaming Association ("AGA") is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and sports betting operators. AGA's members participate in gaming markets throughout the United States, which generate $53 billion in annual tax revenue and support 1.8 million jobs nationwide. On behalf of its members, AGA works with law enforcement, elected officials, state agencies, and tribal leaders to combat illegal sports gambling and to promote next-generation regulatory regimes.

AGA submits this brief to address the disruptive effects that Kalshi's unlicensed sports wagers will have on the carefully crafted regulatory framework adopted by New Jersey and other states. Given the particular expertise and commitment of resources necessary for effective oversight of sports-betting markets, AGA is concerned that the Commodity Futures Trading Commission ("CFTC") is not equipped to carry out the regulatory role traditionally played by state governments. More broadly, AGA and its members have a strong interest in orderly

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, undersigned counsel certifies that (i) no counsel for any party authored this brief in whole or in part, (ii) no entity or person, aside from amicus curiae or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief, and (iii) all parties have consented to the filing of this brief.

application of federal law, which consistently complements and facilitates state regulation of sports wagers—rather than preempting it as Kalshi asserts.

## SUMMARY OF ARGUMENT

Kalshi has made an extraordinary assertion: It does not need to comply with state sports-betting laws. To arrive at that conclusion, Kalshi has creatively interpreted federal commodities law and is now attempting to pass off its sports wagers as derivatives regulated exclusively by the CFTC. That unprecedented argument fails for two main reasons.

*First*, it would upend the well-established system of state gaming regulation. Licensed gaming operators have partnered with state governments to develop and implement sports-wagering laws that advance each state's priorities. These laws vary in many ways, but they all serve important purposes: they incorporate safeguards for responsible gaming; protect the integrity of sports wagers and the underlying sporting events; and generate substantial tax revenue for roads, schools, and other public programs. Kalshi seeks to offer its unlicensed sports wagers without satisfying any of those requirements. Federal regulation by the CFTC cannot fill that void because the agency lacks the legal authority, experience, and resources necessary to provide effective oversight of sports-wagering markets— particularly on the vast, nationwide scale adopted by Kalshi.

*Second*, Kalshi's preemption claim conflicts with the overarching structure of federal gaming law, which consistently respects the States' role in regulating sports wagering. Courts require Congress to speak clearly if it wishes to alter the balance of federal-state power, but Congress has not taken that step here. On the contrary, federal statutes including the Wire Act, the Unlawful Internet Gambling Enforcement Act, and the Indian Gaming Regulatory Act directly address regulation of sports wagers and expressly authorize states to adopt their own laws on the issue. Kalshi's argument would effectively require the Court to abrogate those statutes, without so much as a hint that Congress intended to do so. The CFTC's regulations and Kalshi's prior statements both support the same commonsense conclusion—that obscure provisions of the Commodity Exchange Act ("CEA") do not allow futures exchanges to bypass state sports-wagering laws.

The Supreme Court has repeatedly cautioned that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). Kalshi's preemption argument runs headlong into that principle. It insists that, despite decades of experience to the contrary, the CEA "hide[s]" a sports wagering "elephan[t]" in a statutory "mousehol[e]." *Id.* This Court should reject that novel theory and reverse the District Court's order.

3

## ARGUMENT

**I.     Kalshi's approach undermines the States' strong interest in enforcing sports-wagering regulations.**

In our federal system, states have a strong public interest in being able to enforce their sports wagering laws.  Unless this Court intervenes, Kalshi will continue to circumvent New Jersey's comprehensive gambling safeguards to the detriment of gaming patrons, New Jersey residents, licensed gaming operators, and the State.

New Jersey is among 39 states and the District of Columbia that have authorized what was previously an unlawful activity in most jurisdictions: sports betting.  In so doing, the State has implemented a comprehensive regulatory scheme that addresses the specific needs and interests of New Jersey and its residents.  These regulations protect consumers; raise revenue for public purposes; and safeguard the integrity of betting markets and the sporting events on which those markets are based.  A company offering sports betting in New Jersey must be licensed by the State.  Once the company obtains a license, its employees and services must meet the highest ethical standards, and it must pay significant fees for the privilege of maintaining the license—alongside the taxes that it must pay on its revenue from betting.

Kalshi's offering of unauthorized sports wagering in New Jersey sidesteps every aspect of this comprehensive scheme.  By doing so, Kalshi not only bypasses

the will of New Jersey's voters, whose elected leaders have put these protections in place, but also ignores decades of federal law expressly respecting, even promoting, the leading role of states in implementing their own gambling laws. *See, e.g., Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999) ("That Congress has generally exempted state-run lotteries and casinos from federal gambling legislation reflects a decision to defer to, and even promote, differing gambling policies in different States."); *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025) ("Gambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area.").

## A.    New Jersey's legal gambling regime is specifically designed to protect residents and provide important public benefits.

States have taken many different approaches to gambling. Each state-law framework differs from the next regarding issues such as the types of wagers that may be offered, the rate of taxation and the uses of the resulting revenues, the licensing requirements for operators, the places where gaming is authorized, and whether online wagering is permitted.

Over the years, New Jersey has refined its legal regime to fit the State's particular needs. Indeed, when Congress attempted to prevent New Jersey from updating its sports betting laws, the State successfully litigated—all the way to the Supreme Court—its right to craft its own tailored regulatory framework. *See Murphy v. NCAA*, 584 U.S. 453 (2018). Today, sports betting in New Jersey is safe,

regulated, and fair.  Moreover, New Jersey's comprehensive gaming laws provide important economic benefits to the State and its residents.

Kalshi offers sports wagers that do not comply with New Jersey's—or any state's—gambling laws.  Instead, Kalshi seeks refuge in derivatives markets, asserting the existence of a federal workaround to New Jersey's carefully crafted framework.  The District Court's decision means that Kalshi is not subject to *any* of New Jersey's gambling safeguards despite offering a sports betting service within the State.  That is a remarkable development—and a most unfortunate one.  The gaming industry, including AGA and its members, has worked closely with states like New Jersey to ensure that sports-betting laws balance the economic benefits of gaming with protections for responsible gambling.  Kalshi's sports wagers upset that balance.  In its place, Kalshi seeks to elevate the CFTC to the position of America's sports-betting regulator—a role that Congress did not bestow upon the agency and that the CFTC has neither the experience nor the resources to undertake.

### 1.    New Jersey has adopted a comprehensive sports betting regulatory scheme.

Regulation of gambling has been the subject of active debate throughout much of America's history.  Predictably, states have experimented with a variety of standards—a happy incident of federalism.  These experiments reflect each polity's judgments about what is best for their respective states.  Laws governing gambling thus demonstrate the will of the people in a given state.

New Jersey's sports-wagering laws are no exception. In 2018, the state legislature passed, and the Governor signed into law, a bill that legalized sports betting in the State. The Governor described the law as "the right move for New Jersey" and a means of "strengthen[ing] our economy."[2]

Enactment of New Jersey's sports betting law did not create a free-for-all; instead, it established a highly regulated market crafted to maximize consumer protection and economic benefits. To conduct a gaming operation in New Jersey, a proprietor must obtain a gaming license. *See* N.J. Stat. Ann. § 5:12-112. Gaming licenses are the central means by which New Jersey regulates the operations of gaming entities and ensures a safe and effective marketplace. They are the proverbial keys to the market, and legal operators understand that gaming licenses are a privilege that must be earned on both an initial and ongoing basis. To ensure that licensees are deserving of this privilege, the New Jersey Casino License Bureau conducts extensive investigations of every officer, director, principal employee, backer, or significant investor of any license applicant. *See* N.J. Stat. Ann. §§ 5:12-80, 5:12-84, 5:12-91, 5:12-92. Even once licensed, holders of a casino license and their affiliates are subject to continued monitoring and compliance requirements. *See, e.g.*, N.J. Stat. Ann. § 5:12-96.

---

[2] Dustin Racioppi, *New Jersey Sports Betting Now Legal as Gov. Phil Murphy Signs Bill into Law*, NorthJersey.com (June 11, 2018), https://perma.cc/65VW-ML6P.

Licensed gaming companies comply with a range of laws and regulations designed to ensure that patrons enjoy casino games and sports betting responsibly as a form of entertainment. These include rules regarding preparation and submission of responsible gaming plans, requirements for self-exclusion programs, limits on signage and advertising, minimum standards for employee training, and restrictions on what financial instruments casinos and online gaming operators may accept.[3] Licensed operators monitor patron behavior for signs of problem gaming and employ a tiered outreach approach for identified patrons. *Id.*

The legal gaming industry additionally invests significant time, money, and effort into encouraging responsible gaming. In 2023, companies in the gaming industry invested over $470 million in responsible gaming operations, education, and research.[4] Most gaming operators and suppliers also voluntarily implement responsible gaming programs with measures that expand upon what is formally mandated by law or regulation.[5] And the legal gaming industry contributes significantly to state efforts, with nearly every dollar earmarked by states for problem gambling prevention and treatment coming from taxes paid by the industry.

---

[3] *See* AGA, *Responsible Gaming Regulations and Statutes Guide* (Sept. 1, 2022), https://www.americangaming.org/resources/responsible-gaming-regulations-and-statutes-guide/.

[4] *See* AGA, *State of the States: The AGA Survey of the Commercial Casino Industry* 11 (2025), https://perma.cc/XCT6-AFJ2.

[5] AGA, *Responsibility*, https://www.americangaming.org/responsibility/ (accessed June 16, 2025).

*See, e.g.*, N.J. Admin. Code § 13:69A–9.4 (requiring "[a] $250,000 Responsible Internet Gaming Fee upon the filing for an initial or renewal of an Internet gaming permit" in New Jersey and specifying that certain other licensing fees "be deposited into the State General Fund for appropriation by the Legislature to the Department of Health to provide funds for evidence-based prevention, education, and treatment programs for compulsive gambling").

Through this comprehensive regulatory scheme, the State ensures that those involved in the gaming industry "meet the statutory requirements of good character, honesty, and integrity," thereby protecting bettors and guarding against fraud and other forms of criminal activity. N.J. Stat. Ann. § 5:12-84. Licensees are required to follow key state consumer protection laws, including background checks of employees, know-your-customer requirements that help prevent money laundering, location verification to make sure that online gaming is available only in authorized places, problem gambling identification, and self-exclusion programs. *See, e.g., Defs.' Opp. to Prelim. Inj. Mot., KalshiEX LLC v. Flaherty*, No. 1:25-cv-2152, ECF No. 15, at 5 (D.N.J. Apr. 18, 2025) (discussing New Jersey-specific regulatory requirements). Licensees must also demonstrate financial stability and adequate liquidity. N.J. Stat. Ann. § 5:12A-13(a); N.J. Admin. Code § 13:69N-1.2(d).

These licenses constitute real, tangible value to their holders, akin to a property interest. Licensed gaming operators, such as AGA's members, make

substantial investments to comply with these state-law frameworks. They pay up-front application and licensing fees, make recurring tax and renewal fee payments, partner with sports leagues and teams to ensure the integrity of the wagers they offer, and employ compliance staff specifically focused on adhering to state laws. In exchange, legal gaming operators may participate in a regulated market where competitors must meet the same rigorous standards of financial fitness, good character, honesty, integrity, and responsibility. Relying on this level playing field with clear rules of the road, sports betting operators have invested heavily in their operations and in New Jersey.

Moreover, the law erects other integrity safeguards to which gaming operators must adhere. In New Jersey, a bettor must be "21 and older," bettors may not place a wager on a college event if it "takes place in New Jersey or involves New Jersey schools," and "[b]ets on high school sports [are] prohibited." *See* N.J. Stat. Ann. § 5:12-11(e); *id.* § 5:12-10 (defining a "prohibited sports event").[6]

### 2.    This regulatory scheme provides significant benefits to New Jersey and its residents.

States like New Jersey have a strong public interest in gaming for many reasons, including generating revenue. *See, e.g.*, *Greater New Orleans Broad Ass'n*,

---

[6] Other states permit betting on all college sports teams, while Oregon effectively prohibits college sports betting entirely. Pennsylvania, which permits betting on college sports, prohibits individual player proposition bets, while Indiana permits them only before the beginning of the game. Federalism protects each state's ability to make its own choices on these issues. *See State of the States*, *supra*, at 23-24.

527 U.S. at 186.  In 2024, New Jersey's sports-wagering industry generated over $1 billion in gross revenue and $141.2 million in tax income for the State, $138.3 million of which was from online sportsbooks.[7]  Nationally, the legal sports gaming industry contributed $2.81 billion in direct gaming tax revenue to state and local economies in 2024.[8]  These revenues are directed to law enforcement, social services, and other state priorities, as well as enforcement, consumer protection, and other regulatory expenditures associated with gaming.  This calculation excludes billions in income, sales, and corporate taxes, as well as the significant stimulus that legal gaming provides to state and local economies.

New Jersey's laws also protect consumers and promote integrity.  Before New Jersey legalized sports gambling, New Jerseyans had to leave the state or deal with shady offshore entities and disreputable bookies if they wanted to bet on the game.[9]  The law offered little protection for responsible gaming.  And the integrity of

---

[7] *See* New Jersey Office of the Attorney General, *DGE Announces December 2024 Gaming Revenue Results* (Jan. 16, 2025), https://www.nj.gov/oag/ge/docs/Financials/PressRelease2024/December2024.pdf.

[8] States impose differing tax rates on gaming operations and gambling income.  For example, New Jersey taxes online sportsbooks at a net rate of 14.25%.  By contrast, New York taxes online sportsbooks at 51%, more than triple the rate of New Jersey and nearly eight times the 6.75% tax levied by Iowa and Nevada.  *See State of the States*, *supra*, at 23-24.

[9] *See, e.g.*, Wayne Parry, *Gov. Murphy Places First Wager as New Jersey Begins Taking Legal Sports Bets*, WHYY (June 14, 2018), https://whyy.org/segments/gov-murphy-places-first-wager-as-new-jersey-begins-taking-legal-sports-bets/.

competitions was vulnerable.[10]   Now, however, New Jersey has brought sports

betting into the sunlight.   Addressing compulsive gambling is a key focus of both

regulators and industry.   That work has included collaborative efforts to develop

"state-of-the-art technology to monitor bets, identify suspicious activity, and ensure

compliance with state law."[11]   These developments have benefitted New Jersey's

residents and they have contributed positively to the reputation of the gaming

industry as a responsible, law-abiding partner of the State's regulators.

> **B.     Kalshi's sports wagers undermine the protections and benefits offered by New Jersey's regulatory framework.**

New Jersey's sports betting regulatory regime represents a policy choice by

the State's legislature and Governor, on behalf of the residents of the State.   New

Jersey has legalized sports betting, established limits on the practice, worked closely

with industry to ensure compliance, and generated sizable tax revenue.   By offering

sports wagers not licensed or regulated under state law, Kalshi attempts to bypass

that state-law system.   In so doing, Kalshi's sports betting operation threatens both

consumers and the integrity of sports, undermines the policy choices of New Jersey

---

[10] The history of unlicensed gaming demonstrates the dangers to game integrity, particularly from match fixing. *See, e.g.*, Kendall Howell, *You Can Bet on It: The Legal Evolution of Sports Betting*, 11 Harv. J. Sports & Ent. L. 73 (2020).

[11] *See* N.J. Att'y Gen., *Creating a Legal Framework for Sports Wagering*, https://perma.cc/XJH2-NJKB (archived June 12, 2025).

residents, deprives the State of tax revenue, and diverts revenue from legitimate operators.

Designated contract markets (DCMs) like Kalshi do not comply—by design—with many of the consumer protection requirements prescribed by state law (and observed by licensed gaming companies).  For example, Kalshi's uniform national sports contracts do not comply with state-specific laws prohibiting wagers on in-state teams and requiring geofencing (*i.e.*, technology that restricts online gaming transactions to authorized locations).  Kalshi's sports contracts are available to all users 18 or older, similarly violating the laws of the majority of states.  *See State of the States*, *supra*, at 16-21.  True, Kalshi provides what it describes as "risk management tools," but these fall far short of safeguards provided by licensed operators in cooperation with state regulators.[12]  Kalshi's risk management features include a "trading break" and a "voluntary opt-out" procedure.  *Id.*  These mechanisms limit user access to Kalshi's contracts on its own website, but users can immediately access its contracts via another futures commission merchant.  Kalshi notes that "it is ultimately the trader's responsibility not to trade during this time."[13]

---

[12]    KalshiEX    LLC,    *Responsible    Risk    Management*    (May    2025), https://perma.cc/58KT-8KUB.

[13] *See* KalshiEX LLC, *Voluntary Opt-Out* (May 2025), https://perma.cc/XS5N-VMVJ.  Contrast this arrangement with New Jersey's framework, which allows individuals to self-exclude from *all* licensed gaming operators in the state.  *See* N.J. Admin. Code § 13:69G-2.3.

Consistent with its hands-off approach to self-exclusion and other risk management requirements, there is no indication that Kalshi affirmatively monitors or reaches out to users exhibiting signs of irresponsible use.  Similarly, while Kalshi provides a voluntary deposit limit, *see Responsible Risk Management, supra*, it does not offer customers the ability to set spending or time limits, both of which are offered by licensed operators in New Jersey,  *see* N.J. Admin. Code § 13:690-1.4(n).

State-licensed gaming operators are also subject to restrictions on the nature and content of advertising.  Casinos and sportsbooks make significant efforts to avoid targeting minors, as illustrated by data showing that nearly 95% of advertisements by licensed entities are delivered to persons at least 21 years old.[14] Casinos and gambling-related affiliates must also ensure that self-excluded persons do not receive solicitations and that advertising contains prominent responsible gaming messages.  *See* N.J. Admin. Code §§ 13:69G-2.4, 13:69C-14.2.  Kalshi has provided no evidence that its advertising is similarly tailored, or that it complies with other responsibilities of state-licensed gaming operators, including extensive background checks of employees.

Kalshi's evasion of state gaming regulation results in a bifurcated marketplace in which DCMs offer a lightly regulated, low-cost service that competes directly

---

[14] *See* AGA, Responsible Play, https://www.americangaming.org/responsibility/responsible-play/ (accessed June 17, 2025).

with highly regulated, high-cost services operated by state gaming licensees. That dynamic will create competitive imbalances, make participation in state regimes less viable for commercial operators, and leave consumers without important protections. These same protections have enabled the growth of the legal gaming industry by creating customer confidence. Kalshi thus seeks to profit from the market it undermines.

### C. The CFTC is ill-equipped to regulate the sports-betting market.

In place of state regulators, Kalshi would substitute the CFTC. That agency is a capable regulator of a particular enclave: commodity futures contracts, including in the derivatives markets. Congress established the CFTC to carry out a vital task, but that task does not involve sports-wagering regulation.

Instead, given the strong interests of the States in regulating gaming and to prevent the intrusion of organized crime, states have developed comprehensive gaming regulations, including significant enforcement capabilities. CFTC enforcement and regulatory oversight is designed for commodity futures markets (including the vast derivatives markets)—not the extensive gaming regulatory systems developed by the states, as described above. The CFTC has approximately 699 employees as of June 2025, as compared with the 513 employees of the New

Jersey Division of Gaming Enforcement alone.[15]  The CFTC is neither designed to, nor currently capable of, supervising the sports gaming market on a national basis. As the agency recently acknowledged in a proposed rule, it "is not a gaming regulator" and lacks the specialized knowledge of gaming regulators.  *See* Event Contracts, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024).

More fundamentally, unregulated online gambling via DCMs presents risks that are distinct from those traditionally regulated by the CFTC, including risks related to problem gaming, underage use, money laundering, and match fixing. Addressing these risks would require the CFTC to promulgate a significant and complex body of new regulations tailored to this new marketplace, and would also require congressional action to correspondingly amend the CEA.  Exercising this newfound regulatory authority would further require the CFTC to procure, from Congress, significant new funding to provide the resources necessary to regulate sports event contracts nationwide.  The CFTC performs a venerable function in its regulation and oversight of derivatives markets, but this area is just not its wheelhouse.

---

[15]  *Compare* CFTC, *U.S. Equal Employment Opportunity Commission*, https://perma.cc/KU6P-VZVL (archived June 17, 2025), *with* OpenGovPay, *New Jersey Division of Gaming Enforcement Salaries*, https://opengovpay.com/employer/nj/new-jersey-division-of-gaming-enforcement (archived June 17, 2025).

Additionally, no CFTC rule or regulation mandates the safety features offered by New Jersey and other states, so new entrants likely lack any of these key consumer protections. Moreover, the CFTC's DCM rules (upon which Kalshi relies to offer its sports wagers) permit new entrants to commence offering these contracts via self-certification, meaning that Kalshi could begin offering its sports wagers even without the CFTC's advance approval. This approach, which has been developed by the CFTC for markets in which it is already exercising significant regulatory oversight authority, requires no advance verification by the regulator of any of the above-discussed protections; instead, the applicant simply certifies its compliance with relevant CFTC regulatory standards. Thus, the CFTC has no means of preventing the entry into this market of participants that, for example, lack the necessary structure to protect against the risks that state laws are designed to address.

State-law regimes for sportsbooks vary significantly, in line with variance in gaming regulations broadly. One constant feature, however, is a high level of cooperation between state regulators and gaming operators, who maintain sophisticated monitoring and coordination programs designed to identify and stop manipulation of sporting events in ways that threaten the integrity of sports wagers. The Jontay Porter betting scandal illustrated the value of such cooperation: Licensed sportsbooks detected and reported suspicious bets, and they quickly worked with the NBA to remove opportunities for individual-game bets on players with certain short-

term contracts—bolstering the integrity of the game and preventing manipulation by less-established players.[16]

The CFTC lacks comparable infrastructure to ensure that individual sports-betting markets are not manipulated. Unlike the legal sports gambling industry, the CFTC's regulations lack any requirement that exchanges or brokers report potentially suspicious trades or trading patterns to an affected sports league, or to cooperate with subsequent league investigations into trading activities.[17] Although Kalshi has voluntarily implemented certain protections such as ProhiBet, a third-party prohibited bettor list, there is no requirement that other DCMs do so or that Kalshi maintain this protection.

Allowing DCMs like Kalshi to provide sports wagers in a derivatives wrapper would thus require the CFTC to regulate beyond its core role and capabilities. That is not fair to New Jersey, its consumers, or the gaming industry participants that have long made the investments necessary to comply with the state's licensing laws.

---

[16] *See* Mark Anderson, *BetMGM Cuts Under Prop Bets on NBA Players on 2-way or 10-day Contracts*, Associated Press (Oct. 18, 2024), https://apnews.com/article/nba-betting-player-props-jontay-porter-b828cf958382c5ce8c826fd75a138f0a; *see also* Pat Forde, *Inside the Alabama Baseball Gambling Scandal*, Sports Illustrated (July 10, 2023), https://www.si.com/college/2023/07/10/inside-the-alabama-baseball-gambling-scandal (describing role of sportsbook's monitoring program in thwarting improper wagers on college baseball games).

[17] *See* Letter from Alexandra Roth, General Counsel, NBA, to Commodity Futures Trading Comm'n (May 1, 2025), https://perma.cc/MM6U-GFF7.

**II.    Congress speaks clearly when it displaces state gaming law, and the CEA has no clear statement to this effect.**

The states have long been the primary regulators of gambling activity. When Congress has entered the field of gaming regulation, it typically has done so in specific, discrete contexts in ways that complement state law. Indeed, federal law has long respected, and even promoted, the States' role in this space. And since the Supreme Court's landmark decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), reaffirmed the importance of federalism in the sports-betting sphere, states have been actively experimenting with new and different approaches to that issue.

Enter Kalshi. Advancing a novel understanding of a niche area of federal law, Kalshi asserts that Congress established a quiet workaround to the sports betting laws of all 50 States (and the District of Columbia) through the CEA. The implications of this position are stark: Under Kalshi's view, every state's sports betting laws—problem gaming laws, responsible advertisement regulations, anti-money laundering provisions, all of them—go away if one merely labels its sports betting offerings as "event contracts" and self-certifies compliance with federal derivatives laws. That makes a mockery of federalism, and ordinary principles of statutory construction demonstrate that Kalshi's expansive interpretation is incorrect. At bottom, Kalshi's model is a too-clever-by-half attempt to evade the rules. Congress never intended to allow such evasion.

**A.    Sports betting has long been regulated by the States, and Kalshi's attempted workaround contravenes this carefully crafted system.**

In the United States, sports betting regulation is primarily a function of state law.  As the Supreme Court explained in *Murphy*, "Americans have never been of one mind about gambling, and attitudes have swung back and forth" from the "end of the 19th century," when "gambling was largely banned throughout the country," through "the 1920s and 1930s," when "laws prohibiting gambling were gradually loosened."  584 U.S. at 458.  The Court held up New Jersey as an example of a state that has shifted in its approach, tracing the state's different sports-betting laws over the years.  *See id.* at 458–59.

As "laborator[ies]" of democracy,[18] different states have experimented with their own approaches to sports betting.  Some states, like Nevada, take a more permissive tack, while other states, like Texas, ban online sports betting altogether. *Compare* Becky Harris, *Regulated Sports Betting: A Nevada Perspective*, 10 UNLV Gaming L.J. 75, 76–80 (2020), *with* Tex. Att'y Gen. Op. KP-0057 (2016).  Many states are somewhere in the middle.[19]  And, again, some states (like New Jersey) have adopted different approaches at different times.  But even in more permissive jurisdictions like Nevada, "[e]very entity that conducts wagering … is subject to a

---

[18] *See United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).

[19] *See Legality Map: The State of Betting in the U.S.*, USA Today: Sports Data, https://sportsdata.usatoday.com/legality-map (accessed June 17, 2025).

rigorous licensing investigation to ensure that the entity itself, and the individuals associated with it, meet [the state's] strict gaming standards and are persons of the highest caliber." Harris, *supra*, at 79.

AGA and its members follow these developments closely and expend substantial resources to comply with—and help develop—the relevant statutory and regulatory frameworks. Indeed, the gaming industry partners "with state legislatures across the country to advance policy that creates a strong gaming marketplace and combats illegal gambling."[20] The gaming industry has focused in particular on "building upon the positive reputation gaming has developed over the past decade." *State of the States*, *supra*, at 2. That has work has included supporting responsible-gaming regulation tailored to each state's needs, coordinating with gaming regulators on stopping illegal offshore gambling sites, and sharing information with sports leagues to ensure the integrity of the sports-betting market. *See id.*

**B.    When Congress has enacted gaming laws, it has spoken clearly and specifically delineated between federal and state regulation.**

Against the backdrop of a rich tradition of state law, Congress has regulated sports gaming only in discrete contexts. When it has done so, Congress has been clear about its intentions. Time and again, Congress has chosen to forego

---

[20]    AGA, *State Advocacy & Regulatory Engagement* https://www.americangaming.org/advocacy/state-advocacy-regulatory-engagement/ (accessed June 17, 2025).

comprehensive sports-gambling regulation in favor of enacting laws that cover specific areas of interstate activity, taking a "general federal approach" that "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484.

For example, the Wire Act generally prohibits the interstate transmission of bets or wagers, but carves out exceptions for intrastate wagers and for transmission of information assisting in the placing of a wager from a state where sports betting is authorized to another state where such betting is legal. *See* 18 U.S.C. § 1084(b). Similarly, the Unlawful Internet Gambling Enforcement Act prohibits the knowing acceptance of payments for unlawful internet gambling, but defines that term as gambling that violates *state* law. 31 U.S.C. §§ 5362(10)(A), 5363. These statutes focus on commercial activity across state lines while leaving room for state governments to act as the primary sports-betting regulators within their borders.[21]

When Congress went beyond this carefully crafted balance between state and federal power, the Supreme Court stopped it. The Professional and Amateur Sports Protection Act of 1992 represented an attempt by Congress to freeze in time the sports betting laws of the States as of 1993. The Act prevented states from

---

[21] When enacting the Unlawful Internet Gambling Enforcement Act, Congress distinguished sports betting from "transaction[s] . . . under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii). The legislative history reflects what an ordinary reader would have understood: Gambling (such as sports betting) is different from "business transactions such as securities trading or buying or selling insurance contracts." H.R. Rep. No. 109-412, pt. 1, at 10 (2006).

authorizing sports betting after its effective date, while grandfathering in those states that passed laws allowing sports betting by then. *See generally* 28 U.S.C. § 3704. When New Jersey attempted to lift some of its restrictions on sports betting after the effective date, third parties sued to enjoin the law by arguing that it violated the federal prohibition. *See Murphy*, 584 U.S. at 462. The Court held that the statute violated the Tenth Amendment's anti-commandeering doctrine, under which Congress cannot "issue direct orders to the governments of the States"—including, for example, telling states that they cannot legalize sports betting. *Id.* at 471.

Congress has also advanced tribal sovereignty by carving out exclusive gaming rights for Indian tribes. *See* 25 U.S.C § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands[.]"). The Indian Gaming Regulatory Act allows tribes and states to enter into gaming compacts, pursuant to which tribes may offer sports betting on Indian lands—even within states that do not otherwise allow sports wagers.[22] Still, tribes cannot unilaterally establish these compacts; they need to reach agreements with state governments. The Supreme Court has embraced federalism principles in interpreting this framework, holding in *Seminole Tribe v. Florida*, 517 U.S. 44, 47 (1996), that Congress could not abrogate states' sovereign immunity in cases involving the statutory duty to negotiate in good

---

[22] *See id.* § 2710(d); AGA, *Wisconsin Fact Sheet* 4 (2025), https://perma.cc/EY3C-CWBQ (noting that sports betting is authorized in Wisconsin only on certain tribal lands).

faith regarding compact terms. Speaking again on the role Congress left for states, the Court in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 794–795 (2014), emphasized that although states lack "regulatory authority over gaming on Indian lands," they retain "capacious" "regulatory power over tribal gaming outside Indian territory."

### C.    Familiar canons of construction establish that the CEA does not preempt state sports betting laws.

Ordinary principles of statutory interpretation counsel against Kalshi's reading of the law. This case does not concern preemption principles in a vacuum. Rather, the asserted preemption here would rearrange the power balance between the federal and state governments on an issue that has long been understood to be the primary domain of the States. And if Congress is going to upset that balance of federal-state power, it must do so clearly. Moreover, the major questions doctrine suggests that Kalshi's novel reading of the statute is incorrect.

The federalism canon of statutory interpretation demonstrates that the CEA does not displace the entire framework of sports-betting laws across all 50 states. As recently as 2018, the Supreme Court described the federal framework of sports betting law as generally "respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. And "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the

24

language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation marks omitted). Congress has not taken that step here. True, the CEA establishes conditions for listing a contract on a derivatives market. But the statute provides no safe harbor for the listing of sports-betting contracts that violate state law. Moreover, enactment of other gambling statutes—such as the Wire Act, the Indian Gaming Regulatory Act, and the Unlawful Internet Gambling Enforcement Act—after the CEA's enactment suggests that Congress understood itself as complementing, rather than replacing, state regulation in this sphere. That would have been a curious approach to take if Congress had already blessed unrestricted sports betting as long as it occurs under the CFTC's jurisdiction.

Today, the federal regulatory framework (particularly after *Murphy*, *Seminole Tribe*, and *Bay Mills*) reflects a respect for collaborative federalism. Yet Kalshi attempts an end run around this tradition of state sports-betting regulation with supplementary federal involvement around the edges. It asserts that the provisions of the CEA (and implementing regulations) relating to event contracts preempt state sports-betting law in its entirety. But the CEA regulates particular kinds of markets: speculation about the *future price of commodities* (as its title suggests), often based on the incentive that "commodity producers have … to hedge their supply via short futures contracts in a manner consistent with their monthly production schedule." *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 923

25

(7th Cir. 2024).  This "practice … aims to reduce volatility in revenue." *Id.*  The CFTC regulates the markets for these contracts under the CEA.

Kalshi, however, argues that the separate regulatory framework for futures contracts preempts all sports betting laws, so long as a company describes its sports betting offerings as futures contracts and self-certifies that its event contracts do not violate the CEA.  If Kalshi is correct, then it can offer unrestricted sports betting across the country—including in jurisdictions like Texas and California where sports betting is prohibited.  That means no problem gaming regulations, no state-level licensing requirements, and no accountability to state regulators.  Kalshi's interpretation would thus upend the settled expectations of both states and the gaming industry, and also contravene the federalism canon.

Furthermore, the major questions doctrine casts doubt on Kalshi's claim that the CFTC has the power to offer companies a state-law bypass.  The asserted power would be extraordinary.  But despite the CEA's passage in 1936, only just now has a company—Kalshi—attempted to use the CFTC as a shield against states' sports betting laws.  For its part, the gaming industry has long understood the CEA and the CFTC to occupy a separate sphere.  And Kalshi itself expressly argued as much in briefing before the D.C. federal courts just last year, stating that the "gaming" category flagged in the CEA for special public-interest scrutiny "reaches contracts contingent on *games*," such as "whether a certain team will win the Super Bowl,"

and "thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives market." Mem. Supp. Pl.'s Mot. Summ. J., *KalshiEx LLC v. CFTC*, No. 23-03257, ECF No. 17-1, at 16 (D.D.C. Jan. 25, 2024). Kalshi also explained that the "classic example" of an event contract involving "gaming" is a "contract on the outcome of a sporting event" and that "Congress did not want sports betting to be conducted on derivatives markets." Appellee's Br. at 41, *KalshiEx LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

The sweeping yet novel claim Kalshi asserts in this Court is disfavored in the absence of a clear statement from Congress. As the Supreme Court has explained, the major questions doctrine requires that courts "hesitate before concluding that Congress meant to confer" "in a long-extant statute an unheralded power representing a transformative expansion in [an agency's] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022) (quotation marks omitted). And although the CFTC is empowered to regulate derivatives markets, that does not mean that Congress allowed the agency to become the national regulator for all sports betting so long as a company describes its offering as a futures contract.

### D.     The CFTC's regulations foreclose Kalshi's preemption argument.

The CEA provides that the CFTC "may determine" that an event contract that "involves," among other things, gaming and/or activity unlawful under federal or state law is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). And

if the CFTC determines that such a contract is contrary to the public interest, it may not be offered on a DCM. *See id.*[23]  The agency has exercised that authority, determining by regulation that all contracts involving gaming and/or activity unlawful under federal or state law are contrary to the public interest. *See* 17 C.F.R. § 40.11.  As a result, DCMs are prohibited from listing them.[24]

The CFTC is bound by that regulation, based on the "elementary" administrative-law principle "that an agency must adhere to its own rules and regulations." *Reuters, Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986).  It thus makes little sense to say that the CEA preempts the same state laws that Congress expressly allowed the CFTC to preserve, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii), that the CFTC has in fact preserved through its implementing regulations, and that other federal statutes (such as the Wire Act and the Indian Gaming Regulatory Act) expressly authorize.

---

[23]  When Congress expanded the CFTC's jurisdiction to include swaps in the Dodd-Frank Act, it clearly delineated the boundaries between SEC and CFTC jurisdiction. *See* 15 U.S.C. § 8302.  The absence of similar language balancing the authority of the CFTC and state regulators suggests that the Dodd-Frank Act did not expand the CFTC's jurisdiction to include sports wagering.

[24] A false or misleading self-certification violates the CEA, which can be enforced by the CFTC through imposition of a fine or an injunction, or both.  *See* 7 U.S.C. §§ 9(2), 13a-1(a).

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's preliminary injunction order.

Respectfully submitted,

_s/ Kevin King_

| | |
|---|---|
| Bruce Bennett | Kevin King |
| Benjamin Sovocool | _Counsel of Record_ |
| COVINGTON & BURLING LLP | Matthew J. Glover |
| The New York Times Building | Scott Garfing |
| 620 Eighth Avenue | Eli Nachmany |
| New York, NY 10018 | COVINGTON & BURLING LLP |
| | 850 Tenth Street, NW |
| | Washington, DC 20001 |
| | (202) 662-6000 |
| | kking@cov.com |

_Counsel for Amicus Curiae_

June 17, 2025

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

3.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program, Advanced Endpoint Protection Cortex XDR Agent v. 8.2.2, has been run on the electronic file and no virus was detected.

*s/ Kevin King*
Kevin King

June 17, 2025

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that the following attorneys whose names appear on the brief are members of the bar of this Court: Kevin King, Eli Nachmany.

*s/ Kevin King*
Kevin King

June 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Kevin King*
Kevin King