**25-1922**

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellee*

vs.

MARY JO FLAHERTY, et al.

*Defendants-Appellants*

On Appeal from the United States District Court

for the  District of New Jersey

Case No. 1:25-cv-2152

**BRIEF OF AMICUS CURIAE**
**NEW FINANCE INSTITUTE**
**IN SUPPORT OF NEITHER PARTY AND IN SUPPORT OF REVERSAL**

Scott D. Brenner, Esq.
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, NY 10017
Telephone: 212.603.9918
scott.brenner@parlatorelawgroup.com
*Attorney for Amicus Curiae*
*New Finance Institute*

## **CORPORATE DISCLOSURE STATEMENT**

Amicus curiae have no parent corporation nor does any publicly held corporation own 10% or more of their stock.

No counsel for a party authored this brief, in whole or in part, and no person other than amicus curiae, their members, and their counsel made any monetary contribution to fund the preparation or submission of this amicus brief.

On June 17, 2025, counsel for Amicus Curiae communicated with counsel for the Plaintiff-Appellee and Defendants-Appellants, respectively, to obtain consent for the instant filing. Defendants-Appellants have responded affirmatively but Plaintiff-Appellee has not yet responded as of the date and time of filing.

# **TABLE OF CONTENTS**

**Page**

AMICUS CURIAE'S STATEMENT OF IDENTITY, INTEREST IN THE CASE
AND THE SOURCE OF ITS AUTHORITY ...………..………………………....1

PRELIMINARY STATEMENT...………...…………………….....………………..2

ARGUMENT ……………………….……………..………………………..5

I.    The CFTC Has Sole Decision-Making Powers Over Sports
Gambling.............................................................................................5

    A.    The Commodity Exchange Act ("CEA") Preempted The
Field………………….…………………………………..5

    B.    Sports Is An Excluded Commodity …………………….....10

    C.    Gambling Through Futures is a Matter Left To the Federal
Government…………………..……………………...………….14

    D.    Federal Inaction Enabled the Regulatory Model New Jersey
Now Opposes …………….…………….………………….16

II.    The APA Strongly Favors Reversal ...................................................19

    A.    The CFTC's Actions Are "Unreasonably Delayed."…..........…19

    B.    Failure to Act is Agency Action That Creates A Need for
Relief …………………….…………….……………………..21

C.     The CFTC's Inaction Is Final …………….…..……….…….…..22

D.     Preliminary Injunction is Inconsistent with *Loper Bright*…....25

CONCLUSION .................................................................................................28

CERTIFICATE OF COMPLIANCE ……………………………………….…..30

ELECTRONIC DOCUMENT CERTIFICATE ………………………………..31

CERTIFICATE OF BAR ADMISSION …………………………………….…..32

CERTIFICATE OF SERVICE …………………………………………………33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ah Sin v. Wittman,*

     198 U.S. 500 (1905) …………………………………...……………14,15

*Bibb v. Allen et al.,*

     149 U.S. 481 (1893) ..………………...…………...……………………...5

*Board of Trade v. Christie Grain & Stock Co.,*

     198 U.S. 236, 249 (1905) ………......................................................5

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*

     467 U.S. 837 (1984) ……………………………. …………...……..25,26,28

*Greater New Orleans Broad. Ass'n v. United States,*

     527 U.S. 173 (1999) ……………………………...…………………..14

*Heckler v. Chaney,*

     470 U.S. 821 (1985) …………………………...……………………21,22

*In re American Rivers,*

     372 F.3d 413 (D.C. Cir. 2004) ………………………………………..20

*KalshiEX LLC v. CFTC,*

     No. 1:23-cv-03257 (D.D.C.)..………………………………..……....10,27

*KalshiEX LLC v. CFTC,*

    No. 24-5205 (D.C. Cir. 2024) (dismissed) ………………………..……24,27

*Kerr v. First Commodity Corp. of Boston,*

    735 F.2d 281 (8th Cir. 1984) …………………………………………….9

*Loper Bright Enterprises v. Raimondo,*

    603 U.S. 369 (2024) ……………………………....…………4,25,26,27

*Murphy v. National Collegiate Athletic Association,*

    584 U.S. 453 (2018) ......……………………………………………….2,4

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,

    515 F. Supp. 202 (N.D. Ala. 1981) ………………………………..…8,9

*Telecomms. Research & Action Center v. FCC,*

    750 F.2d 70 (D.C. Cir. 1984) ………………………………………21

*United States v. Cohen,*

    260 F.3d 68 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002) ……………10

*United States v. Texas*,

    599 U.S. 670 (2023) …………………………………...……….…………23

**Statutes**

5 U.S.C. § 551 ……………………..……………………………………..21

5 U.S.C. § 704 …………………….…………………………………….22

5 U.S.C. § 706(1) ………………………………………………………2

5 U.S.C. § 706(2) …………………………...………………………………….21

7 U.S.C. § 2(a)(1)(A) …………………………...……………………………….7

7 U.S.C. § 1a(19)(iv) ………………………………………………………….13

15 U.S.C. § 3001(a)(1)–(3) ……………………………...…………...16

18 U.S.C. § 1084 ……………………………………………………………….11

25 U.S.C. §§ 2701–2721 …………………………………………………16

28 U.S.C. §§ 3701–3704 …………………………………………………...…2,14

**Regulations**

89 Fed. Reg. 48,968 (June 10, 2024) (to be codified at 17 C.F.R. pt. 40) …...….9,19

25 C.F.R. § 502.4(c) ……………………...…………………………………….16

**Legislative Materials**

H.R. REP. No. 421, 74th Cong., 1st Sess. 3 (1935) ………………...….………….6

**Other Authorities**

61 Cong. Rec. 4768 (1921) …………………………………………….……..6

Bart Chilton, *Fighting Futures* (November 1, 2010),

    Speech of Commissioner Bart Chilton at the University of Notre Dame,

    https://www.cftc.gov/PressRoom/SpeechesTestimony/opachilton-34 ……..7

Brian D. Quintenz, Statement of Commissioner Brian D. Quintenz on ErisX

    RSBIX NFL Contracts and Certain Event Contracts: *Any Given Sunday in*

    *the Futures Market* (Mar. 25, 2021),

https://www.cftc.gov/PressRoom/SpeechesTestimony

/quintenzstatement032521 …………………………………….…13,17,23,26

Brief of Amici Curiae States of West Virginia, Arizona, Louisiana, Mississippi, and

Wisconsin in Support of Petitioners, *Christie v. NCAA*, No. 16-476 (U.S.

filed Nov. 2016) …………………………………………………………14

CFTC Release No. 9046-25 (Feb. 5, 2025),

https://www.cftc.gov/PressRoom/PressReleases/9046-25 ………………...24

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,

73 Fed. Reg. 25,669 (May 7, 2008) …………………………………………..11

Dan M. Berkovitz, Statement of Commissioner Dan M. Berkovitz on Review of

ErisX Certification of NFL Futures Contracts: *Sports Event Contracts: No*

*Dice Unless There is an Economic Purpose and the Exchange is Open to the*

*Public*  (Apr. 7, 2021),

https://www.cftc.gov/PressRoom/SpeechesTestimony/

Berkovitzstatement040721 …………………………………………..…....12

Designation Memorandum: *HedgeStreet, Inc., U.S. Commodity Futures Trading*

*Commission* (Feb. 10, 2004) …………………………..………………...11

Event Horizon, *CFTC Cancels Prediction Markets Roundtable* (April 24, 2025),

    https://nexteventhorizon.substack.com/p/news-cftc-cancels-

    prediction-markets ……………………………………………………..24

Event Horizon, *Everything CFTC Pick Quintenz Said About Prediction Markets In*

    *Senate Hearing*, (June 10, 2025),

    https://nexteventhorizon.substack.com/p/everything-cftc-pick-quintenz-said

    ………………………………………………………………………..…24

Graham Purcell and Abelardo Lopez Valdez, The Commodity Futures Trading

    Commission Act of 1974: *Regulatory Legislation for Commodity Futures*

    *Trading in a Market-Oriented Economy*, 21 S.D. L. Rev. 555 (1976)............8

Nevada Resort Association's Emergency Motion to Intervene, *KalshiEX, LLC v.*

    *Hendrick*, No. 2:25-cv-00575-APG-BNW (D. Nev. Apr. 9, 2025)...............18

*Order Disapproving Congressional Control Political Event Contracts,* CFTC,

    Release No. 8780-23 (Sept. 22, 2023),

    https://www.cftc.gov/PressRoom/PressReleases/8780-23 ………………...27

*Order Prohibiting the Listing or Trading of Political Event Contracts*, CFTC

    (April 2, 2012),

    https://www.cftc.gov/sites/default/files/idc/groups/public/

    @rulesandproducts/documents/ifdocs/nadexorder040212.pdf ……………26

Petition for Writ of Certiorari, *Cohen v. United States*, 536 U.S. 922 (2002)

    (No. 01-1521) ...………………………………………………….……...10

Yahoo Finance, *Acting CFTC Chair Discusses Future of Crypto Regulation Under*

    *Trump*, June 12, 2025,

    https://finance.yahoo.com/video/acting-cftc-chair-discusses-future-20194240

    2.html………………………………………………………………………….19

## AMICUS CURIAE'S STATEMENT OF IDENTITY, INTEREST IN THE CASE AND THE SOURCE OF ITS AUTHORITY

New Finance Institute ("NFI") is a public benefit corporation with a mission dedicated to advancing financial literacy and improving legal outcomes through definitional clarity. NFI's work centers on the premise that prosperity and informed decision-making begin with a shared understanding of foundational financial terms. NFI's corporate website can be found at: www.newfinanceinstitute.com. NFI publishes two blogs: 1) Finance 2027 (www.finance2027.com) aims to build consensus on financial definitions; and 2) Full Court Press (www.fullcourtpress.io) is dedicated to exploring the legal implications of financial definitions.

NFI has been an active participant in the courts and has submitted multiple amicus briefs, including in *SEC v. Coinbase Inc.*, No. 1:23-cv-04738 (S.D.N.Y.) and *SEC v. Binance Holdings, Ltd.*, No. 1:23-cv-01599 (D.D.C.), both of which have since been dismissed. With a connection to this matter, NFI offered its perspective on the regulatory treatment of event contracts in its comment letter to the Commodity Futures Trading Commission ("CFTC") on August 8, 2024. This amicus brief draws on NFI's holistic, multi-disciplinary approach to assist the Court. By situating the legal questions in their proper financial and historical context, NFI aims to provide the Court with a distinct and constructive viewpoint to assist in resolving the issues presented.

## PRELIMINARY STATEMENT

This is a case of agency inaction, not preemption. After watching the prediction markets for over 30 years and doing very little, the CFTC–faced with the prospect of nationalized sports gambling through federally regulated markets–chose, for the first time, not to utilize the most powerful tool Congress had unquestionably empowered it with: Its discretionary review authority on event contracts. This Court should reverse not on the basis of preemption, but on the CFTC's failure to act.

It was the CFTC's non-enforcement following the Supreme Court's repeal of the Professional and Amateur Sports Protection Act of 1992 ("PASPA"), 28 U.S.C. §§ 3701–3704, in 2018 that enabled sports gambling under the incorrect premise that states have the right to regulate sports gambling. *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018). In reality, the states *never* had that authority. Now that sports gambling has gained significant traction across many states, designated contract markets, including Kalshi, are seizing the opportunity; they want to offer sports gambling to residents of *all* states. While this bodes well for industry stakeholders, it raises serious concerns for citizens who value consistent enforcement of the law. Kalshi's opponent–the State of New Jersey (through its representatives)–remains resolute, though hampered by statutory limitations, and largely unwilling to acknowledge that its seven-year

successful sports gambling run was merely the result of a regulatory gap created by the CFTC's inaction. Worse still, New Jersey as well as other states realize that acknowledging federal preemption would most likely halt not only designated contracts markets like Kalshi–a favorable outcome for the states–but also jeopardizes the sportsbooks and other operators they have licensed. That poses an existential threat to the very ecosystem they have labored to build.

Caught between a rock and hard place, the states, including New Jersey, have reluctantly tethered their fate to an unconvincing preemption argument, hoping it will buy them time. While their predicament may warrant some sympathy, clinging to the fiction of the states having regulatory authority over sports gambling is no panacea to heal their wounds.

Although the State of New Jersey lacks a compelling legal argument, affirming the preliminary injunction would produce an *even more troubling* result: It would edge the country closer to the de facto legalization of sports betting nationwide. There is little serious debate that Kalshi's offerings qualify as sports bets– Congress didn't think so, the CFTC didn't think so, and even Kalshi didn't think so. If residents of New Jersey–or any other state–wish to legalize sports gambling, the appropriate course is through Congress.

Until and unless that occurs, the law remains unambiguous: There can be no sports gambling on a CFTC-regulated exchange, and, as inconvenient as it may

sound, none at all in *any* state, on *any* platform. As the Supreme Court emphasized in *Murphy*, "[t]he legalization of sports gambling requires an important policy choice, but the choice is not ours to make." *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 490 (2018). That observation applies equally to the CFTC. Its failure to act cannot substitute for congressional judgment, nor can it provide legal cover for what amounts to the backdoor legalization of sports gambling.

Fortunately, both Congress and the Supreme Court have anticipated the risks posed by regulatory vacuums and implemented meaningful safeguards. Congress, through the Administrative Procedure Act ("APA"), has limited agency overreach; and the Supreme Court, in its recent decision in *Loper Bright*, revived the principle that "[t]he [APA] requires courts to exercise their independent judgment in deciding whether an agency has acted within its statutory authority…" *Loper Bright Enterprises v. Raimondo*, 603 US 369 (2024).

Together, these safeguards provide a strong legal foundation for this Court to reverse the preliminary injunction, ensuring that this critically important case can proceed on the merits. The residents of New Jersey–and indeed, of the entire nation–deserve no less.

## ARGUMENT

### I.    The CFTC Has Sole Decision-Making Powers Over Sports Gambling.

#### A.    The Commodity Exchange Act ("CEA") Preempted The Field.

The question of whether futures markets constitute gambling is hardly novel. In fact, 19th-century courts were inundated with attempts to resolve precisely that issue. After decades of judicial uncertainty, the Supreme Court ultimately held that the contracts for the future sale of cotton did not constitute wagers under New York's anti-gambling statute. *Bibb v. Allen et al.*, 149 U.S. 481 (1893). The related question–whether contracts settled through the payment of differences rather than physical delivery constituted gambling–was resolved twelve years later by the Supreme Court: "Set-off has all the effects of delivery… The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties." *Board of Trade v. Christie Grain and Stock Company*, 198 U.S. 236, 248 (1905).

Those two Supreme Court decisions laid the groundwork for the emergence of futures trading on organized exchanges–and began the long process of adapting statutory and regulatory frameworks to accommodate it. Futures markets, by their very nature, have always walked a tightrope. Speculation, an act of *individuals* is useful, unless it is excessive, which turns the *market* into a gambling platform as a whole.

The tension was evident as early as 1921. In advocating for legislation to regulate grain futures, Senator Capper declared: "The one vital industry on which the Nation's welfare and prosperity depend, must have its chance to live and prosper if the rest of us expect to, and if it is to have this chance, the grain gambler must go." 61 Cong. Rec. 4768 (1921).  While well-intentioned, Senator Capper arguably misidentified the source of harm. A person speculating on grain prices was not, in and of themselves, the problem. Nor did speculation alone turn the futures exchange into a casino–unless it became excessive.

The Commodity Exchange Act of 1936 signaled a recalibrated attitude toward speculation. No longer vilified as mere gamblers, speculators were recast in more favorable terms: "[T]hat class of citizens … who like to test their judgment concerning values and price trends by occasional and moderate speculation therein." H.R. REP. No. 421, 74th Cong., 1st Sess. 3 (1935). Congress had come to recognize that if the hedger was the yin, the speculator was the yang–each essential to the functioning of a healthy futures market.

This symbiotic view endures. As one CFTC commissioner put it decades later, describing the dynamic between commercial hedgers and financial participants: "'[C]ommercials' …  have an underlying interest in the physical commodity. Now, to take the other side of futures positions, there needs to be speculators… [W]ithout speculators, there would be no market." Bart Chilton,

*Fighting Futures* (November 1, 2010), Speech of Commissioner Bart Chilton at the University of Notre Dame.[1]

Three central questions continued to guide Congress's approach to federal oversight of futures transactions:  i) whether a dedicated federal agency was appropriate, given the cross-border nature of these markets; ii) how much preemptive authority that agency would possess; and  iii) how would the agency distinguish publicly useful contracts from impermissible gambling. Congress answered all three with the enactment of the Commodity Futures Trading Commission Act of 1974, which i) established the CFTC; ii) granted it exclusive jurisdiction over commodity futures transactions, and iii) introduced the economic purpose test as the analytical framework for distinguishing permissible contracts from disguised wagers.

The CFTC's exclusive jurisdiction is codified at 7 U.S.C. § 2(a)(1)(A), granting the agency authority over "transactions involving swaps or contracts of sale of a commodity for future delivery." One contemporaneous law review article, citing the relevant Senate Conference Report noted: "The legislative history clearly indicates that Congress intended to preempt state jurisdiction over the transactions that the Act covers. A sentence in the Commodity Exchange Act which could have been construed as continuing state law in the field was purposefully deleted from

---

[1] Available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opachilton-34.

the Act to assure preemption of state regulatory authority. The Conference Report on the final bill stated that the Commission 'would preempt the field insofar as futures regulation is concerned.' Therefore, if any substantive state law regulating futures trading is contrary to or inconsistent with the Act, the Act will govern. In view of the broad grant of authority to the Commission, the conferees did not contemplate a need for any supplementary regulation by the states." Graham Purcell and Abelardo Lopez Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market-Oriented Economy*, 21 S.D. L. Rev. 555, 573-74 (1976) (internal citations omitted).

Against the backdrop of Congress's clear intent, courts started to enforce federal preemption: An Alabama district court held that "the Alabama gambling statutes, if construed to require actual delivery, would directly conflict with the federal purpose of fostering the markets in that they would destroy the markets in this state, and that Congress has preempted the field." *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981).

Importantly, state involvement wasn't eliminated entirely as states retained authority over fraud and abuse. As the Eighth Circuit explained, "[T]he continued existence of common law fraud actions permitting punitive damages awards does not conflict with the regulatory scheme established by the [CEA]." *Kerr v. First*

*Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984).  But characterizing

commodity transactions as gambling falls squarely within the CFTC's purview.

The Alabama district court highlighted that critical distinction: "Although there is

no federal interest in whether a state prevents fraudulent commodity transactions,

there unquestionably is a federal interest in whether a state brands commodity

transactions as 'gambling.'" *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,

515 F. Supp. 202, 206 (N.D. Ala. 1981). Congress did not intend for each state to

reach its own conclusion as to whether a futures contract constitutes a wager. That

determination belongs to the CFTC–using the tool that Congress empowered them

with: the economic purpose test, which is "an evaluation of whether a contract

reasonably can be expected to be, or has been, used for hedging and/or pricing

basing on more than an occasional basis" *Event Contracts*, 89 Fed. Reg. 48,968,

48,978 (June 10, 2024) (to be codified at 17 C.F.R. pt. 40).

Congress revisited this structure in the Commodity Futures Modernization

Act of 2000 ("CFMA"), which made two significant changes. First, it expanded the

CFTC's jurisdiction by creating the "excluded commodity" category–sweeping in

virtually any contingent event not expressly prohibited by Congress. Second, and

more consequentially, it repealed the economic purpose test, eliminating the very

standard that had historically guided the Commission's judgment about which

contracts served legitimate commercial functions and which crossed the line into

gambling. Lacking a clear statutory standard for distinguishing publicly useful contracts from gambling, the CFTC continued to rely on the economic purpose test–a framework that, though no longer codified, remained the best available framework to guide its decisions. That changed in *KalshiEX LLC v. CFTC*, when the Commission abandoned that longstanding approach in favor of a newfound interpretation of "gaming," ultimately leading the court to reject its reasoning and permit Kalshi to list and trade its election contracts. *KalshiEX LLC v. CFTC,* No. 1:23-cv-03257 (D.D.C.).

### B.     Sports Is An Excluded Commodity.

Kalshi's sports event contracts story is neither unique, nor novel. As early as 2001, courts encountered efforts to cast sports prediction markets in the form of futures trading. As Cohen described in his petition for certiorari, he was "[i]ntrigued by the interest shown by his fellow traders in casual sports betting that mimicked the operation of the financial markets–trading in so-called sports 'futures'–[and] … explored the possibility of establishing an Internet business that would permit such betting." *See* Petition for Writ of Certiorari at 4*, Cohen v. United States*, 536 U.S. 922 (2002) (No. 01-1521).  Jay Cohen, CEO of World Sports Exchange, built a platform whose "sole business involved bookmaking on American sports events." *United States v. Cohen*, 260 F.3d 68, 71 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002). Cohen correctly observed that in *form*, these

contracts mirrored financial instruments. But, in *substance*, they lacked any legitimate economic purpose. What ultimately sank Cohen was the Wire Act, *see* 18 U.S.C. § 1084–but his enduring legacy is the articulation of what we now recognize as 'sports futures.'

The CFTC began signaling its view that sports-based contracts may fall within its jurisdiction as early as 2004. In evaluating HedgeStreet's proposed event contracts, the Commission noted: "HedgeStreet has stated, however, that it intends to list only contracts that have a legitimate economic purpose and does not intend to list for trading contracts based on terrorist activity or gambling activities, such as the outcome of sporting events." *Designation Memorandum: HedgeStreet, Inc.*, U.S. Commodity Futures Trading Commission (Feb. 10, 2004).[2]

In 2008, the Commission inquired further: "How should the Commission address the potential gaming aspects of some event contracts and the possible pre-emption of state gaming laws?" *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, Fed. Reg. 25,669, 25,670 (May 7, 2008). While stopping short of directly naming sports outcomes, the Commission effectively answered its own question by declaring broad jurisdictional authority, stating: "Although futures contracts that failed the economic purpose test were

---

[2] Available at
https://www.cftc.gov/sites/default/files/files/opa/opahedgestreetdesignationmemo021704.pdf.

prohibited from trading on futures exchanges and thus illegal because of the on-exchange trading requirement, *they (and any instrument with identical terms) remained futures contracts, fully subject to the Commission's jurisdiction.*" *Id.* at 25,672 (emphasis added).

Despite these early signals predating even the Dodd-Frank Act, the CFTC did not have occasion to formally address self-certified sports event contracts until a decade later, when ErisX self-certified contracts tied to NFL outcomes on December 15, 2020.  The Commission initiated review within nine days, and although ErisX withdrew its contracts before a final decision was rendered, one Commissioner publicly expressed their interpretations of the Commission's position emphasizing that economic purpose remains critical. *See* Statement of Commissioner Dan M. Berkovitz Related to Review of ErisX Certification of NFL Futures Contracts: *Sports Event Contracts: No Dice Unless There is an Economic Purpose and the Exchange is Open to the Public*, April 7, 2021.[3] Another commissioner opined that sports events qualify as excluded commodities and should be treated like all others: "But what about an event? An election?  Whether the Summer Olympics will occur in Japan?  A …. football game?  Those, too, are commodities!" *See* Statement of Commissioner Brian D. Quintenz on ErisX

---

[3] Available at
https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement040721.

RSBIX NFL Contracts and Certain Event Contracts: *Any Given Sunday in the Futures Market* (March 25, 2021) ("Quintenz Statement.")[4]

Trying to find an escape in the statutory language, New Jersey insists that sports bets fall outside the Commission's jurisdiction by arguing they do not meet the definition of an "excluded commodity" because they supposedly lack "financial, economic, or commercial consequence." *See* 7 U.S.C. § 1a(19)(iv). That claim is untenable. No serious observer would assert that sporting events drawing audiences of close to 130 million people–alongside billions in advertising, merchandising and tourism–have no economic effect. The state's argument might have more merit if it distinguished between events with consequential economic impacts (e.g., Super Bowl) and those without (e.g., under-10 recreational basketball). But that standard would invite an unworkable line-drawing problem: Who decides how much consequence is enough?

Ironically, the state hints at the better answer without fully embracing it. A clearer boundary exists between *artificially* manufactured games solely for gambling, such as roulette, and events *naturally* occurring for recreational, professional, or entertainment purposes, like sports. While that may appear to be a wide regulatory net to enforce, there is a self-correction mechanism built in: Events

---

[4] Available at
https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521.

with no serious economic interest will attract no sustainable speculative activity, and should any dubious contract arise, the CFTC retains the enforcement power to shut it down–much as authorities distinguish between organized gambling rings and a neighborhood poker game. In other words, the materiality of consequence doesn't determine jurisdiction, it simply guides enforcement priorities.

### C.    Gambling Through Futures is a Matter Left To the Federal Government

When the State of New Jersey led the charge to repeal PASPA, 28 U.S.C. §§ 3701–3704, its central thesis was that gambling regulation is a matter reserved to the states. The American Gaming Association ("AGA") echoed that view in its Supreme Court amicus brief, citing a case in support that had nothing to do with sports gambling: "That Congress has generally exempted *state-run lotteries and casinos* from federal gambling legislation reflects a decision to defer to, and even promote, differing gambling policies in different States." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 187 (1999) (emphasis added). Five state amici committed the same error, cherry-picking a single line from a 1905 case: "The suppression of gambling is concededly within the police powers of a state." *See* Brief of Amici Curiae States of West Virginia, Arizona, Louisiana, Mississippi, and Wisconsin in Support of Petitioners 19-20, *Christie v. NCAA*, No. 16-476 (U.S. filed Nov. 2016) (citing *Ah Sin v. Wittman*, 198 U.S. 500 (1905)). But,

*Ah Sin* involved traditional games of chance–cards and dice–not contingent event markets with national reach.

It is no coincidence that states have long been entrusted with regulating casino-style gambling. This is so because games do not implicate interstate commerce. A hand of blackjack played in Atlantic City does not cross state lines. But a sports bet, even when placed by in-state bettors, is inherently tied to a contingent event that occurs outside the state's borders.

Essentially, the question whether gambling is subject to state vs. federal jurisdiction comes down to two clearly delineated limiting principles: i) Artificially created events (such as the spin of a roulette wheel, the lottery draw, etc.) vs. naturally occurring contingent events (a sports game, elections, weather, etc.); and ii) proximity of the bettor to the contingent event, in particular, whether the contingent event occurs outside the state's borders.

Not realizing the *jurisdiction-shifting* nature of these two factors, New Jersey cites the Interstate Horseracing Act of 1978 in support of its ill-conceived assertion that states have jurisdiction over gambling. But that statute is a poor analogue. Horseracing resembles a casino game more than it resembles a futures contract: It is an artificially created event, organized mostly for the purpose of wagering–horses do not spontaneously race themselves. Moreover, at the time of the Horseracing Act's passage, horseracing was largely local and off-track betting

15

was a nascent practice. The statute itself reflects this narrow scope, emphasizing that "[t]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders," but "any off-track betting office shall obtain the approval of all currently operating tracks within 60 miles of such off-track betting office."" *Interstate Horseracing Act of 1978*, 15 U.S.C. § 3001(a)(1)–(3). As such, New Jersey's reliance on the Horseracing Act as evidence that gambling is a matter reserved to the states is misplaced.

A similar fate awaits the argument the tribes are expected to raise surrounding the alleged violation of the Indian Gaming Regulatory Act ("IGRA") in light of the CFTC preemption. Kalshi's contracts are *not* Class III games under the statute; in fact, IGRA does not mention sports gambling at all. *See* 25 U.S.C. §§ 2701–2721. As its name suggests, IGRA governs gambling *games*–not gambling on contingent events. It is the implementing regulation, 25 C.F.R. § 502.4(c) that expansively defines Class III gaming to include sports betting. The definitional blunder was, and remains, a regulatory overreach with no bearing on this case.

### D.    Federal Inaction Enabled the Regulatory Model New Jersey Now Opposes

New Jersey seeks to frame this dispute as one of federal preemption–because that narrative serves its interests. But the inconvenient reality facing New Jersey, and every other state that legalized sports gambling post-PASPA repeal is this:

Under the Dodd-Frank Act, sports wagers constitute unregulated event contracts (and also swaps), and the platforms offering them are in violation of the CEA, because they are either impermissible off-exchange trading venues, and/or, unregistered swap execution facilities. Incoming CFTC Chairman Brian Quintenz didn't mince words about the legality of event contracts that don't serve public interest on- or off-exchange: "[I]f the Commission deems any event contract that involves one of the enumerated activities to be contrary to the public interest, that contract is banned from trading on any registered futures exchange.  The contract *cannot trade anywhere else either* since it is still a commodity futures contract and, if traded off of an exchange would be illegal." *See* Quintenz Statement (emphasis added).

This is not a case about preemption; it is a case about inaction. The CFTC's political decision not to act–not its lack of legal authority–is what enabled the rise of regulated sportsbooks without federal oversight. That inertia suited the states–until it no longer did. Now that the regulatory tide threatens to shift, their outcry rings hollow.

If sports events or outcomes associated with those events do qualify as excluded commodities–and they do–the entire legal foundation of state-authorized sportsbooks collapses. And the possibility of federal preemption, while inconvenient for many, is hardly surprising to anyone who reads the statute

carefully and honestly. The Nevada Resort Association, seeing the writing on the wall, raised concerns about this exact regulatory risk: "Kalshi's preemption argument could even result in a bizarre result that the CFTC has authority over some types of state sports betting, not currently traded on a CFTC exchange… To the extent that the sports bets offered by Kalshi are considered to be swaps and so the CFTC has exclusive jurisdiction over such swaps, then this could even require other types of sports bets to be only offered on a CFTC exchange." *See* Nevada Resort Association's Emergency Motion to Intervene, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW (D. Nev. Apr. 9, 2025). Yes, the CFTC has exclusive jurisdiction, but no, they can't be offered on CFTC-registered exchanges - or anywhere else- because they are prohibited event contracts, which Kalshi itself has admitted many times in its election markets litigation against the CFTC. Judicial estoppel aside, Kalshi's abrupt about-face– made in a matter of days–underscores the inconsistency of its positions and weighs heavily in favor of a reversal.

The truth is, the states caught a lucky break. For years, they allowed state-licensed operators to offer unregulated event contracts on sports under the theory that they retained exclusive authority to regulate sports gambling within their borders. They did not. Now, as the legal scaffolding wobbles, their true grievance is laid bare–not that they are losing a right, but that they are losing a

revenue stream they never had a legal right to claim in the first place. Sympathy may be warranted–but sympathy cannot trump statute.

## II.    The APA Strongly Favors Reversal.

### A.    The CFTC's Actions Are "Unreasonably Delayed."

The CFTC has been watching for a long time. As Acting Chair Caroline Pham recently acknowledged, "the CFTC has been looking at [prediction markets] like for 30 years." *See* Yahoo Finance, *Acting CFTC Chair Discusses Future of Crypto Regulation Under Trump*, June 12, 2025.[5] As early as 2004, the Commission warned HedgeStreet–a designated contract market– not to list contracts contingent on the outcome of sporting events. *See supra*, Section I.B. In its 2008 Concept Release, the Commission raised concerns about "potential gaming aspects of some event contracts" and solicited public comment on their treatment. *Id*. Yet, despite these early acknowledgements, there is still no "formal statutory or regulatory definition [of gaming]" *Event Contracts*, 89 Fed. Reg. 48,968, 48,988 (June 10, 2024) (to be codified at 17 C.F.R. pt. 40). That is a rather astonishing delay (15 years) for what is arguably the most important word of the Dodd-Frank Act when it comes to event contracts. The CFTC's only attempt to

---

[5] Available at
https://finance.yahoo.com/video/acting-cftc-chair-discusses-future-201942402.html
.

define "gaming" emerged in its proposed rulemaking on event contracts–an effort that appeared more aligned with bolstering its litigation posture in *KalshiEx, LLC* than with establishing a durable regulatory framework. In any event, the proposed rule–which is unlikely to be finalized in its current form– explicitly defines "gaming" to include event contracts contingent on the outcome of a game. *Id.*

The Commission's historical pace of initiating review further underscores its present inaction. When NADEX self-certified its election contracts on December 19, 2011, the CFTC initiated review after waiting 14 days. ErisX self-certified on December 15, 2020 and it took the CFTC only nine days to initiate review. Lastly, a review was initiated in just 11 days when Kalshi self-certified its election contracts on June 12, 2023. But, inexplicably, Kalshi's sports event contracts–which closely mirror the ErisX submission–have now languished without review for nearly five months and counting.

The CFTC's failure to act is not merely a policy choice–it constitutes a violation of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1). Courts have long recognized that agency action may become unlawful when it is unreasonably delayed, and long delays create a presumption of unreasonableness. *See In re American Rivers*, 372 F.3d 413, 419 (D.C. Cir 2004) ("A reasonable time for agency action is typically counted in weeks or months, not years."); *see also*

*Telecomms. Research & Action Ctr. v. FCC* ("TRAC"), 750 F.2d 70 (D.C. Cir.

1984) (establishing the six-factor TRAC balancing test for unreasonable delay).

The CFTC's prolonged silence in the face of ever-expanding sports gambling is not

just problematic—it is a violation under the APA. And while the CFTC is not a

party to this case, its silence is precisely what enables Kalshi to continue to

operate.

### B.    Failure to Act is Agency Action That Creates a Need For Relief

Alternatively, the APA provides another remedy: hold unlawful and set aside

agency action, findings, and conclusions under certain circumstances, including,

arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with

law. *See* 5 U.S.C. § 706(2). Critically, "agency action" includes the whole or a part

of an agency rule, order, license, sanction, relief, or *the equivalent or denial*

*thereof, or failure to act*." *See* 5 U.S.C. § 551 (emphasis added).

Inaction, at scale, becomes policy. Courts have long recognized that an

agency's failure to enforce–or refusal to act–may carry the same weight as

affirmative agency action. In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme

Court explained that agency non-enforcement decisions are presumptively immune

from judicial review, primarily because they are committed to agency discretion by

law. But *Heckler* also involved a narrow request: federal prisoners sought to

compel the FDA to stop the use of unapproved drugs in lethal injections—a
discrete enforcement question affecting a handful of individuals.

By contrast, the CFTC's sustained inaction in the face of proliferating event
contracts involving sports is not an isolated act of non-enforcement–it is a systemic
choice. And unlike *Heckler*, where inaction preserved the status quo, the CFTC's
silence here has allowed entire gambling markets to bloom unchecked.

The CFTC's inaction is too consequential to be justified by competing
priorities or resource constraints–it creates a regulatory vacuum that reshapes the
legal landscape entirely. The longer the CFTC refrains from exercising its
authority, the more deeply entrenched these markets become, making future
oversight politically fraught and practically difficult.

The consequence is staggering. Where the FDA's enforcement choice
affected a few individuals, the CFTC's restraint enables a gambling infrastructure
available to virtually every person in the United States. When an agency allows
that scale of economic and legal transformation without rulemaking, adjudication,
or guidance, it is no longer passive. It is governing by silence.

### C.    The CFTC's Inaction Is Final

Finality is a critical consideration under the APA: "Agency action made
reviewable by statute and final agency action for which there is no other adequate
remedy in a court are subject to judicial review." *See* 5 U.S.C. § 704. This creates a

conundrum: the phrase "agency action" clearly includes "failure to act," i.e. inaction, "[b]ut what would it even mean to say a court must render null and void an agency's failure to act?" *United States v. Texas*, 599 U.S. 670, 697 (2023). Finality of inaction, unlike finality of action, is a rather tricky concept, but the way the statute is constructed, it should mean *something*, otherwise, the statute becomes superfluous. The danger of not applying the APA based on supposed non-finality of inaction is obvious: It would incentivize a regulator to *not* take action. Incoming Chairman Quintenz hinted at this very possibility: "[I]f the Commission decides to punt on analyzing a specific contract's public interest, the Commission has not shirked its statutory duty, because there is no obligation to make any determinations at all." *See* Quintenz Statement. But it would frustrate congressional purpose if futures contracts in violation of the law continue to be traded simply because the agency decided to punt.

In addition to failing to timely define "gaming" or review contracts likely lacking economic purpose–something it had routinely done in the past, including for election markets that at least claimed some predictive or hedging utility– the CFTC has demonstrated other signs of inaction as well.  For example, it has made little effort to document or memorialize stakeholder feedback. On February 5, 2025, after identifying "several key *obstacles* to balanced regulation of prediction markets," including "federal circuit court of appeals and district court orders and

opinions, including that 'gaming involves games'; the CFTC's legal arguments and litigating positions in several ongoing federal court cases; CFTC-registered entities' legal arguments in court that event contracts based on games or sports contests or sporting events constitute 'gaming' and are therefore prohibited under the Commodity Exchange Act," among others, the Commission announced a prediction markets roundtable (emphasis added). *See* CFTC Release No. 9046-25 (Feb. 5, 2025).[6] It then abruptly cancelled the roundtable. *See* Event Horizon*, CFTC Cancels Prediction Markets Roundtable.*[7] Perhaps wary of creating another "obstacle," the CFTC then voluntarily dropped its appeal in *KalshiEX LLC v. CFTC,* No. 24-5205 (D.C. Cir. 2024) (dismissed). More recently, presumptive CFTC Chairman Brian Quintenz stated that he doesn't have "any plans to issue any guidance [for prediction markets] in the near term." *See* Event Horizon, *Everything CFTC Pick Quintenz Said About Prediction Markets In Senate Hearing* (June 10, 2025).[8]

Evaluated in isolation, any one of these individual actions may not rise to final action. Certainly, it is well within the Commission's right to not pursue rulemaking in a certain area given conflicting priorities and resource constraints,

---

[6] Available at https://www.cftc.gov/PressRoom/PressReleases/9046-25.
[7] Available at
https://nexteventhorizon.substack.com/p/news-cftc-cancels-prediction-markets
[8] Available at
https://nexteventhorizon.substack.com/p/everything-cftc-pick-quintenz-said.

to not initiate a discretionary review, or to voluntarily drop a case it no longer wishes to pursue. However, *taken together*, the parts unmistakably point to an undeniable whole: The CFTC does not intend to take meaningful action on sports event contracts.

If the CFTC's examples of inaction, even collectively, are not considered final for the purposes of applying the APA, that conclusion would beg the question: *What exactly would make them final*? Absent this court reversing injunction, Kalshi would continue to offer the contracts subjecting the residents of all 50 states to sports gambling on any given day, an outcome Congress couldn't possibly have intended.

### D.      Preliminary Injunction is Inconsistent with *Loper Bright*

For four decades following *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), federal agencies operated under the protective canopy of the *Chevron* deference, which instructed courts to uphold an agency's reasonable interpretation of an ambiguous statute. That era ended with the Supreme Court's landmark decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which overruled *Chevron* and reasserted the Judiciary's role in interpreting statutes. The Court held that "[t]he Administrative Procedure Act requires courts to exercise their independent judgment in deciding whether an agency has acted within its statutory authority," and that courts "may not defer to

an agency interpretation of the law simply because a statute is ambiguous." *Id*. at 372.

Even under the now-defunct *Chevron* standard, the CFTC's position would have been difficult to defend–Congress spoke clearly in granting the Commission exclusive jurisdiction over futures contracts, including those involving gaming, and that gaming includes sports bets is unambiguous. But *Loper Bright* resets the standard entirely: agency interpretations now receive respect, not deference—and only when earned through consistency and reasoned explanation.

The CFTC's conduct fails that test. From 2012 to 2025, the Commission's approach to event contracts has shifted repeatedly. In the first election market case, the Commission denied approval based on the economic purpose test. *Order Prohibiting the Listing or Trading of Political Event Contracts*, CFTC (April 2, 2012).[9] In 2021, ErisX's NFL contracts were poised for denial on the same grounds, as reflected in the Commissioners public statements: "The [proposed but not finalized] Order concluded that the 'record in this matter does not establish that the ErisX NFL event contracts have a hedging utility,' and the contracts 'do not form the basis for the pricing of a commercial transaction involving a physical commodity, financial asset or service.'" *See* Quintenz Statement.

---

[9] Available at
https://www.cftc.gov/sites/default/files/idc/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

Kalshi's election contracts were initially denied on economic purpose grounds. *See Order Disapproving Congressional Control Political Event Contracts,* CFTC, Release No. 8780-23 (Sept. 22, 2023).[10] Once in litigation, the Commission pivoted to a hastily constructed "gaming" definition instead and lost. *KalshiEX LLC v. CFTC*, No. 1:23-cv-03257 (D.D.C.).

When the CFTC appealed, the appeals court signaled during oral argument that it could lean into the economic purpose test as the most plausible statutory reading, but the Commission ultimately decided to abandon the case altogether. *KalshiEX LLC v. CFTC,* No. 24-5205 (D.C. Cir. 2024) (dismissed).

Most recently, the CFTC inexplicably declined to even initiate its discretionary review of Kalshi's sports event contracts–despite their clear resemblance to ErisX's NFL futures contracts just four years earlier.

This is not consistency. It is regulatory improvisation. And under *Loper Bright*, such vacillation does not merit judicial deference. The court made clear that "respect" must be earned through reasoned consistency, not asserted through institutional habit. The CFTC's shifting rationales–bouncing between the economic purpose test and denouncing it, not to mention its outright silence–do not reflect a stable interpretation of law. The oscillation reflects uncertainty and perhaps political expediency.

---

[10] Available at https://www.cftc.gov/PressRoom/PressReleases/8780-23.

In this post-*Chevron* landscape, it is the judiciary–not the agency–that must interpret the statute. The CFTC's actions–or lack thereof–do not warrant deference; they warrant scrutiny.

## **CONCLUSION**

For over a decade, the Commodity Futures Trading Commission has invoked—and revoked—regulatory theories without clarity or consistency, permitting the growth of unregulated markets while disclaiming responsibility. Meanwhile, Congress has spoken plainly: Contracts involving contingent events, including sports, fall within the scope of federal commodity futures regulation.

The agency's prolonged failure to apply that authority, paired with its shifting rationale for intervention–or lack thereof–, strongly suggests that affirming the injunction would not serve the public interest. The lines drawn by Congress—not the silence or inconsistency of regulators–must guide this Court.

For the foregoing reasons, NFI respectfully requests that this Court reverse.

Dated:  June 23, 2025                                 Respectfully submitted,


                                             /s/ Scott D. Brenner
                              By:     _____

                                             Scott D. Brenner, Esq.
                                             Parlatore Law Group, LLP
                                     One World Trade Center, Suite 8500
                                             New York, NY 10007
                                       Telephone: (212) 603-9918
                                   scott.brenner@parlatorelawgroup.com
                                         Attorney for Amicus Curiae

# CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 5,841 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). In making this certification, I have relied upon the word count function of the word-processing system used to prepare this brief.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the word-processing system used to prepare this brief.

3.    The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.    This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with the following anti-virus software: Windows Defender.

Dated: June 23, 2025                    /s/ Scott D. Brenner

New York, New York                   Scott D. Brenner

                                                      *Attorney for Amici Curiae*
                                                      *New Finance Institute*

## <u>ELECTRONIC DOCUMENT CERTIFICATE</u>

Pursuant to Third Circuit Local Appellate Rule 13.1(c), I hereby certify the text of the electronic brief is identical to the text in the paper copies.

The brief was scanned for viruses using Windows Defender Antivirus Version 1.431.68.0 and no viruses were detected.

Dated: June 23, 2025                           /s/ Scott D. Brenner

New York City, New York                  Scott D. Brenner
                                         *Attorney for Amici Curiae*
                                         *New Finance Institute*

## <u>CERTIFICATE OF BAR ADMISSION</u>

Admitted on June 16, 2025.

Dated: June 23, 2025

New York City, New York

/s/ Scott D. Brenner

Scott D. Brenner
*Attorney for Amici Curiae*
*New Finance Institute*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. To the best of my knowledge, all parties to this appeal are represented by counsel who are registered CM/ECF users and will be served electronically by the appellate CM/ECF system.


/s/ Scott D. Brenner

Scott D. Brenner
*Attorney for Amici Curiae*
*New Finance Institute*