**TENTATIVELY SCHEDULED FOR ARGUMENT
ON SEPTEMBER 8, 2025**

No. 25-1922

IN THE

# United States Court of Appeals
# for the Third Circuit

KALSHIEX LLC,

*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of New Jersey
No. 1:25-cv-02152 (Kiel, J.)

## RESPONSE BRIEF FOR APPELLEE KALSHI

GURBIR S. GREWAL
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5775
ggrewal@milbank.com

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1850 K St. NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

July 24, 2025        *Counsel for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, KalshiEX LLC discloses that its parent corporation, Kalshi Inc., owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ......................................................................... 1

STATEMENT OF RELATED CASES ........................................ 4

STATEMENT OF THE CASE ..................................................... 4

    A.   Legal Background ......................................................... 4

    B.   Factual Background ...................................................... 14

    C.   Procedural History ....................................................... 16

SUMMARY OF ARGUMENT .................................................... 18

STANDARD OF REVIEW ......................................................... 21

ARGUMENT ............................................................................... 21

I.    THE CEA PREEMPTS NEW JERSEY'S GAMBLING LAWS AS APPLIED TO KALSHI'S EVENT CONTRACTS. ......................................... 22

    A.   New Jersey Gambling Laws Are Field Preempted As Applied To Kalshi. ...................................................... 22

    B.   New Jersey Gambling Laws Are Conflict Preempted As Applied to Kalshi. .................................................... 30

II.   SPORTS-EVENT CONTRACTS ARE SWAPS SUBJECT TO THE CFTC'S EXCLUSIVE JURISDICTION. ............................................ 34

    A.   The CEA's Text Confirms That Sports-Event Contracts Are Swaps. ................................................ 35

    B.   Defendants' Extratextual Arguments Do Not Undermine The Conclusion That Sports-Event Contracts Are Swaps. ....... 37

III.  DEFENDANTS CANNOT OVERCOME THE OVERWHELMING EVIDENCE OF PREEMPTION. ............................................................... 48

    A.   The Relevant History Supports Preemption ............................. 48

    B.   Defendants' Field-Preemption Arguments Fail ........................ 53

    C.   Defendants' Conflict-Preemption Arguments Fail ................... 60

CONCLUSION ........................................................................... 63

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
   977 F.2d 1147 (7th Cir. 1992) .............................................................*passim*

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*,
   198 U.S. 236 (1905) ................................................................................ 5

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ............................................................................. 59

*Boynes v. Limetree Bay Ventures LLC*,
   110 F.4th 604 (3d Cir. 2024) ...............................................................21

*Bryan v. Gov't of Virgin Islands*,
   916 F.3d 242 (3d Cir. 2019) ................................................................ 43

*In re Bybee*,
   945 F.2d 309 (9th Cir. 1991) ............................................................... 35

*Chi. Mercantile Exch. v. SEC*,
   883 F.2d 537 (7th Cir. 1989) ......................................................... 26, 62

*Cothran v. Ellis*,
   16 N.E. 646 (Ill. 1888) ..................................................................... 4, 50

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ..............................................................................*passim*

*Dickson v. Uhlmann Grain Co.*,
   288 U.S. 188 (1933) ............................................................................. 50

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
   933 F.3d 882 (7th Cir. 2019) ............................................................... 56

*Emerson Elec. Supply Co. v. Estes Express Lines Corp.*,
   451 F.3d 179 (3d Cir. 2006) ................................................................ 26

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ............................................................................. 44

*Erlenbaugh v. United States*,
409 U.S. 239 (1972) ............................................................... 42

*Frank v. Delta Airlines Inc.*,
314 F.3d 195 (5th Cir. 2002) ................................................. 25

*Free v. Bland*,
369 U.S. 663 (1962) ............................................................... 21

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ................................... 26, 28, 57

*Garcia v. United States*,
469 U.S. 70 (1984) ................................................................ 28

*Gordon v. New York Stock Exch., Inc.*,
422 U.S. 659 (1975) .............................................................. 44

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) .............................................................. 34

*Hi Tech Trans, LLC v. New Jersey*,
382 F.3d 295 (3d Cir. 2004) .................................................. 24

*Hill v. Wallace*,
259 U.S. 44 (1922) .................................................................. 5

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985) .............................................................. 58

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) .............................................................. 27

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) .............................................................. 56

*Int'l Trading, Ltd. v. Bell*,
556 S.W.2d 420 (Ark. 1977) .............................................. 7, 26

*Jones v. B. C. Christopher & Co.*,
466 F. Supp. 213 (D. Kan. 1979) .......................................... 26

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ............................................... 58

*KalshiEX LLC v. CFTC*,
   No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ....... 14, 45, 57

*KalshiEX, LLC v. Hendrick*,
   No. 25-cv-00575, 2025 WL 1073495
   (D. Nev. Apr. 9, 2025) ........................................................ 4, 17, 34, 40-41

*Lackey v. Stinnie*,
   145 S. Ct. 659 (2025) ............................................................................ 35

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) .......................................................... *passim*

*Lewis v. Alexander*,
   685 F.3d 325 (3d Cir. 2012) ................................................................. 58

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .............................................................................. 27

*Lopez v. Davis*,
   531 U.S. 230 (2001) .............................................................................. 32

*Mallet & Co. Inc. v. Lacayo*,
   16 F.4th 364 (3d Cir. 2021) .................................................................. 21

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .............................................................................. 23

*Mississippi v. Louisiana*,
   506 U.S. 73 (1992) ................................................................................ 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) ................................................................. 5, 11, 29, 58

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ......................................................................... 15, 49

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
   738 F.3d 192 (9th Cir. 2013) ................................................................ 24

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) .............................................................................. 22

*Pennsylvania Dep't of Env't Prot. v. Trainer Custom Chem., LLC*,
  906 F.3d 85 (3d Cir. 2018) ....................................................... 39

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) ................................................................. 46

*Polselli v. IRS*,
  598 U.S. 432 (2023) ................................................................ 46

*Pueblo of Pojoaque v. New Mexico*,
  863 F.3d 1226 (10th Cir. 2017) ................................................ 57

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976) ................................................................. 44

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990) ................................................................... 39

*Riccio v. Sentry Credit, Inc.*,
  954 F.3d 582 (3d Cir. 2020) ..................................................... 40

*Rice v. Bd. of Trade of Chi.*,
  331 U.S. 247 (1947) ........................................................ 27, 28-29

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ................................................................ 39

*Sikkelee v. Precision Airmotive Corp.*,
  822 F.3d 680 (3d Cir. 2016) ..................................................... 22

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*,
  108 F.4th 144 (3d Cir. 2024) ............................................... 24, 54

*United States v. Bankoff*,
  613 F.3d 358 (3d Cir. 2010) ..................................................... 38

*United States v. Locke*,
  529 U.S. 89 (2000) ............................................................. 49, 52

*W. Flagler Assocs., Ltd. v. Haaland*,
  71 F.4th 1059 (D.C. Cir. 2023) ................................................. 43

*Williams v. Stone,*
    109 F.3d 890 (3d Cir. 1997) ....................................................... 58

**Constitutional Provisions**

U.S. Const., art. VI, cl. 2 ............................................................. 22

N.J. Const., art. IV, § 7 ............................................................16, 34

**Statutes**

7 U.S.C. § 1a(9) ............................................................................ 8

7 U.S.C. § 1a(19)(iv) ........................................................... 9, 36, 46

7 U.S.C. § 1a(19)(iv)(I) ............................................................... 38

7 U.S.C. § 1a(47)(A)(i) ............................................................... 46

7 U.S.C. § 1a(47)(A)(ii) ....................................................10, 35, 47

7 U.S.C. § 1a(47)(A)(iii) ............................................................. 46

7 U.S.C. § 2(a) ...................................................................*passim*

7 U.S.C. § 2(a)(1)(A) ..........................................................*passim*

7 U.S.C. § 2(e) ........................................................................... 40

7 U.S.C. § 6 ............................................................................... 29

7 U.S.C. § 6(c)(1) ........................................................................41

7 U.S.C. § 6c .......................................................................... 6, 27

7 U.S.C. § 7(a) .......................................................................... 29

7 U.S.C. § 7(d) ............................................................................12

7 U.S.C. § 7a-1 .................................................................... 12, 60

7 U.S.C. § 7a-2(c)(1) ...............................................................13, 29

7 U.S.C. § 7a-2(c)(4)(A) ..............................................................13

7 U.S.C. § 7a-2(c)(5)(B) ..............................................................13

7 U.S.C. § 7a-2(c)(5)(C)(i) ...................................................*passim*

7 U.S.C. § 7a-2(c)(5)(C)(ii) ........................................................ 11

7 U.S.C. § 9......................................................................13, 32, 37

7 U.S.C. § 9a ....................................................................... 29, 30

7 U.S.C. § 12(a)(1) .................................................................... 32

7 U.S.C. § 12c ............................................................... 13, 29, 30

7 U.S.C. § 13a-2 ............................................................. 14, 25, 57

7 U.S.C. § 16(e)(1) ....................................................................... 8

7 U.S.C. § 16(e)(1)(B) ................................................ 25, 40, 54, 56

7 U.S.C. § 16(e)(1)(C) ................................................................ 25

7 U.S.C. § 16(e)(2) ..................................................................... 56

7 U.S.C. § 16(f) ......................................................................... 32

7 U.S.C. § 16(h) ........................................................................ 54

15 U.S.C. § 8302(d)(1) ............................................................... 39

25 U.S.C. § 2701 ....................................................................... 44

28 U.S.C. § 3702(1) .................................................................... 15

31 U.S.C. § 5362(1)(E)(ii) ..................................................... 42, 52

Ala. Code § 13A-12-20(4) .......................................................... 50

Ariz. Rev. Stat. § 13-3301(6) ...................................................... 50

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000) ................................................. 9

Dodd-Frank Act of 2010, Pub. L. 111-203, 124 Stat. 1376, 1666 (July 21, 2010) .....................................................................10

Haw. Rev. Stat. § 712-1223 ........................................................51

Md. Code Regs. 36.10.18.04(C) .................................................. 33

N.H. Rev. Stat. § 647.2(II)(d) ...................................................51

N.J. Rev. Stat. § 2C:37-1(b) .....................................................51

N.J.S.A. 5:12A-11(c) ...............................................................16

N.J.S.A. 5:12A-13(a)(1) ........................................................... 60

N.J.S.A. 2C:43-2  .....................................................................16

N.J. Admin. Code § 13:69N-1.2(d) ........................................ 60

N.J. Admin. Code § 13:69N-1.2(g) ..................................... 16, 60

N.J. Admin. Code § 13:69O-1.2(e)(2) .................................... 33

N.Y. Penal L. § 225.00(2) ........................................................51

Nev. Rev. Stat. § 463.0193 .......................................................51

Pub. L. 2018, c.033 (June 11, 2018) ........................................ 49

R.I. Gen. Laws § 42-61.2-3.3(a)(5)(viii) ................................. 59

## Regulations

17 C.F.R. § 38 .........................................................................12

17 C.F.R. § 38.150(b) ............................................................ 29

17 C.F.R. § 38.151 ................................................................. 60

17 C.F.R. § 38.151(b) .........................................................12, 33

17 C.F.R. § 38.251 .............................................................12, 59

17 C.F.R. § 38.450 ..................................................................12

17 C.F.R. § 40.2(a)(1) ..............................................................13

17 C.F.R. § 40.2(c) ............................................................12, 29

17 C.F.R. § 40.3 ......................................................................13

17 C.F.R. § 40.3(b) ..................................................................13

17 C.F.R. § 40.6(b)(1) ............................................................15

17 C.F.R. § 40.11 .......................................................11, 61, 62

17 C.F.R. § 40.11(c) ..........................................................13, 62

64 Fed. Reg. 40,528 (July 27, 1999) ....................................12

73 Fed. Reg. 25,669 (May 7, 2008) .................................. 9, 35

76 Fed. Reg. 44,776 (July 27, 2011)..................................... 62

77 Fed. Reg. 48,208 (Aug. 13, 2012) ...............................39, 41

**Legislative Materials**

120 Cong. Rec. 30, 464 (Sept. 9, 1974) ........................... 27

156 Cong. Rec. S5902 (July 15, 2010) ..................................61

S. Rep. No. 93-1131 (1974).............................................7, 53

H.R. Conf. Rep. No. 93-1383 (1974) .............................1, 7, 28, 55

H.R. Rep. No. 74-421 (1935) ............................................ 6

H.R. Rep. No. 93-975 (1974) ........................................... 28

H.R. Rep. No. 97-565 (1982).............................................. 8

*Hearings Before the House Comm. on Agriculture*, 93d Cong.,
    1st Sess., (1973) ...................................................... 6

*Hearings Before the Senate Comm. on Agriculture & Forestry*,
    93d Cong., 2d Sess. (1974)................................... 6, 28

**Other Authorities**

Antonin Scalia & Brian Garner, *Reading Law* (2012)................. 44

*Associated*, Oxford English Dictionary (3d. ed 2011)................. 36

*Exclusive*, American Heritage Dictionary (2d ed. 1980) ............. 23

*Gaming*, American Heritage Dictionary (5th ed. 2011) .............................. 37

*Gaming Contract*, Chambers Dictionary (13th ed. 2014) .......................... 37

Jack Otway, *Rory McIlroy Could Land Millions More as Bonuses Explained Following Electrifying Masters Win*, GB News (Apr. 19, 2025), https://perma.cc/254C-UEJ6 .......................... 47

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) ........................................... 5

Kelly Cloonan, *Betting Markets Nailed Trump's Decisive Win*, Business Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X ................................................................................ 15

Marco Mello, *A Kick for the GDP: The Effect of Winning the FIFA World Cup*, 86 Oxford Bulletin of Econ. & Stat. 1313, 1315 (2024) ......................................................... 36

Mark Singelais, *Saint Peter's run to Elite Eight worth millions for MAAC*, Times Union (Mar. 28, 2022) ............................... 36

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) ............................................................. 8, 26, 50

Rachel Moore, *Eagles to generate $1.2B economic impact with Super Bowl, parade, season*, PHL 17 News (Feb. 13, 2025) ................. 45

Shaofeng Yuan & Ying Gao, *When Sports Sponsorship Incurs Brand Risk: The Roles of Team Performance, Brand Familiarity, and Team Identification*, 23 Int'l J. of Sports Marketing and Sponsorship 767, 779-780 (2022) ................................... 36

Sports Business Journal, *Nike Drops Well-Timed Ad After McIlroy's Victory* (Apr. 14, 2025), https://perma.cc/69N7-FSVR ................................................................................ 47

## INTRODUCTION

Defendants ask this Court to vitiate Congress's decision to entrust the Commodity Futures Trading Commission ("CFTC") with "exclusive jurisdiction" to regulate trading on federal derivatives exchanges.  In the seminal 1974 amendments to the Commodity Exchange Act ("CEA"), Congress created the CFTC, tasked it with overseeing nationwide derivatives markets, and gave it exclusive authority over the markets it oversees.  Defendants seek to undo that exclusive authority.  They claim sweeping power not only to regulate, but to prohibit, the trading of contracts on a CFTC-regulated exchange over which they concede the CFTC possesses jurisdiction.  The district court below, joining another district court in Nevada, preliminarily enjoined these efforts.  This Court should affirm.

KalshiEX LLC ("Kalshi") is a CFTC-licensed derivatives exchange, known as a designated contract market ("DCM").  Federal law accordingly preempts state regulation of trading on Kalshi, as confirmed by every conceivable marker of legislative intent.  The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a).  Congress deleted a provision that would have preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Conf. Rep. No. 93-1383, at 35 (1974).  And Congress repeatedly reenacted—indeed, expanded—the exclusive-

jurisdiction provision after courts uniformly concluded that it preempts state regulation. Every court to consider the question since 1974 has concluded that states are preempted from regulating trading on DCMs.

Federal law therefore bars New Jersey from regulating Kalshi's contracts under straightforward preemption principles. Holding otherwise would contravene Congress's judgment that a "contract market could not operate efficiently, and perhaps not at all," if subject to "varying and potentially contradictory legal standards." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). If New Jersey could enforce its laws against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of contradictory regulation, interfering with the CFTC's uniform oversight, and conflicting with Kalshi's federally imposed obligation to provide impartial access to its exchange.

The most notable thing about Defendants' opening brief is the short shrift it gives to the CEA's text. Faced with irrefutable textual evidence of preemption, Defendants respond with a hunch about congressional intent, insisting that states have long regulated gambling and that Congress in the CEA failed to express its preemptive intent with sufficient clarity. This narrative is utterly wrong. For as long as derivatives trading has existed in this country, states have sought to regulate such trading as unlawful

gambling. Congress was aware of these efforts, and answered them by drawing a clear line: States may regulate off-exchange trading, but regulation of trading on federally designated exchanges is reserved for the CFTC.

Finding preemption will not produce Defendants' sky-is-falling consequences. It will not mean that the CEA supersedes *all* state gambling laws. Instead, the CEA preempts state gambling laws only as narrowly applied to trading on DCMs, leaving state law unaffected in every other application, including as to sportsbooks and casinos. Nor would finding preemption impliedly repeal federal gambling statutes, none of which allows states to deploy their gambling laws to regulate trading on DCMs. In fact, the principal federal gambling statute on which Defendants rely expressly *excludes* trading on DCMs from its scope—a provision Defendants overlook that directly refutes their theory. And nothing about finding preemption would mean that all sports bets are "swaps" immune to state regulation, as Defendants and some amici implausibly allege.

By contrast, Defendants' argument would, if adopted, decimate the CFTC's exclusive jurisdiction. Defendants claim the broad authority to enforce not only their sports-wagering laws, but *all* state gambling laws, as to trading on DCMs. Many states broadly define gambling in a way that

would encompass the trading of all event contracts, or even all futures contracts, which necessarily involve placing a financial position on a contingent future event.  Allowing states to use their gambling laws to regulate such trading would nullify the CFTC's authority and undermine the nationwide uniformity necessary for derivatives markets to work—the very consequences Congress sought to avoid when it subjected federal exchanges to the CFTC's exclusive jurisdiction.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court.  Kalshi has asserted similar claims against state authorities in litigation currently pending in Nevada and Maryland.  *See KalshiEX, LLC v. Hendrick*, No. 25-cv-575 (D. Nev.); *KalshiEX v. Martin*, No. 25-cv-01283 (D. Md.).

## STATEMENT OF THE CASE

### A.    Legal Background

1.  This appeal involves derivatives: financial instruments whose value depends on one or more underlying commodities.  Futures contracts, one type of derivative, were developed in the United States in the 19th century as a tool to hedge against fluctuations in commodity prices.  Because futures contracts involve risk-based speculation, many states initially decried them as a form of illegal "gambling." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888).

In fact, many "anti-gaming" laws were originally enacted to make it "as difficult as humanly possible to trade futures."  John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982).

Attitudes changed in the early 1900s following the rise of formalized futures markets.  Previously illegal "[s]peculation" became a "well known" "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 246-47 (1905) (Holmes, J.) (addressing contention that Chicago Board of Trade "itself keeps the greatest of bucket shops").  The industry, however, was not yet subject to centralized regulation.

The Future Trading Act, Congress's first attempt to regulate derivatives, was invalidated as an impermissible exercise of Congress's taxing power. *See Hill v. Wallace*, 259 U.S. 44, 70-73 (1922).  Congress responded with the Grain Futures Act, and then eventually passed the CEA in 1936 to bring a degree of regulation to derivatives markets. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982).  Relevant here, the CEA implemented anti-fraud provisions and began to monitor the growing list of tradeable commodities. *Id.* at 389; Stassen, *supra*, at 832.

Congress in 1936 stopped short of comprehensive federal regulation.  It preserved "any State law applicable" to "transactions" regulated by the Act. 7 U.S.C. § 6c (1940).  The drafters' "intention" at that point was "not to occupy the field."  H.R. Rep. No. 74-421, at 5 (1935).  As markets matured, however, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the House Comm. on Agriculture* ("*House Hearings*"), 93d Cong., 1st Sess., at 121 (1973).

Congress responded in 1974 with seminal legislation designed to "[b]ring all futures trading under federal regulation." *Hearings Before the Senate Comm. on Agriculture & Forestry* ("*Senate Hearings*")*,* 93d Cong., 2d Sess., at 847-848 (1974).  Most relevant here, Congress created the CFTC to oversee trading on federally designated "contract market[s]."  7 U.S.C. § 2(a)(1)(A).  Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *House Hearings* at 128.  Subjecting exchanges to "different State laws would just lead to total chaos." *Senate Hearings* at 685 (statement of Sen. Clark). Congress in Section 2(a) of the amended statute therefore explicitly vested

the CFTC with "exclusive jurisdiction" over trading on federal exchanges. 7 U.S.C. § 2(a)(1)(A).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing provision preserving state laws applicable to derivatives "transactions." H.R. Conf. Rep. No. 93-1383 at 35. As the conference report explained, the amendments were designed "preempt the field insofar as futures regulation is concerned." *Id.*

Courts immediately understood the preemptive effect of those amendments. *See, e.g.*, *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive-jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"). Writing for the Second Circuit, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).

The 1974 amendments did not preempt all state regulation of derivatives trading. They provide that "[n]othing in this chapter shall supersede or preempt" the application of state statutes to a transaction "that is *not* conducted on or subject to the rules" of a federally licensed exchange or to "any person required to be registered" who fails to do so. 7 U.S.C. § 16(e)(1) (emphasis added). Congress thus granted the CFTC exclusive power to regulate trading on exchanges it oversees, while permitting state authorities to police "fraudulent off-exchange investments" and other "transactions outside those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44 (1982).

2. The CEA originally covered agricultural products. In 1974, Congress broadened the definition to reach all "goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The CFTC's exclusive jurisdiction "made it inevitable that [the] growth of the commodity industry would invade areas previously governed by other federal, state, or local agencies." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 22 (1976). Since 1974, Congress has periodically expanded the instruments it regulates.

In 2000, Congress expanded the definition of "commodity" to include events. *See* Pub. L. No. 106-554, 114 Stat. 2763 (2000). A qualifying event is an "occurrence" or "contingency" that is "beyond the control of the parties" to a transaction" and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). Under the CEA, such events are one type of "excluded commodity." *Id.* § 1a(19). DCM transactions in excluded commodities, like all other commodities, fall within the CFTC's exclusive jurisdiction. *Id.* § 2(a)(1)(A).

Derivatives known as "event contracts" soon gained prominence. Event contracts identify an event with multiple possible outcomes, a payment schedule for those outcomes, and an expiration date. The contract's value is determined by market forces, which means its price fluctuates from the time of its creation to its expiration based on perceptions about the event's likelihood. In 2008, the CFTC solicited public comment regarding "the appropriate regulatory treatment of" such "event contracts," which the agency explained may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events." *Concept Release*, 73 Fed. Reg. 25,669, 25,669 (May 7, 2008). It explained that the CEA "supersedes and preempts other laws, including state and local gaming ... laws, with respect to transactions executed on or subject to the

rules of a Commission-regulated market" and sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts." *Id.* at 25,673.

The CFTC's contemplated rulemaking was never finalized, however, because Congress in the Dodd-Frank Act of 2010 added a new class of agreements known as "swaps" to the CFTC's exclusive jurisdiction. *See* Pub. L. 111-203, 124 Stat. 1376, 1666 (July 21, 2010). Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery … traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). Congress defined "swap" to encompass, among other things, contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress's addition of "swaps" confirmed that the CFTC's exclusive jurisdiction extended to event contracts.

Dodd-Frank also created a "Special Rule" regarding certain "swaps" in "excluded commodities"—i.e., "event contracts." Recognizing that certain categories of event contracts warranted closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it

concludes they are "contrary to the public interest."    7 U.S.C. § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" event contracts to be contrary to the public interest if they "involve":

> (I)    activity that is unlawful under any Federal or State law;
> (II)   terrorism;
> (III)  assassination;
> (IV)   war;
> (V)    gaming; or
> (VI)   other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id*. § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11.  No such contract "determined by the Commission to be contrary to the public interest" may be listed.  7 U.S.C. § 7a-2(c)(5)(C)(ii).    Absent an adverse public-interest determination, however, an exchange may list event contracts involving the Special Rule's enumerated activities, subject to the CFTC's exclusive jurisdiction.

3.  The CEA today sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives.   *Merrill Lynch*, 456 U.S. at 356 (quotation marks omitted).   The principal requirement is that entities become "designated" as contract markets, known as DCMs.  DCMs must comply with numerous federal obligations designed to ensure orderly trading and to prevent "price manipulation, cornering and other market disturbances."  *Am. Agric. Movement*, 977 F.2d at 1151.

To obtain CFTC designation, exchanges must prove they can comply with 23 "Core Principles" identified in the CEA and CFTC regulations. *See* 7 U.S.C. § 7(d); 17 C.F.R. § 38, *et seq*. DCMs must make daily disclosures regarding market volume, 17 C.F.R. § 38.450; keep five years' worth of trading records, *id*. §§ 38.950, 1.31(b)(1); offer "impartial access" to their platforms, *id*. § 38.151(b); make their records "open to inspection by" federal regulators, *id*. § 1.31(d)(1); and maintain capital reserves sufficient to cover "operating costs for a period of at least one year," *id*. § 38.1101(a)(2). Among many other requirements, DCMs must also create and maintain a "system capable of detecting and investigating potential trade practice violations," *id*. § 38.156, monitor for "manipulation," *id*. § 38.251, and "have the ability to comprehensively and accurately reconstruct all trading" on their exchange, *id*. § 38.256. DCMs must also work through a CFTC-regulated clearinghouse, ensuring that financial obligations of all trade counterparties are met by entities with sufficient liquidity. 7 U.S.C. § 7a-1.

The CEA prescribes a detailed system for the approval and listing of contracts on DCMs. Until 2000, federal law required DCMs to obtain CFTC preapproval before listing any new contract and subjected all contracts to a public-interest test. *See* 64 Fed. Reg. 40,528, 40,530 (July 27, 1999). But this pre-approval process proved onerous and inefficient, causing Congress

in 2000 to eliminate the public-interest test and allow DCMs to list derivatives contracts without CFTC pre-approval by self-certifying compliance with applicable requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(1).  The CFTC may stay the listing of a new contract in certain circumstances.  *See* 17 C.F.R. § 40.2(c).  Alternatively, exchanges may voluntarily submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. § 40.3.  The CFTC "shall approve a new contract" unless it determines the contract would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B); 17 C.F.R. § 40.3(b).

If the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review.  17 C.F.R. § 40.11(c).  The CFTC may request that the DCM suspend the listing of that contract during the pendency of the review.  *Id.* § 40.11(c)(1).  Following review, the CFTC "shall issue an order approving or disapproving" the contract.  *Id.* § 40.11(c)(2).

The CEA also sets out a detailed enforcement scheme.  If a DCM offers a contract in violation of the CEA, the CFTC has recourse to an array of enforcement mechanisms, including but not limited to civil penalties, 7 U.S.C. § 9, revocation of licensing, *id.* § 12c, and referral for criminal enforcement, *id.* § 13.  The CEA further authorizes appropriate officials "of

any State" to sue over "any act or practice constituting a violation" of the CEA or its regulations, but, consistent with the exclusive-jurisdiction provision, such state actions may only be brought against parties "other than a [designated] contract market." *Id.* § 13a-2(1).

## B.    Factual Background

In 2020, the CFTC unanimously certified Kalshi as a DCM after a nine-month review. *See KalshiEX LLC v. CFTC,* No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024). Since then, Kalshi has been fully regulated under federal law alongside entities like the Chicago Mercantile Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, health, popular culture, and economics. For example, Kalshi allows users to trade on who will win the New York City mayoral race; whether India will meet its 2030 climate goals; whether July 2025 will be the hottest July ever recorded; and what the top movie on Netflix will be next week. These contracts allow customers to hedge and trade based on financially significant events. Because prices are driven by market forces, these contracts have significant predictive value. Kalshi's contract on the

outcome of the 2024 presidential election, for example, proved more accurate than polling.[1]

In December 2024, one of Kalshi's competitors began offering contracts on the outcomes of sports events.  JA29.  Kalshi followed suit in January 2025.  Kalshi's contracts allow users to place positions on, for example, which teams will advance to the World Series and who will win the US Open tennis championship. The Special Rule authorized the CFTC to review Kalshi's sports-event contracts if it concluded they involved "gaming" and prohibit them if it found them "contrary to the public interest."  To date, however, the CFTC has declined to initiate formal review of Kalshi's sports-event contracts.  JA6.  Thus, upon self-certification, Kalshi's sports-event contracts were approved under federal law.  17 C.F.R. § 40.6(b)(1).

When Congress in 2010 listed contracts involving "gaming" among the categories of contracts the CFTC could review for compliance with the public interest, a federal statute called the Professional and Amateur Sports Protection Act ("PASPA") made sports betting unlawful in nearly every state. *See* 28 U.S.C. § 3702(1).  In *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), the

---

[1] Kelly Cloonan, *Betting Markets Nailed Trump's Decisive Win*, Business Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X.

Supreme Court invalidated PASPA. Since then, most states—including New Jersey—have authorized sports betting.

### C.    Procedural History

On March 27, 2025, the New Jersey Division of Gaming Enforcement sent Kalshi a cease-and-desist letter, claiming that Kalshi was "listing unauthorized sports wagers" in violation of New Jersey law. JA37. Although New Jersey has authorized sports betting, it prohibits the operation of an "online sports pool" by anyone other than a "sports wagering licensee." N.J.S.A. 5:12A-11(c). To obtain a license, among other requirements, sports pools must accept wagers only from within New Jersey. N.J. Admin. Code § 13:69N-1.2(g). Additionally, the New Jersey Constitution prohibits "wagering" on college athletic events that take place in New Jersey or involve New Jersey colleges. N.J. Const., art. IV, § 7, ¶ 2(D).

The letter demanded that Kalshi halt its sports-event-contract offerings in New Jersey and "void" any New Jersey transactions already on Kalshi's exchange. JA37-38. The Division represented that it would seek "any measures available under New Jersey law" if Kalshi did not comply by the following day. JA38. Violations of the applicable state law are punishable as "crime[s] of the fourth degree" or by fines of up to $100,000. N.J.S.A. 5:12A-11(c), 2C:43-2.

On March 29, 2025, Kalshi commenced this action and sought a preliminary injunction on the ground that New Jersey gambling laws are preempted as applied to trading on DCMs like Kalshi. While briefing was underway, a federal district court in Nevada granted Kalshi a preliminary injunction in similar litigation, holding that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX, LLC v. Hendrick*, No. 25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).

The district court below (Kiel, J.) agreed and granted Kalshi a preliminary injunction. The court determined that Kalshi was likely to succeed on its claim that "field preemption applies." JA14. It explained that the CEA's "plain language" "supersedes SEC and state authority over contracts on designated exchanges." JA11. The court further noted that even if the Special Rule's reference to "gaming" encompassed "the contracts at issue here, that would subject Kalshi to the review of the CFTC—not state regulators." JA13. Because "at the very least field preemption applies," it was unnecessary to "consider whether conflict preemption may also apply." JA14.

The court next determined that the remaining injunction factors favored preliminary relief. The court underscored that the cease-and-desist letter

presented Kalshi with a "Hobson's choice" of either "facing civil or criminal enforcement" and being "perceived as violating New Jersey law," or "complying," losing business, and "undermining user confidence." JA15-16. It found "at minimum" that reputational harms supported an injunction. JA16. The court added that the public interest is not served by "the enforcement of an unconstitutional law." JA17.

Defendants appealed.

## SUMMARY OF ARGUMENT

**I.A.** Starting with the plain text, every marker of congressional intent confirms that Congress preempted the field as to transactions on DCMs like Kalshi. Congress granted the CFTC "exclusive jurisdiction" over trading on DCMs, thus displacing state regulation. 7 U.S.C. § 2(a)(1)(A). Congress deleted a provision that would have preserved state regulation. And Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field."

**B.** New Jersey's gambling laws are also conflict-preempted as applied to Kalshi. Applying state law—not to mention 50 different states' laws—to regulate trading on DCMs stands as an obstacle to Congress's objective of subjecting DCMs to exclusive federal regulation. New Jersey's laws also create a conflict in enforcement because they purport to criminalize conduct

that the CFTC has permitted.  And state law would require Kalshi to take action that would violate its duties under the CEA, leaving Kalshi with no way to abide by both state and federal law.

**II.A.**  Defendants principally argue that Kalshi's sports-event contracts are not swaps.  But Defendants bury the lede:  Congress in the Special Rule expressly contemplated that sports-event contracts may meet the statutory definition of "swap."   Neither extratextual limitations nor canons of construction displace Congress's clear language.

**B.**  Defendants resort to a parade of horribles, arguing that everything could be a swap subject to CFTC regulation under the CEA's plain meaning. But the CEA's definition of "swap" is subject to express statutory exclusions that fully resolve Defendants' concerns.   Because CFTC regulation is exclusive only as to on-DCM trading, not off-DCM trading, nothing about finding preemption would preempt state law as to all sports betting, as Defendants allege.   Nor would finding preemption impliedly repeal any federal gambling statutes.   Indeed, the principal federal statute on which Defendants rely excludes trading on DCMs from its definition of "bet or wager."

**III.A.**  Defendants distort the relevant history in disputing preemption. One of Congress's principal aims in granting the CFTC exclusive jurisdiction

over on-DCM trading was to preempt state laws—including gambling laws, which states routinely deployed to invalidate futures contracts before the CEA's enactment.  Because many states define gambling to include placing *any* financial position on *any* contingent event, Defendants' position would have seismic repercussions, licensing states to prohibit all event contracts or even all futures contracts.  Any presumption against preemption does not apply because the CEA does not preempt state laws in their entirety, but only as narrowly applied to regulating trading on DCMs.  States have not traditionally occupied the field of trading on DCMs—Congress has.

**B.**  Defendants cannot overcome field preemption.  The CEA's savings clauses simply underscore the CFTC's exclusive jurisdiction over on-DCM transactions, even though state laws apply to off-exchange transactions.  Similarly, the Special Rule did not incorporate state law; Congress reserved the public-interest determination for the CFTC, not states.  Policy considerations could never defeat statutory text, and Defendants' policy concerns here are especially misplaced given that Kalshi has already implemented most of the consumer-protection measures Defendants tout.

**C.**  Conflict preemption is equally evident.  Defendants paint New Jersey's licensing regime as imposing minimal burdens, but compliance would be impossible for a host of reasons.  New Jersey requires all positions

to be placed by individuals in New Jersey (impossible for a national exchange); imposes cash-reserves requirements (impossible and superfluous for a DCM subject to capital requirements and required to work through a fully collateralized clearinghouse); and requires Kalshi to selectively limit access to its exchange (in violation of its federal impartial-access duties).

## STANDARD OF REVIEW

This Court reviews a "grant of a preliminary injunction for abuse of discretion." *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 609 (3d Cir. 2024). In that analysis, it reviews "factual findings for clear error." *Id.* While it reviews "legal conclusions de novo," *id.*, that review is subject to the preliminary-injunction standard under which the injunction's proponent need only demonstrate "a reasonable chance" of prevailing. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quotation marks omitted).

## ARGUMENT

Defendants do not contest that three of the four injunction factors favor Kalshi. They resist only the conclusion that New Jersey gambling laws are likely preempted as applied to regulating Kalshi's contracts. But all markers of congressional intent refute Defendants' position. Kalshi has at the very least established a "reasonable chance" of prevailing on the merits. *Id.*

## I. THE CEA PREEMPTS NEW JERSEY'S GAMBLING LAWS AS APPLIED TO KALSHI'S EVENT CONTRACTS.

The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const., art. VI, cl. 2. Federal law may have preemptive effect no matter how "clearly within a State's acknowledged power" the state's law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962). "Even without an express provision," Congress may displace state law "in at least two circumstances." *Crosby*, 530 U.S. at 372. First, federal law may occupy a field of regulation, "leav[ing] no room for state[s]." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016). Second, state laws must yield where they conflict with a federal statute, such that compliance with both is "impossible" or state law stands as an "obstacle" to Congress's objectives. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015).

Ever since Congress created the CFTC and granted it "exclusive jurisdiction" over trading on DCMs, "courts have held that [Section] 2(a)(1) of the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. Application of New Jersey's gambling laws to Kalshi's event contracts is both field and conflict preempted.

## A. New Jersey Gambling Laws Are Field Preempted As Applied To Kalshi.

The CEA leaves no room for state regulation of trading on DCMs. That is evident from both the "language of the pre-emption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation marks omitted). Every indicator of Congressional intent confirms that the CEA preempts the field of regulating trading on DCMs.

1. Start with the text. The CEA grants the CFTC "*exclusive jurisdiction*" over all "transactions involving swaps" or "future delivery" contracts that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (2d ed. 1980) ("Not divided or shared with others"; "sole . . . separate; incompatible"). Kalshi's sports-event contracts are "swaps" or "future delivery" contracts traded on a "contract market designated" by the CFTC, which necessarily denies jurisdiction to other regulators.

Courts routinely recognize the preemptive effect of similar language. As this Court recently explained, "explicit statutory conferral of exclusive

jurisdiction" to a federal authority withdraws "any concurrent jurisdiction" from state authorities "over that same subject matter." *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024); *accord Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 305 (3d Cir. 2004) (federal statute granting federal agency "exclusive jurisdiction over 'transportation by rail carrier' . . . preempts state regulation with respect to rail transportation"). The CFTC's exclusive jurisdiction over trading on DCMs is no different.

Other features of Section 2's text underscore that CFTC jurisdiction is exclusive as to state authorities. Section 2 contains a savings clause preserving the jurisdiction of "other regulatory authorities" under the laws "of any State." 7 U.S.C. § 2(a)(1)(A). Crucially, the clause applies "[e]xcept as hereinabove provided" by the grant of exclusive jurisdiction to the CFTC. *Id.* That language enables a "logical inference" of preemption as to matters within the CFTC's jurisdiction. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 195–196 (9th Cir. 2013) (interpreting savings clause with an "[e]xcept as provided" proviso). It also confirms that the CFTC's exclusive jurisdiction precludes concurrent state and federal regulation alike.

2.  The CEA's context and structure confirm that Congress intended to preempt state laws as applied to transactions executed on DCMs.  Congress enacted other provisions relevant to states' role, but each one *excludes* from states' purview the right to regulate DCM trading.  Section 16 makes clear that the statute shall *not* "supersede or preempt" the application of state law to transactions "*not* conducted on" a DCM or to entities that are "required to be registered" as a DCM but "fail or refuse" to do so.  7 U.S.C. §§ 16(e)(B)(i), (C) (emphasis added).  The logical inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions.  In addition, Section 13a-2(1) authorizes state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule."  But states may *only* enforce the CEA against parties "*other than a [designated] contract market*." *Id.* (emphasis added).

Congress's decision to authorize a role for states, yet repeatedly *exclude* regulation of DCMs, reinforces the general rule that it intended to preempt the field *on* DCMs.  These clauses would "hardly have seemed necessary" if States could nonetheless enforce their gambling laws against DCMs.  *See Frank v. Delta Airlines Inc.*, 314 F.3d 195, 199 (5th Cir. 2002).

3.  Precedent further reinforces this conclusion.  By the time Congress revisited the CEA in Dodd-Frank, courts of appeals had repeatedly and

uniformly held that "the CEA preempts the application of state law" to trading on DCMs. *Leist*, 638 F.2d at 322; *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*") (quotation marks omitted); *Am. Agric. Movement*, 977 F.2d at 1157 (holding state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"). District courts and state courts of last resort agreed. *E.g.*, *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established … that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC."); *Bell*, 556 S.W.2d at 423 (similar). Commentators similarly recognized that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Johnson, *supra*, at 2.

"Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend." *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006). When it returned to the CEA in 2010, Congress would have been aware of the uniform interpretation of every court that had addressed preemption. And Congress would have

understood that confirming the CFTC's jurisdiction over event contracts in 2010 preempted state law as applied to trading those instruments.

The CFTC shares this view.  In litigation involving the CFTC's authority to regulate certain Kalshi event contracts, the CFTC recently acknowledged that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM." CFTC Br. at *27, *KalshiEX v. CFTC*, 2024 WL 4512583 (Oct. 16, 2024) (emphases added); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute).

4.  Drafting history eliminates any doubt about preemption.  When Congress considered the 1974 amendments, the CEA preserved state law as to "transactions" regulated by the Act.  7 U.S.C. § 6c (1940).  The Supreme Court had explained that *without* this language, the CEA would "almost certainly conflict with state laws," but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).  Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete."  120 Cong. Rec. 30,464 (Sept. 9, 1974) (statement of Sen. Curtis).  Deletion of the clause would have made no sense if Congress intended to preserve state authority to regulate trading on DCMs. *See INS v. Cardoza-Fonseca*, 480 U.S. 421,

442-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

5.   While this Court need not consider the legislative history given Congress's clear intent, this history further supports preemption.  Congress emphasized during the legislative process that one of its goals was to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *Ken Roberts*, 276 F.3d at 588.  The Senate Agriculture Committee understood that the proposed amendments would bring "the futures markets" "under federal regulation." *Senate Hearings* at 249.  One House sponsor added that "different State laws would just lead to total chaos." *Senate Hearings* at 685 (statement of Sen. Clark).  Drafters later reiterated that regulation should be uniform with "all exchanges . . . under the *same* set of rules." H.R. Rep. No. 93-975, at 79 (1974) (emphasis added).  The conference report to the 1974 amendments stated Congress's desire to "preempt the field insofar as futures regulation is concerned." H.R. Conf. Rep. 93-1383 at 35; *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

6. Finally, the "pervasive" regulatory framework for regulating trading on DCMs confirms that Congress preempted the field. *See Rice*, 331 U.S. at

230.  Congress in the CEA created "a comprehensive regulatory structure" to oversee the "futures trading complex." *Merrill Lynch*, 456 U.S. at 356.  That scheme leaves no room for parallel state regulation.

CFTC regulation covers the lifecycle of an exchange.  To list derivatives contracts, an exchange must receive CFTC designation.  *See* 7 U.S.C. § 7(a).  That process requires an application demonstrating myriad capabilities, including the capacity to detect and investigate actors who violate CFTC rules, 17 C.F.R. § 38.150(b), to retain adequate compliance staff, *id.* § 38.155(a), to surveil trades executed on its platform, *id.* § 38.156, and more.  Once the market becomes a DCM, it is subject to exclusive oversight, including recordkeeping requirements, *id.* § 38.950, reporting obligations, *id.* §§ 38.450, 16.00 *et seq.*, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, 7 U.S.C. §§ 9a, 12c.

CFTC regulation also covers transactions *on* a DCM.  The CEA sets out comprehensive rules governing DCM transactions, including restrictions on transactions in foreign currency, prohibitions on insider trading, and rules regarding fraudulent transactions.  7 U.S.C. § 6, *et seq.*  DCMs may self-certify contracts they believe comply with these rules, with the CFTC retaining back-end authority to review contracts for compliance.  *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(c).  In the case of event contracts in certain

categories, the CFTC has discretion to determine whether they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA rounds out the scheme by authorizing an array of sanctions, including civil penalties, revocation of licensing, and referral for criminal enforcement. *Id.* §§ 9a, 12c, 13. That "comprehensive" regime leaves "no room for the States to supplement it." *See Arizona*, 567 U.S. at 401.

### B. New Jersey Gambling Laws Are Conflict Preempted As Applied to Kalshi.

Given that Congress preempted the field of regulating trading on DCMs, the district court did not address conflict preemption. But conflict preemption serves as an alternative basis for affirmance. In at least three respects, subjecting Kalshi's contracts to state laws would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges. *Crosby*, 530 U.S. at 373.

*First*, New Jersey's application of its gambling laws to Kalshi's contracts subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. Congress specifically worried that states "might step in to regulate the futures markets themselves." *Id.* State regulation brings with it the specter of "varying and potentially contradictory legal standards" which would not only hamper DCMs' operations, but potentially prevent them from operating "at all." *Id.*

The Seventh Circuit has accordingly held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

The potential for disuniformity is plain in Defendants' cease-and-desist letter, which demanded that Kalshi cease listing sports-event contracts and immediately void existing contracts.  JA37-38.  Those demands do not currently apply to any other DCM, including a Kalshi competitor that likewise offers sports-event contracts.  That alone is inconsistent with Congress's objective of bringing "all exchanges . . . in the industry under the same set of rules."  H.R. Rep. No. 93-975, at 79.  The conflict is even clearer when considering the possibility that, if New Jersey is permitted to proceed here, 49 other states could equally attempt to subject Kalshi to their own state regimes.  Fifty different regimes for licensing, permissible contracts, age limits, and liquidity standards would grind a national DCM to a halt. Congress did not want that to happen.

*Second*, New Jersey's attempt to prohibit Kalshi's event contracts conflicts with Congress's chosen "method of enforcement."  *Arizona*, 567 U.S. at 406.  Where Congress reserves enforcement "discretion" for federal

authorities, a regime allowing for state enforcement regarding the same actions "violates" the federal scheme. *Id.* at 409.

Once Kalshi self-certified its sports-event contracts, the CFTC had authority to determine whether Kalshi violated the CEA. *See* 7 U.S.C. §§ 9, 12(a)(1), 16(f). It could also "determine" whether the contracts were "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). "Congress' use of the permissive 'may,'" in contrast with the "use of a mandatory 'shall' in the very same section," underscores the CFTC's discretion. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001). Exercising its discretion, the CFTC allowed the contracts to take effect. As the court below recognized, "Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them." JA14. Allowing New Jersey—not to mention 49 other states—to substitute its own view about the public interest for the CFTC's would directly interfere with that discretion.

New Jersey, moreover, threatens to seek *criminal* penalties well beyond what the CEA would authorize. That imbalance "undermines the congressional calibration of force." *Crosby*, 530 U.S. at 380. If 50 different jurisdictions can each impose criminal sanctions for contracts the CFTC has permitted, the CFTC's judgment would be meaningless.

*Third*, compliance with both the CFTC's and New Jersey's requirements would be impossible for Kalshi. New Jersey requires that all gaming it regulates occur within New Jersey. N.J. Admin. Code § 13:69O-1.2(e)(2). Other states impose similar requirements. *E.g.*, Md. Code Regs. 36.10.18.04(C). It would be impossible for Kalshi to comply with these state-by-state requirements while running a national exchange.

Even if Kalshi could overcome that hurdle, doing so would bring Kalshi out of compliance with the CFTC's Core Principles on which its federal designation depends. Core Principle 2 requires Kalshi to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). Offering sports-event contracts everywhere except New Jersey would violate that requirement. Pulling these contracts would also risk market disruption and facilitate manipulation. *See id.* § 38.255 (DCMs must establish mechanisms to prevent "market disruptions"); *id.* § 38.200 (DCMs must ensure contracts "are not readily susceptible to manipulation"). To Kalshi's knowledge, it would be unprecedented for a DCM to attempt to offer contracts in some states but not in others, and the only reason the CFTC has not definitively determined as much is because it has never confronted a DCM that tried.

The conflict between New Jersey's regime and federal regulation is illustrated by New Jersey's ban on any wagering "on a college sport or

athletic event that takes place in New Jersey" or on an "athletic event in which any New Jersey college team participates." N.J. Const., Art. IV, § 7, ¶ 2(D). If Kalshi complied with that obligation in New Jersey alone, Kalshi would prohibit users in New Jersey, but not elsewhere, from entering into contracts concerning the very same events, making impartial access "impossible." *Crosby*, 530 U.S. at 372. Preserving impartial access would thus require Kalshi to comply with the prohibition not just in New Jersey, but *nationwide*. *But see Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (a state "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority"). Still worse, every other state would have a reciprocal right to dictate which contracts are and are not permitted—not just in their state, but everywhere else. "Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Hendrick*, 2025 WL 1073495, at *7.

## II. SPORTS-EVENT CONTRACTS ARE SWAPS SUBJECT TO THE CFTC'S EXCLUSIVE JURISDICTION.

Defendants devote much of their brief not to challenging preemption, but to arguing that Kalshi's event contracts are not "swaps" and therefore do not fall within the CFTC's jurisdiction. Defendants are mistaken.

To begin, Section 2(a)'s exclusive-jurisdiction clause references not just "swaps," but "option[s]" and "future[s]" contracts.  Even before Congress added "swaps" to the CFTC's jurisdiction and defined them to include event contracts, the CFTC recognized that "[e]vent contracts . . . can be designed to exhibit the attributes of either options or futures contracts" and may be subject to CFTC jurisdiction on that basis alone.  73 Fed. Reg. at 25,670.  Courts had similarly concluded that other types of swap transactions qualified as "futures contract[s]."  *E.g.*, *In re Bybee*, 945 F.2d 309, 312 (9th Cir. 1991).  Congress in Dodd-Frank added "swaps" to Section 2(a) to eliminate any doubt that event contracts fall within the CFTC's exclusive jurisdiction.  And Defendants are wrong that "swaps" exclude sports-event contracts.

## A.    The CEA's Text Confirms That Sports-Event Contracts Are Swaps.

Statutory interpretation "begin[s] with the text," *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025), so it is notable that Defendants bury their textual analysis several pages into their argument.  They do so because the text is clear.  Under the CEA, a "swap" encompasses any contract that provides for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a *potential* financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (emphasis

added).  The underlying asset of an event contract—the event itself—is also an "excluded commodity."  *Id.* § 1a(19)(iv).  As Defendants acknowledge (at 22-23), "associated" commonly means "connect[ed]."  *See Associated*, Oxford English Dictionary (3d. ed 2011).  A swap thus requires an event connected to a potential financial, economic, or commercial result.

Sport events fit comfortably within this definition.  The outcomes of major sports events like those for which Kalshi offers contracts have significant financial consequences for a host of stakeholders—including team sponsors, advertisers, television networks, franchises, local communities, and more.  When New Jersey hosts the World Cup finals in 2026, the outcome will affect the gross domestic product of an entire country.[2]  When an underdog advances in the NCAA Basketball Tournament—like Saint Peter's University's historic run to the Elite Eight in 2022—it is "worth millions" to the school, its community, and its conference.[3]  When a favorite exits the tournament early, a range of stakeholders, from sponsors to advertisers, face unexpected losses.[4]  These are *actual* and *significant*

---

[2] Marco Mello, *A Kick for the GDP: The Effect of Winning the FIFA World Cup*, 86 Oxford Bulletin of Econ. & Stat. 1313, 1315 (2024).

[3] Mark Singelais, *Saint Peter's run to Elite Eight worth millions for MAAC*, Times Union (Mar. 28, 2022), https://perma.cc/B42M-YAXK.

[4] Shaofeng Yuan & Ying Gao, *When Sports Sponsorship Incurs Brand Risk: The Roles of Team Performance, Brand Familiarity, and Team*

financial consequences; they easily qualify as *potential* financial consequences.

The Special Rule confirms that "an event" in the swap definition includes a sports event. The Special Rule identifies contracts involving "gaming" among the "swaps" subject to CFTC "review and approval." 7 U.S.C. § 7a-2(c)(5)(C)(i). "Gaming," in turn, commonly refers to the "playing of games," *Gaming*, American Heritage Dictionary (5th ed. 2011), including sports games like a "football match." *Gaming contract*, Chambers Dictionary (13th ed. 2014). The CEA therefore clearly contemplates that sports-event contracts are among the contracts "associated with" potential financial consequences subject to the CFTC's exclusive jurisdiction. No doubt for that reason, the CFTC has taken no action to bar Kalshi's contracts on the ground that they are not swaps. *See* 7 U.S.C. § 9(4).

## B. Defendants' Extratextual Arguments Do Not Undermine The Conclusion That Sports-Event Contracts Are Swaps.

Largely ignoring the CEA's text, Defendants rely on canons of construction to impose extratextual limitations on Congress's definition of "swap." But interpretive canons come into play where a statute is

---

*Identification*, 23 Int'l J. of Sports Marketing and Sponsorship 767, 779-780 (2022).

ambiguous, not where "the statutory language is clear." *United States v. Bankoff*, 613 F.3d 358, 370 n.12 (3d Cir. 2010). Defendants make no attempt to locate an ambiguity in the definition of "swap," nor could they.

*First*, Defendants "start" (at 17-18) with the canon against absurdity, claiming that, under the plain meaning of the CEA, "it is difficult to imagine anything that would *not* be a swap." Defendants are wrong.

The CEA's definition of "swap" is broad but not limitless. An event giving rise to a swap transaction must have potential financial consequences independent of the transaction itself, and for an event to qualify as a commodity, it must be "beyond the control of the parties." 7 U.S.C. § 1a(19)(iv)(I). That limitation addresses many of Defendants' concerns. A bet on whether a friend makes her train, for example, is not a swap because the friend controls the outcome.

Congress followed its definition of "swap" in Section 1a(47)(A) with a series of express "[e]xclusions." *E.g.*, *id.* §§ 1a(47)(B)(iii), (v) (excluding certain transactions in securities); § 1a(47)(B)(vii) (excluding "any note, bond, or evidence of indebtedness"), § 1a(47)(B)(iv) (excluding certain transactions in foreign currency). Those exclusions refute the suggestion that the definition of swap is limitless, and their existence is strong evidence

that additional exemptions "are not to be implied." *Pennsylvania Dep't of Env't Prot. v. Trainer Custom Chem., LLC*, 906 F.3d 85, 92 (3d Cir. 2018).

Congress also delegated to the CFTC and SEC the authority to "further define" swap.  15 U.S.C. § 8302(d)(1).  Pursuant to that authority, the Commissions have adopted regulations that exclude swaths of transactions from the definition's reach, one of which excludes "customary consumer and commercial agreements" that are not traded "on an organized market," or that are entered into "primarily for personal" reasons. *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012).  This broad set of exclusions puts to rest Defendants' parade of horribles.  But it does not encompass Kalshi's sports-event contracts, which *are* traded on a DCM.

Defendants' arguments boil down to a complaint about Congress's use of a broad definition.  But Congress frequently casts a wide net in defining financial instruments, in part to keep up with the "countless and variable schemes" actors devise to circumvent federal regulation. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  Congress's definition of "security," for example, is "sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990).  Rather than artificially "cabin" this definition, courts have permitted regulators to determine "which of the myriad financial

transactions in our society" require regulation, with judicial review serving as a back-end check. *Id.* Congress's choice to follow the same approach in defining a "swap" is sensible, and certainly does not warrant resort to the absurdity canon. "As long as Congress could have any conceivable justification for a result … that result cannot be absurd." *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020).

*Second*, along with some amici, Defendants make the dramatic assertion that construing Kalshi's sports-event contracts as swaps would "federalize the entire sports betting industry." CANJ Br. at 8. Defendants' theory (at 18) is that if Kalshi's sports-event contracts are swaps, then "classic casino games and sports bets" would be swaps as well. Because the CEA generally prohibits offering swaps outside of CFTC-regulated exchanges, 7 U.S.C. § 2(e), Defendants claim that offering off-exchange casino games or sports bets would violate federal law. Invoking the elephants-in-mouseholes canon (at 21-22), Defendants claim that Congress would not have intended to prohibit state regulation of all sports betting.

Nothing about Kalshi's position would produce that implausible result. While CFTC regulation is exclusive as to trading *on DCMs*, Section 16(e)(1)(B)(ii) expressly preserves state regulation of *off-DCM* transactions, including traditional sports bets. *See Hendrick*, 2025 WL 1073495, at *6 ("if

Kalshi were offering its contracts without CFTC designation, then the defendants could regulate it"). Affirming CFTC jurisdiction over sports-event contracts would accordingly have no effect on state sportsbook regulation.

The question whether sportsbooks are transacting in swaps that *should be* traded on an exchange is a matter of CFTC enforcement discretion not implicated by this case. If the CFTC ever confronted the question, it could conclude that traditional sportsbooks are not transacting in "swaps" under the rationale for excluding certain agreements not traded "on an organized market." 77 Fed. Reg. at 48,248. Further, the CEA authorizes the CFTC to "exempt any agreement, contract, or transaction" from the exchange-trading requirement for "[p]ublic interest" reasons. 7 U.S.C. § 6(c)(1). Thus, even in the improbable event the CFTC concluded sports bets were swaps, it would retain ample authority to exempt sportsbooks from the exchange-trading obligation. In all events, nothing about Kalshi's position in this case would require the CFTC to treat bets on sportsbooks as falling within its jurisdiction.

*Third*, Defendants claim (at 19-20) that the plain meaning of "swap" would "impliedly repeal" several federal statutes related to gambling. But the relevant statutes support Kalshi, not Defendants.

As Defendants concede (at 19), just "four years" before Congress gave the CFTC exclusive jurisdiction over swaps in Dodd-Frank, Congress enacted the Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") to prohibit using the internet to facilitate certain bets and wagers unlawful under state law. While Defendants are correct (at 29) that the UIGEA's "definition of 'unlawful Internet gambling' hinges on state law," their brief contains a dispositive omission: The UIGEA provides that the term "bet or wager" "*does not include*" "any transaction conducted on or subject to the rules of a [DCM] under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii); *see also* American Gaming Ass'n Br. 3 (same error). This exclusion underscores Congress's recognition of the CFTC's exclusive jurisdiction. When it enacted Dodd-Frank four years later, Congress legislated against the backdrop of this exclusion, confirming its understanding that federal gambling statutes did not encompass transactions on DCMs.

The various other federal statutes Defendants cite do not expressly define "bet" or "wager." But context confirms that they likewise exclude transactions on DCMs. The UIGEA, as the most recent of the statutes, is entitled "to great weight in resolving any ambiguities and doubts" about how similar terms in "earlier act[s]" should be understood. *Erlenbaugh v. United*

*States*, 409 U.S. 239, 244 (1972) (quotation marks omitted); *see* Indian Gaming Ass'n Br. 11-12 (conceding that the Indian Gaming Regulatory Act ("IGRA") uses the same definition of "wager" as the UIGEA). Reading a broader definition of "wager" into the prior federal statutes would effectively nullify UIGEA's exclusion by subjecting the CFTC-regulated transactions it excludes to criminal penalties under other statutes, a result Congress in the UIGEA is highly unlikely to have intended. By contrast, interpreting the other federal statutes to exclude trading on DCMs would harmonize them with the CEA, comporting with the obligation "to give effect to multiple statutes on the same subject 'unless doing so would be impossible.'" *Bryan v. Gov't of Virgin Islands*, 916 F.3d 242, 248 (3d Cir. 2019).

Even if these other federal statutes were interpreted to treat trading on DCMs as a form of bet or wager, Defendants are quite mistaken (at 20) that subjecting Kalshi's event contracts to the CFTC's exclusive jurisdiction results in any implied repeal. Each of these statutes has full effect in the vast majority of applications. The Wire Act continues to prohibit betting between states where it is illegal—just not trading on DCMs, which, given preemption, is not illegal in any state. *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023) (Wire Act contains a "safe harbor" for "wagering" "to and from states" where that activity "is lawful"). IGRA continues to give

Native American tribes the authority to regulate gaming "on Indian lands," 25 U.S.C. § 2701—just not as to trading on DCMs. So too with the other statutes Defendants cite (at 29-30).

Only in the narrow context of trading on DCMs does the CEA take precedence, in keeping with the principle that a specific statute governs a general one—especially where, as here, the statutes involve a "general prohibition" and a "specific permission." Antonin Scalia & Brian Garner, *Reading Law* 183 (2012). The CEA is the "more specific" statute because it "speaks directly" to transactions on DCMs, while the general prohibitions in other federal gambling statutes do "not mention [DCMs] at all." *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523-24 (2018). Dodd-Frank's CEA amendments are also later-enacted, meaning they take precedence where two laws would subject an entity to "conflicting standards." *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 689 (1975); *see also Scalia & Garner*, *supra* at 328 (a later statute supersedes an earlier one where provisions in the two "are in irreconcilable conflict"). This approach leaves federal gambling statutes generally operative but gives the CEA precedence on the "narrow, precise, and specific subject" where it governs. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

*Fourth*, when Defendants finally address the statutory text, they overlook dispositive text and add nonexistent limitations.  Defendants note (at 20) that the CEA's "definition of 'swap' does not mention sports wagering at all."  But the text of the Special Rule does, listing "event contracts" involving "gaming" as a type of "swap."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).  The Special Rule is irrefutable textual proof that Congress understood contracts involving games, including sports events, to be swaps.  *KalshiEX*, 2024 WL 4164694, at *7 ("Gaming Requires a Game").  Defendants struggle to reconcile the Special Rule's text with their argument, eventually conceding (at 25) that Kalshi could list a contract regarding the Eagles collecting "over $650 million in revenue."  But this example disproves Defendants' argument.  The Eagles stand to generate over $1 billion from their 2025 Super Bowl win.[5]  If an Eagles revenue contract is a swap, an Eagles Super Bowl contract is a swap too:  Winning the Super Bowl is the event *associated with* revenue-based consequences.

Defendants assert (at 22-24) that a swap must be "inherently" financial "in nature," or linked to a "commercial instrument or measure."  But these phrases appear nowhere in the statute—Defendants invent them.  And

---

[5] *See* Rachel Moore, *Eagles to generate $1.2B economic impact with Super Bowl, parade, season*, PHL 17 News (Feb. 13, 2025).

Defendants err in claiming (at 23) that the two "surrounding subclauses" of the relevant swap definition support their extratextual gloss. These subclauses define swaps to encompass payments "based on the value[] of 1 or more . . . commodities," 7 U.S.C. §§ 1a(47)(A)(i), (iii), and Congress defined a "commodity" to include "an occurrence" beyond the parties' control and "associated with a financial, commercial, or economic consequence," *id.* § 1a(19)(iv). These subclauses therefore do not require swaps to be "inherently" financial; they broadly encompass events with economic consequences. Defendants' contrary argument would read subclause (ii) out of the statute, violating the fundamental precept that courts must aim to "give effect to every clause and word of a statute." *Polselli v. IRS*, 598 U.S. 432, 441 (2023) (alteration omitted). Defendants' argument would also mean that other prototypical event contracts—like weather-event contracts or political-event contracts—would not be swaps. Courts routinely reject comparable requests to "distort federal law to accommodate conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623 (2011).

Defendants argue (at 24-25) that the "*outcome*" of a sports event lacks financial consequences. They specifically argue that no such consequences flowed from Rory McIlroy's Masters win because television viewership did not turn on this win. But their own example refutes their position: When

Rory McIlroy won the 2025 Masters, his sponsor Nike reportedly paid him a seven-figure bonus and aired an advertisement promoting the win.[6]  Setting aside this example, Defendants certainly cannot show that the outcomes of sports events as a *categorical matter* lack financial consequences, as needed to support their assertion that *no* sports-events contracts qualify as swaps—much less *potential* financial consequences. *See* 7 U.S.C. § 1a(47)(A)(ii).

*Finally*, Defendants point (at 24) to statements by Kalshi in prior litigation that, "at least in general," gaming contracts are unlikely to serve "commercial or hedging" interests.  But these statements do not mean that games categorically lack commercial consequences, and certainly not potential commercial consequences.  Indeed, Kalshi made clear that "there may be some games that do have extrinsic consequences." *KalshiEX LLC v. Martin*, No. 25-cv-1283, ECF #36-3 at 74:12-16 (D. Md.) (reproducing the relevant transcript).  Kalshi in the prior litigation did not contend that sports-event contracts were not swaps (it was undisputed that they were) but rather that these contracts were subject to public-interest review—which

---

[6] Jack Otway, *Rory McIlroy Could Land Millions More as Bonuses Explained Following Electrifying Masters Win*, GB News (Apr. 19, 2025), https://perma.cc/254C-UEJ6; Sports Business Journal, *Nike Drops Well-Timed Ad After McIlroy's Victory* (Apr. 14, 2025), https://perma.cc/69N7-FSVR.

would only be possible if they were subject to the CFTC's exclusive jurisdiction.

### III. DEFENDANTS CANNOT OVERCOME THE OVERWHELMING EVIDENCE OF PREEMPTION.

Defendants argue that even if sports-event contracts are swaps, the CEA does not prevent states from enforcing their gambling laws as applied to trading these contracts on DCMs. Though couched in modest-sounding terms, this argument amounts to a sweeping assertion of state power to regulate trading on federal exchanges. It would decimate the CFTC's exclusive jurisdiction, and this Court should reject it.

### A. The Relevant History Supports Preemption.

In Defendants' telling (at 19), when Congress amended the CEA in Dodd-Frank, "States had been regulating gambling for well over a century" without any suggestion that the CEA preempted state law. They claim (at 16) that preempting state gambling laws as applied to trading on DCMs would constitute a "massive sea change in gambling regulation" with no indication Congress intended this result. Defendants distort the history.

While states have long regulated gambling, many states forayed into sports betting only very recently. When Congress enacted Dodd-Frank, PASPA prohibited most states (including New Jersey) from permitting sports betting. The Supreme Court (at New Jersey's request) invalidated

PASPA in 2018, simultaneously reiterating that Congress "can regulate sports gambling directly." *Murphy*, 584 U.S. at 486; *contra* CANJ Br. 12. New Jersey legalized sports betting immediately thereafter. *See* Pub. L. 2018, c.033 (June 11, 2018). Since then, nearly 40 states that PASPA previously barred from offering sports betting have legalized it, giving rise to an immense—and new—national industry. The New Jersey sports-betting laws Defendants seek to apply against Kalshi have therefore not existed for "over a century" but were enacted seven years ago—by which time it was overwhelmingly clear that the CEA preempted states from regulating trading on DCMs. Since Defendants seek to displace the extensive regulatory scheme that long predated its sports-wagering laws, "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *United States v. Locke*, 529 U.S. 89, 108 (2000).

Because the sports-specific laws they seek to apply are new, Defendants claim more generally that states are free to apply *all gambling laws* to regulate trading on DCMs. Defendants claim (at 26) that the CEA "Does Not Preempt New Jersey's Gambling Laws," and that (at 30-31) "it makes little sense to interpret" the CEA "as silently stripping the States' ability to regulate gambling."

The opposite is true.  For as long as futures trading has existed in this country, states have claimed that such trading amounts to gambling prohibited by state law.  One representative Illinois case concluded that dealing in "'futures'" "is void by the common law" and "a crime"—a "species of gambling [that] has become emphatically and pre-eminently the national sin." *Cothran*, 16 N.E. at 648.  State efforts to regulate futures as gambling were well-known when Congress enacted the CEA. *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 191, 198 (1933) (CEA precursor did not preempt state-law determination that futures contract was "merely gambling on the rise and fall of the market prices of grain").  Congress was likewise aware of this history when it amended the CEA in 1974 to grant the CFTC exclusive jurisdiction.  The decision to supersede state laws, including gambling laws, was not a "whisper," States Br. 2—it was a shout.  "Congress intended to centralize . . . the full regulatory authority over futures trading on commodity exchanges, regardless of the item or interest being traded." Johnson, *supra*, at 20.

Were this Court to agree that states may enforce their gambling laws as to trading on DCMs, its decision would have radical repercussions.  Some states exclude futures contracts from their definitions of gambling, *see, e.g.*, Ala. Code § 13A-12-20(4); Ariz. Rev. Stat. § 13-3301(6), but others do not.

Absent preemption, an array of state gambling laws could easily be understood to regulate derivatives trading.  Nevada gambling laws, for example, regulate all entities "accepting wagers on sporting events *or other events*."  Nev. Rev. Stat. § 463.0193 (emphasis added).  Absent preemption, Nevada could apply this law to *any* event contract, even though event contracts clearly fall within the CFTC's exclusive jurisdiction.  And while New Jersey has targeted Kalshi's sports-event contracts, it and many other states define gambling sufficiently broadly to permit regulation of *any* financial position on an uncertain outcome—which could be understood to allow regulation of *all* futures contracts.  *See* N.J. Rev. Stat. § 2C:37-1(b) (defining gambling as "staking or risking something of value upon the outcome of . . . a future contingent event not under the actor's influence or control"); N.H. Rev. Stat. § 647.2(II)(d) (same); N.Y. Penal L. § 225.00(2) (same).

States like New Jersey and Nevada have at least authorized gambling subject to licensure requirements, but others prohibit gambling entirely. *See, e.g.*, Haw. Rev. Stat. § 712-1223 (Hawaii law prohibiting participation "in *any* gambling activity") (emphasis added).  And, as an amicus brief submitted by numerous states admits, some states reserve the "full and absolute" right to deny a gaming license "for any cause" they "deem[] reasonable."  States Br. 24 (quoting Nev. Rev. Stat. § 463.220(7)).  If

Defendants prevail, each of these states could deploy their gambling laws to ban some or even all futures trading on DCMs.

Defendants' reliance (at 28-32) on federal statutes that incorporate state law fails for the same reason. Nothing about the CEA (at 32) is a "wholesale override [of] state gambling laws." Instead, preemption exists only in the narrow context of regulating trading on DCMs, leaving state gambling laws operative in all other applications. No federal statute suggests that states may enforce their gambling laws as to trading on DCMs—as discussed above, the UIGEA expressly states the opposite. *See* 31 U.S.C. § 5362(1)(E)(ii). Federal gambling statutes thus strike a balance by generally accommodating state gambling laws while making clear that these laws do not apply in the narrow context of regulating trading on DCMs.

For that reason, this Court can reject Defendants' reliance (at 26-28) on a presumption against preemption. Such a presumption may apply where Congress legislates in "a field which the States have traditionally occupied," but it does not where there "has been a history of significant federal presence." *Locke*, 529 U.S. at 108. Any presumption is unwarranted here given that the CEA preempts state gambling laws only to the extent they seek to regulate trading on DCMs. Regulation of derivatives trading is not a traditional state function, as the "federal government has been vitally

concerned with [derivatives] trading" for over a century.  *Leist*, 638 F.2d at 322.

### B.    Defendants' Field-Preemption Arguments Fail.

With the historical record corrected, Defendants' various attempts to dispute field preemption are conspicuously weak.

*First*, Defendants argue (at 38-40) that field preemption cannot apply because Kalshi's position sounds in express preemption.  If Defendants' point is the CEA expressly preempts state regulation of trading on DCMs, this Court can affirm on that basis.  If Defendants instead contend that the CEA's exclusive-jurisdiction provision forecloses field preemption, that argument is meritless.  The Supreme Court has explained that the various preemption "categories" "are not 'rigidly distinct,'" and "'*field*' preemption may fall into any of the categories of express, implied, or conflict preemption."  *Crosby*, 530 U.S. at 372 n.6 (quoting 1 L. Tribe, American Constitutional Law 1177 (3d ed. 2000)).

*Second*, Defendants claim (at 44-45) that CFTC jurisdiction is only exclusive as to federal regulators like the SEC.  Text, statutory history, purpose, and precedent all refute that claim and make clear the clause applies to states.  *See* S. Rep. No. 93-1131, at 23 (where the CFTC's jurisdiction applies, "it supersedes State as well as Federal agencies").

Defendants never grapple with the dramatic consequences of their interpretation, which would allow states to flood the zone with their own requirements and eliminate the uniform system Congress enacted the 1974 amendments to impose.

*Third*, Defendants cite a series of provisions in the CEA they claim foreclose preemption, but these provisions support Kalshi. Defendants cite (at 31-32) Section 16(e), which provides that the CEA does not "preempt" the application of a "State statute" to "any transaction in or involving any commodity . . . *that is not conducted on or subject to the rules of a [DCM]*." 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). The only coherent inference is that the CEA *does* preempt the application of state law to transactions that *are* conducted on DCMs. *See Transcon. Gas.*, 108 F.4th at 157 (similar provision "carves out permissible state regulation from an otherwise preempted field"). Defendants cite (at 31-32) two sub-provisions in Section 16(e) that expressly preempt state bucket-shop laws and insurance laws, *see* 7 U.S.C. §§ 16(e)(2), (h), which Defendants claim raise an inference that state gambling laws are not preempted. But these subsections preempt state law as to transactions *that do not occur on DCMs*, which is why it was necessary to specify that the laws are preempted. It would have been redundant and

confusing to specify preemption of laws related to transactions on DCMs; that is what the exclusive-jurisdiction provision already accomplishes.

Section 16(e)(2)'s history underscores this conclusion. Congress had granted the CFTC authority to exempt certain instruments from the CEA where necessary to promote "innovation," subject to the CFTC's oversight. 106 Stat. 3590, 3629-30 (1992) (codified at 7 U.S.C. §§ 6(c), (d)). Because exempted instruments would not have been traded on DCMs, states could have banned the very transactions the CFTC had determined should proceed. By preempting state law in that circumstance, Section 16(e)(2) reinforces Congress's intent to establish a uniform federal framework for regulating instruments subject to the CFTC's jurisdiction.

Defendants rely (at 32-34) on two savings clauses in Section 2(a). They claim (at 32) that the first of those clauses "*preserve*[*s*]" state law by providing that "nothing contained in this section" supersedes state jurisdiction. But Defendants gloss over the prefatory clause, which preserves state laws "[*e*]*xcept as hereinabove provided.*" Congress introduced this clause to reject the precise construction Defendants ask this Court to adopt. *See* H.R. Conf. Rep. No. 93-1383 at 35. The second savings clause merely preserves "the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). That provision speaks to state-court

*jurisdiction*, not to the applicability of state substantive law—and it therefore does not bear on preemption.

Defendants claim (at 33) the existence of savings clauses is "incompatible" with preemption. But a "savings clause" "does not preclude pre-emption." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987). The effect of a savings clause turns on its scope. In *Farina v. Nokia Inc.*, a broadly worded clause that nothing "shall in any way abridge" state-law remedies, coupled with a federal agency having "repeatedly disclaimed preemptive authority," raised a compelling inference against preemption. 625 F.3d 97, 121-22 (3d Cir. 2010) (quoting 47 U.S.C. § 414). By contrast, in *Ouellette*, a narrow savings clause did not "purport to preclude pre-emption of state law by other [aspects] of the Act." 479 U.S. at 493. While Defendants cite cases relying on the savings clauses in holding that the CEA does not preempt "the entire field of commodity futures regulation," *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019), these decisions are correct: The CEA does not preempt state regulation of off-exchange trading. 7 U.S.C. § 16(e)(1)(B). Nor does it preempt "antifraud provisions of general applicability." *Id.* § 16(e)(2); *see Am. Agric. Movement*, 977 F.2d at 1156 (CEA does not preempt "common law negligence, fraud and breach of fiduciary duty suits" against brokers). But courts universally agree that the

CEA *does* preempt the "application of state law" to "the operation of a futures market."  *Id.* at 1156-57; *Leist*, 638 F.2d at 322; *Ken Roberts*, 276 F.3d at 590-91.  Defendants make no attempt to distinguish that authority.

*Fourth*, Defendants rely (at 34-36) on the Special Rule, which they argue "explicitly *incorporated*" state law by listing contracts involving activity "unlawful under any … State law" among those subject to public-interest review.  7 U.S.C. § 7a-2(c)(5)(C)(i)(I).  But, as the district court explained, the only "workable" interpretation of the Special Rule's reference to "unlawful" activity references the unlawfulness of the underlying event, not the act of staking a financial position on that event's likelihood.  JA13; *accord KalshiEX LLC*, 2024 WL 4164694, at *12.  Because sports events are not unlawful in New Jersey, the Special Rule's unlawful-activity category does not apply.

Equally important, the CEA's plain text authorizes only "the Commission" to determine whether a contract involves a category listed in the Special Rule.  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA, meanwhile, prohibits states from enforcing the Special Rule against DCMs.  *Id.* § 13a-2(1).  This makes the Special Rule entirely unlike Defendants' examples (at 35) of federal laws that "expressly contemplate[]" a role for states in carrying out the federal scheme, *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1236

(10th Cir. 2017), or allow "concurrent state" regulation of the same conduct governed by federal law, *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 662 (4th Cir. 2024).  Nothing about this construction makes the CFTC the "final arbiter of state laws," as Defendants claim (at 36-37):  It simply allows the CFTC to account for state law in carrying out its functions.  Federal agencies routinely interpret state law in everything from determining Medicaid eligibility, *Lewis v. Alexander*, 685 F.3d 325, 344 (3d Cir. 2012), to charging federal crimes, *see Williams v. Stone*, 109 F.3d 890, 895 (3d Cir. 1997).

*Fifth*, Defendants declare (at 42-44) that the CEA is "hardly a 'comprehensive' framework."  The Supreme Court disagrees:  The CEA establishes "a comprehensive regulatory structure." *Merrill Lynch,* 456 U.S. at 356.  While Defendants maintain that the exclusive-jurisdiction provision alone does not establish comprehensive regulation, this misunderstands Kalshi's position.  The CEA governs all aspects of regulating DCMs—from their designation, to the standards they must satisfy, the instruments they may list, and the penalties they must face for noncompliance—all the while excluding those matters from states' purview.  Those procedures are "sufficiently comprehensive" to enable an inference of preemptive intent. *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985).

*Finally*, Defendants and some amici resort to policy arguments. But "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020). And the policy objections here are notably thin. Defendants tout (at 51) their "anti-money laundering" measures, their "detection and reporting" of suspicious activity, and their laws ensuring "that sports-wagering operators are financially stable enough to cover outstanding sports wagers." But Kalshi complies with federal anti-money-laundering and know-your-customer protections; the Core Principles require Kalshi to evaluate "individual traders' market activity on an ongoing basis in order to detect and prevent manipulation," 17 C.F.R. § 38.251, and all positions on Kalshi are fully collateralized. Kalshi also prohibits any trading by persons capable of influencing the result, *see* Kalshi Rulebook: Rule 5.17(y)-(z),[7] refuting one amicus's accusation that Kalshi allows trades by those who "might be able to influence the outcome," CANJ Br. 29. Amici point to opt-outs for problem gamblers, but Kalshi has voluntary opt-outs as well. And while some amici tout their 21-year age limit for sports betting, many states and Indian tribes allow sports betting for 18-year-olds. *E.g.*, R.I. Gen. Laws § 42-61.2-3.3(a)(5)(viii); D.C. Code Ann. § 36-601.34. The question is not

---

[7] *Available at* https://kalshi.com/regulatory/rulebook.

whether trading on DCMs should be regulated, but by whom.  Congress's clear answer is the CFTC.

### C.    Defendants' Conflict-Preemption Arguments Fail.

Defendants admit (at 45) that state laws "prohibiting futures trading" would conflict with the CEA.  But applying New Jersey's gambling laws would prohibit trading swaps on a federally licensed exchange.

Defendants' principal response (at 49-50 & n.5) is that Kalshi can get a gaming license in New Jersey.  But as Defendants concede (at 6), New Jersey requires sportsbooks to accept wagers only from persons "physically present in the State."  N.J. Admin. Code § 13:69N-1.2(g).  The obligation to accept trades only within New Jersey is impossible for a nationwide exchange and conflicts with the Core Principles' "impartial access" requirement.  17 C.F.R. § 38.151.   New Jersey, moreover, imposes cash reserve requirements, N.J.S.A.  5:12A-13(a)(1); N.J. Admin. Code § 13:69N-1.2(d), that are superfluous and financially paralyzing for a DCM, which is not the counterparty to any trade, must comply with CFTC capital requirements, and is already obligated to use a clearinghouse that collateralizes open positions. *See* 7 U.S.C. § 7a-1.

Defendants err (at 49) in claiming that their effort to prohibit the same conduct the CEA permits complements rather than conflicts with the federal

scheme.   While Defendants define the CEA's purpose at a high level of generality and cherry-pick aspects of its laws that share the same objectives, *Arizona* rejected a similar argument, where a state claimed that a statute allowing arrests of removable immigrants "complement[ed]" federal law. 567 U.S. at 403, 409.   Much like in *Arizona*, New Jersey's regulation cannot complement a process "entrusted" to "the Federal Government," especially where the statute "specifies limited circumstances" in which a state may act. *Id.* at 408-09.

Defendants contend (at 48-49) that no conflict exists because the Special Rule independently prohibits Kalshi's event contracts.   But Defendants misread the Special Rule, which provides that the CFTC "may determine" that contracts involving "gaming" are contrary to the public interest—not that it *must*.   7 U.S.C. § 7a-2(c)(5)(C)(i).   The same legislative history Defendants cite underscores that Congress did not ban sports-event contracts, but rather gave the CFTC "the power to determine" whether such contracts were contrary to the public interest.   156 Cong. Rec. S5902, S5906 (daily ed. July 15, 2010) (statements of Sens. Feinstein and Lincoln).

Defendants likewise misread 17 C.F.R. § 40.11, which they contend (at 48) "expressly prohibited" Kalshi's sports-event contracts.   While Section 40.11(a) generally bars DCMs from listing contracts that reference "gaming,"

Section 40.11(c) reserves the CFTC's discretion to review contracts referencing "gaming" and to "issue an order *approving*" those contracts. *See* Adopting Release, 76 Fed. Reg. 44,776, 44,786 (July 27, 2011) (DCMs "*may always* certify products pursuant to the procedures in § 40.2" subject to back-end review) (emphasis added). Defendants' contrary reading would bring Section 40.11 into conflict with the Special Rule itself, which permits the CFTC to prohibit a contract within the enumerated categories only upon "determin[ing]" that the contract is contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC has never determined that Kalshi's contracts, let alone *all* sports-event contracts, are contrary to the public interest.

Section 40.11 thus undermines Defendants' position. As Defendants concede (at 36), it shows that the CFTC unquestionably possesses jurisdiction over sports-event contracts like Kalshi's. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch.*, 883 F.2d at 548. While Defendants posit (at 36) that the CEA does not make the CFTC "the *only* one responsible" for enforcing the Special Rule, that is precisely what "exclusive jurisdiction" means. Defendants identify no other context supporting state authority to approve or prohibit trading of the very same instruments the CFTC may unquestionably approve or prohibit. The concurrent state-federal jurisdiction Defendants propose would be unique in

all the CEA. Nothing in the statute permits this exception, and this Court should decisively reject it.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: July 24, 2025

By: */s/ Neal Kumar Katyal*

Neal Kumar Katyal
Joshua B. Sterling
William E. Havemann
Ezra P. Louvis
Samantha K. Ilagan
MILBANK LLP
1850 K St. NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

Gurbir S. Grewal
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5775
ggrewal@milbank.com

## COMBINED CERTIFICATE OF COMPLIANCE

1.  Pursuant to this Court's Local Appellate Rules ("LAR") 28.3(d) and 46.1(e), as the signatory on the foregoing document, I am admitted and a member in good standing at the Bar of this Court.

2.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief exempted by FRAP 32(f).

3.  This brief also complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Georgia) using Microsoft Word, the same program used to calculate the word count.

4.  The text of this electronic brief complies with LAR 31.1(c) because it is identical to the text of the paper copies.

5.  This brief complies with LAR 31.1(c) because the electronic file was scanned with the following antivirus software, and no virus was detected: Microsoft Defender Antivirus Version 1.429.516.0.

Dated:  July 24, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.


Dated:  July 24, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal