No. 25-1922

# United States Court of Appeals
# for the Third Circuit

KALSHIEX LLC,

*Plaintiff–Appellee,*

v.

MARY JO FLAHERTY AND MATTHEW J. PLATKIN,

*Defendants–Appellants.*

On Appeal from the United States District Court
for the District of New Jersey
No. 1:25-cv-2152

## BRIEF OF PARADIGM OPERATIONS LP
### AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE

Tyler R. Green
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
conor@consovoymccarthy.com

July 30, 2025

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, *Amicus* discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: July 30, 2025

*/s/ Tyler R. Green*
Tyler R. Green
*Counsel for Amicus*

TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ ii

Table of Authorities .............................................................................. iv

Interest of *Amicus Curiae* ...................................................................... 1

Introduction ............................................................................................ 2

Argument ................................................................................................. 4

   I.   Congress preempted state regulation of instruments falling under the CFTC's jurisdiction. ............................................................. 4

      A.   Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime. ....................... 5

      B.   Congress made preemption of state regulations a central pillar of the 1974 CFTC Act. ......................................................... 11

      C.   The 1978 CEA amendments reaffirmed the CFTC's exclusive jurisdiction over futures. ............................................................... 17

   II.   The Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps. ............................................................................................ 19

   III.   Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction." ........................................................ 21

Conclusion .............................................................................................. 28

Combined Certifications ....................................................................... 29

Certificate of Service ............................................................................. 30

## TABLE OF AUTHORITIES

### Cases

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.,*
198 U.S. 236 (1905) ............................................................... 7, 8, 21, 28

*Dickson v. Uhlmann Grain Co.,*
288 U.S. 188 (1933) ....................................................................... 8, 9

*Gatewood v. North Carolina,*
203 U.S. 531 (1906) ........................................................................ 5, 7

*KalshiEX LLC v. CFTC,*
2024 WL 4164694 (D.D.C. Sept. 12, 2024) ..................................... 22

*MacDonald v. Gessler,*
57 A. 361 (Pa. 1904) ............................................................................ 5

*North Carolina v. McGinnis,*
51 S.E. 50 (N.C. 1905) ......................................................................... 6

*Rice v. Bd. of Trade of Chi.,*
331 U.S. 247 (1947) ........................................................................... 10

### Statutes

1923 N.J. Laws 125 ................................................................................ 7

7 U.S.C. §1a ............................................................................... passim

7 U.S.C. §2 ..................................................................................... 2, 24

Pub. L. No. 67-331, 42 Stat. 998 (1922) ......................................... 9, 25

Pub. L. No. 74-675, 49 Stat. 1491 (1936) ............................... 10, 11, 25

Pub. L. No. 93-463, 88 Stat. 1389 (1975) ................................... 11, 12

### Legislative History

119 Cong. Rec. H41333 (1973) ........................................................... 14

93 Cong. Rec. S16133 (1974) .............................................................. 19

*CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44) (1974) ............................................. 19

*Commodity Futures Trading Commission Act of 1974: Hearings Before the H. Comm. on Agriculture*, 93d Cong. (1974) ........................................................ 15

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture and Forestry*, 93d Cong. (1974) ...................... 16, 17, 19

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*, 95th Cong. (1978) ................................................................................. 20, 21, 30

H.R. Rep. No. 93-975 (1974) ..................................................................... 15, 16, 25

*Review of Commodity Exchange Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Agriculture*, 93d Cong. (1973) ............ 13, 14

S. Rep. No. 93-1131 (1974) .................................................................................. 17

S. Rep. No. 93-1194 (1974) .................................................................................. 18

S. Rep. No. 95-850 (1978) ................................................................... 21, 22, 31

**Rules**

Fed. R. App. P. 29 ................................................................................................. 1

**Regulations**

*Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989) ................................................................ 20

**Secondary Sources**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ........................... 28, 29

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019) ............................... 23, 24, 31

CFTC Release No. 8478-22, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 2, 2022) .......................... 25

Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*,
12 UNLV Gaming L.J. 53 (2021)..................................................... 26

David Hochfelder, *"Where the Common People Could Speculate": The
Ticker, Bucket Shops, and the Origins of Popular Participation in
Financial Markets, 1880-1920*, 93 J. Am. Hist. 335 (2006) ............................. 5

John Hill, Jr., *Gold Brick of Speculation* (1903) .................................... 6

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657 (1982) ............................................. passim

Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole
with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127 (2011)...................... 22, 23

Philip F. Johnson, *The Commodity Futures Trading Commission Act:
Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) ........................... 16, 18

Telford Taylor, *Trading in Commodity Futures—A New Standard of
Legality?*, 43 Yale L.J. 63 (1933)...................................................... 10

### INTEREST OF *AMICUS CURIAE*

Paradigm Operations LP is a research-driven crypto investment firm that backs entrepreneurs, companies, and protocols at the frontier of innovation. Paradigm has an interest in this case because prediction markets are an exciting application of crypto technology and are driving innovation in a field in which Paradigm invests. Recently, Paradigm invested in Kalshi because of its leadership in the prediction market space. Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including investors and entrepreneurs) to hedge exposure to specific events. As a market participant in this developing field, Paradigm brings a valuable perspective and a wealth of experience that the other parties and regulatory authorities do not offer.

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

## INTRODUCTION

The birth and growth of the country's financial markets in the 20th century led to a corresponding birth and growth of financial market regulations. In some specific areas, the resulting tangle of conflicting state regulations left Congress no choice but to intervene and set uniform, national rules, including on telecommunications and much of finance. One such area was the futures market, where Congress created the Commodity Futures Trading Commission and gave it "exclusive jurisdiction" over derivatives, which includes a wide swath of predictive financial instruments. 7 U.S.C. §2(a)(1)(A). Over time, those categories have expanded to include some of the newest futures instruments known as "event contracts," such as those Kalshi offers.

Though derivatives have changed form, states' objections to them have not. Some of what the CFTC regulates as financial instruments the states call gambling. New Jersey sounds that same horn here, mimicking objections that long precede the CFTC: When farmers traded the first futures contracts on Chicago exchanges in the 19th century, the states called that gambling, too. But even before creating the CFTC, Congress quashed those earlier objections with the Commodity Exchange Act of 1936, adopting uniform federal regulations governing then-developing financial instruments like

commodity futures contracts. And as the industry developed more sophisticated contracts, Congress expanded federal jurisdiction.

Since 1974, when Congress passed the CFTC Act establishing the CFTC, the preemptive force of federal rules governing derivatives markets hasn't been subject to reasonable dispute. In the CFTC Act, Congress preempted state regulation of instruments traded on CFTC-designated exchanges. Congress has consistently reasserted since then that the CFTC—not states—has authority over contracts traded on those designated exchanges. Defendants' contrary policy arguments, still focused largely on gambling, just rehash arguments Congress first rejected over a century ago when it concluded that national financial markets require a set of uniform national rules.

Kalshi's event contracts are thus subject to the CFTC's "exclusive jurisdiction," not to disparate regulation in each state. The event contracts plausibly fit in a number of the CFTC's exclusive jurisdictional buckets—as futures, options, swaps, or excluded-commodities contracts. Defendants and *amici* argue against only one narrow sub-definition of "swap," overlooking those other definitions that represent a wide swath of the Commission's jurisdiction.

And their narrow counterargument about "swaps" isn't correct. They would rewrite the CFTC's authority to cover events that are "inherently

'financial, economic, or commercial' in nature," Blue Br. 23, even though Congress gave the CFTC broad authority over events "*associated* with a potential financial, economic, or commercial *consequence*," 7 U.S.C. §1a(47)(A)(ii) (emphasis added). Their analysis occludes the clear meaning of the text and would strip the CFTC of some of its critical jurisdiction over commodity futures.

The district court's preliminary injunction respects the statutory text. This Court should affirm it.

## ARGUMENT

In 1974, Congress preempted state regulation of financial instruments that fall under the CFTC's jurisdiction. Four years later, it doubled down on the CFTC's exclusive jurisdiction. And in 2010, Congress extended that broad preemption to a type of financial instrument called a swap. Because Kalshi's event contracts are traded on CFTC-approved exchanges, the CFTC's regulatory authority preempts New Jersey's regulatory authority over those instruments. Text, context, and history support that conclusion.

## I. Congress preempted state regulation of instruments falling under the CFTC's jurisdiction.

Congress passed the Commodity Futures Trading Commission Act of 1974 to resolve the tension between state gambling laws and federal financial regulation. Investors and business owners were developing new financial technologies to manage risk, but states sought to quash those practices as

4

unlawful gambling. The CFTC Act overrode the states' objections, bringing order and national uniformity. Over time, Congress strengthened the CFTC Act's preemptive scope by granting the CFTC exclusive jurisdiction and expanding its authority to new financial instruments. Each of those succeeding steps untangled an overlapping morass of state and federal regulation by preempting state laws where they overlap with the CFTC's "exclusive jurisdiction."

### A. Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime.

The story of futures-market regulations begins with so-called "bucket shop" laws of the early 20th century. That term originally referred to "abandoned shops" that resold "drained beer kegs thrown out by pubs." David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335, 335 (2006). In the late 19th century, investors appropriated the derogatory term to refer to shops that took "bets or wagers … on the rise or fall of the prices of stocks, grain, oil, etc.," without facilitating the "transfer or delivery of the stock or commodities nominally dealt in.'" *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906). In other words, "customers simply gamble upon stocks, and never have any intention of purchasing outright." *MacDonald v. Gessler*, 57 A. 361, 362 (Pa. 1904). The practice was popular but controversial. A Chicago Board of Trade member

at the time called the bucket shop "a gambling den, and nothing else." John Hill, Jr., *Gold Brick of Speculation* 20 (1903). He dedicated his anti-bucket-shop book to "exposing the methods of a class of vampires whose enterprises differ in no way from those of the highwayman or the burglar." *Id.* at xv.

States thus passed laws prohibiting trades that didn't require the purchaser to take physical delivery. North Carolina's 1905 law, for example, "made void all contracts for the sale of articles therein named for future delivery, wherein … it is not intended that the articles agreed to be sold and delivered shall be actually delivered." *North Carolina v. McGinnis*, 51 S.E. 50, 51 (N.C. 1905). New Jersey passed a similar law in 1923 declaring "[a]ll contracts and agreements" for the sale of "securities" and "commodities" "utterly void and of no effect whatsoever" if they were made without "intending a bona fide purchase or sale or the actual bona fide receipt or delivery." 1923 N.J. Laws 125. "These statutes treated 'bucketing' as a form of gambling and made futures contracts criminally illegal where the parties to the agreement never intended delivery of the underlying commodity but were dealing only for its prospective rise or fall in price." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982).

But the bucket-shop laws were "ill-suited to determining the validity of commodity futures contracts entered into on organized exchanges." *Id.* at

664. Even at that time, "actual delivery on futures contracts occurred on less than three percent of all such transactions." *Id.* Policymakers and jurists were equally flummoxed at distinguishing the financial-instrument wheat from the gambling chaff. Courts thus "experienced great difficulty in trying to distinguish between valid commodity transactions and those which were simply wagers on the price movement of specified commodities." *Id.* And in the absence of federal legislation, constitutional challenges to those bucket-shop laws failed. *See Gatewood*, 203 U.S. at 542-43 (rejecting Fourteenth Amendment challenge to a conviction under North Carolina's bucket-shop law).

Justice Holmes is credited for reversing "the rigid, if not unthinking, application of … bucket-shop statutes" to contracts that divorced trading from physical delivery. Van Wart, *supra*, at 665. In a case challenging the Chicago Board of Trade as a bucket shop, the Supreme Court held that futures contracts serve "a legitimate and useful purpose" by allowing a transaction to "be offset before the time of delivery in case delivery should not be needed or desired." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). The practice allows "collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, [to] secure themselves against the fluctuations of the market by counter contracts for the purchase or sale." *Id.* The Court

distinguished futures contracts traded on the exchange from other bucket-shop contracts that were "merely a speculation entered into for its own sake." *Id.* The result "was to exempt from state bucket-shop laws those transactions executed on exchanges between brokers." Van Wart, *supra*, at 665. But courts continued to wrestle with bucket-shop laws as applied to various futures contracts.

So in 1922, Congress stepped in. Responding to the manipulation of grain prices, Congress enacted the Grain Futures Act. *See* Pub. L. No. 67-331, 42 Stat. 998 (1922). The Act made it a misdemeanor to execute certain grain futures contracts unless performed through exchanges designated as "contract markets" by the Secretary of Agriculture—a precursor to the CFTC's modern designated contract markets.

This Act was the first modern financial regulatory law, passed more than a decade before the more famous financial regulatory laws governing securities. When faced with a case about the Grain Futures Act's preemptive scope, the Supreme Court held that the "Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). That was because the Act set a compliance floor, not a ceiling—Congress established minimum regulatory conditions for grain futures, but it "[did] not purport to validate any dealings." *Id.* "Nor [was] there any basis for the contention

that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded." *Id.* Contemporary commentators feared that the decision would let states loose against futures traders, and the bucket-shop statutes "would render speculation impossible, hedging illegal, and subject all brokers to criminal liability." Telford Taylor, *Trading in Commodity Futures— A New Standard of Legality?*, 43 Yale L.J. 63, 101 (1933).

Congress responded to *Uhlmann Grain Co.* by enacting the Commodity Exchange Act. *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936). The Act expanded regulation to the "'transactions and dealings of brokers and of customers'" and activities that might "'affect such trading on the futures exchanges.'" Van Wart, *supra*, at 669. It "contained its own anti-bucketing provision," and violations "would result in the federal government withholding designation of the exchange as a contract market." *Id.* The Act also liberalized speculative investing by prohibiting only "*[e]xcessive* speculation in any commodity under contracts of sale … for future delivery … causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity." §5, 49 Stat. at 1492 (emphasis added).

Still, Congress didn't include a preemption provision. So when the Supreme Court heard another preemption challenge to Illinois regulations, it held that the Commodity Exchange Act didn't supersede state trade laws.

*Rice v. Bd. of Trade of Chi.*, 331 U.S. 247 (1947). The Act provided that "[n]othing in this section or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." §5, 49 Stat. at 1494. That provision "preserv[ed] state control in two areas where state and federal law overlap." *Rice*, 331 U.S. at 255. So absent "any conflict with the federal law," Illinois could enforce its own regulations. *Id.* Largely due to *Rice*, commodity futures were almost entirely self-regulated into the 1970s.

So Congress put its foot down once again. In 1974, Congress passed the Commodity Futures Trading Commission Act, creating the CFTC and empowering it to regulate the futures trading industry. Pub. L. No. 93-463, 88 Stat. 1389 (1975). The Act enlarged the definition of "commodity" to include not just agricultural products but also "all other goods and articles … and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt." *Id.* §201.

And this time, Congress directly addressed the preemption problems identified in *Uhlmann* and *Rice*. The Act gave the CFTC "exclusive jurisdiction with respect to accounts, agreements … and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. *Id.* The Act "wholly and unequivocally eliminated each of the bases the Supreme Court

10

had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Van Wart, *supra*, at 692-93. Given the history of prior legal fights over preemption, the inclusion of clear preemptive language cannot be taken as anything other than Congress' clear intent to broadly and comprehensively preempt state regulations of commodity futures.

### B.    Congress made preemption of state regulations a central pillar of the 1974 CFTC Act.

Congress meant what it said when it gave the CFTC "exclusive jurisdiction" over the instruments it regulated. 88 Stat. 1389, §201. "[P]reemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA." Van Wart, *supra*, at 692. From the first committee witness to the final reports to early cases interpreting the CFTC Act, virtually everyone recognized that the Act preempted state regulation of instruments traded on CFTC-approved exchanges.

The Committee on Agriculture kicked off the hearings in 1973. The very first witness, Congressman Neal Smith, recommended "that trading in all futures should be under Federal regulation." *Review of Commodity Exchange Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Agriculture*, 93d Cong. 10-11 (1973) (statement of Rep. Neal Smith). Representative Smith's testimony started a wave of support for federal legislation superseding state regulations. The chairman of the Chicago Board

11

of Trade—one of the major players (and targets) in the industry—placed "particular emphasis" on the provision that "would give the commodity regulatory agency exclusive jurisdiction over futures trading." *Id.* at 128 (statement of Frederick G. Uhlmann). Uniform, exclusive federal regulation "would prevent any possible conflicts over jurisdiction over futures trading." *Id.*

Several witnesses called for stronger federal regulation of commodities. Several New York commodities exchanges submitted a comment summing up the rationale: Because previous laws were "virtually silent on those questions," the commodities industry had been mired in confusion, conflict, and mounting legal fees. *Id.* at 121 (statement of Reed Clark). "In addition to the unfairness which is inherent in exposing exchanges to this sort of civil liability, it is extremely important that federal policy regarding commodities futures trading be uniform throughout the United States…." *Id.* at 121 (statement of Reed Clark). The message was clear: remove the jurisdictional mist that had ensnared commodities futures regulation for decades.

"On the basis of these hearings," Representative Poage, Chairman of the House Committee on Agriculture, introduced H.R. 11955 to amend the Commodity Exchange Act. Van Wart, *supra*, at 675. When introducing the bill, Representative Bob Poage explained that "many State laws are

exercising jurisdiction over these same markets to fill what had become a vacuum of regulation." 119 Cong. Rec. H41333 (1973). The resulting "[v]aried and often conflicting regulation," he feared, "could become a burden on commerce, if it is not already." *Id.* Yet H.R. 11955 did little to address the states' concurrent jurisdiction over derivatives. "The only provision … directly related to jurisdictional issues was one which preserved the jurisdiction of the Securities Exchange Commission." Van Wart, *supra*, at 676. Yet that omission was not overlooked for long. The Continental Grain Company sent a letter warning that "[f]ailure to clarify … the exclusive and preemptive jurisdiction of the CFTC over regulation of all aspects of commodities and commodity trading will result in major conflicts of policy and regulation between the CFTC and the S.E.C. and between Federal and State regulatory bodies." *Commodity Futures Trading Commission Act of 1974: Hearings Before the H. Comm. on Agriculture*, 93d Cong. 322 (1974).

The committee responded by strengthening the preemption provisions. "Recognition of the need for exclusive federal jurisdiction pervaded" the committee report. Van Wart, *supra*, at 677-78. The report concluded that "[i]t is abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 41-42 (1974). The new version thus "provide[d] for the exclusive jurisdiction of the CFTC over all futures transactions and all cash transactions related thereto

which are executed on not only domestic boards of trade but also 'on any other board of trade, exchange, or market.'" *Id.* at 7-8. The committee spent a good deal of time writing and rewriting that "exclusive jurisdiction" provision, mostly to clarify the relationship between the jurisdiction of the CFTC and of the Securities and Exchange Commission. Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 11-13 (1976). In the end, the express purpose was to "put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, *supra*, at 76. It was thus "apparent that the committee intended that the proposed amendments to the CEA would serve as a check on renewed state regulatory efforts." Van Wart, *supra*, at 678.

The Senate hearings were even clearer about the need to rein in state regulations. One Senator asked a witness whether "[f]ederal legislation really ought to preempt State legislation so that we do not have the 50 different States legislating in this area." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture and Forestry*, 93d Cong. 396 (1974) (statement of Sen. Dick Clark). The witness, a Minnesota commodities exchange executive, responded, "Very definitely." *Id.* at 384-85, 396. He observed that "State legislation would make an impossible situation for exchanges." *Id.* at 396. Many witnesses highlighted the need for

"'federal legislation'" that would "'preempt the states in making a determination that the various commodity contracts are, in fact, classified, regulated and traded as commodities and not as securities.'" Van Wart, *supra*, at 683 (collecting cites from *1974 S. Comm. Hearings, supra*). Neglecting to give the CFTC exclusive jurisdiction would result in "'confusion'" and a regulatory "'nightmare'" for exchanges. *Id.* at 682-83.

The Senate committee report confirmed that the Act would "supersede" state laws on commodity futures. S. Rep. No. 93-1131, at 23 (1974). In fact, the Senate added "clarifying amendments" that made clear that "the Commission's jurisdiction over futures contract markets or other exchanges is exclusive." *Id.* at 6, 23. And "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies," including the SEC. *Id.*

The conference report was even clearer about what this meant for state laws: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned." S. Rep. No. 93-1194, at 35 (1974). So "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." *Id.* at 35-36. The conference committee thus

did "not contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36.

When it came time to reconcile the bills, "the Senate version prevailed in the Conference," with one exception. Johnson, *supra*, at 17. "The one exception was that the House's language bringing all domestic and foreign commodity markets under the CFTC's exclusive jurisdiction was accepted in lieu of the Senate's narrower provision limiting that exclusive authority to 'contract markets.'" *Id.* Most of the concern was over whether the CFTC Act would divest the SEC of jurisdiction over traditional stocks—it was accepted as a given that the Act divested states of regulatory authority over derivatives. *Id.* at 18-21.

In fact, Congress was generally of one mind about superseding state authority. The Senate rejected an amendment trying to introduce a presumption that the law shouldn't "be construed to impair any State law applicable to any transaction enumerated or described in such sections." 93 Cong. Rec. S16133 (1974). In fact, "the strongest statement *in favor* of a state regulatory role was not submitted until after the formal Senate hearings had concluded." Van Wart, *supra*, at 685. That sole witness advocated "the need and urgency to decentralize the structure of the commodity futures industry." *1974 S. Comm. Hearings*, *supra*, at 814. But the witness missed the "major feature of the proposed amendments," which was to bring "all

commodities under federal regulatory authority," calling doubt on the "validity" of his "remarks." *Van Wart*, *supra*, at 686.

With this clear design of federal supremacy, Congress passed the CFTC Act by a 281–43 margin in the House and by voice vote in the Senate. On October 23, 1974, President Ford signed it into law, noting that he "fully support[ed]" the "new regulatory structure to apply to all commodity futures trading." *CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44), at 1366 (1974).

### C. The 1978 CEA amendments reaffirmed the CFTC's exclusive jurisdiction over futures.

It wasn't long before Congress took up the CFTC's exclusive jurisdiction again. Just four years later, the House Subcommittee on Conservation and Credit held hearings on additional amendments to the Commodity Exchange Act. "Battle lines over the issue of the CFTC's exclusive jurisdiction began to form quite early in these hearings." *Van Wart*, *supra*, at 699. The CFTC Commissioner explained that "[t]he idea behind the exclusive jurisdiction provisions of the Commission was to simplify and centralize regulation of the commodity market." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*, 95th Cong. 80 (1978) (statement of John Rainbolt).

Even critics of the Act demonstrated their awareness that Congress had established preemption over state law. A Texas securities commissioner

criticized the "grant of exclusive jurisdiction to the CFTC," which he claimed had "dismantled an effective regulatory system within the states that was adequately policing the commodity option problem." *Id.* at 364. The Minnesota Secretary of State urged Congress to "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379. But he was mainly concerned with state efforts "to help protect investors from commodities frauds." *Id.* at 380. He claimed that "[t]he simple abolition of the CFTC's exclusive jurisdiction would immediately bring fifty-one more experienced regulatory agencies into the field and vastly expand the available funding and manpower." *Id.* Even those recommendations demonstrated "virtual unanimity among participants in the [House and] Senate hearings that the 1974 amendments had preempted a state regulatory role." Van Wart, *supra* at 712.

The Senate committee report concluded that clearer, stronger regulation was necessary. The report observed that the 1974 Act "reflects the congressional awareness that futures markets would not remain static." S. Rep. No. 95-850, at 22 (1978). New technologies and financial instruments were reasons to give the CFTC more leeway, not clamp down on its jurisdiction. "So long as the futures contract serves a legitimate function, Congress has vested the Commodity Futures Trading Commission with

18

jurisdiction." *Id.* As for the states' authority, the committee clarified that "it will remain possible, as it has been in the past, for an authorized State official to proceed in State court on the basis of an alleged violation of any *general* civil or criminal antifraud statute." *Id.* at 25. But "[t]he States would not, in these actions, be involved in enforcement of their local laws" regulating futures. *Id.* "As to the question of state jurisdiction," both chambers thus decided "in favor of the CFTC." Van Wart, *supra*, at 718.

Congress, even today, understands the significant political consequences that accompany preempting the states on policymaking and regulation. To preempt the states from using some of their existing regulatory powers is a major step. For the CFTC Act's statutory text to so clearly preempt "any state or local law" on the subject of commodities futures regulation shows that Congress intended to establish strong federal preemption. This is not hiding "'elephants in mouseholes.'" *Contra* Blue Br. 21.

## II. The Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps.

In the 1980s, swaps gained traction as a popular variant of derivative. Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127, 131-32 (2011). The CFTC first defined "swaps" through rulemaking: "an agreement between two parties to exchange a series of cash flows measured by different interest rates,

exchange rates, or prices with payments calculated by reference to a principal base (notional amount)." *Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989). Over time, the industry developed more complex variants that became increasingly popular. *See* Greenberger, *supra*, at 136-43.

After the 2008 financial crisis, Congress stepped in again. The Dodd-Frank Wall Street Reform and Consumer Protection Act "transform[ed] the regulation of OTC derivatives." *Id.* at 152. The Act defined a "swap," "swap dealer," and other key terms. And it imposed a variety of restrictions, "generally requiring that swaps be subject to clearing and exchange-like trading." *Id.* "The basic rule of the Dodd-Frank Act is that swaps must be cleared and exchange traded." *Id.* at 156.

Once again, Congress "revisited the question of state law preemption." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 1 (2019). It faced a familiar choice— whether to "maintain or repeal" the "protections against gaming and bucket shop laws for qualifying contracts." *Id.* And once again, "[i]nstead of backing away from preemption, Congress embraced it." *Id.*

Congress couldn't have been clearer in taking swaps regulation out of the states' hands. "The Commission shall have exclusive jurisdiction" over transactions "involving swaps or contracts of sale of a commodity for future

delivery … traded or executed on a [designated] contract market." 7 U.S.C. §2(a)(1)(A). The law is the same today. This provision grafted swaps into the federal preemption framework, putting swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures." Taylor-Brill, *supra*, at 3. The CFTC thus "received an explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference, potentially including a patchwork of conflicting laws." *Id.* at 13.

### III. Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction."

That Kalshi is a CFTC-designated exchange brings its event-contract offerings under the CFTC's "exclusive jurisdiction." 7 U.S.C. §2(a)(1)(A). That's the necessary result of the 20th century's federal regulatory evolution traced above. From the Supreme Court's exempting legitimate exchanges from state bucket shop laws, *Christie Grain & Stock*, 198 U.S. at 249; to Congress's exempting designated exchanges from grain futures regulations, *1922 Act*, 42 Stat. 998; to Congress's expanding federal jurisdiction over designated exchanges, *1936 Act*, 49 Stat. 1491; to Congress's creating the CFTC and giving it "exclusive jurisdiction" over designated exchanges, H.R. Rep. No. 93-975, *supra*, at 7-8—if it's traded on a CFTC exchange, it's exempt from state regulation.

Defendants and their *amici* resist the CFTC's exclusive authority. They suggest that the CFTC doesn't have jurisdiction over event contracts because event contracts don't qualify as "swaps." Blue Br. 20-26. The CFTC itself disagrees. *See* CFTC Release No. 8478-22, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 2, 2022), perma.cc/G9E8-ABYW. Defendants focus on *part of* the definition of "swap," claiming that event contracts aren't "inherently 'financial, economic, or commercial' in nature." Blue Br. 23. The first problem with Defendants' attempts to avoid exclusive CFTC authority is that Defendants fail to recognize that Kalshi's event contracts can plausibly fall within the definition of multiple financial instruments over which the CFTC has exclusive jurisdiction. *See, e.g.*, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024) ("Event contracts are subject to regulation under the CEA as excluded commodities, and thus by the CFTC." (cleaned up)); Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 79-86 (2021) (discussing how sports contracts could be classified as "swaps" under §1a(47)(A) or "options" under §4c(b)). So Defendants' narrow focus on one sub-definition of "swap" isn't even dispositive. Swaps might be one of the most popular forms of products under the CFTC's jurisdiction today, but they are a recent addition to its stable—not the entire barn.

More to the point, Defendants' efforts to show Kalshi's event contracts fall outside the definition of "swaps" are unpersuasive. Congress defined "swap" broadly—a conclusion self-evident from the statutory text, where Congress provided five different definitions of "swap" to cover a wide variety of financial arrangements. 7 U.S.C. §1a(47)(A)(i)-(v). And it removed any doubt by providing a sixth definition "that is any combination or permutation of, or option on, any agreement, contract, or transaction described in" the other five definitions. *Id.* §1a(47)(A)(vi). One definition— the one Defendants zero in on—is a contract "that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* §1a(47)(A)(ii). Defendants don't dispute that Kalshi's event contracts satisfy most of those elements: they are "contracts" that provide for "payment" that's "dependent" on some "event or contingency." *Id.* And Kalshi amply explains why the event contracts it offers are "'associated with' potential financial consequences subject to the CFTC's exclusive jurisdiction." Red Br. 35-37.

Defendants request a carve-out for state gambling laws. They suggest that preemption of state gambling laws would be some new extension of federal law. Blue Br. 19-20. But the clash between federal financial regulation

and state gambling laws is at least as old as the bucket-shop laws that Congress preempted in the early 1900s. *See supra* Section I.A. Congress regulated commodities futures precisely *because* it sought to preempt state gambling laws, which were insufficient for addressing this new area. Defendants point out that Congress has regulated gambling in other statutes. Blue Br.19-20. But those federal laws have nothing to do with whether the CFTC Act preempts state gambling laws. A "broad array of federal gambling laws" doesn't undermine the CFTC's jurisdiction over swaps any more than the broad array of fraud statutes undermines the FTC's jurisdiction over antitrust enforcement, or the broad array of gun laws undermines the ATF's jurisdiction over firearms.

By leading with the absurdity canon instead of the statute, Defendants confirm they have little in the way of textual arguments. Blue Br. 17-18. And Defendants don't even satisfy the "necessary" conditions "for correct application of the absurdity doctrine." Antonin Scalia & Bryan A. Garner, *Reading Law* 237-38 (2012) (Absurdity Doctrine). They don't point to "a disposition that no reasonable person could intend." *Id.* Nor do they supply "a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." *Id.* By not satisfying those elements, Defendants invite "disregarding or changing the text" according to their policy preferences. *Id.*

In any case, Defendants' examples suggest they misunderstand the district court's opinion. The most obvious reason why a "local raffle" doesn't fall under the CFTC's jurisdiction is that it isn't conducted on a CFTC-designated exchange. *Cf.* Blue Br. 18. And the "commercial consequence" of events is in part what distinguishes the Super Bowl from a Little League game, or the President's travel plans from whether your "friend miss[es] his Amtrak train." *Cf.* Blue Br. 18. Defendants' flattening approach to viewing the world is as ahistorical as it is illogical. Not everything is the same.

When Defendants get around to interpreting the text, they claim that "the best interpretation is that something is a 'swap' when the referenced 'event or contingency' is inherently 'financial, economic, or commercial' in nature." Blue Br. 23. But that's not what the text says. Congress used the phrase "associated with." 7 U.S.C. §1a(47)(A)(ii). Defendants' preferred phrase—"is inherently"—appears nowhere in the text. Nor do Defendants do any interpretive work to show that the statutory phrase "associated with" in fact *means* "is inherently." Defendants' proffered interpretation merely embodies their policy preference, but that's "no basis for disregarding or changing the text." Scalia & Garner, *supra*, at 237. If Congress had wanted the CFTC's jurisdiction to extend only to events that "are inherently" financial, economic, or commercial, it would have said that. But it didn't. So as long as the "event or contingency" is "*associated with* a potential financial,

economic, or commercial *consequence*," it fits the definition of a swap. 7 U.S.C. §1a(47)(A)(ii) (emphasis added).

Defendants argue that Congress's definition lists examples of "swaps" that share similar attributes. Blue Br. 23-24 (citing *Beecham v. United States*, 511 U.S. 368, 371 (1994)). But the argument proves too much. Defendants claim that "an 'interest rate swap,' a 'cross-currency rate swap,' 'an equity index swap,' and a 'credit default swap'" refer to inherently financial events. Blue Br. 23. Maybe so. But Defendants ignore other examples in the list that *don't* refer to inherently financial events: "a weather swap," "a metal swap," "an agricultural swap," and "an emissions swap." 7 U.S.C. §1a(47)(A)(iii). The "weather" is not "inherently 'financial, economic, or commercial' in nature." *Contra* Blue Br. 23. Those events are nonetheless covered because they are "associated" with "consequence[s]" that are "financial, economic, or commercial." Dating back to famous storms, floods, and droughts of antiquity, weather events have had tremendously important financial, economic, and commercial consequences on humans and human civilization. *Id.* The non-financial events in the list justify rejecting Defendants' effort to engraft an "inherently financial" limitation on Congress's definition.

*      *      *

26

Defendants' and *amici*'s objections are not new. Neither is their desire to treat CFTC-regulated instruments as illegal gambling. By 1978, a CFTC Commissioner observed that the country "always had a problem throughout history with State regulation of commodity markets." *1978 H. Subcomm. Hearings*, *supra*, at 80. The problem "goes back quite a ways to when they declared futures contract[s] as illegal gambling contracts and could not be enforced." *Id.* Defendants would have this Court revive that "patchwork of conflicting laws." Taylor-Brill, *supra*, at 13. But Congress ended that period long ago.

Congress has also known "that futures markets would not remain static." S. Rep. No. 95-850, *supra*, at 22. That's why, for example, Congress defined "swap" to include instruments that "in the future become[] commonly known to the trade as a swap." 7 U.S.C. §1a(47)(A)(iv). Those flexible provisions "sought to foster a climate in which the economic benefits of futures trading could be extended to other areas where such trading would be of value." S. Rep. No. 95-850, *supra*, at 22.

All this comports with Justice Holmes's observation more than a century ago: "People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing

prices, and providing for periods of want." *Christie Grain & Stock*, 198 U.S. at 247 (1905). States don't have to like what the CFTC allows. But they can't regulate it.

<h2 align="center">CONCLUSION</h2>

For these reasons, the Court should affirm the district court's preliminary injunction.

Respectfully submitted,

*/s/ Tyler R. Green*

Tyler R. Green
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
conor@consovoymccarthy.com

July 30, 2025                    *Counsel for Amicus Curiae*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I certify the following:

1. I am a member in good standing of the Bar of this Court.

2. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,982 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in 14-point Palatino.

4. The text of the electronic brief is identical to the text in the paper copies.

5. The electronic file containing the brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.


Dated: July 30, 2025                    */s/ Tyler R. Green*
                                         Tyler R. Green
                                         *Counsel for Amicus*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2025, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.


Dated: July 30, 2025                    /s/ Tyler R. Green
                                        Tyler R. Green
                                        *Counsel for Amicus*