**No. 25-1922**

IN THE

# United States Court of Appeals for the Third Circuit

KALSHIEX LLC,

*Plaintiff-Appellee*,

– v. –

MARY JO FLAHERTY, ET AL.,

*Defendants-Appellants.*

On Appeal From the United States
District Court for the District of New Jersey (Kiel, J.)

**BRIEF OF BITNOMIAL EXCHANGE, LLC
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE AND
AFFIRMANCE**

Michael M. Rosensaft
Alexander C. Kim
Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, NY 10020
michael.rosensaft@katten.com
alexander.kim@katten.com

Matthew F. Kluchenek
Carrie M. Stickel
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
matt.kluchenek@katten.com
carrie.stickel@katten.com

James A. Walsh
Bitnomial Exchange, LLC
325 W. Huron Street
Chicago, IL 60654
james.walsh@bitnomial.com

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Bitnomial Exchange, LLC states that is wholly owned by Bitnomial, Inc., which is a privately held company. No publicly held corporation owns ten percent (10%) or more of Bitnomial Exchange LLC's stock.

## TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................. 1

    I.    The Commodity Exchange Act Preempts State Regulation of Contracts Traded on CFTC-Regulated Exchanges. ...................................... 2

        A.    The Commodity Exchange Act's Text Mandates Express Preemption. ................................................................................................ 2

        B.    The Comprehensive Federal Regulatory Scheme Leaves No Room for State Regulation, Satisfying the Field Preemption Doctrine. ............................................................................................ 3

    II.    Permitting New Jersey to Assert Authority Over Contracts Traded on a CFTC-Regulated Exchange Would Fly in the Face of Congressional Intent and Open the Door to Expansive and Varied State Regulation. ................................................................................. 4

CONCLUSION ........................................................................................................... 8

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
   977 F.2d 1147 (7th Cir. 1992) ...................................................................... 6

*Arizona v. United States*,
   567 U.S. 387 (2012) ...................................................................................... 4

*Cothran v. Ellis*,
   16 N.E. 646 (1888) ........................................................................................ 5

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ...................................................................................... 2

*Elassaad v. Indep. Air, Inc.*,
   613 F.3d 119 (3d Cir. 2010) ......................................................................... 3

*KalshiEX LLC v. Martin*,
   2:25-CV-01283-ABA (D. Md. Apr. 21, 2025) ............................................ 6

*KalshiEX, LLC v. Hendrick*,
   2:25-CV-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9,
   2025) ............................................................................................................. 7

*KalshiEX, LLC v. Hendrick*,
   2:25-CV-00575-APG-BNW (D. Nev. Mar. 28, 2025) ................................ 7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) ...................................................................................... 3

*Mississippi v. Louisiana*,
   506 U.S. 73 (1992) ........................................................................................ 2

*Sikkelee v. Precision Airmotive Corp.*,
   822 F.3d 680 (3d Cir. 2016) ......................................................................... 3

**Statutes**

7 U.S.C. § 2(a)(1)(A) ........................................................................................... 2

7 U.S.C. § 7 ......................................................................................................... 3

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) ................................................... 1

Federal Rule of Appellate Procedure 29(a)(4)(E) .............................................. 1

**Regulations**

17 C.F.R. pt. 38 ................................................................................................... 3

(17 C.F.R. § 38.151(b)) ....................................................................................... 4

17 C.F.R. § 38.156 .............................................................................................. 4

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Bitnomial Exchange, LLC ("Bitnomial") is a designated contract market ("DCM" or "exchange"), registered with and regulated by the Commodity Futures Trading Commission ("CFTC" or "Commission") under the Commodity Exchange Act ("CEA") and the regulations promulgated thereunder. Bitnomial was founded for the purpose of creating a global marketplace to connect native digital asset hedgers with institutional traders.

Bitnomial operates an exchange for margined and physically deliverable digital asset futures and options. As a DCM, Bitnomial has a longstanding interest in ensuring a stable, unified regulatory framework for commodities and derivatives trading. Bitnomial submits this brief to assist the Court in understanding the implications of permitting states to impose inconsistent and potentially conflicting regulatory regimes on Commission-regulated exchanges.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), amicus curiae states that counsel for both Appellants and Appellee have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for Bitnomial affirms that no counsel for any party authored this brief in whole or in part and that no person other than Bitnomial, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

# ARGUMENT

## I. The Commodity Exchange Act Preempts State Regulation of Contracts Traded on CFTC-Regulated Exchanges.

Bitnomial agrees with the District Court and Kalshi's analysis that the CEA preempts state regulation of trading on Kalshi. The CEA does so expressly and by creating a comprehensive regulatory scheme that occupies the entire field, leaving no room for state legislation.

### A. The Commodity Exchange Act's Text Mandates Express Preemption.

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Here, under the CEA, Congress expressly granted the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). The "plain meaning of 'exclusive'" in the CEA "necessarily denies jurisdiction" to other entities not named in that provision. *See Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992) (interpreting "exclusive" in federal statute). Accordingly, the CEA reflects express Congressional intent to grant exclusive regulatory authority to the CFTC.

2

### B. The Comprehensive Federal Regulatory Scheme Leaves No Room for State Regulation, Satisfying the Field Preemption Doctrine.

New Jersey's gambling laws, and any other state laws seeking to regulate trading of contracts on a DCM, are also subject to field preemption under the CEA. Field preemption applies where "'federal law leaves no room for state regulation and [where] Congress had a clear and manifest intent to supersede state law' in that field." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016) (quoting *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 127 (3d Cir. 2010)). "Where Congress expresses an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards." *Id.* Field preemption is undoubtedly applicable here.

As noted above, the text of the CEA establishes an express intent to displace state laws. Further, the CEA establishes what the Supreme Court has called a "comprehensive regulatory structure," which governs virtually every aspect of DCM operations. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93–975, p. 1 (1974), U.S. Code Cong. & Admin. News 1974, p. 5843). From initial designation requirements through ongoing compliance obligations, recordkeeping standards, reporting duties, and enforcement mechanisms (*see* 7 U.S.C. § 7; 17 C.F.R. pt. 38), federal law in this area creates a complete regulatory ecosystem. This comprehensive framework reflects Congress's judgment about how derivatives markets should function. For example, DCMs must

3

provide "impartial access to its markets and services" (17 C.F.R. § 38.151(b)), a requirement that would be impossible to satisfy if different states could impose different restrictions on who may trade which contracts. DCMs must also maintain sophisticated surveillance systems, retain compliance staff, detect and investigate rule violations, and meet stringent liquidity standards—all under exclusive CFTC oversight. *See* 17 C.F.R. § 38.156 (market surveillance requirements); *id.* § 38.155 (compliance staff requirements); *id.* § 38.1101 (financial resources requirements). Such a comprehensive federal regulatory scheme leaves "no room for the States to supplement it." *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Accordingly, New Jersey's gambling laws are preempted. Allowing states to enforce their gambling laws against federally licensed derivatives exchanges would not merely undermine the statutory scheme Congress expressly created—it would effectively destroy it.

II. **Permitting New Jersey to Assert Authority Over Contracts Traded on a CFTC-Regulated Exchange Would Fly in the Face of Congressional Intent and Open the Door to Expansive and Varied State Regulation.**

DCMs like Bitnomial rely on a uniform regulatory framework that allows them to provide services nationally under the CFTC's regulation and without being subject to a patchwork of various state laws. Permitting state regulation of products traded on DCMs would likely lead to conflicting state and federal requirements, destabilizing and paralyzing national derivatives markets. Such fragmented,

ambiguous, and potentially conflicting regulation would significantly increase the cost of compliance for DCMs and undoubtedly expand operational costs.

Further, permitting state agencies to assert regulatory authority over derivatives markets and transactions would undermine the clarity and consistency of federal oversight that Congress sought to achieve in enacting the 1974 and 1978 amendments to the CEA.

State efforts to regulate derivatives as gambling are not new—they have existed since derivatives markets first began. For over a century, states have characterized derivatives trading as "gambling" and a "species of . . . the national sin" and sought to regulate such trading. *Cothran v. Ellis*, 16 N.E. 646, 648 (1888). Congress was acutely aware of this history when it granted the CFTC exclusive jurisdiction, and the legislative history is unambiguous. Congress "intended that the proposed amendments to the CEA would serve as a check on renewed state regulatory efforts." Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 678 (1982). In enacting the 1974 amendments, it was Congress's "express objective that the legislation would 'put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned,'" (*id.*) and thereby avoid "different State laws [which] would just lead to total chaos." Hearing Before the Comm. On Agric. & Forestry, 93d Cong. 685 (1974) (statement of Sen. Clark). As one commentator summarized:

> [P]reemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA. Numerous witnesses testified extensively as to the efforts of the states to use their securities laws to regulate, in varying fashion, commodities trading. Members of Congress expressed concern that confusion in futures markets could result from these conflicting laws. They concurred with witnesses as to the importance of securing uniform regulation of commodities trading and imposing comprehensive federal authority over a field which had direct implications for the well-being of the national economy. It was against this background of informed and thorough deliberation as to the preemptive scope of the proposed legislation that the 1974 amendments emerged.

Van Wart, *supra*, at 692. Allowing a state to insert its own rules and regulations into the existing national CFTC framework that governs DCMs would fly in the face of Congress's express objective.

Moreover, finding that New Jersey's Sports Wagering Act is not preempted by the CEA will undoubtedly open the door to other state regulators seeking to assert their own regulatory authority. If New Jersey can demand that Kalshi cease listing sports event contracts and void existing transactions, there is nothing stopping forty-nine other states from doing the same, subjecting a national exchange to "varying and potentially contradictory legal standards" that would make operation impossible. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). Indeed, this scenario seems to be unfolding already. Maryland and Nevada gaming authorities have issued similar cease-and-desist demands, forcing Kalshi to seek preliminary injunctive relief in multiple federal jurisdictions simultaneously. *See KalshiEX LLC v. Martin*, 2:25-CV-01283-ABA (D. Md. Apr.

21, 2025); *KalshiEX, LLC v. Hendrick*, 2:25-CV-00575-APG-BNW (D. Nev. Mar. 28, 2025). At least one federal court has already sided with Kalshi on the preemption issue, with the United States District Court for the District of Nevada granting preliminary injunctive relief and holding that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX, LLC v. Hendrick,* 2:25-CV-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).

The breadth of potential state interference extends far beyond sports event contracts. Many states define gambling broadly enough to encompass any financial position on an uncertain outcome, potentially allowing regulation of all derivatives trading. Indeed, some states such as Nevada regulate "accepting wagers on sporting events *or other events*." (Nev. Rev. Stat. § 463.0193) (emphasis added). This language is broad enough to cover any event contract, including with respect to economic, interest rate, and weather events—meaning that Nevada could seek to ban or regulate all trading in event contracts (or impose its own rules and regulations that are inconsistent with the federal regime) if New Jersey's interpretation prevails. Meanwhile, event contracts have traded on DCMs under exclusive CFTC oversight since at least 2004. As discussed above, this is the exact situation that Congress sought to prevent in adopting crucial amendments to the CEA, and that intent must be upheld.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's ruling enjoining New Jersey from enforcing its Sports Wagering Act as to contracts traded on Kalshi and finding that Kalshi is likely to succeed in proving that the Commodity Exchange Act field preempts New Jersey's sports-wagering laws. The alternative—allowing states to enforce their gambling laws against federal derivatives exchanges—would not merely undermine Congress's carefully constructed statutory scheme, but would also make uniform national derivatives markets impossible. Congress chose exclusivity for good reason, and this Court should honor that choice.

Dated: July 31, 2025                        Respectfully Submitted,

                                            /s/ *Michael M. Rosensaft*

James A. Walsh                              Michael M. Rosensaft
Bitnomial Exchange, LLC                     Alexander C. Kim
325 W. Huron Street                         Katten Muchin Rosenman LLP
Chicago, IL 60654                           50 Rockefeller Plaza
james.walsh@bitnomial.com                   New York, NY 10020
                                            michael.rosensaft@katten.com
                                            alexander.kim@katten.com

                                            Matthew F. Kluchenek
                                            Carrie M. Stickel
                                            Katten Muchin Rosenman LLP
                                            525 W. Monroe Street
                                            Chicago, IL 60661
                                            matt.kluchenek@katten.com
                                            carrie.stickel@katten.com
                                            *Counsel for Amicus Curiae*
                                            *Bitnomial Exchange, LLC*

8

## COMBINED CERTIFICATE OF COMPLIANCE

1. Pursuant to this Court's Local Appellate Rules ("LAR") 28.3(d) and 46.1(e), Michael M. Rosensaft is an attorney whose name appears on this brief and is a member of the bar of this Court.

2. This brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure ("FRAP") because this brief contains 1,697 words, exclusive of the material not counted under FRAP 32(f).

3. This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

4. The text of the electronic brief is identical to the text in any paper copies.

5. Apex One, a virus detection program has been run on the file, and no virus was detected.

6. This brief was served and filed with the Court via the Court's ECF system. In accordance with LAR 113.2(c), counsel for all parties are filing users and have therefore consented to electronic service of all documents.

                                                  /s/ *Michael M. Rosensaft*
                                                  Michael M. Rosensaft
                                                  *Counsel for* Amicus Curiae