No. 25-1922

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

KALSHIEX LLC,

Plaintiff-Appellee,

v.

MARY JO FLAHERTY AND MATTHEW J. PLATKIN,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of New Jersey

BRIEF OF AMICI CURIAE SEVEN FORMER MEMBERS OF
CONGRESS IN SUPPORT OF PLAINTIFF-APPELLEE

VENABLE LLP
Megan Barbero
600 Massachusetts Avenue, NW
Washington, DC 20001
202.344.4540
MBarbero@Venable.com

Kyle H. Keraga
Robyn S. Lessans
750 East Pratt Street, Suite 900
Baltimore, MD 21202

Carlos H. Salguero, Jr.
151 West 42nd Street
New York, NY 10036

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 3

ARGUMENT ........................................................................................... 6

  I.   Congress Designed The CFTC's "Exclusive Jurisdiction"
      To Preempt The Field Of Futures Trading On
      Designated Contract Markets. .................................................... 6

      A. Before 1974, piecemeal regulation of futures trading revealed
         the need for uniform rules. ...................................................... 7

      B. Congress created the CFTC to be the sole regulator of futures
         markets nationwide. ................................................................. 9

      C. Congress removed a savings clause to ensure that the
         CFTC's exclusive jurisdiction would preempt the field. .......... 12

  II.  The Dodd-Frank Act's "Special Rule" Confirms Congress
      Intended The CFTC To Have Sole Authority Over
      Event Contracts Traded On Designated Markets. .................. 15

      A. Congress enacted the special rule following nearly a decade
         of derivatives deregulation. ...................................................... 16

      B. The special rule placed event contracts within the CFTC's
         exclusive jurisdiction. .............................................................. 19

  III.  The CFTC's Exclusive Jurisdiction Over Designated
      Contract Markets Reaches Derivatives That Resemble
      Gambling Or Wagering. .............................................................. 23

      A. Congress created the CFTC after years of state efforts to
         regulate futures contracts as gambling. ................................... 24

      B. Congress specifically contemplated that gambling, and
         sports betting, would fall under the special rule ...................... 26

CONCLUSION ..................................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ............................................................ 11

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*,
  198 U.S. 236 (1905) ............................................................................ 23

*Chi. Mercantile Exch. v. SEC*,
  883 F.2d 537 (7th Cir. 1989) ................................................................ 6

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933) ............................................................................ 24

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ........................................................ 9, 15

*Hofmayer v. Dean Witter & Co., Inc.*,
  459 F. Supp. 733 (N.D. Cal. 1978) ...................................................... 13

*Hunter v. FERC*,
  711 F.3d 155 (D.C. Cir. 2013) .............................................................. 6

*Inv. Co. Inst. v. CFTC*,
  891 F. Supp. 2d 162 (D.D.C. 2012) ...................................................... 22

*James v. Clement*,
  223 F. 385 (5th Cir. 1915) .................................................................... 24

*Jones v. B.C. Christopher & Co.*,
  466 F. Supp. 213 (D. Kan. 1979) ......................................................... 13

*KalshiEX LLC v. CFTC*,
  2024 WL 4164694, No. 23-3257 (D.D.C. 2024) .................................. 23

*Khalid Bin Talal Bin Abdul Azaiz Al Seoud v. E.F. Hutton &
  Co., Inc.*, 720 F. Supp. 671 (N.D. Ill. 1989) ........................................ 14

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980) ............................................... 6

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  605 F. Supp. 1105 (N.D. Ga. 1985) ..................................... 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) ............................................... 7, 8, 11

*Mullinix v. Hubbard,*
  6 F.2d 109 (8th Cir. 1925) ................................................. 24

*Murphy v. NCAA,*
  584 U.S. 453 (2018) ......................................................... 29

*Pearce v. Rice,*
  142 U.S. 28 (1891) ........................................................... 24

*Point Landing, Inc. v. Omni Cap. Intern., Ltd.,*
  795 F.2d 415 (5th Cir. 1986) ............................................ 6-7

*Rice v. Bd. of Trade of Chicago,*
  331 U.S. 247 (1947) ......................................................... 12

*SEC v. Am. Commodity Exch., Inc.,*
  546 F.2d 1361 (10th Cir. 1976) ........................................... 7

*Taylor v. Bear Stearns & Co.,*
  572 F. Supp. 667 (N.D. Ga. 1983) ...................................... 10

**Statutes**

7 U.S.C. § 1a ........................................................... 17, 30

7 U.S.C. § 2 ........................................................... 4, 6, 14

7 U.S.C. § 6c (1940) ................................................... 9, 12

7 U.S.C. § 7a-2 ........................................................ 5, 15, 16

7 U.S.C. § 13-1(a) ......................................................... 30

7 U.S.C. § 16(e) ........................................................... 24

28 U.S.C. § 3702(1) ................................................. 29

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491
(1936) ............................................................. 8

Commodity Futures Modernization Act of 2000, Pub. L. 106-
554, 114 Stat. 2763 (2000) ............................. 16, 17

Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922) ................... 8

The Dodd-Frank Wall Street Reform and Consumer
Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).............. 15

Uniform Internet Gambling Enforcement Act, 31 U.S.C.
§ 5362................................................................. 29

## Other Authorities

### *Regulatory Sources*

17 C.F.R. § 40.11......................................................... 16

Concept Release on the Appropriate Regulatory Treatment
of Event Contracts, 73 Fed. Reg. 25,669
(May 7, 2008)............................... 17, 19, 20, 21, 27

CFTC Notice of Proposed Rulemaking, 89 Fed. Reg. 48,968
(June 10, 2024)........................................ 19, 20, 21

CFTC Staff Letter No. 92-04a (Feb. 5, 1992) ......................... 20

CFTC Staff Letter No. 93-66 (June 18, 1993) ....................... 20

Designation Memorandum Re: Application of HedgeStreet
from the Div. of Mkt. Oversight to the CFTC (Feb. 10,
2004) ................................................... 21, 27

### *Legislative Materials*

61 Cong. Rec. 4744 (1921) ....................................... 25

62 Cong. Rec. 9406 (1922) ....................................... 25

120 Cong. Rec. 30,464 (1974) .............................................................. 4, 13

120 Cong. Rec. 34,737 (1974) ................................................................. 10

120 Cong. Rec. 34,997 (1974) ........................................................... 10, 11

156 Cong. Rec. S5870 (daily ed. July 15, 2010)...................................... 27

156 Cong. Rec. S5902 (daily ed. July 15, 2010)............5, 18-19, 23, 28-29

H.R. Rep. No. 93-975 (1974)............................................................ *passim*

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ................................... 4, 12, 13

H.R. Rep. No. 106-711 (2000)................................................................. 16

*Hearing Before the Comm. on Agric.*, 93d Cong., 1st Sess.
    (1973) (Statement of Rep. John Rarick, Member, H.
    Comm. On Agric.)................................................................... 25, 26

*Hearing Before the Comm. on Agric. and Forestry on S. 2495,*
    *S. 2578, S. 2937, and H.R. 13113*, 93d Cong., 2d Sess.
    (1974) (statement of Sen. Dick Clark, Member, S. Comm.
    on Agric. and Forestry). ............................................ 3, 10, 26

*Hearing Before the Subcomm. on Gen. Farm Commodities*
    *and Risk Mgmt., Comm. on Agric.*, 111th Cong., 2d Sess.
    (2010) (Statement of Rep. Peterson, Chair, H. Comm. On
    Agric.) ..................................................................................... 30

S. Rep. No. 93-1131 (1974) .............................................................. 10, 12

S. Rep. No. 111-176 (2010) ................................................... 18, 19, 20, 22

### Secondary Sources

Black's Law Dictionary (9th ed. 2009).................................................... 28

Brian J. Regan & De'Ana H. Dow, *Case Studies: Recent*
    *Legislative and Regulatory Developments in Response to*
    *Changes in Natural Gas Markets*, Futures & Derivatives
    L. Rep., July–Aug. 2008........................................................... 4

Cong. Rsch. Serv., R41350, The Dodd-Frank Wall Street
Reform and Consumer Protection Act: Background and
Summary (2017)........................................................................... 16, 17

*Financial Crisis Inquiry Commission*, Commodity Futures
Trading Comm'n, https://tinyurl.com/5ajsft7n (last visited
July 30, 2025) ................................................................................ 18

Frank D'Souza et. al., *Illuminating the Need for Regulation
in Dark Markets: Proposed Regulation of the OTC
Derivatives Market*, 12 U. Pa. J. Bus. L. 473 (2010) ......................... 27

*History of the CFTC*, Commodities Futures Trade Comm'n,
https://tinyurl.com/txahuvr3 (last visited July 30, 2025) ................... 8

John V. Rainbolt, II, *Regulating the Grain Gambler and His
Successors*, 6 Hoftsra L. Rev. 1 (1977) ...................................... 8, 9, 25

Kevin T. Van Wart, *Preemption and the Commodity
Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982)................................. 25

Lynn A. Stout, *How Deregulating Derivatives Led to
Disaster, and Why Re-Regulating Them Can Prevent
Another*, Cornell L. Fac. Publ'ns, Paper 723 (2009),
https://tinyurl.com/4w3sxzpf ......................................................... 17, 18

*Over-The-Counter Derivatives*, Fed. Rsrv. Bnk. of N.Y.,
https://tinyurl.com/4p8fw3yh (last visited July 30, 2025)................... 18

Peter Gratton, *Event Contracts: What They Are and How
They Are Used*, Investopedia (Mar. 18, 2025),
https://tinyurl.com/rkps3cr6 ............................................................ 20

Philip F. Johnson, *The Commodity Futures Trading
Commission Act: Preemption as Public Policy*, 29 Vand. L.
Rev. 1 (1976)..................................................................................... 4

President's Working Group on Financial Markets, Over-the-
Counter Derivatives Markets and the Commodity
Exchange Act (1999) ........................................................................ 21

Thomas Lee Hazen, *Filling a Regulatory Gap: It is Time to Regulate Over the Counter Derivatives*, 13 N.C. Banking Inst. 123 (Mar. 2009) .......................................................... 27

Tom Snee, *Buying into the Election*, Iowa Now (Sept. 15, 2016), https://tinyurl.com/3yfcu8kc ..................................................... 20

## INTERESTS OF AMICI CURIAE[1]

Amici curiae are a bipartisan group of former members of Congress who are familiar with the statutory provisions governing the jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Amici are particularly familiar with the amendments to the Commodity Exchange Act and the Dodd-Frank Act of 2010, which created a "Special Rule" regarding event contracts. Among the amici are members who drafted the relevant statutory provisions; participated in the debates leading up to the enactment of Dodd-Frank; served on Committees with jurisdiction over the CFTC or other financial regulatory agencies; or served in leadership roles when Dodd-Frank was passed. Amici thus understand the critical role of federal oversight of derivatives trading and the importance of CFTC's exclusive jurisdiction over event contracts and other derivatives listed on designated contract markets. Amici have an interest in ensuring that Congress's intent to occupy this field is given full effect. Individual amici are:

---

[1] No party or party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae and their counsel made a monetary contribution to fund this

Senator Max Baucus (D-MT)
    Senate (1979-2014)
    House (1975-1979)

Senator Blanche Lincoln (D-AR)[2]
    Senate (1999-2011)
    House (1993-1997)

Senator Saxby Chambliss (R-GA)
    Senate (2003-2015)
    House (1995-2003)

Representative K. Michael Conaway (R-TX)
    House (2005-2021)

Representative Collin Peterson (D-MN)
    House (1991-2021)

Representative Cheri Bustos (D-IL)
    House (2013-2023)

Representative Cindy Axne (D-IA)
    House (2019-2023)

---

brief's preparation or submission. Counsel for all parties have consented to the filing of this brief.

[2] Former Senator Lincoln and her company, the Lincoln Policy Group, have had consulting arrangements with plaintiff-appellee Kalshi for several years. Kalshi pays Senator Lincoln's company a retainer, but it has not contributed any money that was intended to fund the preparation or submission of this brief. Because Senator Lincoln was one of the principal architects of a key statutory provision at issue in this appeal, and the defendants-appellants cite her floor statements in support of their position, Senator Lincoln believes her views may be particularly relevant and helpful for the Court.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Congress has long understood that "the futures markets play a significant role in the economic well-being of our country." H.R. Rep. No. 93-975, at 60 (1974). And it has carefully calibrated federal regulation of those markets to ensure our nation's economic strength and stability. In 1922, Congress passed the Grain Futures Act to require grain futures trading on designated markets. In 1936, it enacted the Commodity Exchange Act to strengthen federal oversight by expanding the list of regulated commodities and requiring markets to implement protective rules. In 1974, Congress created the Commodity Futures Trading Commission ("CFTC")—a single, centralized regulator with exclusive jurisdiction over designated markets. And in 2010, it declared in plain terms that event contracts fall within the CFTC's regulatory sweep.

Market events and legislative developments over the last century showed Congress that the futures markets need uniform rules—and that piecemeal state regulation "would just lead to total chaos."[3] Congress

---

[3] *Hearing Before the Comm. on Agric. and Forestry on S. 2495, S. 2578, S. 2937, and H.R. 13113*, 93d Cong. 2d Sess. 685 (1974) (statement of Sen. Dick Clark, Member, S. Comm. on Agric. and Forestry) (hereinafter "*1974 Senate Committee Hearings*").

3

addressed that need by granting the CFTC "exclusive jurisdiction" over trading on designated contract markets. 7 U.S.C. § 2(a)(1)(A). "This statutory grant of exclusive jurisdiction to the CFTC is unequivocal on its face. It embodies the clear intent of Congress to vest sole authority in one expert agency."[4] To date, it has "resulted in the preemption of all other would-be regulators at every level of government."[5]

There is no question that Congress intended to preempt the field. Throughout the debates culminating in the 1974 Act, key sponsors cited the need for uniform rules and the perils of state-by-state regulation. The Senate removed a savings clause that had once preserved state authority in order "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974). And the Conference Committee declared that the CFTC's exclusive jurisdiction "would preempt the field insofar as futures regulation is concerned," with no room for "any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

---

[4] Brian J. Regan & De'Ana H. Dow, *Case Studies: Recent Legislative and Regulatory Developments in Response to Changes in Natural Gas Markets*, Futures & Derivatives L. Rep., July–Aug. 2008, at 13.

[5] Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976).

Nor can there be any doubt that Congress has now extended the CFTC's exclusive jurisdiction to event contracts on designated contract markets. Congress passed the Dodd-Frank Act after the financial crisis of 2008 and eight years of deregulated derivatives markets. In constructing this comprehensive reform bill, Congress intended to "restore CFTC's authority" over derivatives. 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010). It crafted a "special rule" that pertains directly to "event contracts," instructing the CFTC to permit their listing except where it finds specific contracts contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C). And the bill's sponsors made their intentions plain. Asked whether the CFTC had the authority to determine whether to allow trading or prohibit event contracts on designated markets, Senator Lincoln stated: "That is our intent." 156 Cong. Rec. S5906 (daily ed. July 15, 2010).

The statutory text and legislative history could not make Congress's intent any clearer. It intended event contracts on designated contract markets to be regulated by the CFTC, and the CFTC alone. Allowing New Jersey to determine for itself what contracts may be traded or prohibited would fracture Congress's carefully designed structure. The

5

district court correctly issued a preliminary injunction to prevent New Jersey from intruding on this federal regulatory scheme.

## ARGUMENT

### I.    CONGRESS DESIGNED THE CFTC'S "EXCLUSIVE JURISDICTION" TO PREEMPT THE FIELD OF FUTURES TRADING ON DESIGNATED CONTRACT MARKETS.

Section 2 of the Commodity Exchange Act ("CEA") gives the CFTC "exclusive jurisdiction" over accounts, agreements, and transactions for the sale of futures on designated contract markets. 7 U.S.C. § 2(a)(1)(A). This statutory language is sweeping and unequivocal. A chorus of judicial decisions recognize that it means what it says: The CFTC, and only the CFTC, has the authority to regulate commodities futures markets across the country. *See Hunter v. FERC*, 711 F.3d 155, 158 (D.C. Cir. 2013) (acknowledging "Congress's very clear goal of centralizing oversight of futures contracts"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) ("[A]n instrument either is or is not a futures contract. If it is, the CFTC has jurisdiction; if it is not, the CFTC lacks jurisdiction; if the CFTC has jurisdiction, its power is exclusive.").[6]

---

[6] *See also, e.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *Point Landing, Inc. v. Omni Cap. Intern., Ltd.*, 795 F.2d 415, 421 (5th

The district court was right to join them and find that the CFTC's exclusive jurisdiction preempts state regulation of futures trading on designated contract markets such as Kalshi. Congress created the CFTC after decades of piecemeal regulation highlighted the need for a single regulator with uniform rules. Congress gave that new agency "exclusive jurisdiction" to regulate the commodities markets and repealed a savings clause that had preserved parallel state authority. And it declared that this broad grant of jurisdiction would preempt the field, with no room for state regulators to supplement the federal scheme.

### A. Before 1974, piecemeal regulation of futures trading revealed the need for uniform rules.

Congress "has authorized the regulation of commodity futures exchanges for" more than a century because it understands "the potential hazards as well as the benefits of futures trading." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982). Futures regulation started with everyday agriculture. In 1922, Congress enacted the Grain Futures Act to regulate futures contracts in grain—binding contracts for the delivery of a grain at a specified price at a specified

---

Cir. 1986); *SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1369 (10th Cir. 1976).

future time. Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, 998 (1922). That statute formed a commission under the Department of Agriculture to regulate grain futures exchanges.[7] But the commission's role was narrow, and its authority limited. It could only regulate seven grains enumerated by statute. *See id.* § 2(a), 42 Stat. at 998. And though it could designate markets for futures trading, it generally relied on those markets to "police themselves." *Merrill Lynch*, 456 U.S. at 361–62.

As the Great Depression sent shockwaves through the markets, Congress passed the Commodity Exchange Act of 1936 to expand federal oversight to a broader range of crop futures. Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491, 1491 (1936); *Merrill Lynch*, 456 U.S. at 361–62. The CEA created the Commodity Exchange Commission, with authority to set speculation limits and to regulate a broader list of crops. Pub. L. No. 74-675, §§ 2(a), 3(b), 5, 49 Stat. at 1491–92. Still, the Commission had limited power and reach.[8] It had authority over only a

---

[7] *See generally History of the CFTC*, Commodities Futures Trade Comm'n, https://tinyurl.com/txahuvr3 (last visited July 30, 2025).

[8] *See* John V. Rainbolt, II, *Regulating the Grain Gambler and His Successors*, 6 Hoftsra L. Rev. 1, 11 (1977) (labeling 1936 Act "a system of *strong* exchange self-regulation with *weak* federal oversight").

small slice of the national commodities trade and the statute preserved "any State law applicable" to "transactions" regulated under it. 7 U.S.C. § 6c(C) (1940). It relied on the private exchanges "to enforce rules against cheating, fraud, manipulation, wash trading, and puts and calls."[9] For the next thirty years, futures markets were rife with manipulation and scandal, and calls for reform mounted.[10]

### B. Congress created the CFTC to be the sole regulator of futures markets nationwide.

By 1974, Congress recognized the pressing need for uniform regulation of futures markets, with the entire industry "under the same set of rules and regulations." H.R. Rep. No. 93-975, at 79 (1974). It responded with the Commodity Futures Trading Commission Act, "an extensive overhaul of the CEA that . . . for the first time brought *all* commodities under federal regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation omitted). This statute replaced the Commodity Exchange Commission with the CFTC—an independent commission vested with broad authority "to assure the market is free of

---

[9] Rainbolt, *supra* note 8, at 11.

[10] *Id.* at 14-17.

manipulation and other practices which prevent [it] from being a true reflection of supply and demand." S. Rep. No. 93-1131, at 21 (1974).

During the drafting process, Congress expressed concern that state regulation of designated contract markets would undermine the CFTC. One "primary [objective] of Congress was preemption of . . . state regulatory schemes." *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983) (citing Johnson, *supra* note 5). "The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies." *Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985).

Legislators made these concerns clear. Senator Richard "Dick" Clark of Iowa explained that piecemeal state regulation "would just lead to total chaos." *1974 Senate Committee Hearings*, *supra* note 3, at 685. Committee chairs explained that the patchwork of regulation had left markets vulnerable to manipulation and uncertainty. 120 Cong. Rec. 34,737 (1974) (Rep. Poage); 120 Cong. Rec. 34,997 (1974) (Sen. Curtis on behalf of Sen. Talmadge). And the bill's supporters expressed concerns

that the states "might step in to regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).

Congress's solution was the CFTC, "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)). In order "to avoid unnecessary, overlapping, and duplicative regulation," 120 Cong. Rec. 34,997 (1974), and to subject all futures markets to "the same set of rules and regulations," Congress gave the agency "exclusive jurisdiction" over designated markets, H.R. Rep. No. 93-975, at 76, 87 (1974). The result was a single agency with sweeping, exclusive authority to designate and regulate futures markets.

Congress's intent was unequivocal: Under the 1974 Act, the CFTC, and the CFTC alone, may regulate futures trading on designated contract markets. As the Conference Committee explained:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned.* Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the

11

> Conferees do not contemplate that there will be a need for any
> supplementary regulation by the States.

H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.) (emphasis added).
Thus, "[w]here the jurisdiction of the Commodity Futures Trading
Commission is applicable, it supersedes State as well as Federal
agencies," S. Rep. No. 93-1131, at 23 (1974); *see also* H.R. Rep. No. 93-
1383, at 35 (1974), leaving no room for state regulation of designated
markets.

### C. Congress removed a savings clause to ensure that the CFTC's exclusive jurisdiction would preempt the field.

The 1974 Act also repealed a clause that preserved parallel state
authority to regulate futures transactions. Until 1974, the CEA provided:
"Nothing in this section . . . shall be construed to impair any State law
applicable to any transaction enumerated or described in such sections."
7 U.S.C. § 6c(C) (1940). With that provision in place, the CEA did not
occupy the field. *See Rice v. Bd. of Trade of Chicago*, 331 U.S. 247, 255
(1947). The House bill would have preserved this structure, providing
that the CFTC's "exclusive jurisdiction would not supersede or limit the
jurisdiction of the [SEC] or other regulatory authorities." H.R. Rep. No.
93-1383, at 35 (1974) (Conf. Rep.). But the Senate adopted an amendment

to repeal the savings clause and "assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974). And the Conference Committee adopted the Senate's bill, declaring in its report that states would retain no authority to regulate designated contract markets under the new Act. H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.).

The removal of this savings clause dispels all doubt that Congress intended to preclude states from regulating designated contract markets. Acknowledging as much, courts around the country have long found that the CFTC occupies the field of futures trading on those markets, leaving no room for state regulation. *See, e.g.*, *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("[T]he state regulatory agencies are . . . preempted by the 'exclusive jurisdiction' of the CFTC." (citation omitted)); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred." (citation omitted)). The district court correctly reached the same conclusion.

New Jersey resists this result, arguing that a savings clause couched in Section 2 is "fundamentally incompatible" with preemption. (N.J. Br. 33.). That clause provides:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State; or (II) restrict the [SEC] and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

7 U.S.C. § 2(a)(1)(A).

Section 2 also states that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.* But that clause does no more than preserve state-court jurisdiction over common law causes of action, such as fraud and contract, that may arise from transactions on designated contract markets. *See Khalid Bin Talal Bin Abdul Azaiz Al Seoud v. E.F. Hutton & Co., Inc.*, 720 F. Supp. 671, 680 (N.D. Ill. 1989) ("While the CEA may well prohibit state *regulation* of the commodities field, that finding does not compel the preemption of state *common law claims*.").

This savings clause does not give New Jersey the authority it now asserts. By preserving state jurisdiction "except as hereinabove provided," it merely clarifies that nothing in Section 2 preempts state

14

authority over transactions that fall *outside* the CFTC's exclusive jurisdiction. *See Ken Roberts*, 276 F.3d at 591 (holding that the plain meaning of the savings clause confirms that "other agencies may share power with the CFTC over activities that lie outside the scope of [CFTC's exclusive jurisdiction]" but not activities that lie within CFTC's exclusive jurisdiction (cleaned up)).

## II.    THE DODD-FRANK ACT'S "SPECIAL RULE" CONFIRMS CONGRESS INTENDED THE CFTC TO HAVE SOLE AUTHORITY OVER EVENT CONTRACTS TRADED ON DESIGNATED MARKETS.

With the Dodd-Frank Act of 2010, Congress codified a "special rule" for the CFTC's "review and approval of event contracts and swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); *see* Pub. L. No. 111-203, 124 Stat. 1376 (2010). This rule permits the listing of event contracts on designated contract markets unless the CFTC affirmatively finds that a particular contract is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(ii). The CFTC may make such a finding only if the contract "involve[s]" an activity that is enumerated by statute or regulation, namely:

> (I) activity that is unlawful under any Federal or State law;
> (II) terrorism;
> (III) assassination;
> (IV) war;
> (V) gaming; or

15

(VI) other similar activity determined by the [CFTC], by rule
or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(i). And the statute vests the CFTC with jurisdiction to make

public interest findings, including "by rule or regulation." 7 U.S.C. § 7a-

2(c)(5)(C)(iv); *see* 17 C.F.R. § 40.11(a)(1)-(2). Thus, the special rule

provides that all event contracts may be traded on designated markets

unless the CFTC finds them contrary to the public interest. And the

legislative history of the rule makes clear that Congress intended for the

CFTC alone to make that determination.

## A. Congress enacted the special rule following nearly a decade of derivatives deregulation.

Congress enacted the special rule after deregulated derivative

trading contributed to the 2008 financial crisis. The Commodity Futures

Modernization Act of 2000 had "largely exempted swaps and other

derivatives in the [over-the-counter] market from regulation."[11] In

passing that Act, Congress had sought "to promote innovation for futures

and derivatives." H.R. Rep. No. 106-711, at 2 (2000). As the CFTC later

noted, "innovative event markets have the capacity to facilitate the

---

[11] Cong. Rsch. Serv., R41350, The Dodd-Frank Wall Street Reform
and Consumer Protection Act: Background and Summary 19 (2017)
(hereinafter "Cong. Rsch. Serv.").

discovery of information, and thereby provide potential benefits to the public." Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,672 (May 7, 2008) (hereinafter "2008 Concept Release"). And Congress expanded the definition of "excluded commodity" to include events—meaning "an occurrence" that is "beyond the control of the parties" and "associated with a financial, commercial, or economic consequence." Pub. L. 106-554, 114 Stat. 2763, 2763A-371 (2000) (amending then 7 U.S.C. § 1a).

This shift led to an explosion of derivatives trading on unregulated over-the-counter markets. Cong. Rsch. Serv., *supra* note 11, at 19. Those markets swelled to hundreds of trillions in value, *id.*, "amounting to about $100,000 in derivative bets for every man, woman, and child on the planet."[12] But "the deregulation of financial derivatives" eventually "brought the banking system to its knees."[13] Over-the-counter derivatives lacked safeguards such as margin and capital requirements. Cong. Rsch. Serv., *supra* note 11, at 19-20. And "limited transparency concerning

---

[12] Lynn A. Stout, *How Deregulating Derivatives Led to Disaster, and Why Re-Regulating Them Can Prevent Another*, Cornell L. Fac. Publ'ns, Paper 723, at 5 (2009), https://tinyurl.com/4w3sxzpf.

[13] *Id.* at 4.

levels of activity in the market and overall size of counterparty credit exposures" amplified risk.[14] High-volume, high-risk speculative trading created a bubble, as over-the-counter markets became orders of magnitude more valuable than the stock market.[15] And in 2008, that bubble finally burst. "Too-big-to-fail" institutions such as AIG, which had over-leveraged into derivatives, folded when their speculative positions collapsed.[16]

Congress responded to this crisis by enacting the Dodd-Frank Act, strengthening federal oversight of over-the-counter derivatives markets. Congress held "more than 80 hearings" on financial reform, S. Rep. No. 111-176, at 46 (2010), to explore "all specific elements of the financial reform legislation, as well as specific regulatory failures that contributed to the crisis," *id.* at 44. It ultimately resolved to "restore CFTC's authority" to regulate over-the-counter derivatives. 156 Cong. Rec. S5906

---

[14] *Over-The-Counter Derivatives*, Fed. Rsrv. Bnk. of N.Y., https://tinyurl.com/4p8fw3yh (last visited July 30, 2025).

[15] *See* Stout, *supra* note 12, at 6–7.

[16] *See Testimony of Chairman Gary Gensler Before the Financial Crisis Inquiry Commission*, Commodity Futures Trading Comm'n, https://tinyurl.com/5ajsft7n (last visited July 30, 2025) (noting over-the-counter derivatives played a "central role" in the financial crisis).

(daily ed. July 15, 2010) (statement of Sen. Feinstein). Eight years of deregulation after the 2000 Act reinforced what Congress had learned from decades of piecemeal regulation before 1974: Evenhanded, uniform regulation is necessary to ensure stability in volatile futures markets.[17] With Dodd-Frank, it carved that lesson into law.

### B. The special rule placed event contracts within the CFTC's exclusive jurisdiction.

The special rule formalized the CFTC's exclusive jurisdiction over event contracts after years of uncertainty. Event contracts are a species of derivative that typically employ "a binary payment structure, based on the outcome of an underlying occurrence or event." CFTC Notice of Proposed Rulemaking, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024) (hereinafter "2024 NPRM"). The term "has also been used to identify transactions, based on interests other than market prices, which resemble futures contracts." 2008 Concept Release, at 25,671. Event contracts may be contingent on any event—album releases, election outcomes, weather, temperatures, competitions, bankruptcies, and more.

---

[17] *See* Stout, *supra* note 12, at 8 ("[T]he [2000 Act's] deregulation of financial derivatives was a novel legislative experiment. . . . Now we know what happens. The experiment has not turned out well.").

*See, e.g.*, 2024 NPRM, at 48,969 n.9. If the event occurs, the contract pays out; if the event does not occur, the buyer gets nothing. *Id.* at 48,969 n.5. Investors often use event contracts to hedge against significant risks, and they provide a strong metric for societal and economic trends.[18]

Until Dodd-Frank, event contracts occupied a regulatory gray area. CFTC-designated markets have listed derivatives that resemble event contracts since at least 1992. *Id.* at 48,969 n.11. The CFTC, in exercising its jurisdiction over designated markets, evaluated those contracts on a case-by-case basis. In 1992, the CFTC declined to take action against the University of Iowa's "Political Stock Market"—an experimental market listing contracts contingent on the outcome of elections, as Kalshi does today.[19] In 1993, the CFTC allowed that market to expand into economic indicators, listing contracts on the exchange rate between the dollar and other currencies.[20] And in 2004, the CFTC designated HedgeStreet Inc.,

---

[18] Peter Gratton, *Event Contracts: What They Are and How They Are Used*, Investopedia (Mar. 18, 2025), https://tinyurl.com/rkps3cr6.

[19] CFTC Staff Letter No. 92-04a, at 3 (Feb. 5, 1992); Tom Snee, *Buying into the Election*, Iowa Now (Sept. 15, 2016), https://tinyurl.com/3yfcu8kc (explaining history of the Iowa market, now named the "Iowa Electronics Market" or "IEM").

[20] CFTC Staff Letter No. 93-66, at 6 (June 18, 1993).

today known as the North American Derivatives Exchange ("Nadex"), as "the first contract market dedicated to trading event contracts." 2024 NPRM, at 48,969.[21]

The CFTC's hands-off approach to event contracts precipitated requests to develop a clearer and more consistent regulatory framework. In 1999, a Presidential Working Group observed that Congress had not conclusively determined whether over-the-counter derivatives such as event contracts "are forwards, futures, options, or none of the above." President's Working Group on Financial Markets, Over-the-Counter Derivatives Markets and the Commodity Exchange Act, at 4, 11 (1999). By May 2008, the CFTC had received a "substantial number of requests for guidance on the propriety of trading various event contracts." 2008 Concept Release at 25,671. It solicited comments from state and federal regulators about "the substantive and practical concerns that may arise from applying federal regulation to event contracts." *Id.* at 25,669. But as the 2008 financial crisis deepened, it became clear that congressional action was necessary. *See supra* Part II.A.

---

[21] *See* Designation Memorandum Re: Application of HedgeStreet from the Div. of Mkt. Oversight to the CFTC, at 4-6 (Feb. 10, 2004).

Congress answered these calls with the Dodd-Frank special rule, which expressly grounds event contracts in the CFTC's regulatory sweep. In Dodd-Frank, Congress sought to rein in unregulated derivatives "dark markets" that had proliferated since the 2000 deregulatory enactment. *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). The bill's drafters made their intentions clear:

> Sen. Lincoln: Chairman Dodd and I maintained [the special rule] in the conference report to assure that the Commission has the power to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events and also prevent gambling through futures markets. . . . [T]his provision will strengthen the government's ability to protect the public interest from gaming contracts and other events contracts.

> Sen. Feinstein: It is very important to restore CFTC's authority to prevent trading that is contrary to the public interest. As you know, the [CEA] required CFTC to prevent trading in futures contracts that were 'contrary to the public interest' from 1974 to 2000. But the Commodity Futures Modernization Act of 2000 stripped the CFTC of this authority at the urging of industry. Since 2000, derivatives traders have bet billions of dollars on derivatives contracts that served no commercial purpose at all and often threaten the public interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to hedging or economic use?

> Sen. Lincoln: That is our intent.

156 Cong. Rec. S5906–07. Congress crafted the special rule to bring deregulated derivatives back into the CFTC's exclusive jurisdiction. Both the text and history of that rule leave no doubt that event contracts were within its scope.

## III. THE CFTC'S EXCLUSIVE JURISDICTION OVER DESIGNATED CONTRACT MARKETS REACHES DERIVATIVES THAT RESEMBLE GAMBLING OR WAGERING.

By their form and function, futures contracts resemble gambling. "They are simple bets on the future—nothing less, and nothing more."[22] Indeed, "derivatives are regulated because" they are "ideal instruments for speculation."[23] They "involve purchasing (and thus risking money on) some contingent event with the hope of receiving a payoff." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, No. 23-3257, at *8 (D.D.C. 2024). And in a healthy market, futures buyers engage in "competent" speculation "as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of [loss]." *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 246–47 (1905) (Holmes, J.).

---

[22] Stout, *supra* note 12, at 5.

[23] *Id.*

Congress well understood the interplay between derivatives and gambling when it created the CFTC in 1974 and added the special rule in 2010. But needing uniform rules, it settled on a uniform solution: Granting the CFTC exclusive jurisdiction over futures contracts that are listed on a designated contract market. Legislative history confirms that Congress intended to capture such contracts even when they resemble gambling or involve sporting events. And far from displacing all state gambling prohibitions, Congress cabined the CFTC's jurisdiction to only trading on the federal exchanges. *See* 7 U.S.C. § 16(e).

## A. Congress created the CFTC after years of state efforts to regulate futures contracts as gambling.

The 1974 Act was animated by the need for centralized oversight and concerns about patchwork state regulation of markets. *See supra* Part I.A. Much of that patchwork involved state efforts to ban futures contracts as gambling. In the decades before the 1936 Act, many states criminalized futures under their gambling statutes. *See, e.g.*, *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 197–98 (1933) (Missouri); *Pearce v. Rice*, 142 U.S. 28, 34–35 (1891) (Illinois); *James v. Clement*, 223 F. 385, 400–01 (5th Cir. 1915) (Georgia); *Mullinix v. Hubbard*, 6 F.2d 109, 111–12 (8th Cir. 1925) (Arkansas). And in the decades that followed, the states

24

grew bolder in their attempts to block or control futures trading, even on designated contract markets. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 676–83 (1982); Rainbolt, *supra* note 8, at 6–7 (discussing state efforts to regulate futures trades).

Across these forty plus years of regulatory and economic developments, legislators condemned futures trading as gambling and argued for a stronger federal hand. *See, e.g.*, *Hearing Before the Comm. on Agric.*, 93d Cong., 1st Sess., at 58 (1973) (Statement of Rep. John Rarick, Member, H. Comm. On Agric.) (hereinafter "*1973 House Committee Hearings*") (testifying that speculative futures trading "may end up hurting both the producer and the consumer"); 62 Cong. Rec. 9406, 9411 (1922) (Rep. Williams) ("[E]very transaction on a board of trade where the actual delivery of the grain is not contemplated is more or less a gambling transaction."); 61 Cong. Rec. 4744, 4768 (1921) (Sen. Capper) ("[S]o long as this cancer of gambling in one of the necessities of life is permitted, we can not expect to have permanent prosperity in the United States. . . . [T]he grain gambler must go."). By the time Congress

convened in 1974 to debate changes to the CEA, comparisons of futures to gambling were baked into the political dialogue.

With the 1974 Act, the need for uniformity and stability won out. *See supra* Part I.B. Congress declared that "federal policy" involving derivatives must "be uniform throughout the United States," *1973 House Committee Hearings*, at 121, and that allowing "different State laws would just lead to total chaos," *1974 Senate Committee Hearings*, at 685. Its solution was to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 76. It accomplished this by giving CFTC exclusive jurisdiction over futures trading on designated contract markets. And it did all this against decades of mounting criticism that futures contracts were a vehicle for speculation. To the extent futures resembled gambling, then, it fell to the CFTC to regulate them.

### B. Congress specifically contemplated that gambling, and sports betting, would fall under the special rule.

When over-the-counter derivative trading exploded in the buildup to the 2008 financial crisis, the CFTC took steps to guard against gambling. In 2004, the CFTC designated HedgeStreet as a contract market only after the exchange certified that it would "list only contracts

that have a legitimate economic purpose," rather than "gambling activities, such as the outcome of sporting events."[24] In 2008, the CFTC solicited comments regarding "the implications of possibly preempting state gaming laws with respect to event contracts," and questioned whether event contracts are "the functional equivalent of gambling." 2008 Concept Release at 25,673. And as the market slumped, commentators widely recognized and criticized the resemblance between derivatives and gambling slips.[25]

When Congress drafted Dodd-Frank, legislators were not coy about comparing derivatives to gambling. Senator Cardin declared that the new Act "corrects a regulatory structure that today allows reckless gambling on Wall Street." 156 Cong. Rec. S5871 (daily ed. July 15, 2010). Senator Reid lamented "abusive banks" and "derivative markets that operate in the darkness," comparing the lack of consumer protections to gambling in "the great casinos across Nevada." *Id.* at S5879. And Senator

---

[24] Designation Memorandum Re: Application of HedgeStreet from the Div. of Mkt. Oversight to the CFTC, at 2 n.3 (Feb. 10, 2004).

[25] *See, e.g.*, Thomas Lee Hazen, *Filling a Regulatory Gap: It is Time to Regulate Over the Counter Derivatives*, 13 N.C. Banking Inst. 123 (Mar. 2009); Frank D'Souza et. al., *Illuminating the Need for Regulation in Dark Markets: Proposed Regulation of the OTC Derivatives Market*, 12 U. Pa. J. Bus. L. 473 (2010).

27

Lincoln affirmed that the Act would give the CFTC "the power to . . . prevent gambling through futures markets." 156 Cong. Rec. S5906 (daily ed. July 15, 2010). Congress channeled these policy objectives into the special rule, which gave CFTC power to block event contracts that involve "gaming"—a term of art equivalent to "gambling." *Gambling*, Black's Law Dictionary (9th ed. 2009) ("The act of risking something of value, esp. money, for a chance to win a prize. . . . Also termed *gaming*."); *Gambling Contract*, Black's Law Dictionary (9th ed. 2009) ("An agreement to engage in a gamble. . . . Also termed *gaming contract*.").

Senator Lincoln's colloquy with Senator Feinstein confirms beyond doubt that the special rule reaches trading on designated markets, even if that trading resembles gambling. Asked whether the CFTC could prohibit event contracts that resemble gambling, Senator Lincoln confirmed: "That is our intent." 156 Cong. Rec. S5906 (daily ed. July 15, 2010). She also explained that sports-related event contracts could be prohibited under the special rule:

> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around *sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.*

28

These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

*Id.* at S5906–07 (emphasis added). That exchange is revealing. Congress intended for the CFTC to use the special rule to guard against gambling on the exchanges. And it contemplated that sports contracts would fall within this regulatory sweep.

At the time Senator Lincoln urged the Commission to prevent "gambling" through sports-events contracts, federal law prohibited sports betting in almost all states. *See* 28 U.S.C. § 3702(1). But the Supreme Court invalidated that law in *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), and most states have since authorized sports betting. Given the changed landscape, Congress may well take a different view today about how the CFTC should exercise its authority over sports-event contracts. But the point remains: the CFTC has that authority.

Congress also carved the CFTC's designated contract markets out of federal gambling laws. In 2006, Congress passed the Uniform Internet Gambling Enforcement Act to prohibit placing online "bets or wagers" that would violate state law. But it defined "bet or wager" to exclude "any transaction conducted on or subject to the rules of" a designated contract market "under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii).

That carveout is reciprocal proof that Congress intended for the CFTC to regulate contracts on designated contract markets that would otherwise be gambling—and intended no other law to interfere with the agency's exclusive jurisdiction.

Indeed, Congress exempted certain gambling-adjacent derivatives from the definition of commodity. A lengthy debate in April 2010 focused on "movie futures," events contracts contingent on the future value of a film's box office receipts. One representative expressed concern that permitting movie futures markets would be "authorizing gambling," and suggested that they should be "regulated by states."[26] When it enacted Dodd-Frank, Congress prohibited the listing of movie futures on designated contract markets. 7 U.S.C. § 13-1(a); 7 U.S.C. § 1a(9) (exempting "motion picture box office receipts" from definition of commodity). Accordingly, Congress knew full well how to reserve certain commodities for regulation under state gambling laws. But Congress did nothing of the sort for sports-event contracts.

---

[26] *Hearing Before the Subcomm. on Gen. Farm Commodities and Risk Mgmt., Comm. on Agric.*, 111th Cong., 2d Sess., at 16 (2010) (Statement of Rep. Peterson, Chair, H. Comm. On Agric.).

## CONCLUSION

This Court should affirm the preliminary injunction.

Dated: July 31, 2025

VENABLE LLP

/s/ *Megan Barbero*
Megan Barbero
600 Massachusetts Avenue, NW
Washington, DC 20001
T: 202.344.4540
E: MBarbero@Venable.com

Kyle H. Keraga
Robyn S. Lessans
750 East Pratt Street, Suite 900
Baltimore, MD 21202

Carlos H. Salguero, Jr.
151 West 42nd Street
New York, NY 10036

*Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with this Court's Local Appellate Rules ("L.A.R.") 28.3(d) and 46.1(e) because as the signatory of this brief, I am admitted and a member in good standing of the Bar of this Court.

This brief complies with this Court's type-volume limitations because it contains 6,063 words.

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

This brief also complies with L.A.R. 31.1(c) because the text of this electronic copy is identical to the text of the paper copies.

The electronic file was scanned with the following antivirus software, and no virus was detected: CrowdStrike Falcon Sensor version 7.27.19907.0.

Dated: July 31, 2025

/s/ *Megan Barbero*

Megan Barbero

## CERTIFICATE OF SERVICE

I certify that the foregoing brief will be served on all counsel of record through the court's CM/ECF system.


Dated: July 31, 2025

/s/ *Megan Barbero*
Megan Barbero