UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 25-1922

---

KALSHIEX LLC,
*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY AND MATTHEW J. PLATKIN
*Defendant-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:25-CV-02152

---

**REPLY BRIEF OF APPELLANTS
MARY JO FLAHERTY AND MATTHEW J. PLATKIN**

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

STEPHEN EHRLICH
*Deputy Solicitor General*

LIZA B. FLEMING
EMILY M. BISNAUTH
PATRICK JHOO
VIVEK N. MEHTA
*Deputy Attorneys General*

R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Attorneys for Appellants

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ......................................................................... 1

ARGUMENT ............................................................................... 2

I.    Kalshi's event contracts do not fall within the Act......................... 2

II.   The Act does not preempt New Jersey's gambling laws. ............... 7

    A.    The text and structure of federal law
           foreclose all of Kalshi's preemption theories. ......................... 8

    B.    New Jersey's Sports Wagering Act is not barred
           by express, field, or conflict preemption. ............................. 15

          1.    All agree there is no express preemption. ................... 16

          2.    There is no comprehensive federal scheme
               to imply field preemption. ........................................... 17

          3.    New Jersey law does not conflict with the Act............ 21

CONCLUSION ......................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Agric. Movement v. Bd. of Trade,*
  977 F.2d 1147 (7th Cir. 1992) .......................................................... 16, 20

*Arizona v. United States,*
  567 U.S. 387 (2012) ................................................................................ 24

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,*
  846 F.3d 492 (2d Cir. 2017) ..................................................................... 7

*Chicago Mercantile Exch. v. SEC,*
  883 F.2d 537 (7th Cir. 1989) .................................................................. 21

*Cipollone v. Liggett Grp.,*
  505 U.S. 504 (1992) ................................................................................ 11

*Contra Pinho v. Gonzales,*
  432 F.3d 193 (3d Cir. 2005) ................................................................... 15

*Effex Cap., LLC v. Nat'l Futures Ass'n,*
  933 F.3d 882 (7th Cir. 2019) .................................................................. 21

*Erlenbaugh v. United States,*
  409 U.S. 239 (1972) .................................................................................. 4

*Farina v. Nokia Inc.,*
  625 F.3d 97 (3d Cir. 2010) ........................................................... 8, 19, 24

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001) ................................................................ 21

*Head v. N.M. Bd. of Examiners,*
  374 U.S. 424 (1963) ................................................................................ 19

*Hi Tech Trans, LLC v. New Jersey,*
  382 F.3d 295 (3d Cir. 2004) ................................................................... 17

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
  479 F.3d 936 (8th Cir. 2007) .................................................................. 16

*Jones v. B. C. Christopher & Co.*,
   466 F. Supp. 213 (D. Kan. 1979) ........................................................ 20

*Just Puppies, Inc. v. Brown*,
   123 F.4th 652 (4th Cir. 2024) ..................................................... 14, 26

*KalshiEX LLC v. Martin*,
   2025 WL 2194908 (D. Md. Aug. 1, 2025) .................................... *passim*

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ........................................... 18, 19, 23, 24

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
   991 F.3d 458 (3d Cir. 2021) ........................................................ 15

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012) .................................................................... 17

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) ....................................................... 20

*Lewis v. Alexander*,
   685 F.3d 325 (3d Cir. 2012) ....................................................... 15

*Merrill Lynch v. Curran*,
   456 U.S. 353 (1982) .................................................................... 19

*Murphy v. NCAA*,
   584 U.S. 453 (2018) .................................................................... 18

*Pennsylvania v. Navient Corp.*,
   967 F.3d 273 (3d Cir. 2020) ......................................................... 8

*Pueblo of Pojoaque v. New Mexico*,
   863 F.3d 1226 (10th Cir. 2017) ................................................... 14

*Rice v. Bd. of Trade*,
   331 U.S. 247 (1947) .................................................................... 20

*Sackett v. EPA*,
   598 U.S. 651 (2023) ...................................................................... 5

*Sanchez v. Mayorkas*,
   593 U.S. 409 (2021) .................................................................... 15

*Sikkelee v. Precision Airmotive Corp.*,
822 F.3d 680 (3d Cir. 2016) ...................................................... 8

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024).................................... 16, 17, 18

*United States v. Lopez*,
514 U.S. 549 (1995) ................................................................. 4

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................. 5

*Williams v. Stone*,
109 F.3d 890 (3d Cir. 1997) .................................................. 15

*Wisconsin Pub. Intervenor v. Mortier*,
501 U.S. 597 (1991) ............................................................... 19

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..................................................... *passim*

## STATUTES

7 U.S.C. § 1a ....................................................................... 2, 6, 7

7 U.S.C. § 2 .................................................................... 10, 12, 13

7 U.S.C. § 6 ................................................................................. 5

7 U.S.C. § 6d ............................................................................. 10

7 U.S.C. § 7a-2 ...................................................................... 7, 13

7 U.S.C. § 13 .......................................................................... 5, 24

7 U.S.C. § 13a-2 ........................................................................ 14

7 U.S.C. § 16 ............................................................................. 12

15 U.S.C. § 717r ........................................................................ 17

15 U.S.C. § 1172 ......................................................................... 4

15 U.S.C. § 3001 ......................................................................... 9

18 U.S.C. § 1955 .................................................................... 4, 10

31 U.S.C. § 5362 ........................................................................ 11

49 U.S.C. § 10501 ..................................................................... 17

N.J. Stat. Ann. § 5:12A ................................................... 6, 23, 24

## REGULATIONS

75 Fed. Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010) ................ 26

17 C.F.R. § 40.11 ...................................................................... 23

N.J. Admin. Code § 13:69N-1.2 ............................................... 25

## OTHER AUTHORIES

120 Cong. Rec. 30,464 (Sept. 9, 1974) (Sen. Curtis) ................ 20

*Further Definition of "Swap,"* 77 Fed. Reg. 48 (Aug. 13, 2012) ............ 6

H.R. Conf. Rep. 93-1383 at 35 (1974) ...................................... 20

Indictment, *United States v. Gershman,*
  2:25-cr-00595 (C.D. Cal. July 15, 2025) ................................. 10

Mello, Marco, *A Kick for the GDP: The Effect of Winning the FIFA World Cup*, 86 Oxford Bulletin of Econ. & Stat. 1313, 1329 (2024) ................ 3

Rachel Moore, *Eagles to generate $1.2B economic impact with Super Bowl, parade, season*, PHL 17 News (Feb. 13, 2025),
  https://tinyurl.com/2pfedw6t ................................................... 3

Appellee Brief, *KalshiEX LLC v. CFTC,*
  No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .................. 22

## **INTRODUCTION**

Despite well over a century of state gambling regulation and federal statutes that consistently accept and incorporate such state laws, Kalshi contends that Congress silently undid decades of federal gambling policy and superseded state gambling laws by adding a single word—"swaps"— to the CFTC's "exclusive jurisdiction" as part of the 2010 Dodd-Frank reforms. The upshot is that Kalshi thinks it is exempt from state gambling laws simply because it offers sports wagers in a new format (called event contracts) on a CFTC-designated contract market. Still, Kalshi argues (at 3) that its position is not as extreme as it sounds because the Commodity Exchange Act "preempts state gambling laws only as narrowly applied to trading on [designated contract markets], leaving state law unaffected in every other application." But Kalshi's nothing-to-see-here argument ignores that it is a *federal crime* to willfully trade swaps outside CFTC-regulated exchanges. So with Kalshi's expansive definition of "swap" covering essentially all gambling, there is no "other application" left for longstanding state gambling laws to regulate. That has never been the law.

Instead, for the reasons explained by Appellants and their amici— including 36 States and 60 federally recognized tribes—this Court should reject Kalshi's attempt to federalize the multi-billion-dollar gaming industry. For one, the term "swap" in the Act does not cover event contracts tied to athletic events, so the CFTC's "exclusive jurisdiction" never comes

into play. For another, even assuming that "swap" covers sports-related contracts, there is no dispute that the Act *can* preempt state laws as applied to CFTC-regulated markets. But that is a product of conflict preemption, not field preemption. So only state laws that contradict or impede the Act are preempted; complementary state laws are allowed. And because New Jersey's gambling laws complement federal law, there is no preemption. In the end, no matter how much Kalshi likens itself to the Chicago Mercantile Exchange or other derivatives markets, it is no different than any other sportsbook or gambling house. This Court should therefore deny its request for federal immunity and allow the States to govern Kalshi like every other sports pool. The Court should reverse.

## **ARGUMENT**

Kalshi's event contracts—which are based on the outcome of sporting events—are not "swaps" within the CFTC's "exclusive jurisdiction." Even if they were, the Act does not preempt New Jersey's gambling laws.

## I.    **Kalshi's Event Contracts Do Not Fall Within The Act.**

The Act defines a "swap" as "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As the State explained, the historical backdrop of federal gambling laws and the Act's text and structure show that Congress did not intend to effect a

massive sea change in gambling regulation by inserting the word "swap" to cover wagers on the outcome of sporting events. Appellants' Br. 16–26. Kalshi says much in response. But all it does is confirm that Kalshi's definition of "swap" is limitless and would force all gambling onto CFTC-regulated markets, undoing numerous federal gambling laws in the process. The State's definition, in contrast, gives meaning to the Act without forcing parents at the local little-league game to register with the CFTC before exchanging friendly wagers.

Kalshi could not be any clearer that essentially any sporting event has "financial consequences" and therefore any bet on any sporting event (or, really, any event) must be a "swap." Appellants' Br. 36. This includes such attenuated examples as "the outcome" of "the World Cup" affecting "the gross domestic product of an entire country," because winning the World Cup leads to a country's "greater international appeal," causing "enhanced export growth," which in turn leads to a short-term increase in GDP. Marco Mello, *A Kick for the GDP: The Effect of Winning the FIFA World Cup*, 86 Oxford Bulletin of Econ. & Stat. 1313, 1329 (2024). And the Philadelphia Eagles generating over $1 billion from their 2025 Super Bowl win because it caused the city to hold a parade, where fans purchased food and hotel rooms. Rachel Moore, *Eagles to generate $1.2B economic impact with Super Bowl, parade, season*, PHL 17 News (Feb. 13, 2025), https://tinyurl.com/2pfedw6t. Given Kalshi's "level of generality, any activity can be looked upon as commercial" or financial, *United States*

*v. Lopez*, 514 U.S. 549, 565 (1995), proving that almost any transaction tied to an event would be a swap under Kalshi's view of the Commodity Exchange Act. *See* Appellants' Br. 18–19.

The absurdity of that position is compounded by the Act's structure. That structure funnels swaps to CFTC-regulated markets by making it generally unlawful to enter into any swap *outside* those markets. Appellants' Br. 16–17. So any "swap"—including, in Kalshi's view, sports bets and classic casino games—*must* be traded on a CFTC-regulated exchange.[1] Appellants' Br. 18. This torpedoes Kalshi's argument (at 43) that other state and federal gambling laws have "full effect in the vast majority of applications" outside of designated contract markets; under Kalshi's interpretation, *no* gambling could take place outside of those markets.[2] Although the company eventually admits as much, its only re-

---

[1] As discussed below, the Act does not "expressly preserve[] state regulation of *off-DCM* transactions," Appellee Br. 40, because that provision does not apply to swaps, *see infra* 11–12.

[2] Kalshi cannot (at 42–43) avoid the consequences of its interpretation by retroactively importing the definition of "bet or wager" from the Unlawful Internet Gaming Enforcement Act of 2006 into other decades-old federal gambling statutes from other Congresses. Many of those statutes do not use "bet or wager" at all. *See, e.g.*, 18 U.S.C. § 1955 ("gambling"); 15 U.S.C. § 1172 ("gambling device"). And unlike the 2006 statute, none of those other laws contain an exclusion for Act-related transactions. Kalshi's own cited case rejected the same argument it makes here. *Erlenbaugh v. United States*, 409 U.S. 239, 245–47 (1972)

sponse is that this is "a matter of CFTC enforcement discretion not implicated by this case" because the CFTC could "exempt sportsbooks from the exchange-trading obligation." Appellee Br. 41.

Even if that were true,[3] it is cold comfort for everyone from the Bellagio and DraftKings to the local charity running a raffle at the nearby community center; all of them are (in Kalshi's view) committing a felony. *See* 7 U.S.C. § 13(a)(2), (5). This does not bode well for Kalshi's CFTC-exemption theory: either the CFTC did not exempt traditional gambling and sports betting because it does not think "swaps" capture all gambling in the country (as Kalshi claims), or the CFTC is funneling the bingo game at a rural senior-citizen home into its domain (showing the absurdity of Kalshi's position). Either way, the single addition of "swap" is a "wafer-thin reed" on which to rest such "sweeping and consequential authority" to control all gambling (including sports wagering) nationwide. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). And it is not the "exceedingly clear language" Congress must use "if it wishes to significantly alter

---

(refusing "to introduce an exception to the coverage of" another statute "where none is now apparent"). It is much easier to use New Jersey's sensible definition of a swap than to use Kalshi's limitless definition and graft an atextual exception onto numerous other laws.

[3] The CFTC can only exempt transactions that "will be entered into solely between appropriate persons," and "appropriate persons" seemingly does not include consumers placing sports bets. 7 U.S.C. § 6(c)(2)(B)(i); *id.* § 6(c)(3).

the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023).

Again, a better interpretive path is available: something is a "swap" when the "event or contingency" is inherently "financial, economic, or commercial" in nature. Appellants' Br. 22–24. Under that definition, the only qualifying sports-related transactions would be based on events that are connected to a financial instrument or measure, like the price of footballs or the Eagles' revenue.[4] Appellants' Br. 25. But neither would be an unlicensed "sports pool" under New Jersey law because they are not wagers on "any portion" of an actual "sports event." N.J. Stat. Ann. § 5:12A-10. So traditional sports bets (and other forms of gambling) would be largely left to the States, while the CFTC would monitor the financial-related transactions at the heart of its authority.

This gives effect to Congress's broad language and statutory context without Kalshi's absurd consequences. Take the remainder of the statu-

---

[4] Kalshi cites (at 39) the CFTC's enumerated exclusions for certain "consumer and commercial agreements" to try to allay concerns over the sweeping impact of its definition. But these exclusions actually disprove Kalshi's proposed definition because they are all contracts based on some financial measure. *See Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012) (listing consumer loans with variable rates, lease or mortgage agreements, and agreements with an interest rate cap).

tory "swap" definition. All of those subclauses pertain to financial instruments or measures.[5] *See* Appellants' Br. 23; 7 U.S.C. § 1a(47). To the extent Kalshi is correct (at 39) that Congress meant to "cast[] a wide net in defining" swaps, it did so through a different subclause, which captures any transaction "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). And because transactions based on some events (like the price of Super Bowl tickets) might qualify as "swaps" and involve "gaming," the special rule will still come into play even under a proper interpretation of "swap." So the special rule does not, as Kalshi contends (at 37), "confirm[]" that "the swap definition includes a sports event"; it exists to address transactions "involv[ing]" certain categories, including "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i).

Kalshi's contracts—based on the outcome of athletic events—do not qualify as swaps. This Court can reverse on that basis alone.

## II.    The Act Does Not Preempt New Jersey's Gambling Laws.

Even assuming Kalshi is offering "swaps," its preemption theories fail. Gambling has long been regulated by the States and is at the core of

---

[5] While Kalshi cites (at 38–39) "[e]xclusions" from the definition of "swap" as evidence that "additional exemptions 'are not to be implied,'" that "canon of construction is not applicable where, as here, the issue is not whether to create an implied exception to a general [definition], but the scope of the general [definition] itself," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 516 (2d Cir. 2017). Because the scope of "swap" does not reach Kalshi's sports bets, there would be no reason to include them in any list of exceptions.

their police powers, so Kalshi must overcome "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[6] *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016); *see* Appellants' Br. 26–28. And, critically, "the intent of Congress is the ultimate touchstone of preemption analysis." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020). Here, under any possible theory, Kalshi cannot meet its heavy burden to establish that Congress clearly preempted New Jersey's gambling laws. The text and structure of federal law foreclose preemption. And none of the three forms of preemption— express, field, or conflict—apply.

### A. The Text And Structure Of Federal Law Foreclose Kalshi's Preemption Theories.

Kalshi's preemption theories fail because Congress—despite enacting landmark gambling legislation nearly every decade since the 1940s— has repeatedly confirmed that the States retain their traditional role in regulating gambling. Where "Congress has indicated its awareness of the

---

[6] Kalshi attempts to escape this presumption by arguing that the federal government has been concerned with derivatives trading for over a century. Appellee Br. 52. "But the presence of federal regulation, however longstanding, does not by itself defeat the application of the presumption." *Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010); *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (applying presumption despite federal regulation "for more than a century"); *KalshiEX LLC v. Martin*, 2025 WL 2194908, at *5–6 (D. Md. Aug. 1, 2025) (applying presumption over Kalshi's objections), *appeal docketed*, 25-1892 (4th Cir. Aug. 6, 2025).

operation of state law in a field of federal interest" but leaves it in place, the "case for federal pre-emption is particularly weak." *Wyeth*, 555 U.S. at 575. That is fatal here: from the Gambling Ships Act of 1949 to the Wire Act of 1961 to the Indian Gaming Regulatory Act of 1988 to the Unlawful Internet Gaming Enforcement Act of 2006 (and all laws in between), Congress has not only accepted but incorporated state gambling laws. Appellants' Br. 28–31. In fact, four years after creating the CFTC, Congress made clear that States "have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1).

Kalshi has no real answer. In the face of federal statute after federal statute accepting and incorporating state gambling laws, Kalshi's only response (at 52) is that the CFTC has exclusive jurisdiction over designated contract markets, so "preemption exists" only for "trading on" those markets and "leav[es] state gambling laws operative in all other applications." In other words, Kalshi cannot deny Congress wanted to leave state gambling regulation in place generally, so it must argue that the Act does not actually upend state regulation. That response has two problems.

First, as explained above, Kalshi's reading really does upend state laws. After all, the CFTC's "exclusive jurisdiction" covers not just "swaps" on regulated exchanges but also "swaps" on "any other board of trade,

exchange, or market." 7 U.S.C. § 2(a)(1)(A). And the Act specifically outlaws any "swaps" outside covered exchanges. *Id.* § 2(e); *id.* § 6d(a)(1); *see* Appellants' Br. 16–18, 43–44. So Kalshi's interpretation of "swap," paired with the Act's plain structure, means that any wager placed on any event—including raffles or classic casino games—would be a swap subject to the CFTC's "exclusive jurisdiction." And if "exclusive jurisdiction" equates to field preemption, as Kalshi would have it, then there are no "other applications" over which state gambling laws could operate. *See* Appellants' Br. 43–44.

Second, all federal gambling laws accept or incorporate state law regardless of whether those state laws regulate activity that happens to occur on CFTC-regulated exchanges. If Kalshi is using five or more people to manage a long-running and profitable gambling business that is illegal under state law, the company is violating the Illegal Gambling Business Act no less than former-NBA star Gilbert Arenas. *See* 18 U.S.C. § 1955; Indictment, *United States v. Gershman*, 2:25-cr-00595 (C.D. Cal. July 15, 2025). In other words, there is no indication that Congress's decades-long preservation of state gambling law was contingent on those state laws leaving CFTC-regulated exchanges untouched.

That is equally true for the Unlawful Internet Gaming Enforcement Act of 2006. Appellee Br. 42, 52. Everyone agrees that the statute's definition of "unlawful Internet gambling" hinges on state law. *Id.* But because that statute then carves out "any transaction conducted on or

subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act," 31 U.S.C. § 5362(1)(E)(ii), Kalshi claims (at 42) this "exclusion underscores Congress's recognition of the CFTC's exclusive jurisdiction." Quite the opposite. The statute carves out a number of transactions, both regulated and unregulated. *See* 31 U.S.C. § 5362(1)(E). This was simply meant to separate what Congress considered to be "gambling" from what Congress considered to be "bona fide business transactions such as securities trading or buying or selling insurance contracts." H.R. Rep. No. 109-412, pt. 1, at 17 (2006). That says nothing about Congress's understanding of the CFTC's jurisdiction or whether *state* gambling laws—which Congress clearly meant to incorporate—can regulate those same transactions. *See* Appellants' Br. 28–31.

Congress's "certain awareness" of these state laws and its "silence" or outright acceptance of them "is powerful evidence that Congress did not intend" CFTC "oversight to be the exclusive means of" preventing unlawful gambling. *Wyeth*, 555 U.S. at 575. "If Congress thought" state gambling laws hampered the CFTC's ability to oversee regulated markets, "it surely would have enacted an express pre-emption provision at some point." *Id.* at 574. Yet Congress actually *did* expressly preempt some state laws—including other state gambling laws—without preempting those at issue, "impl[ying] that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992); *Martin*, 2025 WL 2194908, at *8–9; Appellants' Br. 32.

Kalshi's response is unavailing. The company cites (at 25, 54) another statutory provision, arguing that because Congress expressly declined to preempt "the application of any" state statute to transactions "*not* conducted on" a designated contract market or to entities that are "required to be registered" but "fail or refuse" to do so, the "only coherent inference is that the [Act] *does* preempt the application of state law to transactions that *are* conducted on" designated contract markets. But that provision does not apply to swaps, which is how Kalshi characterizes its sports bets. *See* 7 U.S.C. § 2(d); *id.* § 16(e)(1). So it cannot counter the opposite inference from the express-preemption provisions that *do* apply to swaps: "Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as to all others—is strong evidence that Congress did not intend to" preempt "all state law." *Martin*, 2025 WL 2194908, at *9; *see* 7 U.S.C. § 2(d).

The Act's two savings clauses reinforce that conclusion. Appellants' Br. 32–34. The first preserves "the jurisdiction" of state authorities when acting *outside* the CFTC's exclusive jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A). Contrary to Kalshi's argument (at 24, 55), it says nothing about the scope of "concurrent state and federal regulation" for transactions *within* the CFTC's exclusive jurisdiction. But the second savings clause does: for activity that falls within the CFTC's exclusive jurisdiction, Congress expressly preserved "the jurisdiction" of state courts. *Id.* Both the district

court and Kalshi seem to recognize that this allows private individuals to bring state-law claims in state court. *See* JA13; Appellee Br. 56–57. But neither can explain why private individuals are free to pursue such claims while the State is preempted from doing the same. That nonexplanation is understandable: if the Act prevented States from bringing state-court actions, then it would "supersede or limit the jurisdiction" of state courts, in direct contravention of the savings clause. 7 U.S.C. § 2(a)(1)(A).

A final piece of statutory evidence points the same way: not only did Congress repeatedly accommodate state law and include savings clauses, it *incorporated* state law into the special rule governing these event contracts. *See id.* § 7a-2(c)(5)(C)(i)(I). Kalshi misses the point (at 57) by quibbling with the scope of the special rule's categories. Regardless of their scope, the special rule's reference to "gaming"—an area long regulated by States—and "activity that is unlawful under" state law, confirms that Congress did not intend to preempt generally applicable state laws merely because they touch a market that might also be regulated by the CFTC. *See* Appellants' Br. 34–37.

As one court recently determined, the "fact that Congress expressly authorized the" CFTC "to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the [Act]." *Martin*, 2025 WL

2194908, at *8. This insight is supported by cases that Kalshi miscites, which recognize that a federal law's contemplation of parallel state law (rather than state enforcement of *federal* law)[7] demonstrates that Congress did not intend to occupy the field to the exclusion of all state law. *Compare* Appellee Br. 57–58, *with Just Puppies, Inc. v. Brown*, 123 F.4th 652, 662 (4th Cir. 2024), and *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1236 (10th Cir. 2017).

Remarkably, Kalshi doubles down on turning the CFTC into the final arbiter of state law. In Kalshi's world, the CFTC's construction of state laws that might apply—from criminal law to election law to sports wagering—would become authoritative because the CFTC alone can enforce them. That result would be bizarre, giving a federal agency responsible for U.S. derivatives markets greater law-interpreting power than even federal courts. *Contra Pinho v. Gonzales*, 432 F.3d 193, 212 (3d Cir. 2005). Kalshi makes no attempt to square that result with precedent or common sense, instead contending that "[f]ederal agencies routinely interpret state law." Appellee Br. 58. But there is massive gulf between a

---

[7] For that reason, Kalshi places undue emphasis (at 57) on the Act's state-enforcement mechanism. *See* 7 U.S.C. § 13a-2(1). Authorizing States to enforce the *federal* law against persons "other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader" says nothing about how States may enforce their *own* laws. It also makes sense that the CFTC would not need assistance enforcing *the Act* against persons and entities—like contract markets and floor brokers—in the heartland of its regulation.

federal agency and a state counterpart *both* using state law (as in RICO prosecutions, *Williams v. Stone*, 109 F.3d 890, 895 (3d Cir. 1997)) or federal law dictating when States can use their laws for certain federal purposes (as in determining Medicaid eligibility, *Lewis v. Alexander*, 685 F.3d 325, 344 (3d Cir. 2012)) and here—with a federal agency becoming the *only* entity that can interpret and apply state law. Given Congress's incorporation of state law into the special rule and its uniform acceptance of state gambling law generally, there is no reason to think Congress intended that anomalous and extreme result.[8]

Combined, the text and structure of federal law indicate Congress's plain intent to account for—not to foreclose—state legislation.

### B. New Jersey's Sports Wagering Act Is Not Barred By Express, Field, Or Conflict Preemption.

Even examined individually, none of the three preemption categories indicate that the Act supersedes New Jersey's law.

---

[8] Nothing in the amicus brief by former members of Congress is to the contrary. No "individual Member of Congress can pre-empt a State's judgment by merely musing about goals or intentions not found within or authorized by the statutory text." *Wyeth*, 555 U.S. at 600–01 (Thomas, J., concurring). "[P]reemption arguments [ ] must be grounded in the text and structure of the [federal] statute at issue," *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021), not in statements offered years later by members of Congress now in private practice. So courts routinely diverge from amicus filings by members of Congress. *See, e.g.*, *Sanchez v. Mayorkas*, 593 U.S. 409 (2021); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942 & n.3 (8th Cir. 2007).

### 1.      All Agree There Is No Express Preemption.

Kalshi (like the district court) misunderstands the preemption analysis. The company's analysis primarily hinges on just two words in the Act: "exclusive jurisdiction." But whether a single, explicit statutory provision preempts state law is not the province of *field* preemption but *express* preemption. Appellants' Br. 38–40. And because "[e]xpress preemption requires an explicit statement of federal law that announces and defines the scope of displaced state regulation," the mere grant of "exclusive jurisdiction" is not enough. *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151 (3d Cir. 2024); *see Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1154 (7th Cir. 1992) ("No one suggests that the CEA expressly preempts state law."). After all, the Supreme Court has long held that Congress "must do much more to oust all of state law from a field" than simply "granting regulatory authority over [some] subject matter to a federal agency." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring); *id.* at 640–41 (Sotomayor, J., concurring in part) (similar).

Kalshi's two cited cases prove the point: neither said that a grant of exclusive jurisdiction alone equated to field preemption. Appellee Br. 23–24. One case dealt with a statutory provision giving "original and exclusive" jurisdiction to federal *courts*, not to a federal agency that shares power with other federal entities. *See Transcon. Gas*, 108 F.4th at 151–

52. And even there, the court primarily analyzed it as express preemption. *Id.* Kalshi's other cited case simply noted that an agency "has exclusive jurisdiction over 'transportation by rail carrier.'" *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 305 (3d Cir. 2004). It did not say that "exclusive jurisdiction" was enough for preemption; rather, the court noted that the statute's "*regulation of rail carriers* preempts state regulation with respect to rail transportation." *Id.* And to the extent there was express preemption in both, it was only because the statutes at issue "announce[d] and define[d] the scope of displaced state regulation." *Transcon. Gas*, 108 F.4th at 151–52; *see* 15 U.S.C. § 717r(d)(1); 49 U.S.C. § 10501(b). Everyone agrees that no such express provision exists here.

All this is to say that state laws are not field preempted just because the CFTC has "exclusive jurisdiction." That is neither a concession that the Act "expressly preempts state regulation of trading on" CFTC-regulated exchanges nor an argument that the exclusive-jurisdiction provision forecloses field preemption. *Contra* Appellee Br. 53. It is simply a recognition of the proper preemption analysis, which the district court failed to conduct.

> **2.    There Is No Comprehensive Federal Scheme To Imply Field Preemption.**

Without express preemption, field preemption can be implied only where "federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy v. NCAA,*

584 U.S. 453, 479 (2018); *see Transcon. Gas*, 108 F.4th at 156. That high standard is met only in "rare cases." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). This is not one of them.

Nothing remotely approaching a comprehensive federal scheme exists to field preempt complementary state regulation of sports wagers when they happen to occur on CFTC-regulated exchanges. Kalshi largely points to federal regulations governing the procedures for an entity to become an CFTC-regulated exchange and certain subsequent record-keeping requirements, reporting obligations, and liquidity standards. Appellee Br. 29. But the company has no response to New Jersey's arguments that field preemption cannot be inferred from regulations, or that this case has nothing to do with the mechanics of how an entity becomes (or maintains its status as) a CFTC-regulated exchange. Appellants' Br. 41–42. As for the relevant question here—the allowable topics of event contracts—Kalshi identifies only two provisions: the special rule and its implementing regulation. Appellee Br. 29–30. Yet those (largely identical) provisions of fewer than 400 words are a far cry from the complete regimes governing nuclear power plants, in-air flight operations, and the other "rare cases" of field preemption. *Garcia*, 589 U.S. at 208.

Nor does it matter that a prior opinion referred to the Commodity Exchange Act as a "comprehensive regulatory structure." Appellee Br. 58 (citing *Merrill Lynch v. Curran*, 456 U.S. 353, 356 (1982)). For one, that quote is drawn from the first line of an opinion that had nothing to do

with preemption. For another, innumerable federal statutes could be colloquially described as "comprehensive" without preempting the field. That is why the Supreme Court has rejected the notion that preemption can "be judged by reference to broad statements about the 'comprehensive' nature of federal regulation" in prior cases. *Head v. N.M. Bd. of Examiners*, 374 U.S. 424, 429–30 (1963) (no preemption despite prior cases saying the Federal Communications Act was "comprehensive"); *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991) (same for the Federal Insecticide, Fungicide and Rodenticide Act). Given Congress's "hesitation to override all state law" for sports betting and its "recognition of a role for state regulation" in the special rule, the Act does not "so thoroughly occup[y] a legislative field" that "Congress left no room for the States to supplement it." *Farina*, 625 F.3d at 121–22.

Kalshi's remaining arguments mistake *conflict* preemption—which all agree could apply in appropriate circumstances—for *field* preemption. Take the Act's legislative history. While Kalshi (at 27) leans on the deletion of a prior savings clause, that clause preserved state laws that would "almost certainly conflict" with federal laws. *Rice v. Bd. of Trade*, 331 U.S. 247, 255 (1947). So with that provision removed (and exclusive jurisdiction given to the newly created CFTC), federal law would now preempt "any substantive State law" that is "contrary to or inconsistent with Federal law." *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (Sen. Curtis). Kalshi's cited conference report says the same. *See* H.R. Conf. Rep. 93-

19

1383 at 35 (1974) ("[I]f any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern."). But there is no indication that Congress had the clear and manifest intent to field preempt even *complementary* state laws—much less state gambling laws it has long accepted—just because they touch a market that also happens to be regulated by the CFTC.

Kalshi's cited cases get the company no closer to field preemption. Some did not address preemption at all. *See, e.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (analyzing whether a private cause of action exists and merely stating without analysis that the Act "preempts the application of state law"); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) (similar). Others rejected field preemption in favor of conflict preemption. *See Am. Agric.*, 977 F.2d at 1155 ("Congress did not intend to preempt the field of futures trading" but left "open the possibility of conflict preemption."). For that reason, one court examined this case law and found that courts have "emphasized that Congress did not intend for the Commodity Exchange Act to preempt every field of state law that would otherwise apply to transactions falling within the scope of the Act." *Martin*, 2025 WL 2194908, at *10 (citing *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019)).

If anything, Kalshi's cited cases prove that Congress was primarily concerned with giving the CFTC authority over certain transactions as distinct from other *federal* agencies. *See FTC v. Ken Roberts Co.*, 276 F.3d

583, 591 (D.C. Cir. 2001) (jurisdiction of CFTC versus FTC); *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (jurisdiction of CFTC versus SEC). Despite Kalshi's (at 28) truncated quotations, their meaning is clear: Congress's goal was to "'avoid unnecessary, overlapping and duplicative regulation,' especially as between the Securities and Exchange Commission and the new CFTC."[9] *Ken Roberts*, 276 F.3d at 588. But when it comes to historic state regulation, "the weight of the evidence strongly confirms that Congress did not intend for Dodd-Frank" to "legaliz[e] sports betting nationwide" nor "displac[e] states' authority to regulate it" entirely. *Martin*, 2025 WL 2194908, at *11.

### 3.    New Jersey Law Does Not Conflict With The Act.

With no express preemption and no comprehensive scheme demonstrating field preemption, Kalshi is left with conflict preemption. But the case for conflict preemption is weak. In the very 2010 Dodd-Frank amendments on which Kalshi relies, Congress specifically empowered the CFTC to *prohibit* the exact type of sports-wagering contracts Kalshi offers here. Appellants' Br. 48–49. And the CFTC exercised its authority to do exactly that: a "registered entity shall not list for trading" a "swap" that "involves, relates to, or references," among others, "gaming, or an

---

[9] To the extent the CFTC wrongly believes that the Act field preempts state laws, its opinion is irrelevant. Appellee Br. 27. Even through the *Chevron* era, courts never "deferred to an agency's conclusion that state law is pre-empted." *Wyeth*, 555 U.S. at 576; *AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 728 n.82 (3d Cir. 2015).

activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). In Kalshi's own words, "the legislative history directly confirms" that "Congress did not want sports betting to be conducted on derivatives markets." *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *44 (D.C. Cir. Nov. 15, 2024). Because federal law prohibits sports-related event contracts, New Jersey's Sports Wagering Act does not stand as an obstacle to the congressional scheme by prohibiting the same thing (absent a license).

Ignoring the State's cited cases, Kalshi primarily responds by conflating the various forms of preemption. The company argues (at 30) that applying New Jersey law to Kalshi would disrupt Congress's goal of bringing "futures markets 'under a uniform set of regulations.'" But Congress establishes total uniformity through either an express statutory provision or through such comprehensive regulation that state laws are impliedly field preempted. *See supra* 16–21. And for the reasons above, "Kalshi has failed to show that Congress intended for the [Act] to *completely preclude* any [S]tate's gaming laws from being applied to" designated contract markets. *Martin*, 2025 WL 2194908, at *12.

In contrast, conflict preemption focuses on whether state law poses an obstacle to the effectuation of federal law's actual "text and structure." *Garcia*, 589 U.S. at 208. And in that sphere, companies are often subject to simultaneous state and federal regulation. *See* Appellants' Br. 52 (col-

lecting examples). Plus, Kalshi admits that the CFTC suspended a competitor's sports-related contracts but "never made a similar request to Kalshi." JA29. So New Jersey's enforcement decisions do not create disuniformity any more than the CFTC's own enforcement decisions do.

Relatedly, the CFTC's enforcement discretion itself cannot preempt anything. *Contra* Appellee Br. 31–32. Under Supreme Court precedent that Kalshi disregards, the "Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 589 U.S. at 212. So the "mere fact that state laws" overlap with federal provisions (and have corresponding federal enforcement discretion) "does not even begin to make a case for conflict preemption." *Id.* at 211. Of course, Kalshi is violating both state and federal law by listing gaming event contracts market without "a sports wagering license." *See* N.J. Stat. Ann. § 5:12A-11(c); 17 C.F.R. § 40.11(a)(1). But it makes no difference that New Jersey is attempting to enforce its law while the CFTC is not; "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Garcia*, 589 U.S. at 212. As is usually the case where "federal and state laws overlap," New Jersey's enforcement "is entirely consistent with federal interests" laid out in the Act. *Id.*

And there are no circumstances here that would convert New Jersey's complementary gambling laws into an unconstitutional conflict. For instance, the State does not "threaten[] to seek *criminal* penalties well

beyond what the [Act] would authorize." Appellee Br. 32. The Sports Wagering Act imposes criminal penalties, including a fine up to $100,000, for offering an unauthorized "sports pool." N.J. Stat. Ann. § 5:12A-11(c). But federal law imposes an even greater penalty of up to $1,000,000 for "willfully" violating the Act or "any rule or regulation thereunder." 7 U.S.C. § 13(a)(5). So this is not a situation where state law criminalizes conduct for which "Congress decided it would be inappropriate to impose criminal penalties." *Arizona v. United States*, 567 U.S. 387, 406 (2012).

Kalshi's last-ditch resort to impossibility preemption fails too. The company belatedly contends (at 33) that "compliance with both the CFTC's and New Jersey's requirements would be impossible." Although Kalshi never raised this theory below, it fails anyway because it is not impossible "to comply with both state and federal requirements." *Farina*, 625 F.3d at 122. Indeed, "[i]t is Kalshi's desire not to comply with [New Jersey] law and presumably incur some additional compliance costs—not the existence of [New Jersey] consumer protection laws themselves—that creates the situation Kalshi professes to worry about." *Martin*, 2025 WL 2194908, at *13.

That largely disposes of Kalshi's impossibility arguments. For example, there is no need to offer "sports-event contracts everywhere except New Jersey." Appellee Br. 33, 60. "So long as Kalshi obtains a license and complies with [New Jersey] sports gambling laws, those laws would not

pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in" New Jersey.[10] *Martin*, 2025 WL 2194908, at *13. Nor is it impossible to comply with state "cash reserve requirements." Appellee Br. 60. Kalshi calls these requirements "superfluous" because it must already "comply with CFTC capital requirements" and "use a clearinghouse that collateralizes open positions." *Id.* So it is obviously possible to comply with requirements that are supposedly redundant. And to the extent Kalshi is not the "counterparty to any trade," *id.*, New Jersey law does not require it to "cover" the "outstanding sports pool wagers," *see* N.J. Admin. Code § 13:69N-1.2(d).

Finally, it is not "impossible" for Kalshi to comply with the "impartial access" requirement just because New Jerseyans cannot place bets on certain college sports events. Appellee Br. 33–34. At the outset, the "impartial access" requirement "does not compel the existence of a market" for particular event contracts; Congress simply wanted the CFTC to regulate market access "to the extent a market exists." *Just Puppies*, 123 F.4th at 664. That New Jersey removed one type of sports-related event contract from the in-state options in no way conflicts with the Act's access requirements to the markets generally. In any event, the CFTC implemented this requirement to "prevent DCMs from using discriminatory

---

[10] New Jersey does not impose any "obligation to accept trades only within New Jersey." Appellee Br. 60. Its sports-gambling laws are limited to its borders and have no effect on Kalshi's conduct nationwide.

access requirements" such as "the creation of exclusive membership standards that focus on high net worth." 75 Fed. Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010). But a contract market can still "establish different categories of market participants" where it does not "discriminate within a particular category." *Id.* at 80,579. So complying with New Jersey's prohibition on this small slice of wagers does not make it "impossible" for Kalshi to provide impartial, nondiscriminatory access.

At bottom, "Kalshi has not shown how obtaining a license in" New Jersey and "complying with" New Jersey "law would prevent it from complying with federal law." *Martin*, 2025 WL 2194908, at *12.

## <u>CONCLUSION</u>

This Court should reverse.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 250-8412

Dated: August 14, 2025

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S. Court of Appeals for the Third Circuit.

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

Dated: August 14, 2025

## CERTIFICATION OF COMPLIANCE

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 6436 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the Microsoft Word processing system.

3.    The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.    This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with the following anti-virus software: Windows Defender and Crowdstrike Windows Sensor, version 7.2219409.0.

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

Dated: August 14, 2025

## **CERTIFICATION OF SERVICE**

I hereby certify that on August 14, 2025, I caused the Reply Brief for Appellants to be filed with the Clerk of the U.S. Court of Appeals for the Third Circuit via electronic filing. Counsel of record will receive service via the Court's electronic filing system.

*/s/ Stephen Ehrlich*
Stephen Ehrlich
Deputy Solicitor General

Dated: August 14, 2025