

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
OFFICE OF THE SOLICITOR GENERAL
PO BOX 080
TRENTON, NJ 08625-0080

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

JEREMY M. FEIGENBAUM
*Solicitor General*

October 16, 2025

**<u>VIA ECF</u>**

Patricia S. Dodszuweit, Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

> **Re: *KalshiEx LLC v. Mary Jo Flaherty, et al.*, No. 25-1922**
> **FRAP 28(j) Letter**

Dear Ms. Dodszuweit:

Appellants write to advise of *North American Derivatives Exchange v. Nevada Gaming Control Board*, No. 2:25-cv-00978 (D. Nev. Oct. 14, 2025).

There, the District of Nevada—which originally enjoined enforcement of state gambling laws against Kalshi—reversed course and rejected Crypto.com's identical argument that event contracts on the outcome of sporting events are "swaps." Holding otherwise, the court explained, "knows no limiting principle" and would not only render other subclauses of the Commodity Exchange Act's swap definition superfluous but would "sweep nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states historically have regulated gambling through their police power." Op.16–17. That is, "if the statutory definition of swaps covers contracts on the outcome of sporting events that have a



potential financial or economic consequence," then "all sports betting must be done on a DCM" absent "exceptions not applicable to casinos and the average sports bettor." Op.18. But the Act's "language and legislative history show that Congress did not intend" such a massive "sea change" and, "to the contrary, did not want gambling to take place on CFTC-designated exchanges." Op.18.

That is consistent with the District of Maryland's thorough analysis in *KalshiEX LLC v. Martin*, 2025 WL 2194908 (D. Md. Aug. 1, 2025), which reasoned that Congress's "concern" about "gambling" on CFTC-regulated exchanges "makes it even less likely that Congress intended for Dodd-Frank to render obsolete state laws limiting or regulating gambling." *Id.* at *11. While the court assumed without deciding that Kalshi's sports bets were swaps, it rightly rejected Kalshi's field and conflict preemption theories. *Id.* at *6–13.

In the end, "Congress did not intend for gaming to be conducted on DCMs, and it defined swaps and enacted the special rule to achieve this intent." Op.20. That speaks to Appellants' two arguments about the scope of the Act and preemption: Congress did not silently undo decades of federal gambling policy, supersede state gambling laws, and federalize the multi-billion-dollar gaming industry by adding a single word—"swaps"—to the CFTC's "exclusive jurisdiction" as part of the 2010 Dodd-Frank reforms. Appellants' Br.16–53; Reply 1–26.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/ Liza B. Fleming*
Liza B. Fleming
Deputy Attorney General

cc: All counsel (via ECF)
Word Count: 350



**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NORTH AMERICAN DERIVATIVES EXCHANGE, INC., | Case No.: 2:25-cv-00978-APG-BNW |
| Plaintiff | **Order (1) Denying Motion for Judgment on Pleadings, (2) Denying Motion for Preliminary Injunction, and (3) Granting in Part Motion to Strike** |
| v. | |
| THE STATE OF NEVADA on Relation of the NEVADA GAMING CONTROL BOARD, et al., | [ECF Nos. 15, 42, 43] |
| Defendants | |

Plaintiff North American Derivatives Exchange, Inc. d/b/a Crytpo.com (Crypto) is a Commodity Futures Trading Commission (CFTC) designated contract market (DCM). Earlier this year, Crypto began offering event contracts that turn on the outcome of sporting events. The Nevada Gaming Control Board deemed these contracts to be sports wagering subject to Nevada's gaming laws and sent Crypto a cease-and-desist letter. Crypto brought this suit to permanently enjoin the Nevada Gaming Control Board, its members in their official capacities, and the Nevada Attorney General from pursuing civil or criminal enforcement against Crypto for offering event contracts in Nevada. Crypto contends that its contracts are legal under federal law and that Nevada law is preempted due to the CFTC's exclusive jurisdiction over transactions on DCMs.

Crypto moves for a preliminary injunction to preclude the defendants from pursuing civil or criminal remedies against it. Crypto also moves for judgment on the pleadings and to strike the defendants' affirmative defenses. The defendants oppose, arguing that Crypto is not likely to succeed on the merits because the Commodity Exchange Act (CEA) does not preempt Nevada

gaming laws and, in any event, Crypto's sports wagers are not "swaps" and thus do not fall within the CFTC's exclusive jurisdiction. Additionally, the defendants argue that Crypto cannot meet the other factors to support preliminary injunctive relief. The defendants contend that judgment on the pleadings is premature because fact issues remain, and they argue that the motion to strike should be denied, except for one affirmative defense that they concede is now moot. Several Indian tribes and Indian gaming associations move for leave to file an amicus brief.[1] Crypto does not oppose granting leave for the amicus brief to be filed and responded to the amicus brief on the merits.

I deny the motion for judgment on the pleadings because, based on the pleadings, Crypto's event contracts are not "swaps" falling within the CFTC's exclusive jurisdiction. I deny the motion for preliminary injunction because Crypto has not met its burden to show that it is likely to succeed in demonstrating that its event contracts based on the outcome of live events are swaps that fall within the CFTC's exclusive jurisdiction. I grant in part the motion to strike, with leave to amend. Finally, I grant the amici leave to file the amicus brief.

## I. BACKGROUND

The CFTC regulates financial derivative markets. "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024

---

[1] The amici are the Indian Gaming Association, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, National Congress of American Indians, the Native American Finance Officers Association, Tribal Alliance of Sovereign Indian Nations, San Manuel Gaming and Hospitality Authority, United South and Eastern Tribes Sovereignty Protection Fund, and 24 federally recognized Indian Tribes. ECF No. 74 at 1-2.

1   WL 4164694, at *1 (D.D.C. Sept. 12, 2024) (quotation omitted). Derivatives "provide a way to

2   transfer market risk or credit risk between two counterparties." *Id.* (quotation omitted). Event

3   contracts are a form of derivative in which the "payoff is based on a specified event, occurrence,

4   or value." *Id.* at *2 (quotation omitted). "These contracts usually pose a yes-or-no question. The

5   buyer of the event contract, for example, may take a 'yes' position on whether the underlying

6   event will happen," and the "seller implicitly takes the opposite, or 'no,' position." *Id.* The

7   contract prices fluctuate because they are based on the current probability that the relevant event

8   will occur. *Id.*

9        An entity like Crypto must apply to and receive designation from the CFTC to become a

10  DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.1, 38.3(a). Until the year 2000, a DCM had to get

11  the CFTC's preapproval to list contracts by convincing the CFTC that its contracts satisfied an

12  economic purpose test and were not contrary to the public interest. *KalshiEX LLC*, 2024 WL

13  4164694, at *2 (quotation omitted). But Congress amended the CEA in 2000 to allow DCMs to

14  self-certify that their contracts comply with the law and regulations with no prior CFTC review.

15  *Id.*[2]; *see also* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2.

16       In 2010, Congress amended the CEA again by enacting a special rule for event-based

17  contracts in "excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C); *see also* 7 U.S.C. § 1a(19)(iv)

18  (defining excluded commodity, as relevant here, to mean "an occurrence, extent of an

19

---

20  [2] Under the CEA, a DCM can self-certify to the CFTC that the listed contract complies with the
    CEA and the CFTC's regulations. 17 C.F.R. § 40.2. The CFTC can thereafter request additional
21  "evidence, information or data that demonstrates that the contract meets, initially or on a
    continuing basis, the requirements of the Act or the Commission's regulations or policies
22  thereunder." 17 C.F.R. § 40.2(b). The CFTC can stay a listing of a contract under certain
    circumstances, including if the CFTC initiates proceedings for filing a false certification. 17
23  C.F.R. § 40.2(c). Alternatively, a DCM can request the CFTC pre-approve a contract before
    listing it. 17 C.F.R. § 40.3.

3

occurrence, or contingency . . . that is . . . beyond the control of the parties to the relevant

contract, agreement, or transaction; and . . . associated with a financial, commercial, or economic

consequence"). Under this special rule, DCMs can still self-certify and immediately begin

offering event contracts, or they can request the CFTC's preapproval. *KalshiEX LLC*, 2024 WL

4164694, at *3; *see also* 17 C.F.R. §§ 40.2, 40.3. But under the special rule, Congress delegated

to the CFTC to determine whether an agreement, contract, transaction, or swap in "excluded

commodities that are based upon the occurrence, extent of an occurrence, or contingency" is

contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i) (footnote omitted). Among the types

of contracts Congress expressly included in this public interest review are contracts that

"involve" terrorism, war, assassination, gaming, and "activity that is unlawful under any Federal

or State law." *Id.* Under the CEA, "[n]o agreement, contract, or transaction determined by the

Commission to be contrary to the public interest under clause (i) may be listed or made available

for clearing or trading on or through a registered entity." 7 U.S.C § 7a-2(c)(5)(C)(ii).

The CFTC subsequently conducted a public interest review under 7 U.S.C. § 7a-

2(c)(5)(C)(i) and adopted a regulation that prohibits DCMs from listing event contracts that

involve, relate to, or reference gaming or an activity that is unlawful under any State or Federal

law. Specifically, 17 C.F.R. § 40.11(a) states:

> (a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:
>
> (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or
>
> (2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the

1    Commission determines, by rule or regulation, to be contrary to the
2    public interest.

3    In addition to this general prohibition on the front end, the CFTC's regulation provides a review

4    process through which it can determine on the back end whether an event contract that was listed

5    despite the prohibition involves a prohibited activity. Under 17 C.F.R. § 40.11(c), the CFTC

6    may determine, based upon a review of the terms or conditions of a submission
     under § 40.2 [(self-certification)] or § 40.3 [(preapproval)], that an agreement,
7    contract, transaction, or swap based on an excluded commodity, as defined in
     Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an
8    activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day
     review.
9

10   The CFTC can approve or disapprove a contract following that review. 17 C.F.R. § 40.11(c)(2).

11       When adopting this regulation, the CFTC acknowledged that "the term 'gaming' requires

12   further clarification and that the term is not susceptible to easy definition." *Provisions Common*

13   *to Registered Entities*, 76 Fed. Reg. 44776, 44785 (July 27, 2011) (to be codified at 17 C.F.R. pt

14   40). The CFTC noted that it had "solicited public comments on the best approach for addressing

15   the potential gaming aspects of some event contracts and the potential pre-emption of state

16   laws." *Id.* (simplified). The CFTC indicated that it would continue to consider comments it

17   received "and may issue a future rulemaking concerning the appropriate regulatory treatment of

18   event contracts, including those involving gaming." *Id.* (simplified). But "[i]n the meantime, the

19   Commission has determined to prohibit contracts based upon the activities enumerated in Section

20   745 of the Dodd-Frank Act[3] and to consider individual product submissions on a case-by-case

21   basis under § 40.2 or § 40.3." *Id.*

22   _____

23   [3] Section 745 of the Dodd-Frank Wall Street Reform and Consumer Protection Act includes the
     special rule for event contracts in excluded commodities enumerated in 7 U.S.C. § 7a-
     2(c)(5)(C)(i). PL 111-203, 124 Stat. 1376 (July 21, 2010).

1    Crypto is a CFTC-registered DCM. ECF No. 15-2 at 3.  On January 30, 2025, Crypto

2  self-certified to the CFTC that it would start offering event contracts based on "live presentation

3  industry events." ECF No. 15-3 at 2-3.  Crypto described the event contracts as swaps. *Id.* at 2, 5.

4  According to Crypto's self-certification, live presentation industry events "not only have an

5  outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder

6  or a winner of a particular live presentation industry event, but more importantly the outcome of

7  a live presentation industry event has a substantial economic and commercial impact on business

8  and individuals . . . ." *Id.* at 3, 5.  The term "industry event" refers to events in the performing

9  arts, spectator sports, and related industries. *Id.* at 5.

10    Crypto advised the CFTC that certain persons were prohibited from trading these event

11  contracts, including the players, coaches, agents, staff, employees, management, and owners, as

12  well as these persons' immediate family and household members. *Id.* at 6.  Crypto identified

13  various financial impacts of live industry events, including advertising, ticket and food sales,

14  employment related to the event, ancillary impacts such as hotel rentals and taxi rides, and tax

15  implications. *Id.* at 8-9.  Crypto asserted that the event contracts are "designed to manage the risk

16  of a variety of market participants, whose business face economic consequences based on the

17  outcome of a respective Industry Event, and to enable price discovery for related commercial

18  enterprises." *Id.* at 9.

19    The CFTC thus far appears not to have acted against Crypto or other DCMs who have

20  offered similar event contracts that are based on the outcome of sporting events.  Instead, various

21  state entities, like the Nevada Gaming Control Board (Board), have attempted to regulate Crypto

22  and other DCMs who are offering sports-based event contracts.  That led Crypto and other

23  DCMs to file suits seeking injunctions against state regulation based on the argument that

1   because they are CFTC-designated exchanges, only the CFTC can regulate them and state laws

2   are preempted.

3            And that is what happened in this case.  On May 20, 2025, the Board sent Crypto a letter

4   stating that the Board was "aware that Crypto.com has been offering, and continues to offer,

5   event-based wagering contracts in Nevada on sporting events on its exchange," and that

6   "offering event-based wagering contracts is unlawful in Nevada, unless and until approved as

7   licensed gaming by the Nevada Gaming Commission." ECF No. 15-4 at 2.  According to the

8   Board, Crypto was operating as an unlicensed sports pool and thereby violating Nevada law,

9   including Nevada criminal law. *Id.* at 3.  The Board stated that if Crypto continued to offer event

10  contracts after receipt of this letter, that conduct would be "considered willful violations of

11  Nevada law." *Id.*

12           Crypto thereafter filed this lawsuit and moved for a preliminary injunction seeking to

13  enjoin the Board and the Nevada Attorney General from pursuing civil and criminal penalties

14  against Crypto.  In another case involving a different DCM, I granted an injunction based on my

15  preliminary conclusion that the Board was likely field preempted from regulating the event

16  contracts offered by that DCM, KalshiEX, LLC (Kalshi). *KalshiEX, LLC v. Hendrick*, No. 2:25-

17  CV-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).  The District of New

18  Jersey reached a similar conclusion. *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS,

19  2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025).  But the District of Maryland concluded the

20  opposite and held that Maryland state gaming laws were not preempted and therefore the

21  Maryland state gaming authorities could regulate event contracts on Kalshi's exchange.

22  *KalshiEX LLC v. Martin*, No. 25-CV-1283-ABA, --- F. Supp. 3d ----, 2025 WL 2194908, at *13

23  (D. Md. Aug. 1, 2025).  Both the District of New Jersey and District of Maryland's orders have

been appealed. *KalshiEX LLC v. Flaherty*, No. 25-1922 (Third Cir.); *KalshiEX LLC v. Martin*, No. 25-1892 (Fourth Cir.).  The Third Circuit heard oral arguments on September 10, 2025, but has not yet issued a decision.  The Fourth Circuit appeal is still in briefing.

Despite my prior ruling in *Hendrick*, I reach a different conclusion in this case.  For the reasons discussed below, I deny Crypto's motion for judgment on the pleadings and for a preliminary injunction.

## II. CRYPTO'S EVENT CONTRACTS BASED ON THE OUTCOME OF LIVE EVENTS ARE NOT SWAPS FALLING WITHIN THE CFTC'S EXCLUSIVE JURISDICTION.

"A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999).  When, as here, the plaintiff moves for judgment on the pleadings, I look to the defendants' allegations in their answer. *See Nat'l Lifeline Ass'n v. Batjer*, No. 21-15969, 2023 WL 1281676, at *2 (9th Cir. Jan. 31, 2023) ("Because [the plaintiff] moved for judgment on the pleadings, this court looks to the allegations in the Defendants' pleadings, here their answer.").

To qualify for a preliminary injunction, a party must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the movant, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, under the sliding scale approach, the plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

1    Under the Supremacy Clause, "state laws that conflict with federal law are without

2  effect," meaning they are preempted by federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76

3  (2008) (simplified).  The "ultimate touchstone" in preemption analysis is congressional purpose.

4  *Id.* (quotation omitted).  "Congress may indicate pre-emptive intent through a statute's express

5  language or through its structure and purpose." *Id.*

6    Absent an express preemption clause, federal law may preempt state law where Congress

7  has occupied the field or where state laws conflict with federal law.  Field preemption occurs

8  when it "can be inferred from a framework of regulation so pervasive that Congress left no room

9  for the States to supplement it or where there is a federal interest so dominant that the federal

10  system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v.*

11  *United States*, 567 U.S. 387, 399 (2012) (simplified).  Conflict preemption occurs when

12  "compliance with both federal and state regulations is a physical impossibility," or "where the

13  challenged state law stands as an obstacle to the accomplishment and execution of the full

14  purposes and objectives of Congress." *Id.* (quotation omitted).  I assume that the States' "historic

15  police powers" are not preempted "unless that was Congress's "clear and manifest purpose." *Id.*

16  at 400.  Regulation of gambling has long been considered to "lie at the heart of the state's police

17  power." *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003)

18  (quotation omitted).

19    I begin with the "plain meaning of [the CEA's] language." *United States v. Lillard*, 935

20  F.3d 827, 833 (9th Cir. 2019).  Title 7 U.S.C. § 2(a)(1)(A) provides:

21    The Commission [CFTC] shall have exclusive jurisdiction . . . with respect to
     accounts, agreements . . ., and transactions involving swaps or contracts of sale of
22    a commodity for future delivery . . ., traded or executed on a contract market
     designated pursuant to section 7 of this title . . . .  Except as hereinabove provided,
23    nothing contained in this section shall (I) supersede or limit the jurisdiction at any
     time conferred on the Securities and Exchange Commission or other regulatory

9

1    authorities under the laws of the United States or of any State, or (II) restrict the
2    Securities and Exchange Commission and such other authorities from carrying out
     their duties and responsibilities in accordance with such laws.  Nothing in this
     section shall supersede or limit the jurisdiction conferred on courts of the United
3    States or any State.

4    As I stated in *Hendrick*, "Section 2's plain and unambiguous language grants the CFTC

5    exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts

6    of sale of a commodity for future delivery that are traded or executed on exchanges that the

7    CFTC has designated under section 7." 2025 WL 1073495, at *5 (internal footnotes omitted).

8    "The second sentence in section 2—which states that nothing in section 2 supersedes 'other

9    regulatory authorities' under state law—does not give states regulatory authority over swaps

10   traded on CFTC-designated exchanges because that language is limited by the phrase '[e]xcept

11   as hereinabove provided.'" *Id.*  "Section 2's first sentence supersedes the SEC and state

12   regulatory authorities' jurisdiction for transactions involving swaps on a CFTC-designated

13   exchange." *Id.*  "The remainder of the second sentence preserves the SEC and states' regulatory

14   authority over exchanges or transactions that are not covered by the CFTC's exclusive

15   jurisdiction." *Id.*  "For example, [state regulators] could pursue an entity that offered sports event

16   contracts that were not listed on a CFTC-designated exchange." *Id.*

17        But to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), the

18   listed item must be a "swap[] or contract[] of sale of a commodity for future delivery . . . traded

19   or executed on" a DCM.  Crypto does not assert that the event contracts at issue are contracts for

20   the sale of a commodity for future delivery.  Rather, Crypto contends that the event contracts

21   qualify as swaps. *See* ECF Nos. 1 at 3; 15-3 at 2, 5.

22        Preliminarily, I have authority to interpret the CEA, including its definition of "swap."

23   Crypto argues that the legislative history shows that Congress intended the CFTC, not courts or

1  state regulators, to decide what is a swap and whether that swap is contrary to the public interest

2  under the special rule. *See* 156 Cong. Rec. S5902-01, S5906 (July 15, 2010) (Sen. Lincoln

3  stating that the "Commission [(CFTC)] needs the power to, and should, prevent derivatives

4  contracts that are contrary to the public interest because they exist predominantly to enable

5  gambling through supposed 'event contracts'"). But the CEA does not expressly delegate to the

6  CFTC the exclusive power to decide what is a swap. *Compare Batterton v. Francis*, 432 U.S.

7  416, 430-31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health,

8  Education, and Welfare the power to define a statutory term through statutory language:

9  "unemployment (as determined in accordance with standards prescribed by the Secretary)"

10  (simplified)), *with* 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over

11  "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract

12  market designated" by the CFTC). "It is emphatically the province and duty of the judicial

13  department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 2 L. Ed. 60 (1803);

14  *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts

15  to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation

16  away from courts. *See* 7 U.S.C. § 2(a)(1)(A) ("Nothing in this section shall supersede or limit the

17  jurisdiction conferred on courts of the United States or any State"). I therefore have the power to

18  interpret the statute. While agency interpretations and fact finding carry weight, I have been

19  presented with no agency fact finding or reasoned interpretation regarding whether these

20  contracts are swaps. *See Loper Bright Enters.*, 603 U.S. at 394, 402. As relevant here, the CEA

21  defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase,

22  sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent

23  of the occurrence of an event or contingency associated with a potential financial, economic, or

1    commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).  The CEA does not define "occurrence" or

2    "event," so I "interpret the words consistent with their ordinary meaning at the time Congress

3    enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (simplified).

4    I may refer to dictionaries from the relevant time to aid in this analysis. *See id.*; *Schindler*

5    *Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011).  However, the fact that "a

6    definition is broad enough to encompass one sense of a word does not establish that the word is

7    ordinarily understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568-69

8    (2012).  Where dictionaries distinguish between the most common usages and rare or obsolete

9    usages, that may suggest that, "although acceptable," the rare or obsolete usages "might not be

10   common or ordinary." *Id.*  "Statutory language, however, cannot be construed in a vacuum.  It is

11   a fundamental canon of statutory construction that the words of a statute must be read in their

12   context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land*

13   *Servs., Inc.*, 566 U.S. 93, 101 (2012) (quotation omitted).

14          Various dictionaries from before the 2010 amendment to the CEA that added swaps to

15   the CFTC's exclusive jurisdiction define "occurrence" as "[s]omething that happens or takes

16   place." Black's Law Dictionary (9th ed. 2009).[4]  Dictionaries define "event" in various ways,

17   including "a happening or occurrence, esp. when important," "a particular contest or item in a

18   program (the pole vault, high jump and other events)," or "any organized activity, celebration,

19   etc. for members of the general public or a particular group." Webster's New College Dictionary

20   _____

21   [4] *See also* Webster's New College Dictionary (2009) (defining occurrence as "the act or fact of
     occurring" or "something that occurs; event; incident"); Random House Dictionary of the

22   English Language (Second ed. 1987) (defining occurrence as "something that happens; event;
     incident"); The American Heritage Dictionary of the English Language (4th ed. 2000) (defining

23   occurrence to mean "[s]omething that takes place"); Merriam-Webster's Collegiate Dictionary
     (11th Ed. 2003) (defining occurrence as "something that occurs; the action or instance of
     occurring").

12

(2009).  Most indicate that an event is an occurrence "of some importance" or similar language.

Random House Dictionary of the English Language (Second ed. 1987).[5]  Although some

dictionaries suggest "event" could mean "outcome,"[6] Webster's and Merriam-Webster's noted

this definition of event is an "archaic" use of the word.  Webster's New College Dictionary

(2009) (definition of event); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003)

(definition of event).

Dictionaries often identify "event" as a synonym for "occurrence," but make distinctions

between the two.  For example, Webster's stated that "occurrence is the general word for

anything that happens or takes place," while "an event is an occurrence of relative significance,

especially one growing out of earlier happenings or conditions." *Id.* (under definition of

---

[5] The American Heritage Dictionary of the English Language (4th ed. 2000) (defining event as "[s]omething that takes place; an occurrence"; a "significant occurrence or happening"; a "social gathering or activity"; the "final result; the outcome"; a "contest or an item in a sports program"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining event as "outcome"; "the final outcome or determination of a legal action"; "a postulated outcome, condition, or eventually (*in the event that* …)"; "something that happens: occurrence"; a "noteworthy happening", a "social occasion or activity", and "any of the contests in a program of sports"); Random House Dictionary of the English Language (Second ed. 1987) ("something that happens or is regarding as happening; an occurrence, esp. one of some importance"; "the outcome, issue, or result of anything: *The venture had no successful event.*"; "something that occurs in a certain place during a particular interval of time"; and "[a]ny of the contests in a program made up of one sport or of a number of sports").  In discussing synonyms for "event," Random House stated that an event "is usually an important happening" whereas an occurrence is "something that happens, often by surprise."  The American Heritage Dictionary likewise distinguished occurrence versus event, stating that "[o]ccurrence and happening are the most general" and "[e]vent usually signifies a notable occurrence." The American Heritage Dictionary of the English Language (4th ed. 2000) (under the definition for occurrence).  And Merriam-Webster's made a similar distinction, stating that an event "usu. implies an occurrence of some importance." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (under the definition of occurrence).

[6] The American Heritage Dictionary of the English Language (4th ed. 2000) (defining event to include the "final result; the outcome"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining event to include "outcome"); Random House Dictionary of the English Language (Second ed. 1987) (defining event to include "the outcome, issue, or result of anything: *The venture had no successful event.*").

1    "occurrence"). Merriam-Webster's stated that an occurrence "may apply to a happening without

2    intent, volition, or plan," while an event "usu. implies an occurrence of some importance."

3    Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (under the definition of

4    "occurrence").[7]

5          Although definitions for both occurrence and event refer to a happening and are often

6    referred to as synonyms, Congress chose different words for occurrence and event in the

7    definition of a swap, and I must ascribe some significance to that decision. *See S.E.C. v.*

8    *McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established canon of statutory

9    interpretation that the use of different words or terms within a statute demonstrates that Congress

10   intended to convey a different meaning for those words."). I thus cannot interpret occurrence

11   and event to both mean anything that happens. The ordinary meaning of the word occurrence is

12   something happened, and that is consistent with the surrounding words of nonoccurrence and

13   extent of the occurrence. Those words mean something happened, did not happen, or happened

14   to an extent. For example, in the context of sports,[8] a boxing match could either take place

15   (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence).

16          The ordinary meaning of event is a happening of some significance that took place or will

17   take place, in a certain location, during a particular interval of time, such as a particular sporting

18

19   [7]  In discussing synonyms for "event," Random House stated that an event "is usually an
     important happening" whereas an occurrence is "something that happens, often by surprise."
20   The American Heritage Dictionary likewise distinguished occurrence versus event, stating that
     "[o]ccurrence and happening are the most general" and "[e]vent usually signifies a notable
21   occurrence." The American Heritage Dictionary of the English Language (4th ed. 2000)
     (definition for occurrence).

22   [8] The definition of a swap was not written specifically for sports. I thus am not interpreting the
     statutory terms solely or primarily as they apply to sports. But sports provide a useful illustration
23   of the terms and are particularly relevant in this case where Crypto is offering sports-based
     contracts.

1  event or an organized activity or celebration for the public or a particular group. And the

2  ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it.

3  Indeed, Webster's notes that equating an event with an outcome or result is an archaic use of the

4  word "event," not the ordinary meaning. An ordinary American interpreting the word "event"

5  would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an

6  outcome of that event, not a separate event in and of itself.[9]

7      Crypto's live presentation industry event contracts are not swaps because, as Crypto self-

8  certified to the CFTC, these contracts turn on the outcome of the live event, not on the

9  "occurrence, nonoccurrence, or the extent of the occurrence" of a live event. *See* ECF Nos. 1 at

10  3-4 ("At issue here are 'Sports Event Contracts,' with return profiles dependent on the outcome

---

[9] At the hearing, Crypto suggested that the outcome of a sporting event could count as a
contingency, even if it is not an event. ECF No. 104 at 50-52. I do not consider this argument
because it was raised for the first time in reply argument at the hearing. I do not definitively
decide in this order what "contingency" in the swap definition means because the parties have
not addressed it. But I at least preliminarily conclude that a contingency does not mean every
potential happening, and every event with a potential outcome is not a contingency. Looking at
the statutory definition of a swap, event and contingency are grouped together and so should be
read in context together. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (stating
that it is a "fundamental canon of statutory construction that the words of a statute must be read
in their context and with a view to their place in the overall statutory scheme" (quotation
omitted)); *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985) ("[I]t is a familiar principle of
statutory construction that words grouped in a list should be given related meaning." (quotation
omitted)). And many dictionaries define contingency to include a contingent event. *See*
Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining contingency to include "a
contingent event or condition"); The American Heritage Dictionary of the English Language (4th
ed. 2000) (defining contingency to include "[a]n event that may occur but that is not likely or
intended; a possibility"); Webster's New College Dictionary (defining contingency to include
"some thing or event which depends on or is incidental to another"); Random House Dictionary
of the English Language (Second ed. 1987) (defining contingency to include "a contingent
event"). Thus, I preliminarily conclude that a contingency in the swap definition means a
contingent event. For example, the Stanley Cup Finals automatically has four games (events)
and may have more games (contingent events) if one team does not win the first four games. So
a contingency would be whether a game 5 of the Stanley Cup Finals will occur, because that is
contingent on who wins the first four games. But a contingency is not who wins that game
because that is an outcome, not a contingency.

of a live sporting event."); 15-3 at 3 (Crypto self-certifying that the event contracts at issue relate to the "impacts of the outcome of an event in the live presentation industry"), 5 (stating that the payment criterion "is determined by the outcome of the Industry Event").  According to Crypto's self-certification, it is not offering event contracts on, for example, whether the Kentucky Derby (the event) will take place (occur, not occur, or extent of occurrence) but on who will win it (the outcome).  Crypto's self-certified contracts therefore are not "swaps" within the CFTC's exclusive jurisdiction.

Crypto's proposed reading of the statute knows no limiting principle because anything could be defined as an event.  Although Crypto argues that Congress intentionally defined swaps broadly, the words Congress chose must have content.  If everything can be defined as an event, the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (A "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (simplified)).  For example, section 1a(47)(iii) includes credit default swaps within the definition of a swap.  A "credit default swap is a bilateral financial contract in which a protection buyer makes periodic payments to the protection seller, in return for a contingent payment if a predefined credit event occurs in the reference credit." *Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 96 (2d Cir. 2007) (quotation omitted).  In other words, a credit default swap is a contract that provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event (a default) associated with a potential financial, economic, or commercial consequence (credit).  Because a credit default swap could fit the definition of a swap in 7 U.S.C.

16

1 | § 1a(47)(A)(ii) the way Crypto reads that section, there would be no need for Congress to define

2 | a swap to include credit default swaps in 7 U.S.C. § 1a(47)(A)(iii).

3 |       Crypto's position, that its live presentation event contracts are swaps, would sweep

4 | nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states

5 | historically have regulated gambling through their police power.  According to Crypto's

6 | arguments and self-certification to the CFTC,[10] nearly every sports bet would be a transaction in

7 | which payment is dependent on the outcome of a sporting event and is associated with a potential

8 | financial, economic, or commercial consequence.[11]  That cannot be a proper reading of the

9 | statute because that would mean that all sports wagering must be done on a DCM, and not at

10 | casinos, as the CEA forbids nearly all swap dealing and trading unless done on a DCM, except

11 | for certain market participants, none of whom are casinos or the average sports bettor.[12]  The

12 | —————————

13 | [10] *See* ECF No. 15-3 at 3, 8-12.

[11] I need not and do not address in this order whether a particular event contract has a potential

14 | financial, economic, or commercial consequence within the CEA's meaning.

15 | [12] *See* 7 U.S.C. § 2(e) ("It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title."); *id.* at § 1a(18)

16 | (defining "eligible contract participant" to include certain financial institutions, insurance companies, investment companies, commodity pools, governmental entities, regulated securities

17 | brokers or dealers, futures commission merchants, regulated floor brokers or traders, and individuals who have millions of dollars invested on a discretionary basis); *id.* at § 6d(a) (making

18 | it unlawful to be a futures commission merchant unless the person is registered with the CFTC); *id.* at § 1a(28)(A)(i)(I)(aa)(CC) (defining futures commission merchant to mean a person or

19 | entity that is "engaged in soliciting or in accepting orders for . . . a swap"); *id.* at § 7b-3(a)(1) ("No person may operate a facility for the trading or processing of swaps unless the facility is

20 | registered as a swap execution facility or as a designated contract market under this section."); *id.* § 6s(a)(1) ("It shall be unlawful for any person to act as a swap dealer unless the person is

21 | registered as a swap dealer with the Commission."); *id.* § 1a(49) (defining a "swap dealer" to mean "any person who . . . holds itself out as a dealer in swaps; . . . makes a market in swaps; . . .

22 | regularly enters into swaps with counterparties as an ordinary course of business for its own account; or . . . engages in any activity causing the person to be commonly known in the trade as

23 | a dealer or market maker in swaps").  The CEA provides exceptions from being a swap dealer for "an insured depository institution . . . to the extent it offers to enter into a swap with a customer in connection with originating a loan with that customer;" a person who "enters into

1  factual distinctions Crypto makes between itself and a typical casino sports book do not

2  distinguish Crypto's event contracts from sports wagers at Nevada casinos when considered

3  under the statutory definition of a swap.  But casinos have openly operated sports books and

4  accepted sports wagers on the outcomes of sporting events in this state and others both before

5  and after the 2010 amendments to the CEA.[13]  And no one, including Congress and the CFTC,

6  has suggested those bets are "swaps" that had to be conducted on a DCM.  At the hearing I held

7  on the pending motions, Crypto stated that the "CFTC has never taken the position and we have

8  never taken the position that all gaming [wagers] are swaps regulated by the CFTC." ECF No.

9  104 at 51.  But Crypto does not explain why that is not the necessary implication of its position.

10  Because if the statutory definition of swaps covers contracts on the outcome of sporting events

11  that have a potential financial or economic consequence, and all swaps must be done a DCM

12  absent exceptions not applicable to casinos and the average sports bettor, then all sports betting

13  must be done on a DCM.

14      Had Congress intended such a sea change in the regulatory landscape, it surely would

15  have said so. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we

16  have held, does not alter the fundamental details of a regulatory scheme in vague terms or

17  ancillary provisions—it does not, one might say, hide elephants in mouseholes.").  The CEA's

18  language and legislative history show that Congress did not intend such a change and, to the

19  contrary, did not want gambling to take place on CFTC-designated exchanges.  As discussed

20  above, Congress enacted the special rule granting the CFTC authority to determine whether

21  _____

22  swaps for such person's own account, either individually or in a fiduciary capacity, but not as a
   part of a regular business;" and persons the CFTC exempts due to their de minimis quantity of
   swap dealing "in connection with transactions with or on behalf of its customers." *Id.*

23  §§ 1a(49)(A), (C), (D).

[13] *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 462 (2018).

1  swaps contracts in excluded commodities are contrary to the public interest. 7 U.S.C. § 7a-

2  2(c)(5)(C)(i). Among the types of contracts that Congress stated can be subject to this public

3  interest review are contracts that "involve . . . gaming." *Id.* § 7a-2(c)(5)(C)(i)(V). And Congress

4  set forth in the CEA that if the CFTC determines that a contract is contrary to the public interest

5  under this rule, then that contract may not be "listed or made available for clearing or trading on

6  or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii); *see also* 7 U.S.C. § 7a-2(c)(5)(B) ("The

7  Commission shall approve a new contract or other instrument unless the Commission finds that

8  the new contract or other instrument would violate this chapter (including regulations)."). The

9  CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R.

10 § 40.11(a), which prohibits DCMs from listing a swap based on an excluded commodity that

11 "involves, relates to, or references . . . gaming," or "an activity that is similar to" gaming. And it

12 provided a mechanism for the CFTC to review and delist a self-certified contract that runs afoul

13 of that prohibition.[14]

14      The CFTC's decision to prohibit DCMs from listing gaming contracts is consistent with

15 congressional intent to "prevent gambling through futures markets." 156 Cong. Rec. S5902-01,

16 S5906 (July 15, 2010) (statement of Sen. Lincoln). Legislators commented specifically on sports

17

---

18 [14] As part of the self-certification process, Crypto had to certify its contracts complied with the
   CEA and CFTC regulations. 17 C.F.R. § 40.2(a)(3)(iv). Although Crypto's certification
19 addressed some of the CFTC's Core Principles, it did not address Core Principle 1. ECF No. 15-
   3 at 17 (deeming it "Not applicable (designation granted)"). Core Principle 1 requires DCMs to
20 comply with "[a]ny requirement that the Commission may impose by rule or regulation pursuant
   to section 8a(5) of the Act." 7 C.F.R. § 38.100(a)(2). Section 8a(5) of the CEA grants the CFTC
21 the authority "to make and promulgate such rules and regulations as, in the judgment of the
   Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any
22 of the purposes of this chapter." 7 U.S.C. § 12a(5); *First Commodity Corp. of Bos. v. Commodity
   Futures Trading Comm'n*, 676 F.2d 1, 5 (1st Cir. 1982). Crypto did not explain in its self-
23 certification how its event contracts based on the outcome of sporting events comply with the
   CFTC's regulation in 17 C.F.R. § 40.11(a) that prohibits DCMs from listing contracts that
   involve, relate to, or reference gaming.

1   wagers on events like the Super Bowl or the Kentucky Derby as the type of "supposed 'event

2   contracts'" that the CFTC had "the power to, and should, prevent . . . because they exist

3   predominantly to enable gambling." *Id.* at S5906-07 ("It would be quite easy to construct an

4   'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and

5   Masters Golf Tournament.  These types of contracts would not serve any real commercial

6   purpose.  Rather, they would be used solely for gambling.").

7        With this congressional intent in mind, the CFTC stated when promulgating its

8   regulations that "the term 'gaming' requires further clarification and that the term is not

9   susceptible to easy definition." *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776,

10   44785 (July 27, 2011) (to be codified at 17 C.F.R. pt 40).  So the CFTC "solicited public

11   comments on the best approach" for addressing the "potential gaming aspects of some event

12   contracts and the potential pre-emption of state laws." *Id.* (quotation omitted).  The CFTC

13   ultimately decided "to prohibit contracts based upon the activities enumerated in [the special

14   rule] and to consider individual product submissions on a case-by-case basis under § 40.2 or

15   § 40.3." *Id.*  The CFTC specifically stated that its "prohibition of certain 'gaming' contracts is

16   consistent with Congress's intent to prevent gambling through the futures markets and to protect

17   the public interest from gaming and other events contracts." *Id.* at 44786 (simplified).

18        "Pre-emption fundamentally is a question of congressional intent." *Eng. v. Gen. Elec.*

19   *Co.*, 496 U.S. 72, 78-79 (1990).  Congress did not intend for gaming to be conducted on DCMs,

20   and it defined swaps and enacted the special rule to achieve this intent.  Thus, based on the

21   statutory language and Congressional intent, Crypto's contracts on the outcome of live events are

22   not "swaps" that fall within the CFTC's exclusive jurisdiction in 7 U.S.C. §2(a)(1)(A).  Crypto's

23   motions for judgment on the pleadings and for a preliminary injunction depend on its argument

that the CFTC has exclusive jurisdiction over its event contracts as swaps on a DCM. Crypto is not likely to prevail on its argument that the CFTC has exclusive jurisdiction over Crypto's event contracts, so I deny its motions for judgment on the pleadings and for a preliminary injunction.

Because Crypto must show that all four *Winter* factors support granting an injunction, I need not address the remaining factors. But given my ruling that Crypto has not shown it is likely to succeed, the analysis of those factors changes from what I determined in *Hendrick*. Allowing Crypto to offer sports wagers guised as swaps on its exchange unfettered by state regulation imposes substantial hardships on the defendants, who are statutorily charged with the "dut[y] to preserve public confidence and trust in licensed gaming." *State Gaming Control Bd. v. Breen*, 661 P.2d 1309, 1310 (Nev. 1983) (citing Nev. Rev. Stat. § 463.0129(1)(c)). And the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges, as that would be contrary to the CEA, congressional intent, CFTC regulations, and Nevada law.

## III. I GRANT IN PART THE MOTION TO STRIKE, WITH LEAVE TO AMEND.

Crypto moves to strike the defendants' affirmative defenses for various reasons, including that they are denials of Crypto's allegations, not affirmative defenses; they either do not apply or fail as a matter of law; or they lack factual support.

Under Rule 12(f), I "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see also Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1089 (9th Cir. 2025). The purpose of a Rule 12(f) motion to strike "is to avoid the expenditure of time and money that must arise from litigating spurious issues." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.

1  1983). I "view the pleading under attack in the light most favorable to the pleader." *Cardinale v.*

2  *La Petite Acad., Inc.*, 207 F. Supp. 2d 1158, 1162 (D. Nev. 2002).

3  **A. I deny the motion to strike the defendants' denials that Crypto is a DCM on**
   **which sports event contracts are listed.**
4

5  Crypto argues that I should strike the defendants' denials in their answer that Crypto is a

6  DCM and that sports contracts are traded on it. Crypto argues that these facts can be verified

7  through its filings with the CFTC and thus are not subject to reasonable dispute. The defendants

8  respond that their denials are not proper subjects for a motion to strike and the way for Crypto to

9  test the defendants' denials is through dispositive motions after discovery. The defendants also

10 argue that they should not have to take Crypto's word for it that it is a DCM properly listing

11 sports event contracts.

12 I deny this portion of Crypto's motion because the defendants' denials are not insufficient

13 defenses, immaterial, or impertinent. Crypto's preemption argument fails if it is not a DCM or

14 did not properly list event contracts subject to the CFTC's exclusive jurisdiction. *See Quintara*

15 *Biosciences*, 149 F.4th at 1089 (explaining that immaterial means the matter "has no essential or

16 important relationship to the claim for relief or the defenses being pleaded," and impertinent

17 means "statements that do not pertain, and are not necessary, to the issues in question"

18 (simplified)). The denials are not redundant or scandalous, and Crypto does not contend that

19 they are. Consequently, I deny this portion of the motion to strike.

20 **B. I deny the motion to strike affirmative defense one.**

21 The defendants' first affirmative defense alleges that Crypto's complaint fails to state a

22 claim. ECF No. 38 at 16. Although failure to state a claim is merely a denial of Crypto's ability

23 to state its claim, Federal Rule of Civil Procedure 12(h)(2)(A) provides that failure to state a

claim may be raised in the answer. I therefore deny the motion to strike this defense.

**C. I deny the motion to strike affirmative defenses two, three, four, and five because the motion seeks to litigate the merits of the defenses rather than to strike them.**

The defendants' second, third, fourth, and fifth affirmative defenses are that Crypto's claims are barred by Eleventh Amendment immunity, official act immunity, discretionary act immunity, and the Tenth Amendment. ECF No. 38 at 16. Crypto relies on my rulings in *Hendrick* to argue that these defenses fail and should be stricken. The defendants respond that *Hendrick* did not resolve the defenses as they may apply in this case and that my order in that case is not final.

I deny the motion to strike. If Crypto wants a ruling on these defenses, it should file a dispositive motion addressing them in the context of this case, rather than moving to strike them.

**D. I strike the affirmative defenses asserting judicial and collateral estoppel because the answer does not give fair notice of the grounds for them.**

The defendants' sixth and seventh affirmative defenses assert that Crypto's claims are barred by judicial and collateral estoppel. *Id.* Crypto argues that it does not have sufficient notice of the factual bases for these defenses. The defendants respond that some courts have held that pleading "estoppel" alone is sufficient to provide fair notice.

An affirmative defense is sufficiently pleaded if it gives the plaintiff fair notice of the nature of the defense. *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010). The fair notice standard "only requires describing the defense in general terms." *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015) (quotation omitted). It does not "require a detailed statement of facts." *Vanguard Dealer Servs., LLC v. Cervantes*, No. 2:21-cv-01121-JAD-EJY, 2023 WL 3852404, at *3 (D. Nev. June 6, 2023) (quotation omitted). For example, the Ninth Circuit held that a plaintiff received fair notice of the nature of a statute of limitations defense because the amended answer stated only that the "plaintiff's claims are barred by the

23

1  applicable statute of limitations," but the defendant attached a memorandum of points and

2  authorities that mentioned the specific statutory section on which the defendant relied. *Wyshak v.*

3  *City Nat. Bank*, 607 F.2d 824, 827 (9th Cir. 1979); *see also Kohler*, 779 F.3d at 1019 (declining

4  to "disturb the district court's finding" that an answer gave fair notice of a defense that the store

5  gave "substantially equivalent" access to the disabled plaintiff where the answer stated that the

6  defendant complied with the Americans with Disabilities Act (ADA) by having "alternate

7  methods of accessibility" even though alternative methods of accessibility "stem[s] from a

8  distinct portion of the ADA apart from the equivalent facilitation" (quotation omitted)).

9       Here, the defendants' answer gives no hint as to how either doctrine would apply to

10  Crypto.  Although the defendants need not give a detailed statement of facts to support their

11  invocation of these defenses, they must at least give fair notice of the grounds for them.  Because

12  they have not done so, I strike the judicial and collateral estoppel defenses.  But I grant the

13  defendants leave to amend. *See* Fed. R. Civ. P. 15(a)(2) (stating that "[t]he court should freely

14  give leave [to amend] when justice so requires").

15      **E.  I strike the unclean hands affirmative defense because the answer does not give**
16      **fair notice of the grounds for it.**

17       The defendants' eighth affirmative defense is that Crypto's claims are barred by the

18  unclean hands doctrine. ECF No. 38 at 16.  Crypto argues that this defense does not give fair

19  notice of the grounds for asserting it.  And it contends that even if the defense was adequately

20  pleaded, the doctrine should not apply because enjoining the defendants from prosecuting Crypto

21  serves the public interest where state law is preempted.  The defendants respond that whether

22  Crypto's alleged unclean hands prevents it from obtaining injunctive relief is a disputed question

23  that cannot be resolved through a motion to strike.

1    I grant the motion to strike this defense because, like the defendants' estoppel defenses,

2    the answer gives no indication how the defense applies to Crypto in this case.  But I grant leave

3    to amend because the defendants may be able to properly plead this defense.  Crypto's argument

4    that enjoining the defendants from prosecuting Crypto serves the public interest is a merits

5    argument that is based on disputed questions of fact and law, so I do not address it in ruling on a

6    motion to strike.

7       **F.  I grant in part the motion to strike affirmative defenses nine, eleven, twelve, and**
        **thirteen and construe them as denials of Crypto's claims rather than affirmative**
8       **defenses.**

9       The defendants' ninth affirmative defense asserts that Crypto cannot show irreparable

10   harm. ECF No. 38 at 16.  Their eleventh, twelfth, and thirteenth defenses assert that Congress did

11   not intend the CEA to preempt state gaming laws, the Nevada gaming laws do not conflict with

12   the CEA, and there is a presumption against preemption in areas of traditional state regulation.

13   *Id.* at 16-17.

14      Crypto argues that I should strike these defenses because they are mere denials of

15   Crypto's allegations, not affirmative defenses.  The defendants respond that this is not a basis to

16   strike the defenses and Crypto does not identify any prejudice from being required to respond.

17      I agree with Crypto that these are denials, not affirmative defenses.  But I do not strike

18   them.  Instead, I construe them as denials.

19      **G.  I grant the motion to strike the tenth affirmative defense because, although**
        **Crypto's conduct may bear on the balance of the equities in Crypto's request for**
20      **injunctive relief, the defense has no factual content.**

21      The defendants' tenth affirmative defense is that Crypto failed to mitigate any alleged

22   harm. ECF No. 38 at 16.  Crypto contends this defense does not apply because Crypto is not

23

1  seeking money damages so it had no duty to mitigate.  The defendants respond that Crypto's

2  conduct bears on whether it is entitled to injunctive relief.

3      The defendants have clarified that this defense refers to Crypto's conduct and how that

4  may impact the balance of the equities in determining whether an injunction is appropriate.  But

5  like some of the defendants' other defenses, it has no factual content to give Crypto fair notice of

6  the defense.  Indeed, Crypto assumed it was a defense based on the failure to mitigate damages,

7  which does not apply in this case where Crypto seeks only injunctive relief.  I therefore strike it,

8  with leave to amend.

9

10  **H.  I strike the fourteenth affirmative defense because the defendants acknowledge it is moot.**

11      The defendants' fourteenth affirmative defense asserts any affirmative defense advanced

12  by the intervenors in this case.  ECF No. 38 at 17.  The defendants concede this defense is moot

13  because intervenor Nevada Resort Association has not pleaded any additional defenses.  *See* ECF

14  Nos. 50-2; 64 at 4.  I therefore strike this defense.

15  **I.  I grant the motion to strike the fifteenth defense that seeks to incorporate all affirmative defenses enumerated in Federal Rule of Civil Procedure 8 because it is conclusory and seeks to incorporate defenses that plainly do not apply.**

16

17      The defendants' fifteenth affirmative defense seeks to assert "the affirmative defenses

18  enumerated in Rule 8 of the Federal Rules of Civil Procedure." ECF No. 38 at 17.  Crypto argues

19  this defense does not give fair notice and seeks to incorporate defenses that do not apply in this

20  case.  The defendants argue that Crypto has not shown that this defense causes it any prejudice.

21      I strike this affirmative defense because it improperly seeks to incorporate every defense

22  in Rule 8(c) with no factual basis.  That does not give fair notice.  If this were proper, all any

23  defendant would have to do is state that they assert every possible affirmative defense and call it

a day.  The defendants do not attempt to explain how several of the defenses in Rule 8 could

even apply in this situation, such as accord and satisfaction, arbitration and award, or statute of

frauds. *See* Fed. R. Civ. P. 8(c).  Crypto should not have to guess which of these 18 defenses the

defendants are asserting or the grounds for asserting them.  I therefore strike this defense, with

leave to amend.

## IV.  CONCLUSION

I THEREFORE ORDER that North American Derivative Exchange, Inc.'s motion for a

preliminary injunction **(ECF No. 15) is DENIED**.

I FURTHER ORDER that North American Derivative Exchange, Inc.'s motion for

judgment on the pleadings **(ECF No. 42) is DENIED**.

I FURTHER ORDER that North American Derivative Exchange, Inc.'s motion to strike

**(ECF No. 43) is GRANTED in part** as set forth in this order.

I FURTHER ORDER that the defendants may file an amended answer by November 4,

2025.

I FURTHER ORDER that the motion for leave to file an amicus brief **(ECF No. 74) is**

**GRANTED**.

I FURTHER ORDER the clerk of court to substitute as a defendant the current chairman

of the Nevada Gaming Control Board, Mike Dreitzer, for former chairman Kirk Hendrick under

Federal Rule of Civil Procedure 25(d).

DATED this 14th day of October, 2025.

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE