

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
OFFICE OF THE SOLICITOR GENERAL
PO BOX 080
TRENTON, NJ  08625-0080

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

JEREMY M. FEIGENBAUM
*Solicitor General*

November 26, 2025

**<u>VIA ECF</u>**

Patricia S. Dodszuweit, Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

> Re:  ***KalshiEx LLC v. Mary Jo Flaherty, et al.***, No. 25-1922
> **FRAP 28(j) Letter**

Dear Ms. Dodszuweit:

Appellants write to advise of *KalshiEx v. Hendrick*, No. 2:25-cv-0575 (D. Nev. Nov. 25, 2025). There, the District of Nevada—which originally enjoined enforcement of state gambling laws against Kalshi—dissolved its injunction. That makes the district court here the only court in the country to accept Kalshi's attempted federalization of the multi-billion-dollar gaming industry.

Reaffirming its ruling in *Crypto* (ECF No.84), the *Henrick* court again held that Kalshi's sports bets are not "swaps" under the Commodity Exchange Act. Op.11. But the court went further. Expressly adopting Appellants' argument here (Br.22–26; Reply 6–7), the court held that "the phrase 'associated with a potential financial, economic, or commercial consequence'" in the Act's definition of "swap" means "that the event or contingency must be inherently associated with a



HUGHES JUSTICE COMPLEX · TELEPHONE: (609)292-4925: FAX: (609)292-3508
*New Jersey is an Equal Opportunity Employer · Printed on Recycled Paper and Recyclable*

potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence." Op.14. So Kalshi's theory that its sports bets are swaps "based on their impact on downstream externalities like hotel room rentals, food sales, [and] advertising dollars" does not work. Op.12.

That is "supported by the surrounding statutory text, legislative context, the CFTC's post-enactment guidance, and federalism principles." Op.13. As Appellants explained (Br.23), the "other subparts of the 'swap' definition in § 1a(47)(A) refer almost exclusively to financial measures, indices, or instruments." Op.13. "This is consistent with the congressional purposes behind the Dodd-Frank" reforms, which were aimed "at systemic risks in the financial sector that undermined U.S. financial stability." Op.15. And it is "further supported by the CFTC's rulemaking after Congress added swaps to the" Act. *Id.*

In stark contrast, Kalshi's reading "has no limiting principle." Op.19. Not only does it criminalize all sports betting outside CFTC-regulated exchanges, but it "upends" the "traditional balance between state and federal regulation of gaming" with "no expressed congressional intent to do so, with no federal gaming regulator to replace the states' regulatory infrastructures, and contrary to the expressed congressional intent that CFTC exchanges should not become sports gambling venues." Op.16–17. As *Hendrick* confirms, Kalshi's "sports-related event contracts" are "sports wagers and everyone who sees them knows it." Op.16.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    */s/ Liza B. Fleming*
Liza B. Fleming
Deputy Attorney General

cc: All counsel (via ECF)
Word Count: 350



# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC,<br><br>    Plaintiff<br><br>v.<br><br>KIRK D. HENDRICK, et al.,<br><br>    Defendants | Case No.: 2:25-cv-00575-APG-BNW<br><br>**Order Granting Motion to Dissolve Preliminary Injunction**<br><br>[ECF No. 142] |

KalshiEX, LLC is registered with the Commodity Futures Trading Commission (CFTC) as a designated contract market (DCM). Kalshi has established a market for sports betting. Kalshi advertised that it is the "first app for legal sports betting in all 50 states." But Kalshi is not licensed to conduct gaming in Nevada or any other state. So the Nevada gaming regulators sent it a cease-and-desist letter. Kalshi now contends that it is not taking sports bets and, even if it were, no state can regulate it because it is a DCM under the CFTC's exclusive jurisdiction. Kalshi relies on a strained reading of the already convoluted Commodities Exchange Act (CEA) in an attempt to evade state regulation. Kalshi's interpretation would require all sports betting across the country to come within the jurisdiction of the CFTC rather than the states and Indian tribes. That interpretation upsets decades of federalism regarding gaming regulation, is contrary to Congress' intent behind the CEA, and cannot be sustained.

# I. PROCEDURAL POSTURE

In January 2025, Kalshi started listing sports-related event contracts on its exchange. The Nevada Gaming Control Board sent Kalshi a cease-and-desist letter stating that Kalshi was operating an unlicensed sports pool in violation of Nevada gaming law. Kalshi filed this lawsuit against the Board and its members in their official capacities, the Nevada Gaming Commission

1    and its members in their official capacities, and the Nevada Attorney General (collectively, the

2    Board) seeking declaratory and injunctive relief.  Kalshi asserted that the CFTC has exclusive

3    jurisdiction over the contracts traded on Kalshi's exchange, so the Board cannot enforce Nevada

4    state law against Kalshi.

5        Kalshi moved for a preliminary injunction to preclude the Board from pursuing Kalshi

6    for civil or criminal penalties under Nevada law based on Kalshi offering sports-related event

7    contracts on its exchange.  I granted that motion, concluding that the CFTC had exclusive

8    jurisdiction over contracts listed on a DCM, so Nevada state gaming law was preempted. ECF

9    No. 45.

10       After my preliminary injunction ruling, the District of New Jersey granted Kalshi's

11   motion for an injunction in a similar suit. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-

12   MJS, 2025 WL 1218313, at *4-7 (D.N.J. Apr. 28, 2025).  The New Jersey state regulatory

13   authorities appealed, and the Third Circuit heard oral arguments on September 10, 2025. Third

14   Cir. Case No. 25-1922.  The Third Circuit has yet to issue a decision.

15       Meanwhile, the United States District Court for the District of Maryland denied Kalshi an

16   injunction in similar litigation in that court, ruling that Maryland state gaming authorities were

17   not preempted from regulating Kalshi's sports-related event contracts. *KalshiEX LLC v. Martin*,

18   No. 25-cv-1283-ABA, 2025 WL 2194908, at *1, 5-13 (D. Md. Aug. 1, 2025).  Kalshi appealed

19   to the Fourth Circuit, where briefing is ongoing. Fourth Cir. Case No. 25-1892.

20       Then in October 2025, I denied an injunction in a similar case, *North American*

21   *Derivatives Exchange, Inc., d/b/a Crypto.com v. Nevada Gaming Control Board* (the *Crypto*

22   case).  In *Crypto*, I ruled that event contracts that turn on the outcomes of sporting events are not

23

2

swaps and thus do not fall within the CFTC's exclusive jurisdiction. Case No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *11 (D. Nev. Oct. 14, 2025).

Within days of my *Crypto* ruling, the Board moved to dissolve the preliminary injunction in this case, asserting that I should reach the same conclusion as I did in *Crypto*. ECF No. 142. Kalshi opposes, arguing that the Board has not set forth an adequate basis to seek dissolution and, in any event, I erred in *Crypto* and so I should not dissolve the injunction. On November 14, 2025, I held a hearing in this case jointly with a related case, *Robinhood Derivatives, LLC v. Dreitzer*, Case No. 2:25-cv-1541-APG-DJA (the *Robinhood* case). ECF Nos. 219; 220. For the reasons set forth below, I grant the motion to dissolve the preliminary injunction.

## II. THE BOARD HAS PRESENTED NEW LAW AND FACTS TO SUPPORT CONSIDERING DISSOLUTION.

Kalshi argues that I should not revisit my preliminary injunction ruling because the Board has not identified a significant change in the facts or the law. The Board responds that the District of Maryland's ruling and my *Crypto* decision are new law. The Board also contends that the subject matter of numerous event contracts Kalshi has offered since I entered my injunction constitute new facts.

A party seeking to modify or dissolve an injunction "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quotation omitted). Here, the Board identified new law, both in the form of my *Crypto* order and the District of Maryland's order in *KalshiEX LLC v. Martin*. The Board also identified new facts. Since my preliminary injunction order, Kalshi has issued a range of new contracts that potentially are contrary to what Kalshi told me at the preliminary injunction hearing likely would not count as swaps because they have no real-

3

world economic consequence, such as prop bets on things like whether a team will score a touchdown in a certain part of a game or the point total over/under on a game. *See* ECF Nos. 46 at 7-8; 143-2 at 5-6. Further, under Federal Rule of Civil Procedure 54(b), I can modify an interlocutory order "at any time" before entry of a final judgment. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quotation omitted).

This is a novel and evolving area of the law, and the nuances of the parties' positions have changed as new arguments, facts, and law develop. My preliminary injunction order was issued very early in this litigation on an accelerated schedule. The law and facts have evolved in this court and others. The circumstances may change yet again when the Third and Fourth Circuits rule on the appeals pending in those courts, or when the Ninth Circuit rules on the inevitable appeal of my rulings in *Crypto*, this case, and *Robinhood*. Additionally, it would be unfair for me to not consider dissolving the injunction given that I denied an injunction under similar circumstances for one of Kalshi's competitors in *Crypto*. So, I reject Kalshi's procedural arguments, and I will consider the motion to dissolve the preliminary injunction on the merits.

## III. I GRANT THE BOARD'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION.

The Board argues I should dissolve the injunction because Kalshi's sports-related event contracts do not fall within the statutory provision Kalshi relies on to invoke the CFTC's exclusive jurisdiction. The Board also argues that the CFTC's jurisdiction is not exclusive in any event. Further, the parties dispute whether the balance of hardships and the public interest weigh for or against an injunction.

The inquiry into whether to dissolve an injunction is "guided by the same criteria that govern the issuance of a preliminary injunction." *Karnoski*, 926 F.3d at 1198. To qualify for a

4

preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, under the sliding scale approach, a plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  But where a party seeks to dissolve an injunction, "the burden with respect to these criteria is on the party seeking dissolution." *Karnoski*, 926 F.3d at 1198.

I dissolve the injunction because the Board has shown that Kalshi is not likely to succeed on the merits, although there are serious questions on the merits.  The Board also has shown that the balance of hardships does not tip sharply in Kalshi's favor.  Rather, the balance of hardships tips in favor of the Board, and the public interest favors dissolving the injunction.

## IV.  KALSHI IS NOT LIKELY TO SUCCED ON THE MERITS, BUT THERE ARE SERIOUS QUESTIONS ON THE MERITS.

As I ruled in *Crypto*, event contracts that turn on the outcomes of sporting events are not swaps and thus do not fall within the CFTC's exclusive jurisdiction. 2025 WL 2916151, at *11. I adopt in full my analysis in *Crypto*, so I give only a summary here.  In brief, I ruled in *Crypto* that similar event contracts based on the outcome of live events are not "swaps" within the meaning of the Commodity Exchange Act (CEA), and thus do not fall within the CFTC's exclusive jurisdiction in 7 U.S.C. § 2(a). *Id.* at *6-11.  First, I have authority to construe the CEA to determine what falls within that jurisdictional provision, such as what constitutes a "swap." *Id.* Second, I interpreted the relevant provision of the CEA's definition of a swap related to event

5

contracts.  That provision states that a swap is "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).  I interpreted the word "occurrence" to mean something happened. *Id.* at 8.  I interpreted the word "event" to mean "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.*  I rejected the proposed definition that an "event" can be an "outcome," and in the specific context of sports, I ruled that the "event" would be "the sporting event itself, not who wins it." *Id.* ("An ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event.  But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself.").

Kalshi raises several arguments as to why I should not evaluate whether Kalshi's contracts qualify as swaps, why it believes I erred in *Crypto*, and why I should consider other parts of the CEA to conclude that Kalshi's sports-based event contracts fall within the CFTC's exclusive jurisdiction.  I address each in turn.

**A.  The Administrative Procedure Act is not the Board's only avenue to litigate whether Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction.**

Kalshi argues that the only mechanism for the Board to challenge the CFTC's action or inaction in relation to the listing of event contracts on a CFTC-designated exchange like Kalshi's is through a claim under the Administrative Procedures Act (APA).  The Board responds that courts routinely review statutory language to conduct a preemption analysis without requiring that be done through an APA claim.  They also argue that an APA claim requires final agency

action, and the CFTC has not taken final agency action with respect to the event contracts that

Kalshi and other exchanges have been listing.

Under the APA, "[a]gency action made reviewable by statute and final agency action for

which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C.

§ 704; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024)

("Unless another statute makes the agency's action reviewable . . ., judicial review is available

only for final agency action." (quotation omitted)); *Prutehi Litekyan: Save Ritidian v. United

States Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025) (stating the APA "limits review to

final agency action" (quotation omitted)).  No one has pointed to anything in the CEA that makes

the CFTC's action or inaction on a listed contract subject to judicial review.  And the CFTC has

recently made clear that it has taken no final, definitive position on these contracts. CFTC Letter

No. 25-36 (Sept. 30, 2025).  The CFTC indicated that it is aware of the controversy surrounding

these event contracts, including the various related lawsuits. *Id.* at 1-2.  In footnote 4 of that

letter, the CFTC stated that it "has not, to date, been requested to take or taken any official action

to approve the listing for trading of sports-related event contracts on any DCM . . . . *Id.* at 2 n.4.

The CFTC also stated:

> All sports-related event contracts that are currently listed for trading on DCMs
> have been listed pursuant to self-certifications filed by the relevant DCM . . . and
> the Commission has not, to date, made a determination regarding whether any
> such contracts involve an activity enumerated or prohibited under . . . 7 U.S.C.
> § 7a-2(c)(5)(C)(i) or Commission regulation 40.11(a), 17 CFR 40.11(a).

*Id.*  Consequently, there has been no final agency action so the APA provides no avenue for

relief.

Nor is the CFTC's inaction on these contracts a basis to channel a suit solely through the

APA.  Where a person sues over an agency's failure to act, "the APA expressly authorizes a

7

1  court to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Plaskett v.*

2  *Wormuth*, 18 F.4th 1072, 1081 (9th Cir. 2021) (quoting 5 U.S.C. § 706(1)).  A "claim under

3  § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency

4  action that it is required to take." *Id.* (quoting *Norton v. Southern Utah Wilderness All.*, 542 U.S.

5  55, 63-64 (2004)).  But here, the CEA does not require the CFTC to act on self-certifications. *See*

6  7 U.S.C. § 7a-2(c)(1).  Rather, the self-certified contracts go forward unless the CFTC acts to

7  prohibit them. *See id.*  Alternatively, the registered entity can ask the CFTC for pre-approval or

8  the CFTC can initiate a review. *See id.* §§ 7a-2(c)(5)(B), (c)(5)(C).  That is consistent with the

9  CFTC's letter indicating that it has not acted to approve or disapprove any of the self-certified

10  contracts because nothing in the CEA requires it to do so.

11  　　　　Kalshi relies on *Big Lagoon Rancheria v. California* to argue that the Board must file suit

12  under the APA and not "use a collateral proceeding to end-run the procedural requirements

13  governing appeals of administrative decisions." 789 F.3d 947, 953-54 (9th Cir. 2015) (en banc)

14  (quotation omitted).  But in *Big Lagoon*, the federal Bureau of Indian Affairs, had made final

15  decisions to take land into trust for an Indian tribe and to include a tribe on a list of recognized

16  Indian tribes. *Id.* at 950-51.  The Ninth Circuit held that challenges to the Bureau of Indian

17  Affairs' decisions to take land into trust and to recognize an Indian tribe are "garden-variety"

18  APA claims that must be brought under the APA and not as a defense in a separate case. *Id.* at

19  953-54 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.

20  209, 220 (2012)).  Here, the CFTC has not made a final decision regarding Kalshi's listing of

21  sports-related event contracts, nor was it required to do so.  Challenging the CFTC's inaction

22  under these circumstances is not "a garden-variety APA claim." *Big Lagoon*, 789 F.3d at 953

23

8

(quotation omitted).  Therefore, *Big Lagoon* is distinguishable and does not prohibit the Board's action where the relevant federal agency has not and is not required to have taken final action.

Further, regardless of whether the CFTC took final action, I disagree that the Board's only route for relief is through the APA.  Concluding that a defense to Kalshi's preemption argument must be brought solely through the APA puts the cart before the horse.  To decide if something falls within the CFTC's jurisdiction to potentially preempt state law, courts must interpret the CEA because the CEA specifically defines that jurisdiction.  Additionally, Congress, through the CEA, defined what is a swap, and nothing in the CEA gives the CFTC the exclusive power to interpret the statutory language defining words like "swap." *See Crypto*, 2025 WL 2916151, at *6, 11.

Kalshi (and Robinhood in the related case) assert that the CEA expressly delegates to the CFTC the exclusive power to decide whether products listed on a DCM qualify as swaps or other regulated derivatives.  They contend the CEA does so through the provisions that delegate to the CFTC the authority to oversee the listing of new contracts, including through the self-certification process.  They note that under 7 U.S.C. § 7a-2(c)(5)(B), Congress directed that the CFTC "shall approve a new contract . . . unless the [CFTC] finds that the new contract . . . would violate [the CEA or the CFTC's regulations]."  But that speaks to what the CFTC must do, not what a court can or must do.  It also refers to the CFTC's "approval" of a contract, not the CFTC's inaction on a self-certification.  A registered entity can seek the CFTC's prior approval of a contract, and the CFTC can conduct a post-listing review. *See* 7 U.S.C. §§ 7a-2(c)(4), (c)(5)(C).  Thus, § 7a-2(c)(5)(B) provides that if the CFTC reviews a listing, either pre- or post-listing, it must approve the contract unless it finds the listing violates the CEA or CFTC regulations.

That does not explicitly confine all statutory interpretations of the CEA's language, including its definition of a word like "swap," to the CFTC with no room for court interpretation except through an APA action.  For example, if a DCM chose to run on its exchange an auction for real property it had no authority to auction off, no one would conclude that is a swap or a commodity within the CEA's meaning.  Yet according to Kalshi, a DCM could run the auction, hope the CFTC does not notice, and no one else could do anything about it except file an APA suit against the CFTC (not against the DCM) even though an auction of real property plainly does not fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a).  I disagree.  A DCM cannot insulate itself from state regulation through self-certification where its conduct does not fall within the CFTC's exclusive jurisdiction provision.

Kalshi brought this suit to obtain injunctive relief, arguing that state law is preempted. Courts routinely evaluate statutory language to determine whether state law is preempted and the scope of any preemption. *See, e.g.*, *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (examining "arguments about the [Atomic Energy Act's] preemptive effect much as [the Court] would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation"); *Wyeth v. Levine*, 555 U.S. 555, 566-81 (2009); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443-44 (2005) ("That [a preemption clause in a federal statute] may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the scope of that pre-emption.").  I therefore reaffirm my position in *Crypto* that in evaluating Kalshi's preemption arguments and the Board's defenses against preemption, I can interpret the statutory language to determine what falls within the CFTC's jurisdiction in the first place.

That does not mean, as Robinhood argues in the related case, that the CFTC cannot regulate the listing of event contracts on DCMs if those contracts do not meet the statutory definition of the word "swap."  Under 7 U.S.C. § 7(d)(1), to "be designated, and maintain a designation, as a contract market," a DCM must comply with the CEA and CFTC regulations. The CFTC thus can regulate a DCM under § 7(d)(1), even if it does not have exclusive jurisdiction under § 2(a).

**B.  Kalshi is not likely to succeed in showing that its sports-related contracts are swaps.**

As relevant here, the CEA defines a "swap" as an "agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C.A. § 1a(47)(A)(ii).  I reaffirm my holding in *Crypto* that the word "event" in this definition means "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group," and does not mean an outcome. 2025 WL 2916151, at *8.  And I adopt my preliminary conclusion in *Crypto* that "contingency" means a contingent event. *Id.* at *8 n.9.  And like the contracts in *Crypto*, Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event.  Thus, they are not swaps within the CEA's meaning.

In my *Crypto* order, I did not address the part of the swap definition that the event or contingency must be "associated with a potential financial, economic, or commercial consequence." *Id.* at *9, n.11.  I do so now.

11

At the November 14, 2025 hearing before me, Kalshi argued that this language means "the event itself has to have potential financial, commercial, or economic consequence. It can't be an event that makes another financially consequential event more or less likely to occur." ECF No. 219 at 19. But by Kalshi's own argument, financial consequences of games based on their impact on downstream externalities like hotel room rentals, food sales, advertising dollars, or the fact that people bet on it cannot suffice because a game only makes room rentals, food sales, advertising, or bets more or less likely to occur. Later in the hearing, Kalshi argued that the potential financial consequences must be "extrinsic to the parties to the contract." *Id.* at 42. That would include anything imaginable about a potential downstream financial consequence, including that two other people who are not parties to the contract might bet on it.

Just like Kalshi's interpretation of the other words in the statute, its interpretation of potential financial consequences knows no limiting principle. Congress did not define a swap as a contract on anything that happens or could happen. So interpreting the statutory terms to include everything anyone can conjure up as a subject to bet on, or that might have some conceivable financial consequence if one is creative enough, is not a reasonable interpretation of the statute.

Like the words "event" and "contingency," I must give these words a reasonable and coherent meaning within the statutory context that does not lead to absurdities. I conclude that the phrase "associated with a potential financial, economic, or commercial consequence" means that the event or contingency is itself inherently joined or connected[1] with a potential financial,

_____

[1] The parties in *Robinhood* agree that "associated with" means joined or connected to, although they dispute what that means in terms of the degree of association between the event or contingency and the financial consequences called for in the statute. *See* 2:25-cv-01541-APG-DJA, ECF Nos. 25 at 9-10; 47 at 4. Kalshi did not specifically define "associated with," but like

economic, or commercial consequence.  This means that the event or contingency itself has some

potential financial, economic, or commercial consequence without looking at externalities like

potential downstream financial consequences such as parties extrinsic to the event betting on it.

And it does not include consumer transactions that have not historically been known to be swaps,

such as sports wagers.

My interpretation is supported by the surrounding statutory text, legislative context, the

CFTC's post-enactment guidance, and federalism principles.  The other subparts of the "swap"

definition in § 1a(47)(A) refer almost exclusively to financial measures, indices, or instruments.

Subpart (i) refers to a transaction that is "for the purchase or sale, or based on the value, of 1 or

more interest or other rates, currencies, commodities, securities, instruments of indebtedness,

indices, quantitative measures, or other financial or economic interests or property of any kind."

Subpart (iii) similarly refers to the "exchange . . . of 1 or more payments based on the value or

level of 1 or more interest or other rates, currencies, commodities, securities, instruments of

indebtedness, indices, quantitative measures, or other financial or economic interests or property

of any kind . . . ."[2]  The fourth subpart refers to a contract "that is, or in the future becomes,

commonly known to the trade as a swap."  The fifth part refers to a "security-based swap

agreement" that has "a material term . . . based on the price, yield, value, or volatility of any

---

Robinhood, it argues for an expansive understanding of the overall phrase to mean essentially
any potential financial consequence from the event.

[2] Subpart (iii) also identifies "commonly known" transactions of this sort, such as interest rate
swaps, foreign exchange swaps, and the like.  Admittedly, a few of the specifically identified
swaps in subpart (iii) do not directly reference a financial instrument or measure, such as a
weather swap or an emissions swap.  But Congress could have concluded that such swaps are so
closely related to financial consequences or were already so commonly traded as swaps as to
include them within the definition.  Additionally, weather (and its impacts on agriculture, among
other things) and emissions are linked to the national interest in a way that the outcome of a
sporting event or how many points a particular team scores are not.

security . . . ."  Finally, the sixth part covers any contract "that is any combination or permutation" of contracts in the other five parts. *See also* 17 C.F.R. § 1.3 (defining swap to have the meaning set forth in the CEA and including "particular products" like cross-currency swaps, currency options, and foreign exchange rate agreements).  Reading subpart (ii) in context of the surrounding subparts supports the conclusion that "associated with a potential financial, economic, or commercial consequence" means that the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (referring to the principal that "a word is known by the company it keeps . . . to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (simplified); *Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").  Thus, externalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient.[3]

---

[3] In litigation between Kalshi and the CFTC, Kalshi distinguished election contracts from those involving gaming by stating that games and events like horse racing or boxing matches "are staged purely for entertainment and to facilitate betting.  They have no independent significance; their outcomes carry no economic risks." *KalshiEX, LLC v CFTC*, ECF No. 17-1 at 40 (D.D.C. 1/25/2024) (the *D.C. Kalshi* case).  Kalshi also stated at oral argument in front of the D.C. district court that a game has "no inherent economic significance. . . .  Contracts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them.  But again, what's tying that together is the existence of the game because the game is the thing that doesn't have intrinsic economic significance." ECF No. 40 at 15.  Kalshi reiterated this position to the D.C. Circuit, arguing that "a game doesn't have economic consequences outside of the game itself." D.C. Cir. Case No. 24-5205, Stay OA Tr. at 63:14-15.

Kalshi also told me at the April 8, 2025 TRO hearing that a coin flip would not be a swap because it does "not have independent real-world consequences" and that would not change just because people bet on it. ECF No. 46 at 7.  Kalshi has changed its tune and now self-certifies to

This is consistent with the congressional purposes behind the Dodd-Frank Wall Street Reform and Consumer Protection Act that added swaps to the CEA. Pub. L. No. 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank"). Dodd-Frank was a "direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. 111-176, 2, 29-30 (Apr. 30, 2010).[4] A "major contributor to the financial crisis was the unregulated over-the-counter ("OTC") derivatives market" that was "explicitly exempted" from the CFTC's jurisdiction and posed a "systemic threat" to the U.S. economy. *Id.* Congress thus aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability, and the Act's language should be interpreted through that lens.

This view is further supported by the CFTC's rulemaking after Congress added swaps to the CEA. The CFTC determined that certain consumer agreements, contracts, and transactions would not be considered swaps "when entered into by consumers . . . primarily for personal, family, or household purposes."[5] *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208-01, 48246, 2012 WL 3257776 (Aug. 13, 2012). The CFTC stated that in determining whether consumer transactions are swaps, it would consider factors such as whether the contracts at issue (1) "do not contain payment obligations, whether or not contingent, that are severable from the agreement, contract, or transaction"; (2) "are not traded

---

the CFTC that not only a game but things that happen during a game have potential financial consequences. *See, e.g.*, ECF No. 152-8 at 2, 14.

[4] Dodd-Frank is another name for The Restoring American Financial Stability Act of 2010. *See Laborers' Loc. v. Intersil*, 868 F. Supp. 2d 838, 848 (N.D. Cal. 2012).

[5] The CFTC did not specifically identify sports wagers as consumer contracts that are not swaps, but that may be explained by the fact that the CFTC had already issued its regulation at 17 C.F.R. § 40.11(a) that prohibits DCMs from listing contracts involving gaming. *See Provisions Common to Registered Entities*, 76 FR 44776-01, 44785, 2011 WL 3099850 (July 27, 2011).

on an organized market or over-the-counter"; and (3) "[i]nvolve an asset of which the consumer is the owner or beneficiary, or that the consumer is purchasing, or they involve a service provided, or to be provided, by or to the consumer." *Id.* at 48247. Sports wagers do not contain payment obligations that are severable from the contract itself. They are not (until Kalshi and other DCMs started offering them) traded on organized markets. They involve a service provided to the consumer as entertainment. And sports wagers have not historically been considered swaps. *See id.* at 48248 (stating that the CFTC and SEC "do not intend to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps are within the swap or security-based swap definitions.").

During the November 14, 2025 hearing, Kalshi stated that the CFTC has expressed that there are "some customary consumer transactions that you would expect to happen off exchange." ECF No. 219 at 35. I agree that sports bets are in that category. Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers. As Justice Potter Stewart famously said about pornography in his concurrence in *Jacobellis v. State of Ohio*, "I know it when I see it." 378 U.S. 184, 197 (1964). These are sports wagers and everyone who sees them knows it. That includes Kalshi, who has advertised itself as the "first app for legal sports betting in all 50 states." *See Martin*, Case No. 1:25-cv-01283-ABA, ECF No. 28-2 at 3.[6] Kalshi has not disputed that is how it advertised itself, nor has it successfully distinguished its arguments here from its own plain words.

Finally, my interpretations comport with the traditional balance between state and federal regulation of gaming. In contrast, Kalshi's proposed reading upends that regime with no

---

[6] I can consider the exhibits in the Martin case because I can consider hearsay "in deciding whether to issue a preliminary injunction" or TRO. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

expressed congressional intent to do so, with no federal gaming regulator to replace the states'
regulatory infrastructures, and contrary to the expressed congressional intent that CFTC
exchanges should not become sports gambling venues. *See Crypto*, 2025 WL 2916151, at *6. I
noted in my *Crypto* order that the broad interpretation of swaps that Crypto (and Kalshi and
Robinhood) are promoting "would sweep nearly all sports wagering into the CFTC's exclusive
jurisdiction even though the states historically have regulated gambling through their police
power." *Id.* at *9. That is so because "nearly every sports bet would be a transaction in which
payment is dependent on the outcome of a sporting event and is associated with a potential
financial, economic, or commercial consequence." *Id.* (footnote omitted). That "cannot be a
proper reading of the statute because that would mean that all sports wagering must be done on a
DCM, and not at casinos, as the CEA forbids nearly all swap dealing and trading unless done on
a DCM, except for certain market participants, none of whom are casinos or the average sports
bettor." *Id.* (footnote omitted). As I stated in *Crypto*, "[h]ad Congress intended such a sea
change in the regulatory landscape, it surely would have said so. The CEA's language and
legislative history show that Congress did not intend such a change and, to the contrary, did not
want gambling to take place on CFTC-designated exchanges." 2025 WL 2916151, at *10
(simplified).

       Kalshi argues that wagers at sportsbooks are not swaps falling within the CFTC's
jurisdiction because the CEA covers products traded on an exchange, and "once a gambler places
a bet with a sportsbook in Nevada, neither the gambler nor the sportsbook can sell that bet to
anyone else on any organized exchange." ECF No. 184 at 17. I have no evidence before me that
sports wagers are not tradeable. But even if they are not, being tradeable is not included in the
CEA's definition of a swap. Instead, the CEA defines a swap and states that if something is a

swap, it must be traded on an exchange. *See* 7 U.S.C. §§ 1a(47) (defining swap); 2(e) (making it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title").  And while the CFTC has stated that it will consider whether an instrument is traded on an exchange as a factor to distinguish consumer contracts from swaps, it is not the only factor the CFTC identified. *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 FR 48208-01, 48247 (Aug. 13, 2012).  Further, Kalshi's proposed distinction becomes self-fulfilling, circular, and inconsistent with the statutory text. Kalshi essentially argues that if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange.  But the CEA states that all swaps must be traded on an exchange.  Additionally, the CFTC has prohibited DCMs from listing contracts that involve gaming. 17 C.F.R. § 40.11(a)(1).  By Kalshi's logic, Kalshi's gaming contracts should not count as swaps because the CFTC prohibited them from being traded on an exchange.

The Board thus has met its burden to show that Kalshi is not likely to succeed in showing that Kalshi's sports-related contracts are swaps because those contracts are based on the outcome of sports events or are based on things that take place during an event (such as a coin flip) but that are not events or contingencies themselves within the CEA's meaning.  Additionally, although a sports game might be inherently associated with a potential financial consequence (people pay to attend), discrete moments or acts during a sports game like a coin flip or whether there is a fumble are not inherently associated with potential financial, economic, or commercial consequences within the CEA's meaning.

Although Kalshi critiques my interpretations, Kalshi's proposed reading is worse because it has no limiting principle, has similar semantic and superfluity problems it identifies in my interpretation, and goes against congressional intent. Kalshi argues that Congress defined "swap" broadly, but a "statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Epic Systems Corp. v. Lewis*, 584 U. S. 497, 523 (2018) (simplified). In interpreting the statute, I must construe the words in context and avoid absurdities. *Marinello v. United States*, 584 U. S. 1, 7-8 (2018); *Arizona State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006). Perhaps here, like the cases Justice Stewart mentions in *Jacobellis*, I am "faced with the task of trying to define what may be indefinable." 378 U.S. at 197. But if everything a person can conceive of happening is an event or contingency, and if every downstream economic consequence someone can conjure up makes that event or contingency associated with a potential financial, commercial, or economic consequence, the words lose all meaning or render superfluous the rest of the swap definition. *See United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial").

Kalshi's position also does not comport with what Congress was trying to achieve when it added swaps to the CEA. Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008. Congress was not enabling nationwide gambling on CFTC-designated exchanges. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic*

19

*Contractors, Inc.*, 458 U.S. 564, 575 (1982). It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator[7] without ever mentioning that was the goal when Congress added swaps to the CEA in 2010.

### C. Kalshi has not shown a likelihood of success that excluded commodities fall within the CFTC's exclusive jurisdiction under § 2(a).

Kalshi argues that even if its contracts are not swaps, they are "excluded commodities" subject to the CFTC's regulation.[8] The Board responds that excluded commodities also require

---

[7] The CFTC has stated that "in the United States, gambling is overseen by state regulators with particular expertise, and governed by state gaming laws aimed at addressing particular risks and concerns associated with gambling. **The Commission is not a gaming regulator.** The CEA and Commission regulations are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling. **Permitting event contracts involving gaming, as proposed to be defined, to trade on CFTC-regulated markets would in effect permit instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections.** Gambling is a rapidly evolving field, and the Commission does not believe that it has the statutory mandate nor specialized experience appropriate to oversee it, or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner." *Event Contracts*, 89 FR 48968-01, 48982-83 (June 10, 2024) (internal footnotes omitted, emphasis added). Although the CFTC made this statement in the context of a proposed rule that was never finalized, the CFTC's statements express its view on its own expertise (or lack thereof) in this area. The importance of strict gaming regulation has been highlighted by the recent arrests of high-profile players and coaches related to illegal gambling allegations in professional baseball and basketball. *See Two Current Major League Baseball Players Charged in Sports Betting and Money Laundering Conspiracy*, https://www.justice.gov/usao-edny/pr/two-current-major-league-baseball-players-charged-sports-betting-and-money-laundering; *31 Defendants, Including Members and Associates of Organized Crime Families and National Basketball Association Coach Chauncey Billups, Charged in Schemes to Rig Illegal Poker Games*, https://www.justice.gov/usao-edny/pr/31-defendants-including-members-and-associates-organized-crime-families-and-national.

[8] Kalshi also asserts, without elaboration, that its contracts are "futures" or "options." ECF No. 184 at 14. Section 2(a) does not use the word "futures" standing alone. Rather, it refers to "contracts of sale of a commodity for future delivery." Kalshi does not analyze how its contracts fit this statutory language. As for options, the Ninth Circuit has indicated that "an option means the contract whereby the creator (or writer) of the option grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'"

an associated financial consequence and, in any event, excluded commodities do not fall within the statutory provision that Kalshi asserts gives the CFTC exclusive jurisdiction, 7 U.S.C. § 2(a)(1)(A).

Section 2(a)(1)(A) states that the CFTC:

> shall have exclusive jurisdiction . . . with respect to accounts, agreements . . ., and transactions involving swaps or contracts of sale of a commodity for future delivery . . ., traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

Section 1a(9) defines a commodity to mean various products like wheat, cotton, and rice, "all other goods and articles" (with some exceptions not relevant here), and "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." The CEA separately defines an excluded commodity to mean:

> (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;
> (ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is--
> > (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or
> > (II) based solely on one or more commodities that have no cash market;
> (iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or
> (iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is--
> > (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and
> > (II) associated with a financial, commercial, or economic consequence.

---

*Commodity Futures Trading Comm'n v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (quoting 1 Derivatives Regulation § 1.02[10]). Kalshi does not explain how its contracts fit this definition either.

21

7 U.S.C. § 1a(19).[9]

First, the relevant portion of the excluded commodity definition requires the "occurrence, extent of an occurrence, or contingency" to be "associated with a financial, commercial, or economic consequence." Thus, an event contract that does not satisfy the swap definition's requirement for a potential financial consequence also does not fit within the excluded commodity definition. The CFTC has often referred to excluded commodities as intangible financial commodities, thus suggesting that the CFTC also reads the phrase "associated with" to require the event or contingency to inherently have a financial consequence.[10] Kalshi argues that

---

[9] Kalshi and Robinhood note that the word "event" does not appear in the definition of an excluded commodity. But the word "event" also does not appear in the special rule for public interest review in 7 U.S.C. § 7a-2(c)(5)(C)(i). The special rule is not limited to swaps because it also refers to contracts, agreements, and transactions. And in the special rule, although the word "swaps" appears in the opening clause along with agreements, contracts, and transactions, it is dropped in the clause that states that the CFTC may determine that such "agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve" one of the enumerated subjects. No one has suggested that the CFTC cannot conduct a public interest review of swaps under the special rule even though the word was omitted in the phrase giving the CFTC the authority to conduct the public interest review. And unlike the swap definition, the excluded commodity definition does not include the word "potential" in relation to the financial consequence. All this shows is that the CEA has some drafting peculiarities that courts must interpret as best they can.

[10] *See, e.g.*, *Position Limits for Derivatives*, 78 FR 75680-01, 75749 (Dec. 12, 2013) ("Initially, the Commission limited its approval of position accountability to financial instruments (i.e., excluded commodities) that had a high degree of liquidity."); *id.* at 75762, n.730 (stating that the excluded commodity definition "includes financial products such as interest rates, exchange rates, currencies, securities, credit risks, and debt instruments as well as financial events or occurrences"); *Position Limits for Derivatives*, 81 FR 96704-01, 96742 (Dec. 30, 2016) ("In 1987, the Commission provided interpretive guidance regarding the bona fide hedging definition and risk management exemptions for futures in financial instruments (now termed excluded commodities)."); *Effective Date for Swap Regulation*, 76 FR 42508-01, 42511, n.27 (July 19, 2011) ("The term 'excluded commodity' is defined . . . to include, among other things, financial instruments such as a currency, interest rate, or exchange rate, or any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the transaction."); *Effective Date for Swap Regulation*, 76 FR 65999-01, 66000 (Oct. 25, 2011) (referring to excluded commodities as "generally, financial, energy and metals commodities"); *Significant Price Discovery Contracts on Exempt Commercial Markets*, 73 FR 75888-01, 75889

22

1  if its sports-based event contracts do not qualify as excluded commodities, then the special rule

2  in 7 U.S.C. § 7a-2(c)(5)(C) does not work with respect to contracts involving gaming.  But a

3  contract on whether the World Series of Poker will occur this year would be such a contract.

4  The World Series of Poker has inherent financial consequences because the host (Caesars

5  Entertainment) charges entrance fees to participants.  And it involves gaming.

6       Further, even if Kalshi's contracts are deemed excluded commodities, § 2(a) does not

7  state that the CFTC has exclusive jurisdiction over excluded commodities, which are defined

8  separately from commodities.  Congress could have included excluded commodities in § 2(a) but

9  it did not. *See S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("Congress's explicit

10 decision to use one word over another in drafting a statute is material.").  Given the subject

11 matter of excluded commodities, that distinction makes sense.  The CFTC does not have

12 exclusive jurisdiction over interest or exchange rates, currencies, securities, or macroeconomic

13 indicators.  Nor does it have exclusive jurisdiction over the subject matter in the special rule

14 related to excluded commodities, such as activity that is unlawful under federal or state law,

15 terrorism, assassination, war, or gaming. *See* 7 U.S.C. 7a-2(c)(5)(C).

16      Although an "excluded commodity" could be thought of as a subset of "commodity,"

17 substituting "excluded commodity" for "commodity" in § 2(a) does not grammatically or

18 logically make sense.  Excluded commodities do not involve things that are "contracts of sale of

19 a commodity for future delivery." 7 U.S.C. § 2(a).  Interest rates, exchange rates, credit risks,

20 inflation indexes and measures, and other macroeconomic indexes or measures are not sold "for

21 future delivery."  Nor are occurrences, extents of occurrences, or contingencies that are beyond

22

23 _____

(referring to excluded commodities as "primarily financial commodities but also commodities
such as weather").

23

the control of the parties to the relevant contract and associated with a financial consequence sold for "future delivery." It is not logical to state that Kalshi is offering contracts of sale of a sports event (or its outcome) for future delivery. Thus, Kalshi's gaming contracts do not qualify as "contracts of sale of commodities for future delivery" under § 2(a).

Ruling that the CFTC does not have exclusive jurisdiction over excluded commodities under § 2(a) does not oust the CFTC from regulating excluded commodities. The CFTC would still have jurisdiction over DCMs who list such agreements under § 7(d)(1), just not exclusive jurisdiction under § 2(a). Thus, the Board has established that Kalshi is not likely to succeed in showing that Kalshi's contracts fall within the CFTC's exclusive jurisdiction under § 2(a) even if they are excluded commodities.

### D. Kalshi has shown serious questions on the merits.

Although I conclude Kalshi has not shown a likelihood of success, it has raised serious questions on the merits. The issues in this and similar cases are complex, novel, and evolving. Kalshi has raised serious questions about how to properly interpret the statutory language, to divine congressional intent, and to resolve the tension between what constitutes state-regulated gambling versus federally regulated derivatives. I therefore address the other factors regarding whether to grant a TRO under the sliding scale approach of *Alliance for the Wild Rockies.*

## V. THE BALANCE OF HARDSHIPS DOES NOT TIP SHARPLY IN KALSHI'S FAVOR AND THE PUBLIC INTEREST DOES NOT FAVOR AN INJUNCTION.

Because Kalshi has shown serious questions on the merits, the Board must show that the balance of hardships does not tip sharply in Kalshi's favor. It also must show that the public interest does not favor the injunction. The Board has met its burden on these factors.

1       Kalshi's concerns are essentially that it will not be able to profit from the trades, and that

2   it suffers some reputational harm if it cannot offer those contracts to Nevada residents or must

3   close out contracts involving Nevada residents.  Kalshi also asserts that it risks its DCM

4   designation if it does not offer its products nationwide.

5       Kalshi's harms are largely monetary.  Kalshi may not be able to recover damages from

6   the defendants if it turns out that it can offer these contracts without violating Nevada law, which

7   is a factor to consider in balancing the hardships.  But Kalshi's monetary harm is weighed

8   against the State of Nevada's financial interests in tax revenues and Kalshi's competitors'[11]

9   financial interests in fair competition.

10      Kalshi's monetary harm can be mitigated through geofencing, which regulated entities in

11  this jurisdiction employ.  Although Kalshi contends that it risks losing its DCM designation if it

12  geofences, there is no evidence before me that the CFTC would take adverse action against

13  Kalshi for complying with court orders and state law while the various lawsuits play out.  To the

14  contrary, it appears the CFTC would not act against registered entities in these circumstances.

15  For several months after the Board announced that it sent Kalshi a cease-and-desist letter,

16  Robinhood did not offer its Nevada customers the option of trading on Kalshi's exchange. *See*

17  *Robinhood*, ECF No. 8 at 3-4.  There is no evidence that the CFTC threatened Robinhood's

18  status as a registered entity for doing so.  And recently, Crypto reached an agreement with the

19  Board while the appeal in its case plays out. *See Crypto*, ECF No. 110.  Although it is not clear

20  from the record what that agreement is, there is no evidence that the CFTC has acted or

21  threatened to act against Crypto for satisfying the Nevada regulators while that case is on appeal.

22  Additionally, I find it difficult to credit Kalshi's fear given its apparent willingness to risk its

23

---

[11] This includes Nevada-licensed entities and Crypto.

1  DCM status by listing contracts involving gaming (however one defines it) in the face of the

2  CFTC's regulation that prohibits DCMs from doing so. *See* 17 C.F.R. § 40.11(a).

3       The CFTC has recently directed DCMs like Kalshi and FCMs like Robinhood to warn

4  customers about the various lawsuits and risks they pose. CFTC Letter No. 25-36 (Sept. 30,

5  2025). As a result, Kalshi's customers are on notice that offering gaming contracts implicates

6  the CFTC's regulation, that the legal landscape under which Kalshi is operating could change,

7  and that customers' contracts could be disrupted. If customers continue trading in Kalshi's

8  products, they, like Kalshi, are proceeding at their own risk. Kalshi could have proceeded

9  cautiously until this and other lawsuits played out, but instead it greatly expanded its offerings,

10  so it has to some extent created or amplified its own harm.

11       Balanced against Kalshi's harms are substantial irreparable harms to the Board, the State

12  of Nevada, the gaming industry in this state, and the public interest. First, the Nevada

13  Legislature made findings, and it is self-evident to anyone who lives in Nevada, that the "gaming

14  industry is vitally important to the economy of the State and the general welfare of the

15  inhabitants." Nev. Rev. Stat. (NRS) § 463.0129(a). The Nevada Legislature also found that a

16  "comprehensive regulatory structure, coupled with strict licensing standards, will ensure the

17  protection of consumers, including minors" and problem gamblers. NRS § 463.745. The Nevada

18  Legislature also found that the success of legal gaming is dependent on public confidence and

19  trust, and that public trust can be maintained only through strict regulation of those involved in

20  the gaming industry in this state. NRS §§ 463.0129(b), (c).

21       The defendants thus have strong interests in regulating gaming in Nevada. Indeed, they

22  are statutorily charged with doing so under Nevada law. The defendants and the public have an

23  interest in prohibiting gaming in Nevada that is not subject to the same rigorous regulations and

1    oversight as the licensed entities in this state, including gaming involving individuals who are

2    under the age of 21 or problem gamblers.  Whatever one's views are on gambling, there is no

3    question that some segment of the population will suffer from problem gambling, but neither

4    DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators

5    and licensed entities are.[12]  The CFTC admits it is not a gaming regulator. *See supra* n.6.

6    Allowing Kalshi to continue offering sports-related event contracts to 18-year-olds, even though

7    the CFTC issued a regulation that prohibits DCMs like Kalshi from listing gaming contracts, is

8    not in the public interest. *See* 17 C.F.R. § 40.11(a).[13]

9         I must also consider, as part of the public interest, the interests of the gaming industry in

10   this state.  Licensed gaming companies have invested millions of dollars to comply with state

11   regulations only to supposedly find out that they could have just become CFTC-registered

12

---

13   [12] *See* NRS § 463.350(1)(a) (prohibiting gambling for persons under 21 years old); NRS
     § 463.151(2) (State maintains a list of persons who may not participate in gambling); Nev.

14   Gaming Control Reg. 5.17(2) (requiring licensees to post "written materials concerning the
     nature and symptoms of problem gambling" and toll-free number for the National Council on

15   Problem Gambling or a similar Board-approved entity); *id.* 5.17(4) requiring licensees to
     implement a program to allow patrons to self-limit access to credit, check cashing, or direct mail

16   marketing of gaming opportunities by that licensee).

17   [13] Kalshi argues that § 40.11(a) does not categorically prohibit gaming-related contracts because
     under § 40.11(c), the CFTC can do a case-by-case review of self-certified contracts. *See* ECF

18   No. 184 at 16.  But § 40.11(a) states in unambiguous language that a "registered entity shall not
     list for trading or accept for clearing on or through the registered entity . . . [a]n agreement,

19   contract, transaction, or swap based upon an excluded commodity, as defined in Section
     1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war,

20   gaming, or an activity that is unlawful under any State or Federal law" or an agreement, contract,
     transaction, or swap based on an excluded commodity that "involves, relates to, or references an

21   activity that is similar to" the enumerated activities.  Section 40.11(c) reflects the practical reality
     that if a DCM nevertheless lists a contract that involves an enumerated activity or something

22   similar to an enumerated activity, the CFTC may review it.  The idea that the CFTC could not
     categorically prohibit contracts on things like terrorism or assassination and instead must review

23   each and every contract individually is dubious, particularly where a DCM who believes their
     contract is not contrary to the public interest can seek pre-approval from the CFTC. *See* 17
     C.F.R. § 40.3(a).

exchanges to offer sports gambling nationwide for anyone over the age of 18 without complying with Nevada's gaming regulatory regime or paying taxes in this state. If Kalshi's view is adopted, there is a not-insignificant chance that the regulated entities in this state will abandon their current model and become DCMs, unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues. Indeed, recently, two of the "largest sports betting operators in the U.S., FanDuel and DraftKings, agreed . . . to not seek licensing in Nevada in order to focus efforts on launching prediction markets in other states." *DraftKings, FanDuel Agree to Abandon Nevada in Favor of Prediction Markets*, The Nevada Independent, Nov. 12, 2025, available at https://thenevadaindependent.com/article/draftkings-fanduel-agree-to-abandon-nevada-in-favor-of-prediction-markets.[14]

The traditional police powers of the states, which are considerable and longstanding, particularly in this state which has led the nation in gaming regulation and enforcement for decades, weigh heavily against Kalshi's harms. As I mentioned in my *Crypto* order, had Congress intended to upset the balance between state and federal gaming regulation and turn CFTC-designated markets into nationwide casinos for anyone over the age of 18 with no comparable federal regulator, it surely would have made that intent more explicit.

I therefore find that the balance of hardships does not tip sharply in Kalshi's favor. Rather, the balance of hardships and the public interest weigh in favor of the defendants and of dissolving the preliminary injunction.

## VI. CONCLUSION

---

[14] As mentioned previously, I can consider hearsay in deciding whether to issue a preliminary injunction. Additionally, the Board confirmed at the November 14, 2025 hearing that FanDuel and DraftKings have voluntarily abandoned their Nevada licensing applications. ECF No. 219 at 89.

1       I THEREFORE ORDER that the defendants' motion to dissolve the preliminary

2   injunction **(ECF No. 142) is GRANTED**.  The preliminary injunction at ECF No. 45 is

3   dissolved and no longer in force or effect.

4       DATED this 24th day of November, 2025.

5

6   _____

7   ANDREW P. GORDON
    CHIEF UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23