

# Milbank

**WILL HAVEMANN**

*Partner*

1101 New York Ave., N.W.  |  Washington, DC 20005
T: +1 (202) 835-7518
whavemann@milbank.com  |  milbank.com

February 20, 2026

**By Electronic Filing**

Patricia S. Dodszuweit
Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

> **Re:**   ***KalshiEX LLC v. Mary Jo Flaherty, et al.***, No. 25-1922
> **FRAP 28(j) Letter**

Dear Ms. Dodszuweit:

Kalshi writes to advise the Court of *KalshiEX LLC v. Orgel*, No. 3:26-cv-34, Dkt. 48 (M.D. Tenn. Feb. 19, 2026), in which the court preliminarily enjoined Tennessee gaming regulators from enforcing state law against Kalshi. The court concluded that "Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies." Op. 13. *Orgel* puts to rest Defendants' contention that the district court below is "the only one" to accept Kalshi's argument, Dkt. 94 at 2, and it strongly supports Kalshi's position on appeal.

First, *Orgel* held that Kalshi is likely to prove that its contracts are swaps. Op. 13. The court determined that the outcome of a sporting event is an "occurrence[] of [an] event[]" within the Commodity Exchange Act's "swap" definition. Op. 15. And such outcomes satisfy the requirement that an event underlying a swap be "*associated* with *potential* financial consequences." Op. 17. The court rejected the argument—advanced by Defendants here, *see* Opening Br. 23— that a swap requires an "inherent" connection to financial consequences as inconsistent with Congress's use of the word " 'potential,' which is broad." Op. 16-17. The court added that sporting events, including "individual player performance, and how a team performs, *can* have financial consequences, even if not right away." Op. 17 (emphasis added).

Second, without "address[ing] express or field preemption," *Orgel* held that state gaming laws are conflict-preempted. Op. 18-19. Tennessee's requirements—including the requirement that bettors be " 'physically located in' Tennessee"—would require Kalshi to "create a Tennessee-only exchange." Op. 19. But doing so would "violate" Kalshi's impartial-access obligation, making it "impossib[le]" to comply with both state and federal law. Op. 19; *see* 17 C.F.R. § 38.151(b).

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

New Jersey's near-identical requirements conflict with the CEA for the same reason. *See* Answering Br. 33. The court also agreed that "state law likely stands as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market." Op. 20. Preemption thus applies where, as here, "[s]tate law would directly affect trading on Kalshi by limiting who can trade with whom." Op. 20.

Respectfully submitted,

/s/ William E. Havemann
William E. Havemann

*Counsel for Appellee KalshiEX LLC*

cc:      All Counsel (via ECF)
Word Count: 348

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **KALSHIEX LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:26-cv-00034** |
| | ) | **Judge Aleta A. Trauger** |
| **WILLIAM ORGEL**, in his official | ) | |
| capacity as Chairman of the Tennessee | ) | |
| Sports Wagering Council; **MARY BETH** | ) | |
| **THOMAS**, in her official capacity as the | ) | |
| Executive Director of the Tennessee Sports | ) | |
| Wagering Council; **TENNESSEE** | ) | |
| **SPORTS WAGERING COUNCIL**; and | ) | |
| **JONATHAN SKRMETTI**, in his official | ) | |
| capacity as Attorney General of Tennessee, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

This case concerns whether state or federal law governs a novel form of sports betting. Plaintiff KalshiEX LLC ("Kalshi") is a federally designated derivatives exchange on which people bet on sports, among other things. Tennessee permits online sports betting, but operators must be licensed, pay taxes and fees, and abide by various restrictions—requirements with which Kalshi does not comply. Tennessee sent Kalshi a cease-and-desist letter threatening an enforcement action, in response to which Kalshi has sued three Tennessee officials in their official capacities and the Tennessee agency that regulates gambling, seeking declaratory and injunctive relief. Now before the court is Kalshi's Motion for Preliminary Injunction (Doc. No. 6) which, for the reasons set forth herein, the court will grant as to the individual defendants and deny as to the state agency defendant.

As a preliminary matter, the court notes that other states, too, have sent Kalshi cease-and-desist letters, in response to which Kalshi has sued them and moved for preliminary injunctions. District courts have reached different results.[1] Several of those decisions are on appeal, but no appellate court has yet ruled. *See KalshiEX LLC v. Martin* ("*Kalshi D. Md.*"), 793 F. Supp. 3d 667, 687 (D. Md. 2025) (denying Kalshi's motion for a preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025);[2] *KalshiEX, LLC v. Hendrick* ("*Kalshi D. Nev. I*"), No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (granting Kalshi's motion for a preliminary injunction), *order dissolved* ("*Kalshi D. Nev. II*"), No. 2:25-cv-00575-APG-BNW, --- F. Supp. 3d ----, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025) (granting Nevada defendants' motion to dissolve the preliminary injunction), *appeal docketed*, No. 25-7516 (9th Cir. Nov. 28, 2025);[3] *KalshiEX LLC v. Flaherty* ("*Kalshi D.N.J.*"), No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *8 (D.N.J. Apr. 28, 2025) (granting Kalshi's motion for a preliminary injunction), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025).[4] Similar motions for a preliminary injunction are pending in federal courts in Ohio, New York, and Connecticut. *See* Pl.'s M. & Mem. Prelim. Inj., *KalshiEx LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Oct. 7, 2025), ECF No. 11;

---

[1] Kalshi itself appears to have taken a different position than it does now, in a case concerning betting on election results. *See* Brief of Appellee KalshiEX LLC at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ("[A]s the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets."); *see also* Kalshi's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at the district court level, ECF No. 17-1 (noting that a provision of the Commodity Exchange Act, which the court will discuss, "functions as a check on attempts to launder . . . sports gambling through the derivatives markets" (citing 7 U.S.C. 7a-2(c)(5)(C)(i)(V))).

[2] *KalshiEX LLC v. Martin* is "tentatively" calendared for oral argument in early May, 2026. Case No. 25-1892, ECF No. 61 (4th Cir. Feb. 4, 2026).

[3] *KalshiEX, LLC v. Hendrick* is set for oral argument on April 16, 2026. Case No. 25-7516, ECF No. 58 (9th Cir. Feb. 8, 2026).

[4] The Third Circuit held oral argument in *KalshiEX LLC v. Flaherty* on September 10, 2025. Case No. 25-1922, ECF No. 80 (3d Cir. Sept. 10, 2025).

2

Pl.'s Prop. Order to Show Cause for Prelim. Inj., *KalshiEx LLC v. Williams*, No. 1:25-cv-08846 (S.D.N.Y. Oct. 27, 2025), ECF No. 15; Pl.'s Mot. P.J., *KalshiEx LLC v. Cafferelli*, No. 3:25-cv-02016 (D. Conn. Dec. 5, 2025), ECF No. 30.

## I.    PROCEDURAL HISTORY

Kalshi filed a Complaint for Permanent Injunction and Declaratory Relief (Doc. No. 1) and soon thereafter filed a Motion for Preliminary Injunction and Temporary Restraining Order ("Motion") (Doc. No. 6) and an accompanying Memorandum (Doc. No. 7). The court entered a Temporary Restraining Order enjoining the defendants from enforcing the relevant statutes against the plaintiff and setting a hearing. (Doc. No. 22 at 2.) The defendants filed a Response (Doc. No. 34), and the plaintiff filed a Reply (Doc. No. 41) and then a Notice of Supplemental Authority (Doc. No. 44). The court held a hearing on the plaintiff's Motion for Preliminary Injunction on February 2, 2026, at the conclusion of which defense counsel represented that the defendants would not enforce their cease-and-desist letter against Kalshi pending this court's ruling. (*See* Doc. No. 47, Tr. 105.)

## II.    LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Curran v. Fronabarger*, No. 23-6015, 2024 WL 4805017, at *2 (6th Cir. Aug. 27, 2024) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). On a motion for preliminary injunction, the court weighs: (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020) (citation omitted). Factors (3) and (4) "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418,

3

435 (2009). And, "[i]n constitutional cases, the first factor is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (order) (per curiam)). This is because courts presume irreparable harm when constitutional rights are impaired, no harm results from stopping unconstitutional conduct, and it is in the public interest to prevent violations of constitutional rights. *Id.* (first citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); and then citing *Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 400 (6th Cir. 2001)). Still, movants seeking a preliminary injunction "'must establish' the four factors." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## III.    FACTS

Broadly speaking, the facts are undisputed. Kalshi is a derivatives exchange on which traders buy and sell "event contracts," which concern whether certain things will or will not happen. For example, "Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks," and "which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship." (Doc. No. 1 ¶¶ 48, 49.) This case concerns Kalshi's *sports* event contracts only. Tennessee argues that Kalshi, despite its status as a federally designated derivatives exchange, is in fact an unlicensed sportsbook operating contrary to Tennessee gambling law and thereby depriving the state of gambling revenue and gamblers the protections state law provides. Kalshi argues that it need not comply with Tennessee law because it is exclusively regulated by federal law. The court first describes the relevant statutory schemes and then describes the plaintiff's operations and the defendants' enforcement threat.

4

A.    **Statutory Background**

1.    *The Commodity Exchange Act*

The Commodity Futures Trading Commission ("CFTC") is an independent federal agency that regulates the derivatives market under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq. See KalshiEX LLC v. CFTC* ("*Kalshi D.C. Cir.*"), 119 F.4th 58, 61 (D.C. Cir. 2024) (citing 7 U.S.C. § 2(a)). "A derivative is a financial instrument or contract with a price that is directly dependent on the value of one or more underlying assets." *Kalshi D.N.J.*, 2025 WL 1218313, at *1 (citing *KalshiEX LLC v. CFTC* ("*Kalshi D.D.C.*"), Case No. 23–03257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *stay denied*, *Kalshi D.C. Cir.*, 119 F.4th). This case concerns a subset of derivatives contracts known as *event contracts*. "An event contract is a derivative contract for which the payoff is based on a specified event, occurrence, or value—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage." *Kalshi D.C. Cir.*, 119 F.4th at 61 (internal quotation marks and citation omitted). Thus, if a buyer of an event contract takes the "yes" position—that a particular event will occur—upon the contract's designated expiration, the seller would pay the buyer if and only if the event on which the buyer took the "yes" position occurred. The contract can be traded until its expiration, and the market sets the price, which fluctuates with the event's perceived likelihood. *See KalshiEX D.N.J.*, 2025 WL 1218313, at *1 (citation omitted); *Kalshi D.D.C.*, 2024 WL 4164694, at *1–2.

Under the CEA, only exchanges regulated by the CFTC—known as designated contract markets ("DCMs")—can offer event contracts. *Kalshi D.C. Cir.*, 119 F.4th at 61 (citing 7 U.S.C. §§ 2(e), 7a-2(c)(5)(C)(i)). To become a DCM, and before offering event contracts, an entity must apply to the CFTC and be approved. *Kalshi D. Md.*, 793 F. Supp. 3d at 672 (citing 7 U.S.C. §§ 2(e), 7a). Once approved, however, DCMs cannot list any contract they like; the contracts must comply with the CEA and its implementing regulations. A DCM *may* request that the CFTC grant prior

5

approval for new contracts, to ensure compliance. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. § 40.3(a); *see also Kalshi D.D.C.*, 2024 WL 4164694, at *2. But it is not required to do so. Rather, as amended in 2000, the CEA permits DCMs to *self*-certify that their contracts comply with the CEA and applicable regulations "and start trading the contracts the following business day." *Kalshi D.C. Cir.*, 119 F.4th at 61 (citing 7 U.S.C. § 7a-2(c)(1), 17 C.F.R. § 40.2).

In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), PL 111-203, 124 Stat. 1376 (July 21, 2010), amended the CEA in two ways relevant here. *First*, while the CEA historically regulated derivatives known as *futures* and *options*, Congress amended the CEA to grant the CFTC exclusive jurisdiction over the regulation of *swaps*, as well. *Accord United States v. Phillips*, 155 F.4th 102, 112–13 (2d Cir. 2025). The CEA now grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps." 7 U.S.C. § 2(a)(1)(A); *see also Kalshi D. Md.*, 793 F. Supp. 3d at 672 (citing 7 U.S.C. § 2(a)(1)(A)). Under the CEA, a "swap" is, among other things:

> any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A), (A)(ii).[5] As the Second Circuit has explained, "[c]ontrary to futures and traditional options, which contemplate delivery of or performance related to a commodity at some future time, swaps are 'pure financial instrument[s] . . . based on the difference between two fluctuating values.'" *Phillips*, 155 F.4th at 112 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 243 (5th Cir. 2010) (alteration and omission in *Phillips*)).

---

[5] The definition is subject to certain exclusions, defined in 7 U.S.C. § 1a(47)(B).

*Second*, the Dodd-Frank Act added a "[s]pecial rule for review and approval of event contracts and swaps contracts" ("Special Rule"), 7 U.S.C. §7a-2(c)(5)(C). *See N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, --- F. Supp. 3d ----, 2025 WL 2916151, at *3 n.2 (D. Nev. Oct. 14, 2025), *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025). The Special Rule authorizes the CFTC to review certain event contracts to determine if they are contrary to the public interest and therefore cannot be traded. Under the Special Rule, the CFTC:

> may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve . . . (I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission . . . to be contrary to the public interest.

7 U.S.C. § 7a-2(c)(5)(C)(i); *see also* 17 C.F.R. § 40.11(c) (describing the CFTC's review process). If the event contract involves one of the enumerated categories and is "determined by the Commission to be contrary to the public interest," then the contract cannot be listed for trading. 7 U.S.C. § 7a-2(c)(5)(C)(ii). *See also Kalshi D.C. Cir.*, 119 F.4th at 61 (citing 7 U.S.C. § 7a-2(c)(5)(C)(i)).[6]

---

[6] The CFTC has never conducted a public interest review of any of Kalshi's sports event contracts, even though it could have. (Doc. No. 9, Sottile Decl. ¶ 7; *see also* Doc. No. 7 at 25 ("[E]xercising discretion delegated by Congress, the CFTC has declined to initiate review." (citing Doc. No. 1 ¶ 58)).) A recently withdrawn proposed rule would have amended the CFTC's regulations "to include a categorical [contrary to] public interest determination with respect to contracts involving each of the Enumerated Activities . . . . Rather, the focus of any such review would be to evaluate whether the contract involves an Enumerated Activity, in which case, it may not be listed for trading[.]" Event Contracts, 89 Fed. Reg. 48,968, 48,978 (proposed June 10, 2024), *withdrawn* Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026) ("The Commission is withdrawing the proposed rule published at 89 FR 48968 (June 10, 2024) as of February 4, 2026."). The proposed rule would have prohibited, without further public interest review, among others, contracts "involv[ing] . . . gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), which the proposed rule would have defined as:

> the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance

7

While neither the CEA nor the CFTC's regulations define the term, under the Special Rule, "event contracts" include "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market." 7 U.S.C. § 7a-2(c)(5)(C)(i). Among other things, an "excluded commodity" is "an occurrence, extent of an occurrence, or contingency . . . that is . . . (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). At issue in this case is whether the event contracts Kalshi offers are "swaps," and, therefore, subject to the CEA's grant of exclusive jurisdiction to the CFTC. (*Contrast* Doc. No. 7 at 10 ("This exclusive jurisdiction extends to event contracts." (citing 7 U.S.C. § 1a(47)(A)(ii), (iv), (vi) (the CEA's definition of "Swap")), *with* Doc. No. 34 at 21 ("Kalshi's sports-event contracts are not 'swaps' under the CEA.").).[7]

### 2.    Tennessee Sports Gaming Act

The Tennessee Sports Gaming Act (the "Act"), Tenn. Code Ann. §§ 4-49-101 *et seq.*, authorizes sports betting in Tennessee and vests regulation, licensing, and enforcement authority with the Tennessee Sports Wagering Council ("SWC"). (Doc. No. 1 ¶ 22; Doc. No. 35, Thomas Decl. ¶¶ 5–6.) The Act requires that any sports gaming operator obtain a license before accepting wagers in Tennessee and that it pay initial and annual license fees and a privilege tax. Tenn. Code

---

of one or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games.

89 Fed. Reg. at 48,974.

[7] Kalshi argues that its event contracts, besides being properly characterized as swaps, "are also 'future[s]' or 'option[s]' in excluded commodities, which are subject to exclusive CFTC jurisdiction." (Doc. No. 41 at 9 n.4 (first quoting 7 U.S.C. § 2(a)(1)(A) (alterations in original); and then quoting *Kalshi D.D.C*, 2024 WL 4164694, at *2, for the proposition that "[e]vent contracts are subject to regulation under the CEA as 'excluded commodities.'").)

8

Ann. §§ 4-49-117(b)(11)(A)(i)–(ii), (e), -104(b).[8] Bettors must be at least 21 years old and "physically located in" Tennessee. *Id.* § 4-49-111. The Act enumerates fourteen categories of people who cannot place bets and prohibits certain kinds of bets on college sports. *Id.* §§ 4-29-112(a), -114(a)(1)(B). To ensure "[r]esponsible sports wagering," the Act requires that licensees "allow bettors to restrict themselves from placing wagers with the licensee" and to limit the amount they bet or the time they spend betting. *Id.* § 4-49-119(a.) The Act provides for the use of the privilege tax: 80% toward public school buildings, 15% to local governments for "emergency services or local infrastructure projects," and 5% for mental health treatment to address problem gambling and juvenile addiction and mental health disorders. *Id.* §§ 4-49-104(e)(1)(A), (2), (3), -119(c)(1)(A). The Act imposes administrative fines[9] and civil penalties[10] for violations. *Id.* §§ 4-49-126(c), -127(b), -129(a). And it is a misdemeanor to accept bets from anyone under 21 years of age. *Id.* § 4-49-118(a)(1), (b), -102(19) (defining "minor").

## B. Kalshi's and its sports event contracts

"Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts." (Doc. No. 1 ¶ 19.) In 2020, the CFTC designated Kalshi as a contract market. (*Id.* ¶ 46.) Kalshi has since offered event contracts "related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics." (*Id.* ¶ 48.) Since January 2025, it has also offered sports event contracts. (*Id.* ¶ 49.) On January 22,

---

[8] The initial licensing fee is $750,000, and the annual fee is either $750,000 or $350,000, depending on betting volume. Tenn. Comp. R. & Regs. 1350-01-.04(1)(b). The privilege tax is 1.85% of the licensee's gross wagers. Tenn. Code Ann. §§ 49-49-104(b), -102(12).

[9] The Act provides for fines of up to $25,000 per offense for accepting wagers without a license. Tenn. Code Ann. § 4-49-127(b)(2)(C); *see also* Tenn. Comp. R. & Regs. 1350-02-.11(2) (describing the range of fines "depending on the seriousness of the violation").

[10] The Act provides for civil penalties of $5,000 per violation and authorizes the attorney general to seek an injunction to enforce the penalty. Tenn. Code Ann. § 4-49-129(a), (b).

9

2025, Kalshi self-certified its first sports event contracts, under the procedure the court has described above, as permitted by 7 U.S.C. § 7a-2(c)(1). (*Id.* ¶ 49.) Shortly thereafter, the CFTC asked Kalshi to submit a "Demonstration of Compliance" with the CEA, which it did, and since then the CFTC has taken no further action regarding Kalshi's thousands of sports event contracts. (*Id.* ¶¶ 50–51.)

Kalshi takes pains to distinguish itself from traditional sports betting. (*See* Doc. No. 7 at 13 ("Kalshi is entirely different."); Doc. No. 9, Sottile Decl. ¶ 33 ("Kalshi does not operate a sportsbook.").) And it is different in certain respects. Unlike traditional sportsbooks, Kalshi operates an exchange on which gamblers bet against each other, rather than the house. (Doc. No. 1 ¶ 26 ("Traders exchange positions with other traders in the marketplace.").) Thus, Kalshi does not set the odds (they are determined by the market), is not a party to the bets (the two people on either end of the bet are), and has no interest in who wins (Kalshi makes money by charging fees for each trade).[11] (Doc. No. 9, Sottile Decl. ¶ 33; *see also* Doc. No. 7 at 13.) In other respects, it does resemble traditional sports betting. As the defendants argue, Kalshi has marketed itself as a traditional sports betting operation. (Doc. No. 34 at 15 (citations omitted).) And, based on Kalshi's description of its operations, although there may be differences under the hood between trading on Kalshi and placing a bet with a licensed sportsbook, for any sports-betting enthusiast unfamiliar with the CEA, it appears to the court that a user would find Kalshi's offerings similar, if not

---

[11] Kalshi's model resembles, in certain respects, "pari-mutuel" wagering, common in horserace betting, wherein "wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool . . . and in which the participants are wagering with *each other* and not against the operator." *Churchill Downs*, 162 F.4th at 635 (quoting 15 U.S.C. § 3002(13) (emphasis in *Churchill Downs*)). In such a system, betting organizers have no stake in the outcome of the bets; rather, they take a percent of the betting pool. *Id.*

10

identical, to a sportsbook.[12] (*See* Doc. No. 1 ¶¶ 47–49; Doc. No. 7 at 12–13.) In any event, the defendants do not contest Kalshi's description of its operations *per se*, but they contend that the sports event contracts Kalshi offers do not fall under, or do not fall exclusively under, federal regulation.

### C.    Tennessee Sports Wagering Council and its Cease-and-Desist Letter

The individual defendants, who are sued in their official capacities only, are Mary Beth Thomas, SWC's Executive Director; William Orgel, SWC's Chairman; and Jonathan Skrmetti, Tennessee's Attorney General. (Doc. No. 1 ¶¶ 20–21, 23.) The SWC is also a defendant. (*Id.* ¶ 22.) On January 9, 2026, Thomas, in her capacity as the SWC's Executive Director—and copying defendants Orgel and Skrmetti, identified in their official capacities—sent Kalshi's CEO a cease-and-desist letter ("Letter") (Doc. No. 1-6). The Letter states that Kalshi's sports event contracts violate the Act, in part because Kalshi is not licensed in Tennessee; it "demands that Kalshi cease offering sports events contracts to customers in Tennessee *immediately*," void any such contracts, and refund deposits; and it threatens fines, civil injunctive relief, and criminal referral.[13] (Doc. No. 1-6 at 3–4 (emphasis in original).) Kalshi filed suit the same day the defendants sent it the Letter.

## IV.    DISCUSSION

### A.    Jurisdiction and the Eleventh Amendment

Kalshi brings suit under the Supremacy Clause, U.S. Const. art. 6, cl. 2, and grounds this court's subject matter jurisdiction in 28 U.S.C. § 1331. (Doc. No. 1 ¶ 16.) The defendants argue that Kalshi lacks a cause of action, that its suit is barred by Tennessee's sovereign immunity, and

---

[12] *Cf. Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) ("When I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck.").

[13] Under Tennessee law, gambling promotion is a misdemeanor, and aggravated gambling promotion is a felony. (Doc. No. 1-6 at 4 (citing Tenn. Code Ann. §§ 39-17-503, -504).)

11

that the *Ex parte Young* exception does not apply. (Doc. No. 34 at 17–21.) The plaintiff disagrees. (Doc. No. 41 at 6.) The court finds the defendants' arguments unavailing, at least with respect to the state official defendants.

The Eleventh Amendment bars suit in federal court against states, state agencies, and state officials sued in their official capacities. *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023) (citations omitted). However, under the doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908), suits seeking prospective equitable relief against state officials in their official capacities are not barred by the Eleventh Amendment. *Morgan v. Bd. of Pro. Resp.*, 63 F.4th 510, 515 (6th Cir. 2023) (citing *Mich. Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 867 (6th Cir. 2000)). The *Ex parte Young* exception is narrow; it "applies only when a plaintiff seeks . . . prospective equitable relief to stop a continuing violation of federal law." *Josephson v. Ganzel*, 115 F.4th 771, 782 (6th Cir. 2024) (citations and internal quotation marks omitted). While usually a statute must be enforced for a plaintiff to have standing, the Supreme Court has permitted "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Moreover, parties "may use *Ex parte Young* as a *shield* against the enforcement" of state laws that are contrary to federal law and thus preempted. *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (citations omitted).[14] Kalshi seeks to prevent state officials from enforcing a state law that they have credibly threatened to enforce and that, Kalshi argues, is preempted by federal law. Accordingly, the court has

---

[14] By contrast, the "*Ex parte Young* exception 'does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.'" *Block*, 74 F.4th at 406 (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)).

12

jurisdiction under 28 U.S.C. § 1331. And the state-official defendants are not immune from suit under *Ex parte Young*.

However, the *Ex parte Young* exception does not apply to state agencies like the SWC. *See Harris v. Sec'y of State*, No. 23-5833, 2024 WL 4225713, at *3 (6th Cir. May 29, 2024) ("The *Ex parte Young* exception does not apply to the [Tennessee Secretary of State's Administrative Procedures Division] because it is a state agency, not a state official." (citing *Morgan*, 63 F.4th at 515)), *cert. denied sub nom. Harris v. Hargett*, 145 S. Ct. 594 (2024). The state has not consented to suit, and Congress has not abrogated Tennessee's sovereign immunity. *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022) (citing *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017)). The SCW is therefore immune from suit in this court, and the court will dismiss it from this case.

### B.    Likelihood of success on the merits

The court finds that Kalshi is likely to succeed on the merits because sports event contracts are "swaps" and conflict preemption applies.

#### 1.    Kalshi's sports event contracts are "swaps"

The CEA grants the CFTC "exclusive jurisdiction" over swaps. 7 U.S.C. § 2(a)(1)(A). Swaps include "any contract . . . that provides for any purchase, sale, payment, or delivery . . . that is [1] dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [2] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). The defendants argue that Kalshi's sports event contracts are not swaps because they are neither dependent on the occurrence or nonoccurrence of an *event*, nor *associated with* a potential financial, economic, or commercial consequence. (Doc. No. 34 at 22–24.) Kalshi disagrees, based on the language of the statute and CFTC regulation. (Doc. No. 41 at

13

6–9.) The court begins its analysis, as it must, with the statute's text. *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (citations omitted).

### a) Events

The CEA "define[s] 'swap' broadly." *Phillips*, 155 F.4th at 113. A swap is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A). The parties disagree about whether an "event" necessarily takes place over time—for example, the length of a football game—or whether it can be something that happens in an instant, as a result of things that have happened—for example, a team winning a football game.

The defendants argue that, with respect to sports, the *occurrence* of an *event* relates to whether a game takes place at all, whereas Kalshi's event contracts—regarding who wins, or how many points a player scores—concern the *outcome* of an event, not the event's occurrence or nonoccurrence. As the defendants put it, "Kalshi's sports-event contracts cannot be 'swaps' because they are not dependent on the sports event *taking place* (*i.e.*, its occurrence)—it is dependent on a *result* of the sports event (*i.e.*, its outcome)." (Doc. No. 34 at 22.) Based on this interpretation, Kalshi could offer sports event contracts concerning whether a game is played but not who will win or how many points a player will score.

The defendants cite dictionaries that define "occurrence" as "something that occurs," the "action or instance of occurring," and "[s]omething that happens or takes place," and dictionaries that define "event" as "usually impl[ying] an occurrence of some importance and frequently one having antecedent cause," and "significant occurrence or happening." (Doc. No. 34 at 22 (citations omitted).) Kalshi responds with its own dictionary definitions indicating that "event" means "outcome" and "[s]omething that happens." (Doc. No. 41 at 7 (citations omitted).) But even accepting the defendants' proposed definitions, if, for example, the Titans won a Super Bowl, that would be a significant occurrence, something that happened or took place, and an occurrence of

14

some importance with an antecedent cause—perhaps better coaching. Put another way, a three-hour-long game, and the Titans' winning that game, are both occurrences of events. As the plaintiffs put it, and the court agrees, "President Trump winning the 2024 presidential election was an outcome, but also an event." (*Id.*)[15] Based on the plain language of the statute, the plaintiff has shown a likelihood of prevailing on the issue of whether its event contracts concern the occurrences of events.

Moreover, this court's interpretation of the CEA squares with how courts have construed it outside of sports-betting. For example, in *United States v. Phillips*, the Second Circuit affirmed the district court's denial of the defendant's motion for a new trial. 155 F.4th 102, 133 (2d Cir. 2025). The defendant, a hedge fund founder, had been convicted of commodities fraud under the CEA for manipulating the U.S. dollar/South African rand exchange rate. *Id.* at 108, 111. The scheme was as follows:

> Phillips purchased an option that would pay out if, at some point between October 30, 2017, and January 2, 2018, the exchange rate dropped below 12.50 rand to 1 dollar. This type of option is called a "one-touch barrier option"—if 1 dollar were worth less than 12.50 rand (the "barrier") at any moment ("one touch") during that period, the option would be triggered.

---

[15] The District of Colorado reached the opposite conclusion in an opinion cited by the defendants. There, the court dissolved the preliminary injunction it had originally entered in Kalshi's favor because it found that "Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event. Thus, they are not swaps within the CEA's meaning." *Kalshi D. Nev. II*, 2025 WL 3286282, at *6. The court reasoned:

> the word "event" in this definition means "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group," and does not mean an outcome.

*Id.* (citing *N. Am. Derivatives Exch.*, 2025 WL 2916151, at *8). No other court appears to have examined this precise issue in as much depth as the District of Colorado, although the District of New Jersey, in its analogous case, found that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and granted Kalshi's motion for a preliminary injunction. *Kalshi D.N.J.*, 2025 WL 1218313, at *6.

15

*Id.* at 108. Discussing the history of CFTC regulation, the court wrote, "*swaps* . . . like the one-touch barrier option, *are* regulated by the CEA after the Dodd-Frank amendments." *Id.* at 113 (emphasis in original); *see also id.* at 112–113 ("An example of a swap is the type of one-touch barrier option at issue here: The parties entered into a contract based on their expectations about the relative value of dollars to rand."). Years before, the defendant had filed a motion to dismiss his indictment, which the district court denied. *United States v. Phillips*, 690 F. Supp. 3d 268, 293 (S.D.N.Y. 2023). In its analysis, the court quoted the CEA's definition of swap—the precise provision at issue here—and then continued, "[t]he Indictment alleges that the One Touch Option was a 'contract,' . . . that provided for a 'payment,' . . . based on the 'occurrence of an event,' *namely the USD/ZAR exchange rate falling below 12.50 at any point* prior to on or about January 2, 2018. Thus, the One Touch Option itself falls squarely within the CEA." *Id.* at 285 (quoting 7 U.S.C. § 1a(47)A(ii)) (emphasis added) (citations omitted). The same analysis applied to this case means that a contract providing for payment, for example, if "at any point during the game one team leads another by at least 20 points" would fall squarely within the CEA's regulation of swaps.

b)  *Potential financial, economic, or commercial consequence*

The defendants argue in the alternative that Kalshi's sports event contracts are not swaps because they are not "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). According to the defendants, for a sports event contract to constitute a swap, "the outcome of the event must be logically connected with" a financial result "that *naturally follows* from the sports outcome," which "requires more than simply *having* some incidental or down-the-line financial implication . . . . [T]here must be an inherent connection." (Doc. No. 34 at 23–24 (citing *Kalshi D. Nev. II*, 2025 WL 3286282, at *6).) But, the defendants argue, an individual player's performance, or the number of points a team scores, has no, or, if any, only attenuated, commercial consequence. (*Id.* at 24.) The plaintiff disagrees and takes issue

16

with the defendant's use of "inherent," which, it correctly points out, is not in the definition. (Doc. No. 41 at 8.) Rather, Kalshi argues, its contracts meet the CEA's lenient requirement that swaps be *associated* with *potential* financial consequences. (*Id.*)

The court pressed plaintiff's counsel on this very issue during the preliminary injunction hearing. (*See* Doc. No. 47, Tr. 14–17.) In response to the court's question regarding what possible financial consequence results from, for example, whether a particular player makes a three-pointer in the second half, plaintiff's counsel made two convincing points. First, aside from how many games a team wins during a season, individual player performance, and how a team performs, can have financial consequences, even if not right away. Second, the statute uses the term *potential* financial, economic, or commercial consequence. Congress could have imposed a more stringent requirement. Or it could have omitted a qualifier altogether. Congress chose to use "potential," which is broad. *Accord* Oral Argument at 3:44–3:53, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. Sept. 10, 2025), ECF No. 80 (Chagares, C.J.: "Well it's not only that, it's associated with a *potential* financial, economic or commercial consequence. I mean that's that's – that's pretty broad." (emphasis in original locution)), https://www2.ca3.uscourts.gov/oralargument/audio/25-1922KalshiexLLCv.MaryJoFlahertyetal.mp3 [perma: https://perma.cc/8YTV-Q8TW]. Moreover, Kalshi alleges that its contracts concern "financially significant events." (Doc. No. 1 ¶ 26.) And plaintiff's counsel represented that an office within Kalshi screens contracts to determine whether they are associated with a potential financial consequence. (*See* Doc. No. 47, Tr. 74.) In response to the court's request for an example of a contract that Kalshi would not offer, for lack of a potential financial consequence, plaintiff's counsel responded that it would not offer a contract on, for example, "what is the color of a Gatorade shower going to be[?]" (*Id.* 74–75.)

17

2.      *Preemption*

Kalshi argues that the CEA preempts Tennessee's efforts to regulate its sports event contracts.[16] When state and federal laws conflict, the Supremacy Clause of the U.S. Constitution "'provides a clear rule' that federal law wins out." *Churchill Downs*, 162 F.4th at 637 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Preemption can be express or implied, and implied preemption takes two forms: field and conflict. *Id.* at 637–38.[17] Kalshi argues that all three categories of preemption apply in this case. (Doc. No. 7 at 16–26; Doc. No. 41 at 9–12.) The defendants argue that federal law does not preempt their regulation of Kalshi's sports event contracts. (Doc. No. 34 at 30–38.) Because the court can rule solely on conflict preemption, it will not address express or field preemption.[18] *Accord Churchill Downs*, 162 F.4th at 638.

Under the doctrine of conflict preemption, "federal law preempts state law if the two 'directly conflict,'" which occurs when complying with both is "impossible," or when "state law 'stand[s] as an obstacle to the accomplishment' of Congress's objectives." *Id.* (first quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011); and then quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)). Kalshi is likely to succeed on either conflict preemption theory.

---

[16] The court does not reach Kalshi's argument that "Tennessee law does not permit the SWC to enforce state gambling laws against Kalshi." (Doc. No. 7 at 26–28.)

[17] As Kalshi points out, however, the Supreme Court has stated that categories of preemption are not "rigidly distinct" and has suggested that "'field' preemption may fall into any of the categories of express, implied, or conflict preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (citations omitted)."

[18] Other courts that have addressed field preemption in analogous cases have reached conflicting results. *Contrast Kalshi D. Nev. I*, 2025 WL 1073495, at *6 ("[B]ecause Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."), *and Kalshi D.N.J.*, 2025 WL 1218313, at *6 ("[A]t the very least field preemption applies[.]"), *with Kalshi D. Md.*, 793 F. Supp. 3d at 684 ("Kalshi has not shown a likelihood of success on the merits that the CEA has the effect of field-preempting the regulation of sports-event contracts that are traded on DCMs.").

18

*First*, Kalshi is likely to prevail on an impossibility argument. Under the CEA, a DCM "must provide its members . . . with impartial access to its markets and services, including . . . [a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1). As the court discussed above, Tennessee requires that bettors be at least 21 years old and "physically located in" Tennessee. Tenn. Code Ann. § 4-49-111. Kalshi argues that, if it were required to comply with Tennessee law, it would need to create a Tennessee-only exchange, on which those wishing to place bets from within Tennessee could only trade against other people in Tennessee, and those elsewhere could not bet with people in Tennessee. This, the plaintiff argues, would violate the CEA's impartiality requirement. (Doc. No. 7 at 26.) The defendants argue that the purpose of the impartial access rule was to ensure fairness to participants regardless of "economic means," not geographic location. (Doc. No. 34 at 38 (citing *Core Principles and Other Requirements for Designated Contract Markets*, 75 Fed. Reg. 80572 (proposed Dec. 22, 2010)).) This may be so, but the defendants have pointed the court to no caselaw stating that the purpose of CFTC's impartiality requirement, as promulgated, so limits its application.

The defendants rely on the opinion of the District of Maryland, which denied Kalshi's motion for a preliminary injunction, in part because it found that Kalshi had not shown a likelihood of success on a conflict preemption theory. (*See* Doc. No. 34 at 38 (citing *Kalshi D. Md.*, 937 F. Supp. 3d at 686).) In relevant part, that court was not persuaded by Kalshi's impartiality argument. *Kalshi Md.*, 937 F. Supp. 3d at 686 ("To the extent Kalshi is arguing that Maryland's gaming laws prevent it from complying with the impartial access principle by not allowing it to offer sports-event contracts to Marylanders unless it were to obtain a license, the Court rejects that argument."). The court concluded that Kalshi need only obtain a Maryland sports gambling license to allow it

19

to offer its platform to Marylanders and would thereby comply with the CEA's impartiality requirement. *Id.* But this court does not see how Kalshi could allow impartial access nationwide when those within Tennessee can only trade with others in the state, who are over 21 years old, and those outside the state cannot trade with those within the state. It is hard to see how a federally regulated nationwide derivatives exchange could function in this way, as the plaintiff argues. (Doc. No. 41 at 12.)

*Second*, even if Kalshi could comply with both state and federal law, Kalshi has shown that state law likely stands as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market. *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (citing *Am. Agric. Movement, Inc v. Bd. of Trade*, 977 F.2d 1147, 1155–57 (7th Cir. 1992), *abrogated on other grounds* by *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287–89 (1995)). As the defendants point out, however, states can share power with the CFTC over activities that lie outside its exclusive jurisdiction. (Doc. No. 34 at 36–37 (citation omitted).) For example, as the Seventh Circuit explained, "common law claims such as negligence, fraud, and breach of fiduciary duty could be brought by futures investors against their brokers" because "claims against brokers ha[ve] 'little or no bearing upon the actual operation of the commodity futures markets' and . . . '[o]nly in the context of market regulation does the need arise for uniform legal rules.'" *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric.*, 977 F.2d at 1156). By contrast, "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Id.* (quoting *Am. Agric.*, 977 F.2d at 1156). That is the case here. State law would directly affect trading on Kalshi by limiting who can trade with whom.

Accordingly, Kalshi has shown a likelihood of prevailing on the merits.

20

### C.  Irreparable harm

Kalshi has also met its burden to show a likelihood of irreparable injury without an injunction. The Sixth Circuit has explained that, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Vitolo*, 999 F.3d at 360 (quoting *Obama for Am.*, 697 F.3d at 436). The defendants argue that cases involving such a presumption are "almost entirely restricted" to cases involving personal liberties, like freedom of speech, "as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." (Doc. No. 34 at 40 (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987)).) But the defendants do not meaningfully contend with the Sixth Circuit's recent opinion, published in December 2025, finding irreparable injury where Michigan's attempt to enforce a state wagering law against an out-of-state wagering platform was preempted by the Interstate Horseracing Act under the Supremacy Clause. *Churchill Downs*, 162 F.4th at 635; *see also Kalshi D. Nev. I*, 2025 WL 1073495, at *7 ("A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992))).

Absent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability, or else attempt to comply. Both options, it argues, constitute irreparable harm. The court agrees. The Letter demands that Kalshi cease offering sports event contracts to people in Tennessee, void all pending contracts entered into by a person in Tennessee, and return deposits for pending contracts. (Doc. No. 1-6 at 3.) Kalshi argues that discontinuing access to the nationwide exchange for its roughly 50,000 Tennessee users would cause lost profits and reputational harm. (Doc. No. 7 at 29.) In addition, because Kalshi operates a nationwide exchange through which traders enter contracts throughout the country, to which Kalshi is not a party—including traders who are only temporarily in Tennessee—determining which contracts to

21

void would be logistically difficult, and Kalshi would lose money by refunding some deposits because of the way the trading on Kalshi is collateralized. (Doc. No. 9, Sottile Decl. ¶¶ 18–38.) Kalshi further argues that cancelling contracts may jeopardize its compliance with CFTC regulations, and therefore its status as a DCM—in particular the requirement that Kalshi offer impartial access and prevent market manipulation and price distortion. (*Id.* ¶¶ 49–56 (first citing 17 C.F.R. § 38.250; and then citing 17 C.F.R. § 38.151(b)).)[19] In addition, Kalshi argues that it would face reputational injuries. (Doc. No. 7 at 30–31.) As the Sixth Circuit recently held, losing access to thousands of users and reputational harm suffice for irreparable harm. *Churchill Downs*, 162 F.4th at 643; *accord Kalshi D.N.J.*, 2025 WL 1218313, at *7 ("Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.").

The defendants respond that Kalshi's harms are "speculative at best," because (1) its sports event contracts make up only a portion of its business; (2) Kalshi has not shown that its Tennessee users would stop using Kalshi; (3) Kalshi could "easily comply with both Tennessee law and the CEA if it wanted to," and any logistical burdens are the cost of doing business in Tennessee; and (4) other courts have already denied Kalshi's motions for a preliminary injunction, so "any reputational harm has already occurred." (Doc. No. 34 at 40–41.)

---

[19] The court notes, however, that Kalshi has not presented evidence that the CFTC would likely take adverse action against Kalshi "for complying with court orders . . . while the various lawsuits play out." *Kalshi D. Nev. II*, 2025 WL 3286282, at *12. If anything, Kalshi has presented evidence showing the CFTC's solicitude to the sports event contracts industry. *See* Doc. No. 44-1, Remarks of Chairman Michael S. Selig, The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance at 6 (Jan. 29, 2026) ("I have directed CFTC staff to withdraw the 2024 event contracts rule proposal that would prohibit political and sports-related event contracts[.]"); *see also* 91 Fed. Reg. at 5386 (withdrawing proposed rule published at 89 Fed. Reg.).

These arguments are unconvincing. First, a company may suffer irreparable harm even if only some of its business is affected. And, at bottom, Tennessee's argument is that Kalshi need only obtain a license in Tennessee to accept bets in this state, and therefore its harms are self-inflicted. But it is unclear how Kalshi could operate a nationwide exchange subject to Tennessee's restrictions. And, as Kalshi has shown, complying with the Letter's demands would be difficult and costly. Moreover, Kalshi has shown a likelihood of reputational harm among Tennessee users, notwithstanding the opinions of some courts that have sided against it.

### D.    Balance of interests

The third and fourth factors in the preliminary injunction analysis—substantial harm to others and the impact of the injunction on the public interest—merge because the defendant is the state. *Churchill Downs*, 162 F.4th at 643 (citing *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). And "enjoining the enforcement of a law that violates constitutional rights 'is always in the public interest.'" *Id.* (quoting *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (per curiam)).

Kalshi faces substantial expenses and reputational harm if it complies with Tennessee's demands, or civil and criminal enforcement if it does not. Tennessee, meanwhile, is likely to face no harm because the court finds its enforcement in this case is likely preempted. And, if the defendants succeed on the merits, the court can then pursue enforcement against Kalshi. As another court has noted, a finding for Kalshi on a motion for preliminary judgment "does not prejudge a finding for defendants through dispositive motion practice or trial." *Kalshi D.N.J.*, 2025 WL 1218313, at *7 (citation omitted).[20]

---

[20] The court acknowledges the defendants' argument that the SWC has a statutory duty to protect consumers, and in particular "vulnerable consumers." (Doc. No. 34 at 42.) Furthermore, the court appreciates the defendants' position that "[s]ports gaming is highly addictive, particularly among young men, so protecting consumers aged 18 to 20 from exposure to sports gaming is an

23

Accordingly, the balance of preliminary injunction factors weighs in Kalshi's favor, and the court will grant Kalshi's Motion for Preliminary Injunction (Doc. No. 6) as to the state-official defendants.

### E.     Bond

The court has discretion over whether the movant needs to post a security bond and, if so, how much it should be. *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins.*, 714 F.3d 424, 431 (6th Cir. 2013). In compliance with this court's TRO, Kalshi has already posted $500 in security. (Doc. No. 22 at 2; Doc. No. 25.) Kalshi requests that the court require no further security, or, in the alternative, a *de minimis* bond, because the defendants "will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation." (Doc. No. 7 at 32 n.7.) The defendants request that, if the court grants Kalshi's motion, it require a bond of $875,000. (Doc. No. 34 at 42.) According to the defendants, this amount represents 10% of the fine Kalshi would owe the state if it had accepted just *one* sports wager each day since it first offered sports event contracts, in January 2025. (*Id.* (citing Tenn. Code Ann. § 4-49-127).)[21] Kalshi argues that the defendants' request is unreasonable. (Doc. No. 41 at 15.)

---

important state interest." (*Id.* at 10–11 (citations omitted).) And the court notes that part of the taxes on licensed sports gambling in Tennessee goes toward fighting problem gambling. On the record presently before the court, it does not appear that Kalshi limits its services to those 21 and over, and therefore the state's legitimate concern that Kalshi contributes to problem gambling, particularly among young adults, is not lost on this court. However, as the District of Columbia has stated, "[t]his case is not about whether the Court likes Kalshi's product or thinks trading it is a good idea. The Court's only task is to determine what Congress did, not what it could or should do." *Kalshi D.D.C.*, 2024 WL 4164694, at *1.

[21] Alternatively, there are 53,233 "full-fledged Kalshi Members" with a Tennessee address. (Doc. No. 9, Sottile Decl. ¶ 30.) Assuming each of those members has made exactly one trade, Kalshi could be liable to the state for $1,330,800,000. Tenn. Code Ann. § 4-49-127(b)(2) (listing penalties for the first ($10,000), second ($15,000), and subsequent offenses ($25,000)).

24

If the defendants succeed on the merits, they can seek fines against Kalshi. But they will have lost months, if not years, of maintaining the integrity of sports betting and treating and preventing problem gambling and gambling disorders, including among those under 21 years of age, as the Act requires. (Doc. No. 35, Thomas Decl. ¶¶ 5, 8–9, 14, 18 (citations omitted).) Some portion of Kalshi's Tennessee members, the court presumes, are "minors" under Tennessee gambling law. Tenn. Code Ann. § 4-49-102(19). And it is likely that some portion of Kalshi's Tennessee members now have, or will develop during the pendency of this case, gambling disorders. If the defendants succeed on the merits, then the cost to the state for being improperly enjoined is the missed opportunity to help problem gamblers, would-be problem gamblers, and minors, some of whose behavior will lead to heartbreak for themselves and their families, with consequent deleterious effects on the state.

The court will order Kalshi to post an additional bond of $500,000. Either party may file a properly supported motion to increase or decrease the bond amount.

## V.    CONCLUSION

For the forgoing reasons, the court will grant the plaintiff's Motion for Preliminary Injunction (Doc. No. 6) as to the state official defendants and deny it as to the state agency. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

25