

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
OFFICE OF THE SOLICITOR GENERAL
PO BOX 080
TRENTON, NJ 08625-0080

**MIKIE SHERRILL**
*Governor*

**DR. DALE G. CALDWELL**
*Lt. Governor*

**JENNIFER DAVENPORT**
*Attorney General*

**JEREMY M. FEIGENBAUM**
*Solicitor General*

March 12, 2026

**<u>VIA ECF</u>**

Patricia S. Dodszuweit, Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

> Re: ***KalshiEX LLC v. Mary Jo Flaherty, et al.***, No. 25-1922
> **FRAP 28(j) Letter**

Dear Ms. Dodszuweit:

Appellants advise of *KalshiEX, LLC v. Schuler*, 25-cv-1165 (S.D. Ohio Mar. 9, 2026), and *QCX LLC v. Nessel*, 26-cv-710 (W.D. Mich., Mar. 10, 2026), which joined the growing number of courts holding that the Commodity Exchange Act does not preempt state regulation of sports-event contracts.

Both *Schuler* and *Nessel* declined to enjoin enforcement of state gaming regulations against sports-event contracts. As *Schuler* explained, sports-event contracts are not "swaps" because the Act's definition is limited to a "transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*"; "the number of points scored in the Huskies-Bobcats game does not." Op.11–12. *Nessel* agreed: "[a]nything can potentially have economic ramifications given enough attenuation and happenstance." Op.6. So reading



"associated with" in the Act's swap definition "to require an inherent connection to those consequences rather than a downstream, attenuated consequence" both "reins in the potential chains of association to infinity" and keeps the statutory text "in line with its surrounding provisions." *Id.*

As *Schuler* explained, a contrary interpretation would be absurd: the Act makes it unlawful "to enter into a swap" outside of a DCM, so if "swaps" included sports-event contracts, then all sports bets "would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business." Op.12. And Kalshi's counterargument—that States can still regulate off-exchange bets— makes no sense: that logic is "self-fulfilling, circular, and inconsistent with the statutory text." Op.13.

Regardless, the Act does not preempt States' gaming laws. Op.14. Its "text and structure" leave "ample room for states to legislate and regulate." Op.17. The Act also "expressly preempts state gambling laws in certain limited circumstances" not present here—"strong evidence" against preemption. *Id.* Nor does state law conflict with the Act: by statute and regulation, sports-event contracts are not "regulated by or permissible under" the Act. Op.18–20. And it is not impossible for Kalshi to comply with state and federal law. Op.20.

Together, *Schuler* and *Nessel* further confirm that sports-event contracts are not subject to the Act at all, much less that the Act preempts longstanding state gambling laws.

Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/ Liza B. Fleming*
     Liza B. Fleming
     Deputy Attorney General

cc:  All counsel (via ECF)
Word Count: 350



# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KALSHIEX, LLC,**

        **Plaintiff,**

    **v.**

**MATTHEW T. SCHULER,** *et al.***,**

        **Defendants.**

:

:

**Case No. 2:25-cv-1165**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M.**
**Vascura**

## OPINION AND ORDER

KalshiEX, LLC operates a futures exchange specializing in event contracts. An event contract is a "form of derivatives contract" that allows "users" across the nation to "trade on the outcome of real-world events." (Compl., ECF No. 1, ¶¶ 29, 46.) In January 2025, Kalshi listed its first contract allowing traders to take positions on the outcome of a sporting event. Given the sports-event contracts' resemblance to sports betting, state gaming regulators began knocking on Kalshi's door; Ohio's Casino Control Commission was among them. After months of correspondence, the Commission concluded that Kalshi's provision of sports-event contracts to Ohio consumers violated state law; it threatened to initiate civil and criminal enforcement actions if Kalshi continued.

Kalshi initiated this suit to enjoin the Commission and the Ohio Attorney General from regulating contracts traded on Kalshi's exchange. (Compl.) The matter is before the Court on Kalshi's Motion for Preliminary Injunction. (Mot., ECF No. 11.) Ohio responded (Resp., ECF No. 31-5) and Kalshi replied (Reply, ECF

No. 49). The Indian Gaming Association, National Congress of American Indians, Washington Indian Gaming Association, Arizona Indian Gaming Association, California Nations Indian Gaming Association, Oklahoma Indian Gaming Association, Minnesota Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, San Manuel Gaming and Hospitality Authority, and twenty-two federally recognized Indian Tribes filed an Amicus Brief in support of Ohio's response to the Motion. (Amicus Br., ECF No. 55.) The parties have also made the Court aware of relevant authority issued since the Motion was filed. (ECF Nos. 57, 61, 64, 66, 68.)

For the reasons below, Kalshi's Motion for Preliminary Injunction is **DENIED.**

## I. BACKGROUND

There is no dispute about the facts giving rise to this case. The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quotation omitted). Subject to limited exceptions, the CEA gives the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on" boards of trade or designated contract markets. 7 U.S.C. § 2(a)(1)(A). "Swaps" were only added to the CFTC's portfolio in 2010, by way of the Dodd-Frank Wall Street Reform and Consumer Protection Act developed

in the aftermath of the 2008 financial crisis. *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 11 (D.D.C. 2014).

Kalshi was first approved as a designated contract market ("DCM") in 2020. The company "specializes in event contracts," which are instruments that provide for payment based on the occurrence of an event or contingency. (Compl., ¶ 47.) *See also* 7 U.S.C. §§ 1a(47), 7a-2(c)(5)(C). As Kalshi describes it, an event contract

> identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a . . . contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

(Compl., ¶ 29.)

A DCM must conduct its business in accordance with certain "core principles," including that the DCM comply with the CEA and any CFTC rules and regulations. 7 U.S.C. § 7(d)(1)(A). A DCM can list new contracts for trading on its exchange in two ways: it can either request approval from the CFTC, 7 U.S.C. § 7a-2(c)(4), or it can "self-certify" that the contract complies with all applicable law and list the contract subject to an opportunity for CFTC review, 7 U.S.C. § 7a-2(c)(1). Event contracts are subject to an additional "Special Rule" for review and approval. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). Under the Special Rule, the CFTC has explicit authority to conduct a public-interest review of newly listed event contracts that "involve" unlawful activity, terrorism, assassination, war, gaming, or other similar activity. *Id.* The CFTC has further authority to prohibit a DCM from listing an

3

event contract that has been determined to be against the public interest. *Id*. The CFTC has, by rulemaking, concluded that event contracts involving the enumerated activities are contrary to the public interest and DCMs are thus prohibited from listing them. 17 C.F.R. § 40.11.

For five years, Kalshi offered a platform for trading event contracts on "an array of substantive areas" while complying with the CFTC's "extensive" regulatory framework. (*Id*., ¶¶ 40, 48.) Then, on January 22, 2025, Kalshi self-certified "the first of a number of sports contracts that are now available on its exchange." (*Id*., ¶ 49.) These contracts (which the Court will refer to as "sports-event contracts") "allow users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." (*Id*.)

Two months later, the Ohio Casino Control Commission sent Kalshi a letter (i) warning the company that it appeared to be operating an "unlicensed sportsbook" and "facilitating bookmaking" in violation of Ohio civil and criminal law, and (ii) demanding that Kalshi cease offering sports-event contracts in Ohio without complying with Ohio's sports gambling laws. (ECF No. 1-1 (citing Ohio Rev. Code §§ 2915.02, 3775.02, 3775.99).)

Like many other states, Ohio legalized sports gambling after the Supreme Court struck down the federal prohibition on state-approved sports betting. *See, e.g., Commonwealth of Mass. v. KalshiEX, LLC*, No. 2584CV02525, 2026 WL 188019, at *3 (Mass. Super. Jan. 20, 2026) (noting that Massachusetts legalized

sports betting in 2022) (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)). Even still, sports gambling "cannot be offered in Ohio without a license issued by the Commission." (ECF No. 1-1 (citing Ohio Rev. Code § 3775.03(A).) Licensees must then comply with Ohio Revised Code Chapter 3775. Among other things, Chapter 3775 prohibits sports gambling for people under age 21 and for identified problem gamblers. Ohio Rev. Code §§ 3775.13, 3775.99(A)(2). As the Commission pointed out in its letter, Kalshi does not have a sports gambling license and only age-gates its platform for those under 18. (ECF No. 1-1.) The Commission also sent a letter to sports gambling licensees advising that companies that offer sports-event contracts "are operating online sports gaming"; the Commission warned that a licensee's decision to affiliate with an unlicensed sports gaming operator may form the basis of Commission action against the licensee. (ECF No. 31-1, PAGEID # 428–29.)

The parties engaged in fact-finding and dialog for more than six months before the State demanded Kalshi comply with Ohio's sports gambling laws. (ECF Nos. 1-2, 1-3, and 1-4.) This suit followed.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602

5

U.S. 339, 345–46 (2024)). "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 372 (2022) (further quotation omitted).

Courts examine four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury without a preliminary injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the requested injunction. *EOG Res.*, 134 F.4th at 874 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). While courts generally "balance" these four factors, a plaintiff must prove all four to prevail. *Id.* at 885 (citing *Winter*, 555 U.S. at 20).

## III. ANALYSIS

This Court is not the first to hear a request from Kalshi to enjoin a state from applying its gaming regulations to sports-event contracts listed on Kalshi's exchange. The question has been considered by at least four other federal district courts and is pending before at least three courts of appeals. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (denying Kalshi's motion for preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) (granting Kalshi's motion for preliminary injunction), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) (granting Kalshi's motion for preliminary

injunction) (*Hendrick I*), *order dissolved*, 2025 WL 3286282, --- F. Supp. 3d --- (D. Nev. 2025) (dissolving the earlier order granting Kalshi's motion for preliminary injunction) (*Hendrick II*), *stay denied*, No. 25-7516 (9th Cir. Feb. 17, 2026); *KalshiEX LLC v. Orgel*, No. 3:25-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting Kalshi's motion for preliminary injunction). Having studied the parties' filings and the growing body of relevant case law, the Court concludes that the instant motion presents questions of law, not fact.[1] As such, no hearing is necessary to issue a ruling. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007). For the reasons below, Kalshi fails to make a clear showing that it is entitled to the extraordinary preliminary injunctive relief it seeks.

## A. Likelihood of Success on the Merits

The merits of this case center on the Constitution's Supremacy Clause. U.S. CONST. art. VI, cl. 2. The Supremacy Clause "specifies that federal law is supreme in case of a conflict with state law." *Murphy*, 584 U.S. at 477. Said another way, when state and federal laws are "in conflict or at cross-purposes," "federal law wins out." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

---

[1] The parties represented to the Court at the Rule 65.1 Informal Conference that neither "discovery" nor "fact-finding" was necessary on the preliminary injunction. (ECF No. 30, PAGEID # 354–55.) They later declined the Court's invitation to convert the motion for preliminary injunction to a motion for judgment on the merits. (*See id.*, PAGEID # 367–68.)

Kalshi argues that the CEA preempts Ohio's sports gambling laws and, as a result, Ohio cannot regulate the sports-event contracts either directly (by requiring Kalshi to apply for a license) or indirectly (by restricting Kalshi's ability to do business with Ohio licensees). In Kalshi's view, the CEA's grant of exclusive jurisdiction over DCMs and the event contracts they list gives the CFTC authority over the sports-event contracts. Ohio argues in response that sports-event contracts fall outside the CFTC's exclusive jurisdiction and that, in any case, Congress did not intend the CEA to preempt states from exercising their police power to regulate sports gambling.

### 1. The CEA does not govern the sports-event contracts.

Before considering whether the CEA preempts Ohio's sports-gambling laws, the Court must ask whether the CEA even applies. The CEA grants the CFTC "exclusive jurisdiction" over "accounts, agreements . . . , and transactions involving swaps . . . traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A). The CEA provides several definitions of "swap." *See* 7 U.S.C. § 1a(47)(A). Kalshi relies on subsection (ii), which defines a "swap" as a contract "that provides for . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence[.]" 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define the words comprising this definition. The parties disagree over whether the sports-event contracts constitute "swaps."[2]

---

[2] Kalshi engages in a painstaking effort to point out differences between traditional gambling and the sports-event contracts traded on its exchange. (*See*

As the Supreme Court has recognized, "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (internal quotation marks and citation omitted). Where, as here, undefined terms lead to a dispute over a statute's meaning, courts walk the "well-trod path" of statutory interpretation. *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018). On the first pass, those terms are given their "ordinary and natural meaning." *Id.* (quoting *United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013)). But if "a word in isolation is susceptible of multiple meanings," courts also consider the word's "placement and purpose in the statutory scheme." *Id.* (quoting *Miller* at 540). Finally, "working only within the range of 'textually permissible meanings,' [courts] consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose." *Id.* at 442–43 (quoting Antonin Scalia & Bryan A. Garner, Reading Law 57 (2012)). It follows that "courts should not construe a statute to produce an absurd result that [the court is] confident Congress did not intend." *Id.* at 447.

Kalshi gives the words comprising the "swap" definition broad meaning. It construes "occurrence of an event" to include the outcome of a sporting contest (*Who will win the NCAA football match-up between Northern Illinois University and Ohio University?*) and happenings within it (*Will the total number of points scored in that*

---

Mot., 7, 8; ECF No. 11-2, PAGEID # 248–49, 251; ECF No. 11-3, PAGEID # 260–61, ECF No. 11-6, PAGEID # 285.) Though tempting to engage with this question, it is the wrong one. The pertinent question here is not "Are sports-event contracts gambling?"—it is "Are sports-event contracts swaps?"

*game exceed 41?*). (*See* ECF No. 31-2, PAGEID # 446.) Kalshi also construes

"associated with a potential financial, economic, or commercial consequence" to

encompass all of sports business: ticket sales, hotel rooms, athlete sponsorships,

coaching staff salaries, broadcast rights, licensing and merchandising, and tourism.

(Reply, PAGEID # 639.)

Ohio urges a more limited construction of those words, hemmed in by the

statute's context. The State looks to subsections (i) and (iii) of the "swap" definition

to identify guideposts for interpreting subsection (ii). In full, subsections (i)–(iii)[3]

define "swap" to include any agreement, contract, or transaction

> (i)      that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

> (ii)      that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; [or]

> (iii)      that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in

---

[3] "Swap" also includes any agreement, contract, or transaction "that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;" that is a security-based swap agreement "of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein;" and "that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)." 7 U.S.C. §§ 1a(47)(iv)–(vi).

> whole or in part, the financial risk associated with a future
> change in any such value or level without also conveying a current
> or future direct or indirect ownership interest in an asset
> (including any enterprise or investment pool) or liability that
> incorporates the financial risk so transferred[.]

7 U.S.C. §§ 1a(47)(A). Subsection (iii) goes on to list specific examples of swaps, including: an interest rate swap; a foreign exchange swap; an equity index swap; a debt swap; a credit spread; a weather swap; an energy swap; a metal swap; an agricultural swap; an emissions swap; and a commodity swap. Canons of statutory interpretation counsel courts to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Applying this canon to the CEA, Ohio argues that swaps are limited to "events and contingencies that have a . . . direct and inherent association with matters of financial, economic, or commercial consequence." (Resp., 12.)

Both interpretations of the CEA are textually permissible, but Ohio's better serves the purpose of the statute. By enacting the CEA, Congress sought to serve the national public interest of "managing and assuming price risks, discovering prices, or disseminating pricing information" by establishing a system to deter market disruptions, ensure financial integrity, avoid systemic risk, protect market participants from fraud and abuse, and promote responsible innovation. 7 U.S.C. § 5. These goals are better achieved when a "swap" is understood as a transaction involving financial instruments and measures that traditionally and directly <u>affect</u>

11

commodity prices. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not.[4]

This conclusion is further supported by the Court's obligation to avoid absurdity. Ohio argues that absurd results would flow from defining a "swap" to include a sports-event contract. The Court agrees. The CEA makes it "unlawful for any person[[5]] . . . to enter into a swap" outside of a DCM. 7 U.S.C. § 2. Under Kalshi's construction, a sports-event contract is a swap because it is a contract for payment based on the outcome of a sporting event. But if that is true, then all contracts for payment based on the outcome of a sporting event—all sports bets— would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business.[6] In the absence of congressional intent to effect such a sea

---

[4] The Middle District of Tennessee recently issued a decision granting Kalshi's motion for preliminary injunction after finding that the sports-event contracts constitute swaps. *Orgel*, 2026 WL 474869 at *7. But the court stopped short of considering whether Kalshi's or the state's interpretation of the CEA better served the statute's purpose. Instead, the court pointed to *United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) to support its conclusion that, under the plain language of the CEA, Kalshi's sports-event contracts are swaps. *Orgel* at *8. But the swap at issue in *Phillips* dealt with the exchange rate of the U.S. dollar to the South African rand—a financial measure that directly affects commodity prices.

[5] Eligible contract participants (institutional or other highly sophisticated investors) are permitted to enter into off-DCM swaps. *See* 7 U.S.C. § 1a(18) (defining "eligible contract participant").

[6] Further, as Amici argue (and Kalshi does not dispute), finding that sports-event contracts are swaps, and thus must be traded on DCMs would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land. (Amicus Br., *generally*.) "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

change, that result is absurd. Kalshi resists this point, arguing that the CEA leaves Ohio "free to apply state laws to *off-DCM* transactions offered by traditional sportsbooks." (Reply, 9 (citing 7 U.S.C. § 2(a)(1)(A).) As the *Hendrick II* court aptly described it, Kalshi's argument boils down to this: "if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange." *Hendrick II*, 2025 WL 3286282 at *9. Like the District of Nevada, this Court finds Kalshi's logic "self-fulfilling, circular, and inconsistent with the statutory text." *Id.*

What's more, the CEA's legislative history indicates that at least some members of Congress believed that sports-event contracts would <u>not</u> be considered swaps. During a July 15, 2010 exchange with Senator Diane Feinstein, Senator Blanche Lincoln (who, as Chair of the Senate Agricultural Committee, was a principal contributor to the Dodd-Frank Wall Street Reform and Consumer Protection Act) acknowledged that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament"—but that "[t]hese types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." 156 CONG. REC. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).

Kalshi fails to clearly show that its sports-event contracts are subject to the CFTC's exclusive jurisdiction and thus fails to establish a likelihood of success on the merits.

## 2. Even if the CEA governs, Kalshi fails to establish that Ohio's sports gambling laws are preempted.

Even if this Court were to find that sports-event contracts are swaps subject to the CFTC's exclusive jurisdiction, Kalshi has not shown that the CEA would necessarily preempt Ohio's sports gambling laws.

The Sixth Circuit recently explained the three ways federal law can preempt state law:

> Sometimes, Congress expressly withdraws specified powers from the states. [*Arizona v. United States*, 567 U.S. 387, 399 (2012).] Express preemption provisions indicate Congress's preemptive intent through language rather than through a statute's structure and purpose. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).
>
> Preemption can also be implied. There are two kinds of implied preemption: field and conflict.
>
> Field preemption is the principle that States may not regulate conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 390 (2015) (Natural Gas Act occupies the field of "wholesale sales and transportation of natural gas in interstate commerce," but preserves state-law antitrust claims based on gas price manipulation). And, in the context of field preemption, the Supreme Court has noted "the importance of considering the target at which the state law aims in determining whether that law is preempted." *Id*. at 385.
>
> Under the principle of conflict preemption, federal law preempts state law if the two "directly conflict." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011). That occurs when compliance with both is impossible, or when . . . state law "stand[s] as an obstacle to the accomplishment" of Congress's objectives. *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020); *Arizona*, 567 U.S. at 399.

*Churchill Downs*, 162 F.4th at 637–38 (citations simplified).

14

Kalshi argues that Ohio's sports gambling laws are field and conflict preempted by the CEA when it comes to sports-event contracts traded on its exchange.[7] Congressional intent—as shown in a statute's language, structure, and purpose—is "the ultimate touchstone" of any implied preemption inquiry. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 860 (6th Cir. 2023) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Kalshi fails to establish that Congress intended the CEA to preempt state laws on sports gambling.

### a)   Field Preemption

To examine the extent of the CEA's field preemption, the Court must first define the field in which the CEA has preemptive effect. Kalshi argues that the CEA preempts "the field of regulating trading on DCMs[.]" (Mot., 11.) Ohio asserts that framing is overbroad, and urges the Court to focus instead on whether Congress intended to preempt state laws regulating sports gambling. (Resp., 21.) The Supreme Court has "emphasize[d] the importance of considering the *target* at which [a] state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasis in original). Kalshi offers no compelling reason to upset the recognized and "coherent federal policy . . .

---

[7] Kalshi briefly argues in its reply that the CEA expressly preempts the application of Ohio's sports gambling laws. (Reply, 10–11.) The argument is made only in passing and is thus considered waived for purposes of the instant motion. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation and alteration omitted).

respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. Instead, the Court finds several compelling reasons why the CEA does not disturb Ohio's sports gambling laws.

As in any implied preemption case, the Court starts with a presumption against preemption. "Because preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (quoting *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). The "enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989); *cf Churchill Downs*, 162 F.4th at 635 (noting that states "have traditionally regulated intrastate gambling activity like wagering on horseracing"). It would thus be "inappropriate" to treat the CEA as preempting Ohio's sports gambling laws without first finding that Congress had the "clear and manifest purpose" to do so. *Wellons v. Nw. Airlines, Inc.*, 165 F.3d 493, 494 (6th Cir. 1999) (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).

History reveals no evidence that Congress intended to preempt state sports gambling laws. Consider the legal landscape in 2010, when Dodd-Frank amended the CEA to govern swaps. At the time, the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701, *et seq.*, largely prohibited states from authorizing sports betting; it allowed only the handful of states that already

16

regulated sports gambling to maintain their regimes. 28 U.S.C. §§ 3702, 3704(a). It was not until eight years after the passage of Dodd-Frank that the Supreme Court struck down PASPA. *Murphy*, 584 U.S. at 474. There is no evidence that Congress intended the CEA to preempt sports gambling laws in those few states where it was allowed under PASPA. In fact, all available evidence points to the contrary.

First, the CEA's text and structure support the conclusion that Congress did not intend to preempt state sports gambling laws. It is beyond dispute that the CEA has, and was intended to have, some preemptive effect. But it is just as clear that the CEA does not cover the waterfront of DCM-related activity. The language of 7 U.S.C § 2(a)(1)(A) illustrates the point. The statute gives the CFTC "exclusive jurisdiction" over swaps and futures traded on DCMs. It goes on to say that, outside of those swaps and futures, "nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State[.]" *Id.* This language leaves ample room for states to legislate and regulate, as Ohio has, on matters tangential to trading swaps and commodity futures on DCMs.

Further, the CEA expressly preempts state gambling laws in certain limited circumstances. *See* 7 U.S.C. § 16(e)(2) (preempting "any State or local law that prohibits or regulates gaming or the operation of bucket shops" in the case of electronic trading facilities and agreements excluded or exempted from the CEA under enumerated provisions). But those circumstances do not cover the sports-event contracts at issue here. As other courts have recognized, this is "strong

17

evidence" that Congress did not intend the CEA to preempt state sports gambling laws. *Martin*, 793 F. Supp. 3d at 681 (citing *Cipollone*, 505 U.S. at 517).

And finally, the CFTC has itself recognized Congressional intent to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011). Indeed, that was the policy behind the Special Rule's public-interest review. *See* 156 CONG. REC. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).

Kalshi thus fails to establish a likelihood of success on its field preemption theory.

### b) Conflict Preemption

Kalshi also argues that conflict preemption applies because Ohio law poses an obstacle to the accomplishment of Congress's purpose and because complying with both sets of law would be impossible. Both arguments fail.

Kalshi first argues that Ohio law poses an obstacle to the accomplishment of Congress's purpose in enacting the CEA. (Mot., 15.) In Kalshi's view, once the company "was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were 'contrary to the public interest,' 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so." (Mot., 16.) By extension, Ohio's attempt to regulate Kalshi's conduct "substantially interfere[s] with the CFTC's

discretion," frustrating Congress's intent to centralize regulation of futures trading markets.[8] (*Id.*, 17.)

First, Kalshi overstates Congress's intent. As explained above, the CEA's text, structure, and history support the conclusion that Congress did not intend to preclude any and all state action relative to DCMs. *See, e.g.*, 7 U.S.C. §§ 7(a)(1)(A), 16(e)(1). And further, Kalshi overstates its authority. Though a DCM can list any contract that it self-certifies, the certification does not carry the force of law. Said another way, the DCM can certify, <u>but cannot conclude</u>, that the contract is lawful. That authority rests with the CFTC and, if in dispute, with the courts.

Here, in fact, the CFTC prohibits DCMs from listing any event contract "that involves, relates to, or references . . . gaming[.]" 17 C.F.R. § 40.11(a). That includes, by Kalshi's own admission (albeit in separate litigation), "a contract on who's going to win the Kentucky Derby" or "the point spread in the Super Bowl[.]" *KalshiEx LLC v. Commodity Futures Trading Comm'n*, D.D.C. Case No. 1:23-cv-3257-JMC (Oral Arg. Tr., ECF No. 40, 14:9–13). *Accord KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *8, *10 (D.D.C. Sept. 12, 2024) (adopting Kalshi's position that "gaming" as used in the CEA "refers to playing games or playing games for stakes"). This Court does not endeavor to explain why the CFTC has not exercised its authority under the Special Rule or § 40.11(a) with respect to the sports-event contracts. But the agency's inaction is not

---

[8] Kalshi points out that the CEA seeks to establish nationwide standards for futures markets—but Congress has done the opposite with gambling, leaving that topic for the states to govern on a state-by-state basis.

proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not.

*Impossibility*. Kalshi also argues that it would be impossible to comply with the CEA's core principles and Ohio's sports gambling laws at the same time. CFTC regulations require DCMs to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). Meanwhile, Ohio's sports gambling laws restrict licensees from accepting wagers made by individuals who are not physically present in Ohio. Ohio Rev. Code § 3775.11(A). In Kalshi's view, the CFTC's impartial-access rule is in direct conflict with Ohio's location-based requirements. But Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as "partial."

Kalshi fails to establish a likelihood of success on a conflict preemption theory.

### B. Irreparable Injury

Kalshi next asserts that it will face wide-ranging irreparable injury without an injunction, including: the threat of civil and criminal enforcement action, harm to customer goodwill and the company's reputation, and the cost of implementing geofencing technologies. Because Kalshi fails to carry its burden on the remaining three factors, analysis of irreparable injury is unnecessary.

### C. Balance of Equities

Because Kalshi seeks an injunction against a state government, the final two preliminary injunction factors (harm to third parties and the public interest) are considered together. *Churchill Downs*, 162 F.4th at 643. Kalshi argues that

requiring "[i]mmediate compliance with Ohio law . . .will harm Kalshi's users in Ohio and impose intractable technological difficulties on a very short timeframe[,]" thus weighing in favor of the injunction. (Mot., 24.) These concerns are dwarfed by Ohio's interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare.[9] *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). The balance of equities and public interest thus cut in favor of the State.

## IV.   CONCLUSION

Because the Court finds that Kalshi has not carried its burden to establish that the circumstances demand such extraordinary relief, the Motion for Preliminary Injunction is **DENIED**.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[9] This Court has not been called upon to pass judgment on the wisdom or morality of sports betting. But the Undersigned feels compelled to remark on the risk Kalshi's sports-event contracts pose for Ohioans ages 18 through 20. The General Assembly determined these individuals were too young to participate in legal sports gambling, *see* Ohio Rev. Code § 3775.99(A)(2), but they have unrestricted access to sports-event contracts on Kalshi's exchange. This population is particularly vulnerable to problem gambling (Schuler Decl., ECF No. 31-1, PAEGID # 423) and, when trading on Kalshi, is unprotected by Ohio's responsible gaming laws.

# Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QCX LLC,                                    )
              Plaintiff,                    )
                                           )       No. 1:26-cv-710
v.                                          )
                                           )
                                           )       Honorable Paul L. Maloney
DANA NESSEL, *et al.*,                       )
              Defendants.                   )
_____  )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

This matter comes before the Court on Plaintiff's motion for a temporary restraining order ("TRO") and preliminary injunction. (ECF No. 15). Defendants have not yet had the opportunity to be heard, so the Court presently only considers the motion insofar as it requests a TRO. *See* Fed. R. Civ. P. 65(b). The Court is not persuaded that the likelihood of success on the merits is great enough to warrant a TRO, nor is it persuaded that there is sufficient evidence that irreparable injury will result before Defendants can be heard. *See id.* 65(b)(1)(A). While additional argument and evidence may yet persuade the Court with regard to a preliminary injunction, the Court finds a TRO is not warranted, so Plaintiff's motion will be denied to that extent.

### I.

District courts may issue TROs at their discretion. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Under Rule 65, courts may issue TROs without notice to the adverse party only if two conditions are met. Fed. R. Civ. P. 65(b)(1). First, the

moving party must establish specific facts through an affidavit or a verified complaint showing that an immediate and irreparable injury will result to the moving party before the adverse party can be heard in opposition to the motion. Fed. R. Civ. P. 65(b)(1)(A). Second, counsel for the moving party must certify in writing any efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). In addition, courts must consider each of four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party*, 543 F.3d at 361 (quoting *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The four factors "are not prerequisites that must be met, but are interrelated concerns that must be balanced together." *Ne. Ohio Coal.*, 467 F.3d at 1009. TROs are meant to preserve the status quo until a more fulsome exploration of the legal issues is possible, so the weighing of factors may differ between the TRO and preliminary injunction contexts. *See Moore v. U.S. Ctr. for SafeSport*, 685 F. Supp. 3d 490, 495 (E.D. Mich. 2023).

## II.

Plaintiff operates a prediction contract market, wherein parties may form contracts with each other stipulating that one party will pay the other if a specified thing happens (or fails to) in a specified way. Plaintiff then charges a fee for facilitating the transaction. The prediction contracts include contracts involving sporting events, including individual happenings within sporting events, such as the scores of games. Defendants, officials of the state of Michigan, recently brought an enforcement action against a different prediction

contract market operator, KalshiEX. Defendants alleged that KalshiEX was in violation of state laws against operating an unlicensed sports betting establishment. Fearing that enforcement action against it is imminent, Plaintiff filed the present motion for a TRO and for a preliminary injunction.

III.

### A. Plaintiff Has Not Shown a Substantial Enough Likelihood of Success on the Merits to Merit a TRO.

Plaintiff's theory is that Defendants may initiate proceedings against it similar to those initiated against KalshiEX in Michigan state courts, and that the laws Defendants would seek to enforce are preempted by federal law. Plaintiff's legal theory hinges on the contention that the "event contracts" on its marketplace fall under the definition of "swap" under 7 U.S.C. § 1a(47)(A)(ii). If this is true, then the rest of Plaintiff's preemption theory builds naturally from there: other parts of the legislation would expressly preempt state laws, *see id.* § 2(a)(1)(A), and there would be evidence that Congress intended to occupy the field of event contract regulation and that state laws could conflict with federal law, *see KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026). But if the relevant event contracts are not "swaps," then Plaintiff's theory never gets off the ground. This is a statutory interpretation question, so the Court must begin with the text. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 708 (6th Cir. 2025). It must then construe that text consistent with its "place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

Plaintiff devotes precious little energy in its brief expounding on its theory of what the text in § 1a(47)(A)(ii) means. It argues that the definition "comfortably covers event contracts" and would include "event contracts based on the winner or score of the NFC Championship" but does not explain exactly why. (ECF No. 14 at PageID.82). The relevant portion of the statute for Plaintiff's argument is "the term 'swap' means any agreement, contract, or transaction-- . . . that provides for any purchase, sale, payment or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." § 1a(47)(A)(ii). There are two pertinent questions here based on the plain text: what constitutes an *event* or a *contingency*, what does it mean for each to be *associated with* an enumerated consequence?

The Court must first determine what *events* and *contingencies* are for the purposes of the statute, since the other terms interact with those central objects. Other courts interpreting the word "event" surveyed dictionaries and found it to refer to happenings of some importance, but not to outcomes or results of those things. *See, e.g.*, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025). The term does have common usages that allow it to mean essentially anything that happens. *See* American Heritage Dictionary, *Event* (3d ed. 1996) ("Something that takes place; an occurrence"). But to read the statute this way would flatten the differences between "event" and any other term by expanding its reach beyond any logical limit. *See N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *9. There would be no difference between *event* and *occurrence*, and the statute's other inclusive definitions of *swap* would

4

serve little to no purpose as they would be subsumed by the all-encompassing *event* clause. *See id.* at *8-9. In addition to rendering superfluous much of § 1a(47)(A) itself, such a broad reading of *event* would also be contrary to legislative intent regarding the statute's interaction with gambling and have wide-reaching consequences for other federal legislation not clearly spoken to in the legislative text. *See id.* at *10; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 683-84 (D. Md. 2025).

Based on Plaintiff's arguments, the Court sees no logical way to interpret the term *event* consistent with Plaintiff's position without extending its reach to any and all things that happen. Individual actions and scores in individual sporting events have no intrinsic importance outside the context of the game. The definition of *swap* under this expansive interpretation of *event* would sweep in not only all wagers on sporting events but would potentially sweep in all service contracts in any industry, as *swap* includes any "contract" that "provides for any payment" that "is dependent on the occurrence . . . of an event." § 1a(47)(A)(ii). That would include contracts dependent on the performance of a service. A grant of exclusive authority in the CFTC that radical would surely call for a more explicit statement. *N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *10. The Court is thus at this time most persuaded by the District of Nevada's more limiting conception of "event" as a happening "of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* at *8. This definition also allows for a separate, significant role for the word *contingency*, which would include those hypothetical

events dependent on certain outcomes. *See id.* at *8 n.9; *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282, at *6 (D. Nev. Nov. 24, 2025).

One potential limit on Plaintiff's necessarily implied vision of *events* and *contingencies* is the statutory requirement that they be *associated with a potential financial, economic, or commercial consequence*. But Plaintiff's position would render this restriction meaningless as well. Plaintiff puts forward evidence that individual happenings within a sporting event, such as the number of points scored, can have economic ramifications in terms of "the team's valuation, retailers' sales of team merchandise, and the hometown economy." (ECF No. 14 at PageID.83). These are all potential consequences dependent on the reactions of parties outside the game. Anything can potentially have economic ramifications given enough attenuation and happenstance. Reading *associated with* to require an inherent connection to those consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity. *See Hendrick*, 2025 WL 3286282, at *6. This reading also keeps the pertinent provisions of § 1a(47)(A)(ii) in line with its surrounding provisions, which "refer almost exclusively to financial measures, indices, or instruments." *Id.* at *7.

The text, then, when read in the light of the rest of the provision and its place in the statutory scheme, seems to undercut the necessary basis of Plaintiff's preemption arguments. If the event contracts allegedly threatened by the state's enforcement actions are not "swaps," federal law does not stand in the state's way. The Court recognizes that other courts across the country have reached contrary conclusions. *See KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *4-6 (D.N.J. Apr. 28, 2025); *Orgel*, 2026 WL

474869, at *7-8. However, the Court is more persuaded by the relatively more fulsome explorations of the text, purpose, and structure of the statutes and relevant surrounding provisions in *North American Derivatives Exchange*, *Hendrick*, and *Martin*. Plaintiff has raised questions meriting further argument and investigation. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). But the Court is not convinced at this juncture that it is so likely to succeed that a TRO is warranted given the lack of limiting principles inherent to their reading of the statute.

### B. Plaintiff Has Not Shown that It Is Likely to Suffer Irreparable Injury Before Defendants Can Respond.

One difference between the analyses of a motion for a TRO and one for a preliminary injunction is the requirement in Rule 65 that the moving party provide "specific facts" showing that irreparable injury will result "before the adverse party can be heard in opposition." While Plaintiff has demonstrated that state officials have begun articulating their legal position by suing KalshiEX, it is not yet clear that "the prospect of state suit" is "imminent" for Plaintiff. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992). Plaintiff has not provided any evidence that Defendants have threatened enforcement actions against them specifically in the coming days. It is thus not yet clear that Defendants would bring enforcement action against Plaintiff specifically rather than waiting for the resolution of the Kalshi case. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) (explaining that when a plaintiff's license was suspended, it could get an injunction, but if it had sought an injunction beforehand, "it would have been premature"). The threat of prosecution Plaintiff cites is currently in the realm of the

hypothetical rather than so immediate as to warrant relief before Defendants can respond. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Plaintiffs must also comply with Rule 65(b)(1)(B), which requires that the movant's attorney certify in writing "the reasons why [notice] should not be required." The Court notes the absence of such reasoning in Plaintiff's filings related to the present motion.

### C.  The Balance of Harms and Interests Does Not Clearly Favor Plaintiff.

Plaintiff's arguments regarding the balance of harms and the public interest rely on Plaintiff succeeding on the merits. Plaintiff argues that it is in the public interest to block the application of unconstitutional laws and that state officials have no legitimate interest in enforcing unconstitutional laws. This is fair enough in and of itself. But the argument falls apart if the state laws are not in violation of the Supremacy Clause, so Plaintiff's public interest arguments are only as persuasive as its arguments on the likelihood of success on the merits. Plaintiff is not clearly ahead there, so it is not clearly ahead here either. In the Court's judgment at this point, Plaintiff is fighting to keep things even there, so the factors cannot tip far enough in its favor to warrant the extraordinary remedy of a TRO.

## IV.

Plaintiff certainly presents issues warranting further argument and examination. Courts across the country have reached different conclusions and no appeals court has yet provided conclusive guidance. But the most fulsome explorations of the statutory interpretation question at the heart of the issue do not favor Plaintiff's position, and Plaintiff has not demonstrated that irreparable harm is likely to occur so imminently that there is no time for Defendants to respond or for the Court to continue its examination of the issues.

Plaintiff's motion (ECF No. 15) is **DENIED IN PART** to the extent it seeks a temporary restraining order. Briefing on Plaintiff's motion insofar as it seeks a preliminary injunction shall proceed as usual under the Court's rules.

**IT IS SO ORDERED.**

Date: __March 10, 2026__                     /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge